# Exhibit A

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PFIZER INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: _____ [CCLD] |
| v. | ) | |
| | ) | TRIAL BY JURY OF |
| FEDERAL INSURANCE | ) | TWELVE DEMANDED |
| COMPANY, THE NORTH RIVER | ) | |
| INSURANCE COMPANY, and | ) | |
| RSUI INDEMNITY COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Pfizer Inc. ("Pfizer"), by and through its undersigned counsel, for its

Complaint against Defendants Federal Insurance Company ("Federal"), The North

River Insurance Company ("North River"), and RSUI Indemnity Company

("RSUI") (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an action for declaratory relief, as well as for damages for

breach of contract and/or anticipatory breach and repudiation of contract, arising

out of Defendants' repudiation and breach of obligations under their excess

directors' and officers' ("D&O") insurance policies (the "Policies") sold to Pfizer.

The Policies obligate Defendants to pay for the costs incurred by Pfizer in

defending against and settling a lawsuit captioned *Mary K. Jones v. Pfizer Inc., et al.*, No. 1:10-CV-03864 (AKH) (S.D.N.Y.) (the "Jones Action").

2.      The Jones Action was brought on or about May 11, 2010 by a class of Pfizer shareholders against Pfizer and certain of its directors and officers.  The lawsuit generally alleged that, in violation of federal securities laws, the underlying defendants had made false statements to investors concerning Pfizer's off-label marketing of multiple pharmaceutical products including Bextra, Geodon, Lyrica, and Zyvox and that, as a result, the investing public was induced to transact in Pfizer stock at artificially inflated prices.

3.      After more than five years of litigation, the court granted final approval of a $400 million settlement of the Jones Action.

4.      Collectively, certain of Pfizer's insurers (not Defendants) have paid over $70 million to reimburse Pfizer's defense costs (totaling tens of millions of dollars) and a portion of the settlement, leaving hundreds of millions of dollars unreimbursed.  In this action, Pfizer seeks, *inter alia*, to have Defendants honor their contractual obligations and pay the $30 million in limits under their Policies in partial reimbursement of this sum.

5.      In direct violation of the terms of the Policies, the Defendants have impermissibly denied coverage for and have refused to pay the costs Pfizer has

incurred in settling the Jones Action.

6.     Pfizer seeks damages for Defendants' breach of contract and/or anticipatory breach and repudiation of contract for refusing to comply with their coverage obligations owed to Pfizer under the Policies and a declaration as to the existence, scope, and breach of Defendants' obligations to pay Pfizer's loss arising from the Jones Action.

## THE PARTIES

7.     Plaintiff Pfizer is among the world's largest pharmaceutical companies and develops and produces medicines and vaccines for a wide range of medical disciplines.  Pfizer is a Delaware corporation with its principal place of business in New York.

8.     Upon information and belief, Defendant Federal is an Indiana corporation with its principal place of business in New Jersey.  Upon information and belief, Federal is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

9.     Upon information and belief, Defendant North River is a New Jersey corporation with its principal place of business in New Jersey.  Upon information and belief, North River is authorized to sell or write insurance in Delaware and, at

all material times, has conducted and continues to conduct substantial insurance business in Delaware.

10.     Upon information and belief, Defendant RSUI is a New Hampshire corporation with its principal place of business in Georgia.  Upon information and belief, RSUI is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to Art. IV, § 7 of the Delaware Constitution as well as 10 Del. Code § 541.  This matter is designated to be heard in the Complex Commercial Litigation Division (CCLD) because the amount in controversy exceeds $1 million.

12.     This Court has jurisdiction over each Defendant because each Defendant is authorized either to sell or to write insurance in Delaware and/or, at all material times, has conducted business within the State of Delaware.

13.     This Court has the power to declare the parties' rights and obligations under 10 Del. Code §§ 6501 - 6513.

## FACTUAL ALLEGATIONS

14.     Pfizer was founded more than 150 years ago and has grown to be one

of the largest pharmaceutical companies in the world, selling products in more than 125 countries.  Pfizer is engaged in the discovery, development, and manufacture of healthcare products, including medicines and vaccines, as well as consumer healthcare products.  Key Pfizer pharmaceutical products include Lyrica, Viagra, Chantix, Xeljanz, Sutent, Eliquis, Ibrance, Inlyta, Prevnar 13, Eucrisa, Xtandi, and Xalkori.  Key Pfizer consumer healthcare products include Advil, ChapStick, Centrum, and Robitussin.

## I.    THE INSURANCE POLICIES

15.    As part of its risk management efforts, Pfizer annually purchased insurance, including D&O insurance, which was intended to insure Pfizer for third-party claims alleging wrongful conduct on the part of Pfizer's directors and officers.

16.    Pfizer's D&O insurance coverage tower in effect from April 16, 2008 to April 16, 2009 provides $225 million in Side B/C (entity) coverage in 14 layers of insurance, all in excess of a $25 million self-insured retention.

17.    With certain exceptions, all excess policies within the 2008-2009 coverage tower "follow form" to Policy No. 4433708 sold by the primary carrier, Illinois National Insurance Company (the "Illinois National Policy," attached hereto as Exhibit A).  "Follow form" means that, aside from attachment points and

limits of liability, the excess policies incorporate and adopt the terms, conditions, definitions, and exclusions of the Illinois National Policy.

18.     The Illinois National Policy, with limits of $25 million above a $25 million self-insured retention, is not subject to this dispute, since the self-insured retention already has been met and Illinois National paid its full policy limit with regard to a previously-filed shareholder derivative lawsuit entitled *Henrietta Klein v. Dennis A. Ausiello, et al.*, 09-civ-7822 (JSR) (S.D.N.Y.) (the "Klein Action"). The Klein Action contained the same allegations as the Jones Action, but was brought derivatively on behalf of Pfizer, while Jones was brought by Pfizer shareholders.

19.     Further, the three excess insurers who sold policies directly above the Illinois National Policy have likewise paid their full policy limits to Pfizer in connection with the Jones and Klein Actions, and, accordingly, are not named as parties to this action.

20.     In addition, fourth layer excess quota share insurer State National Insurance Company and the fifth- through eleventh-layer excess insurers have settled with Pfizer, and, accordingly, are not named as parties to this action.

21.     Defendants have failed to pay or have disputed their obligation to pay any amount in connection with the Jones Action under the following Policies:

     (a)    fourth-layer excess quota share Policy No. 8209-9878, issued by Federal (the "Federal Policy," attached hereto as Exhibit B), with limits of $5 million part of $10 million excess of $70 million;

     (b)    twelfth-layer excess quota share Policy No. 5560050006, issued by North River (the "North River Policy," attached hereto as Exhibit C), with limits of $10 million part of $25 million excess of $175 million; and

     (c)    twelfth-layer excess quota share Policy No. NHS628836, issued by RSUI (the "RSUI Policy," attached hereto as Exhibit D), with limits of $15 million part of $25 million excess of $175 million.[1]

22.    All insurance policies with limits below the Policies at issue in this dispute have been released either by payment of full policy limits or by settlement with Pfizer, although hundreds of millions of dollars of Pfizer's Jones Action-related liability remain unreimbursed.

### A.    **The Illinois National Policy**

23.    The Illinois National Policy provides coverage to Pfizer for both: 1) its own Loss[2] arising from a Securities Claim made against Pfizer for any alleged Wrongful Act of Pfizer; and 2) its Loss arising from indemnifying an Insured

---

[1] The next layer excess policy, sold by Endurance Specialty Insurance Ltd., contains a mandatory arbitration clause.

[2] Capitalized terms are defined in the Policies.

Person, including a director or officer, for a Claim made against the Insured Person for any alleged Wrongful Act of such Insured Person.

24.    Under the Illinois National Policy, "Claim" includes, *inter alia*, a civil proceeding for monetary relief, "Securities Claim" includes a lawsuit alleging violation of any federal statute regulating securities, "Loss" is defined to include "damages, settlements, judgments . . . [and] Defense Costs," and "Wrongful Act" means "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act[.]"

25.    The Illinois National Policy contains a provision that requires that the parties engage in non-binding mediation or arbitration of all coverage disputes before litigation can be commenced (the "Alternative Dispute Resolution Provision").  If mediation is selected, then the Alternative Dispute Resolution Provision requires that a party wait 120 days after the termination of the mediation before beginning a judicial proceeding.

26.    The Illinois National Policy contains several exclusions that the Defendants have raised in the context of this dispute.

27.    In particular, Endorsement Nos. 6 and 7 of the Illinois National Policy, both entitled "Specific Investigation/Claim/Litigation/Event or Act Exclusion," exclude Loss in connection with Claims related to, among others, two

previous securities class action lawsuits against Pfizer and/or a pharmaceutical company acquired by Pfizer in April 2003, Pharmacia Corporation ("Pharmacia"): 1) *Robert L. Garber v. Pharmacia, et al.*, No. 3:03-CV-01519 (AET) (D.N.J.) ("*Garber*"); and 2) *Philip Morabito v. Pfizer, Inc., et al.*, No. 1:04-CV-09967 (LTS) (S.D.N.Y.) ("*Morabito*").  *Garber* was a lawsuit against Pharmacia and certain of its directors and officers alleging that Pharmacia investors were misled about the gastrointestinal safety of arthritis drug Celebrex.  *Morabito* was a lawsuit against Pfizer and certain of its directors and officers, alleging that Pfizer investors were misled about the cardiovascular safety of arthritis drugs Celebrex and Bextra.

28.     The Illinois National Policy also contains Endorsement No. 29, which excludes coverage for Loss in connection Claims made against an Insured "alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given, under any directors and officers liability policy, employment practices liability policy or employee benefit plan fiduciary liability insurance policy of which this policy is a renewal or replacement or which it may succeed in time" (the "Related Wrongful Acts Exclusion").

29.     The Illinois National Policy also contains Endorsement No. 11, entitled "Conduct Exclusions Final Adjudication" (the "Criminal Act Exclusion"),

which provides that the insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

> . . . (c) arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the Insured if any final adjudication establishes that such deliberate criminal or deliberate fraudulent act was committed.

## B.   Defendants' Policies

30.    In addition to following form to the Illinois National Policy, the Federal, North River, and RSUI Policies contain additional provisions that Defendants have raised in their efforts to avoid coverage for the Jones Action.

31.    North River and RSUI have argued that coverage is barred under their Pending or Prior Litigation Exclusions ("PPL Exclusions"), which exclude coverage for Claims arising out of litigation against an insured that was commenced before, or pending as of, June 28, 2004.

32.    Further, all Defendants have cited to provisions in each of their Policies purportedly providing that their coverage attaches after the underlying layer of insurance has been fully exhausted.

33.    While the Policies sold by Defendants generally follow form to the Illinois National Policy, they specifically follow form to the exhaustion language of the first-layer excess Twin City Fire Insurance Company Policy No. 00DA0218117-08 (the "Twin City Policy," attached hereto as Exhibit E).

-10-

34.     The Twin City Policy states at Endorsement No. 5, titled "Exhaustion of Underlying Insurance," in relevant part:

> A.     It is expressly agreed that liability for any covered Loss shall attach to the Underwriters only after the Primary and Underlying Excess insurers or the Insured shall have paid the full amount of their respective liability for such covered Loss.  If the Insured shall pay, in the applicable legal currency, any such covered Loss, then the Underwriters shall recognize such payment for the depletion of the respective limits of liability of the Underlying Insurance.  In no way shall such payment by the Insured constitute a waiver of any terms, conditions or exclusions of the Underlying Insurance or this policy.  The Underwriters shall then be liable to pay only such additional amounts up to the Limit of Liability set forth in Item C of the Declarations, which shall be the maximum liability of the Underwriters in each Policy Period.

## II.     **THE JONES ACTION**

35.     On or about May 11, 2010, plaintiff Mary Jones filed a putative class action lawsuit against Pfizer and certain Pfizer directors and officers, alleging violations of federal securities laws.  The lawsuit was later amended and alleged that the defendants had made false and misleading statements to class plaintiffs, defined as persons who had purchased Pfizer securities during the purported class period of January 19, 2006 to January 23, 2009.

36.     According to the First Amended Consolidated Class Action Complaint in the Jones Action (attached hereto as Exhibit F), underlying defendants had concealed from investors Pfizer's unlawful off-label marketing of its pharmaceutical products, including Bextra, Geodon, Lyrica and Zyvox, and the

company's alleged illegal payment of kickbacks to physicians to promote the sale of these drugs.  Underlying plaintiffs alleged two causes of action:  violations of Sections 10(b) (securities fraud) and 20(a) (fraud by control person) of the Securities Exchange Act of 1934.

37.     Underlying plaintiffs alleged that the defendants' false and misleading statements about Pfizer's financial performance and sales practices caused Pfizer stock to trade at artificially inflated prices throughout the class period.  As alleged, the stock price then dropped on January 26, 2009 when the defendants revealed the company's illegal marketing and sales practices and Pfizer and/or Pharmacia's agreement to pay $2.3 billion to resolve criminal and civil investigations.

38.     Of the $2.3 billion, $1.3 billion in criminal fines was assessed against Pharmacia pursuant to its September 2009 US Department of Justice guilty plea (the "DOJ Plea") for a one-count violation of the Food Drug and Cosmetic Act for placing Bextra, a misbranded drug within the meaning of 21 U.S.C. § 352(f)(1), into interstate commerce.  The remaining $1 billion was paid by Pfizer as a civil settlement to resolve several *qui tam* lawsuits (the "*qui tam* actions").  The *qui tam* actions asserted that Pfizer illegally promoted various drugs and thereby caused false claims to be submitted to government health care programs for uses that were not medically accepted indications and therefore not covered by those programs.

39.     Pfizer was forced to defend the Jones Action for more than five years before the lawsuit was finally resolved, incurring tens of millions of dollars in defense costs.  On July 30, 2015, the court granted final approval of a $400 million settlement.  Prior to final approval, Pfizer incurred more than $42 million in defense costs on behalf of itself and its directors and officers.

## III.   DEFENDANTS' REFUSALS TO COVER THE JONES ACTION

40.     Pfizer timely notified all of its 2008-2009 coverage tower insurers of the Jones Action.  The first four layers of insurance below Federal's quota share layer, with policy limits totaling $70 million, have paid Pfizer the full amounts of their policies' limits with respect to the Jones and Klein Actions.

41.     All remaining insurance companies who issued policies with limits below the Policies at issue in this dispute have settled with Pfizer.

42.     By contrast, Defendants have all denied coverage based on five equally meritless defenses.

43.     First, Defendants assert that coverage is barred by the Illinois National Policy's Specific Investigation/Claim/Litigation/Event or Act Exclusions because the Jones Action is allegedly related to *Garber* and *Morabito*.

44.     However, *Garber* was a securities claim against Pharmacia and its directors and officers alleging that investors were misled about the gastrointestinal safety of the drug Celebrex.  *Morabito* was a securities claim against Pfizer and its

-13-

directors and officers alleging that investors were misled about the cardiovascular safety of the drugs Celebrex and Bextra. By contrast, the Jones Action was a securities fraud claim based on allegations that Pfizer and its directors and officers made false and misleading public statements about Pfizer's unlawful promotion of Bextra, Geodon, Lyrica, and Zyvox. The Jones Action arose from different facts, different alleged Wrongful Acts, and different drugs than *Garber* and *Morabito*.

45. Second, Defendants assert that coverage is barred by the Illinois National Policy's Related Wrongful Acts Exclusion because the Jones Action is allegedly related to *Garber*, *Morabito*, and the *qui tam* actions.

46. However, as stated above, the Jones Action is not related to *Garber* or *Morabito*. Further, the *qui tam* actions alleged that Pfizer caused false claims to be submitted to government health care programs for uses that were not medically accepted indications and therefore not covered by those programs, in violation of federal and state false claims acts. In contrast, the Jones Action was a securities fraud claim alleging that Pfizer and its directors and officers made false and misleading statements to investors about Pfizer's promotion of Bextra, Geodon, Lyrica, and Zyvox that induced the investing public to transact in Pfizer stock at artificially inflated prices. The Jones Action arose from different facts, different alleged Wrongful Acts, and different drugs than in the *qui tam* actions.

-14-

47.     Third, Defendants assert that coverage is barred by the Illinois National Policy's Criminal Act Exclusion because the Jones Action supposedly arose from the DOJ Plea.

48.     However, the DOJ Plea, entered on behalf of Pharmacia rather than Pfizer, involved a one-count violation of the Food Drug and Cosmetic Act for placing Bextra, a misbranded drug within the meaning of 21 U.S.C. § 352(f)(1), into interstate commerce.  By contrast, the Jones Action was a civil securities fraud claim against Pfizer and its directors and officers, not Pharmacia, based on their false and misleading statements to investors about Pfizer's promotion of Bextra, Geodon, Lyrica, and Zyvox.

49.     Fourth, North River and RSUI assert that coverage is barred under their Policies by the PPL Exclusion for litigations asserted before or pending as of June 28, 2004.

50.     However, as discussed above, the Jones Action does not relate to any claims or lawsuits that were filed against Pfizer before June 28, 2004, including *Garber* and one or more of the *qui tam* actions.

51.     Fifth, Defendants assert that coverage does not attach because the policies underlying the Defendants' Policies may not have been fully exhausted.

52.     However, all underlying policies have either paid full limits or settled. In addition, the Policies at issue contain or incorporate by reference language

which permits exhaustion of the underlying insurance via payment by the underlying insurer or the insured.

53.     In light of the parties' continued disagreement, and in light of the Illinois National Policy's Alternative Dispute Resolution Provision, Pfizer demanded mediation in an attempt to resolve this dispute.

54.     The mediation did not resolve the parties' dispute. 120 days have passed since Pfizer terminated the unsuccessful mediation, allowing Pfizer to bring the present action pursuant to the Alternative Dispute Resolution Provision.

55.     To date, Defendants have not paid a single penny towards Pfizer's defense and indemnity costs incurred with regard to the Jones Action.

### FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT AGAINST ALL DEFENDANTS)

56.     Pfizer repeats and realleges the allegations set forth in paragraphs 1 through 55 of this Complaint as if fully set forth herein.

57.     Pursuant to the terms of their Policies, Defendants are obligated, upon attachment, to pay Pfizer's losses, including 100% of the as-yet unreimbursed costs of the settlement incurred in connection with the Jones Action, up to the limits of their Policies.

58.     Defendants have breached their obligations under their Policies by failing and refusing to pay such losses.

59.     Pfizer has complied with all terms, conditions, and prerequisites to coverage set forth in the Policies, including exhaustion of the self-insured retention and exhaustion of all underlying insurance.

60.     As a result of Defendants' breach of their obligations under their Policies, Pfizer has suffered damages in the amount of $30 million, before prejudgment interest.

## SECOND CAUSE OF ACTION (IN THE ALTERNATIVE) (ANTICIPATORY BREACH AND REPUDIATION OF CONTRACT AGAINST NORTH RIVER AND RSUI)

61.     Pfizer repeats and realleges the allegations set forth in paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62.     Pursuant to the terms of their Policies, North River and RSUI are obligated, upon attachment, to pay Pfizer's losses, including 100% of the as-yet unreimbursed costs of the settlement incurred in connection with the Jones Action, up to the limits of their Policies.

63.     North River's and RSUI's obligations of good faith and fair dealing do not allow North River and RSUI to deny their coverage obligations simply because underlying carrier, Defendant Federal, has wrongly denied coverage.

64.     To the extent the Jones Action is covered under their Policies, North River and RSUI have anticipatorily repudiated their obligations to pay such losses under their Policies, in that they have unequivocally demonstrated that they will

not make any payment towards the Jones Action, even upon exhaustion by payment of all limits underlying their Policies.

65.     Pfizer has complied with all terms, conditions and prerequisites to coverage set forth in the North River and RSUI Policies, and Pfizer remains ready to perform all of its obligations under the Policies.

66.     As a result of North River's and RSUI's anticipatory breach and repudiation of their obligations under their Policies, Pfizer has suffered damages in the amount of $25 million, before prejudgment interest.

## THIRD CAUSE OF ACTION
## (DECLARATORY RELIEF AGAINST ALL DEFENDANTS)

67.     Pfizer repeats and realleges the allegations set forth in paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68.     Pursuant to the terms of the Policies, each Defendant is obligated, upon attachment, to pay Pfizer's losses, including 100% of the as-yet unreimbursed costs of the settlement incurred in connection with the Jones Action, up to the limits of their Policies.

69.     Defendants dispute their legal obligations to pay such losses.

70.     Pfizer is entitled to a declaration by this Court of the Defendants' obligations under the Policies with regard to the Jones Action.

71.     An actual controversy of a justiciable nature presently exists between

Pfizer and the Defendants concerning the proper construction of the Policies, and the rights and obligations of the parties thereto, with respect to losses incurred in connection with the Jones Action.

72.     The issuance of declaratory relief by this Court will terminate the existing controversy among the parties.

73.     The Court should enter a declaratory judgment in favor of Pfizer and against Defendants, declaring that Defendants are obligated to pay all losses incurred in connection with the Jones Action, subject to the applicable attachment points and limits of the Policies.

## PRAYER FOR RELIEF

**WHEREFORE**, Pfizer prays for relief as follows:

i.      On the first cause of action, Pfizer requests that the Court enter judgment against all Defendants, awarding Pfizer compensatory and consequential damages in an amount to be determined in this action;

ii.     On the second cause of action, Pfizer requests that the Court enter judgment against Defendants North River and RSUI, awarding Pfizer compensatory and consequential damages in an amount to be determined in this action;

iii.    On the third cause of action, Pfizer requests that this Court enter a declaratory judgment in favor of Pfizer and against all Defendants, declaring that

each such Defendant is obligated to pay Pfizer, upon attachment and up to the applicable liability limit, for any as-yet unreimbursed losses incurred in connection with the Jones Action;

iv.      On all causes of action, Pfizer requests that the Court award Pfizer all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees, as well as prejudgment and post-judgment interest; and

v.       Additionally, Pfizer requests such other and further relief as the Court deems just and proper.

Dated:  January 31, 2018

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

/s/ *John P. DiTomo*
Kenneth J. Nachbar (#2067)
John P. DiTomo (#4850)
Barnaby Grzaslewicz (#6037)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200 – Telephone
(302) 658-3989 – Facsimile
knachbar@mnat.com
jditomo@mnat.com
bgrzaslewicz@mnat.com

*Attorneys for Plaintiff Pfizer Inc.*

OF COUNSEL:

Robin L. Cohen (to be admitted *pro hac vice*)
Adam Ziffer (to be admitted *pro hac vice*)
Marc T. Ladd (to be admitted *pro hac vice*)
Denise N. Yasinow (to be admitted *pro hac vice*)
MCKOOL SMITH, P.C.
One Bryant Park, 47th Floor
New York, New York 10036
(212) 402-9400 – Telephone
(212) 402-9444 – Facsimile
rcohen@mckoolsmith.com
aziffer@mckoolsmith.com
mladd@mckoolsmith.com
dyasinow@mckoolsmith.com

# EXHIBIT A

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aigproducercompensation.com or by calling AIG at 1-800-706-3102.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

91222 (7/06)

# AIG AIG EXECUTIVE LIABILITY ℠

Insurance provided by the following member of American International Group, Inc.

## Illinois National Insurance Company

A capital stock company

---

**EXECUTIVE AND ORGANIZATION LIABILITY INSURANCE POLICY**

**NOTICE: COVERAGES A, B AND C ARE CLAIMS MADE. THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND CRISIS FIRST OCCURRING DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THIS POLICY CAREFULLY AND REVIEW ITS COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL REDUCE THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS, AND SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND. THE INSURER MUST ADVANCE DEFENSE COSTS, EXCESS OF THE APPLICABLE RETENTION, PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

**NOTICE: TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING. SEE CLAUSE 2 OF THE POLICY.**

POLICY NUMBER: *443-37-08*          REPLACEMENT OF POLICY NUMBER: *741-57-82*

### DECLARATIONS

| ITEMS | | |
|---|---|---|
| 1 | **NAMED ENTITY:** (herein "**Named Entity**") | *PFIZER INC.* |
| 1(a) | MAILING ADDRESS: | *235 EAST 42ND STREET NEW YORK, NY 10017-5703* |
| 1(b) | STATE OF INCORPORATION/FORMATION: *Delaware* | |
| 2 | **POLICY PERIOD:** From: *April 16, 2008*   To: *April 16, 2009* 12:01 A.M. standard time at the address stated in Item 1(a) | |
| 3 | **POLICY AGGREGATE LIMIT OF LIABILITY** (herein "**Limit of Liability**") For all **Loss**, in the aggregate, under this policy including **Defense Costs**:   *$25,000,000* | |
| 4 | **RETENTION:** Not applicable to **Non-Indemnifiable Loss** and certain **Defense Costs** – (See Clause 6 for details.) | |
| 4(a) | **Securities Claims:** *$25,000,000* | 4(b) **Employment Practices Claims:** *$25,000,000* |
| 4(c) | All other **Claims:** *$25,000,000* | |

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

*7246638*

**2-14047**

75010 (2/00)

| ITEMS (continued) | | | | |
|---|---|---|---|---|
| 5 5(a) | **CONTINUITY DATE** (herein "**Continuity Date**") Coverages A and B, other than **Outside Entity Executive** coverage: *S/B N/A – all Paula's* *letter of 7/7/08* | 5(b) | **Outside Entity Executive** coverage, including Coverage C: | The date on which the **Insured Person** first served as an **Outside Entity Executive** of such **Outside Entity**. |
| 5(c) | Coverage D: *June 21, 2001* | | | |

| 6 | **PREMIUM:** *$3,000,000* |
|---|---|
| | *Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act 2002: $29,703 included in policy premium. Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula established by TRIA as follows: 85% of TRIA Losses in excess of the insurer deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism. A copy of the TRIA disclosure sent with the original quote is attached hereto.* |

| 7 7(a) | **CRISISFUND**[SM] limit: **Crisis Loss:** *$50,000* | 7(b) | Additional **CRISISFUND**[SM] for **Delisting Crisis Loss:** *$25,000* |
|---|---|---|---|

| 8 | **NAME AND ADDRESS OF INSURER** (herein "**Insurer**"): *Illinois National Insurance Company 175 Water Street New York, NY 10038* This policy is issued only by the insurance company indicated in this Item 8. |
|---|---|

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

*7246638*
**2-14047**
75010 (2/00)

2

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (APPLICABLE TO CERTIFIED AND NON-CERTIFIED ACTS)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury–in concurrence with the Secretary of State, and the Attorney General of the United States–to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

### COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *PFIZER INC.*

Policy Number: 449-37-08
Policy Period Effective Date From: *April 16, 2008*     To: *April 16, 2009*

NOTICE – THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

**IN WITNESS WHEREOF**, the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_
SECRETARY

_[signature]_
PRESIDENT

_[signature]_
AUTHORIZED REPRESENTATIVE

_____
COUNTERSIGNATURE & DATE

_____
COUNTERSIGNED AT

*MARSH USA, INC.*
*1166 AVENUE OF THE AMERICAS*
*NEW YORK, NY 10036-3712*

NOTICE:   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.   HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

7246638

**2-14047**

75010 (2/00)

## NEW YORK REGULATION 121
## DECLARATIONS DISCLOSURE SUPPLEMENT

Solely for the purposes of this supplement, "Claims-made relationship" means that period of time between the effective date of the first claims made policy between us (the Insured) and you (the policy holder) and the cancellation or nonrenewal of the last consecutive claims-made policy between such parties, where there has been no gap in coverage, but does not include any period covered by tail coverage.

### Retroactive Date/Prior Acts Exclusion Date/"Nose" Coverage

Coverage for events that occurred prior to the beginning of the policy period is referred to in this supplement as "nose" coverage. If the policy has a retroactive date feature or an exclusion or other wording deleting coverage for events that occurred before a certain date (a prior acts exclusion), then nose coverage is limited (or non existent) and **THERE WILL BE NO COVERAGE FOR CLAIMS ARISING OUT OF SUCH EVENTS THAT OCCURRED PRIOR TO THAT DATE.**

### Extended Reporting Period/Discovery Period/"Tail" Coverage

The Extended Reporting Period, or Discovery Period as it may be called, will increase the time within which a claim may be eligible for the policy's coverage. This is referred to in this supplement as "tail" coverage. Tail coverage helps to prevent the situation of a claim going uncovered because of cancellation or nonrenewal of the policy or other termination of coverage. Tail coverage provides for a period of time after termination of coverage during which claims first made against you and reported to us in writing, events that occurred before the termination of coverage and otherwise covered by the policy, will be covered. Generally, this optional tail coverage can be purchased if coverage is terminated either by us or by you. If such optional tail coverage is not purchased, an automatic tail coverage goes into effect upon termination of coverage, however, this automatic tail coverage lasts for only 60 days, (90 days if the policyholder is a public entity as defined in section 107 (a)(51) of the New York Insurance Law). After the expiration of the tail coverage, you will have a gap in your insurance coverage, unless you have obtained appropriate coverage to fill the gap. **UPON TERMINATION OF COVERAGE IT IS VERY IMPORTANT THAT YOU CONSULT WITH YOUR INSURANCE AGENT, BROKER OR OTHER PROFESSIONAL INSURANCE ADVISER.**

The length of the optional tail offered in the policy is one (1) year generally, but, this option will not be available in some circumstances. It will not be available if coverage is terminated by us because of non-payment of premium or fraud and at the effective date of such termination of coverage a claims-made relationship has continued for less than one year.

### Future Premium Increases As Claims-Made Relationship Matures

During the first several years of being covered on a claims-made basis, claims-made rates are generally comparatively lower than rates on other types of policies generally known as occurrence policies, especially if there is no nose coverage initially, and you can expect substantial annual premium increases, independent of overall rate level increases, until the claims-made relationship reaches maturity.

### Length of Optional Tail and Premium Charged For it

The length of the optional tail offered in this policy and the premium charged for it is as follows (please see the policy form and endorsements for complete details):

THESE POLICY FORMS AND APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

75029 (7/02)

| Length Of Optional Tail | Premium Charge For Optional Tail |
|---|---|
| One Year | *200* % |

**THIS DISCLOSURE SUPPLEMENT GENERALLY DISCUSSES CERTAIN IMPORTANT FEATURES OF THE POLICY. PLEASE READ THE ENTIRE POLICY CAREFULLY AND DISCUSS IT WITH YOUR INSURANCE AGENT OR BROKER OR OTHER PROFESSIONAL INSURANCE ADVISER. THE PROVISIONS OF THE POLICY FORM AND ENDORSEMENTS THERETO ARE CONTROLLING.**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

75029 (7/02)

**AIG** AIG EXECUTIVE LIABILITY [SM]

Insurance provided by the following member of American International Group, Inc.

# EXECUTIVE AND ORGANIZATION LIABILITY INSURANCE POLICY

In consideration of the payment of the premium, and in reliance upon the **Application** and the statements therein, which form a part of this policy, the **Insurer** agrees as follows:

## 1. INSURING AGREEMENTS

With respect to Coverage A, B and C, solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy affords the following coverage:

### COVERAGE A: EXECUTIVE LIABILITY INSURANCE

This policy shall pay the **Loss** of any **Insured Person** arising from a **Claim** made against such **Insured Person** for any **Wrongful Act** of such **Insured Person**, except when and to the extent that an **Organization** has indemnified such **Insured Person**. Coverage A shall not apply to **Loss** arising from a **Claim** made against an **Outside Entity Executive**.

### COVERAGE B: ORGANIZATION INSURANCE

(i) *Organization Liability:* This policy shall pay the **Loss** of any **Organization** arising from a **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**.

(ii) *Indemnification of an Insured Person:* This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** (including an **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**.

### COVERAGE C: OUTSIDE ENTITY EXECUTIVE LIABILITY INSURANCE

This policy shall pay the **Loss** of any **Outside Entity Executive** arising from a **Claim** made against such **Outside Entity Executive** for any **Wrongful Act** of such **Outside Entity Executive** but only excess of any indemnification provided by an **Outside Entity** and any insurance coverage afforded to an **Outside Entity** or its **Executives** applicable to such **Claim**, except when and to the extent that an **Organization** has indemnified such **Outside Entity Executive**.

### COVERAGE D: CRISISFUND [SM] INSURANCE

This policy shall pay the **Crisis Loss** (including **Delisting Crisis Loss**) of an **Organization** solely with respect to a **Crisis** (including a **Delisting Crisis**) occurring during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, up to the amount of the respective CrisisFund [SM], from first dollar; provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law. This Coverage D shall apply regardless of whether a **Claim** is ever made against an **Insured** arising from such **Crisis** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**.

## 2. DEFINITIONS

(a) "**Application**" means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy issued by

DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

75011 (2/00)

the **Insurer**, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time, and any public documents filed by an **Organization** with any federal, state, local or foreign regulatory agency (including but not limited to the Securities and Exchange Commission (SEC)).

(b) "**Claim**" means:

    (1) a written demand for monetary, non–monetary or injunctive relief;

    (2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non–monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges; or

    (3) a civil, criminal, administrative or regulatory investigation of an **Insured Person**:

        (i) once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (b)(2) may be commenced; or

        (ii) in the case of an investigation by the SEC or a similar state or foreign government authority, after the service of a subpoena upon such **Insured Person**.

The term "**Claim**" shall include any **Securities Claim** and any **Employment Practices Claim**.

(c) "**Crisis**" has the meaning as defined in Appendix B attached to this policy.

(d) "**CrisisFund** $^{SM}$ " means:

    (1) in the case of all **Crisis Loss**, other than **Delisting Crisis Loss**, the dollar amount set forth in Item 7(a) of the Declarations; and

    (2) in the case of **Delisting Crisis Loss** the dollar amount set forth in Item 7(a) of the Declarations plus the additional dollar amount set forth in Item 7(b) of the Declarations, combined.

(e) "**Crisis Loss**" has the meaning as defined in Appendix B attached to this policy. "**Delisting Crisis Loss**" means a **Crisis Loss** resulting solely from a **Delisting Crisis** (as defined in Appendix B).

(f) "**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**, but excluding any compensation of any **Insured Person** or any **Employee** of an **Organization**.

(g) "**Employee**" means any past, present or future employee, other than an **Executive** of an **Organization**, whether such employee is in a supervisory, co–worker or subordinate position or otherwise, including any full–time, part–time, seasonal and temporary employee.

(h) "**Employment Practices Claim**" means a **Claim** alleging any **Employment Practices Violation**.

(i) "**Employment Practices Violation**" means any actual or alleged:

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

    (1) wrongful dismissal, discharge or termination, either actual or constructive, of employment;

    (2) harassment (including but not limited to sexual harassment);

    (3) discrimination;

    (4) retaliation;

    (5) employment–related misrepresentation;

    (6) employment–related libel, slander, humiliation, defamation or invasion of privacy;

    (7) wrongful failure to employ or promote;

    (8) wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation;

    (9) wrongful discipline

    (10) failure to grant tenure; or

    (11) with respect to any of the foregoing items (1) through (10) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights,

but only if such act, error or omission relates to an **Executive** of, an **Employee** of or an applicant for employment with an **Organization** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally. In addition, with respect to any natural person customer or client, **"Employment Practices Violation"** shall mean only actual or alleged discrimination, sexual harassment or violation of an individual's civil rights relating to such discrimination or sexual harassment, whether committed directly, indirectly, intentionally or unintentionally.

(j) **"Executive"** means any:

    (1) past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position);

    (2) past, present and future person in a duly elected or appointed position in an entity organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in Definition (j)(1); or

    (3) past, present and future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

(k) **"Foreign Jurisdiction"** means any jurisdiction, other than the United States or any of its territories or possessions.

(l) **"Foreign Policy"** means the **Insurer's** or any other company of American International Group, Inc.'s (AIG) standard executive managerial liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then **"Foreign Policy"** means the standard policy most recently registered in the local language of the **Foreign Jurisdiction**, or if no such policy has been registered, then the policy most recently registered in that **Foreign Jurisdiction**. The term **"Foreign Policy"** shall not include any partnership managerial, pension trust or professional liability coverage.

(m) **"Indemnifiable Loss"** means **Loss** for which an **Organization** has indemnified or is permitted or required to indemnify an **Insured Person** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an **Organization**.

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

3

(n)  **"Insured"** means any:

    (1)  **Insured Person**; or

    (2)  **Organization**, but only with respect to a **Securities Claim**.

(o)  **"Insured Person"** means any:

    (1)  **Executive** of an **Organization**;

    (2)  **Employee** of an **Organization**; or

    (3)  **Outside Entity Executive**:

(p)  **"Loss"** means damages, settlements, judgments (including pre/post–judgment interest on a covered judgment), **Defense Costs** and **Crisis Loss**; however, "Loss" (other than **Defense Costs**) shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) punitive or exemplary damages; (4) the multiplied portion of multiplied damages; (5) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; and (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Notwithstanding the foregoing paragraph, **Loss** shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to exclusions relating to profit or advantage, deliberate fraud or deliberate criminal acts): (1) civil penalties assessed against any **Insured Person** pursuant to Section 2(g) (2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd–2(g)(2)(B); and (2) solely with respect to **Securities Claims**, punitive, exemplary and multiplied damages. Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such penalties and punitive, exemplary and multiple damages.

In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss** in connection therewith.

(q)  **"Management Control"** means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an **Organization**, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

(r)  **"No Liability"** means a final judgment of no liability obtained: (1) prior to trial, in favor of each and every **Insured** named in the **Claim**, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) after trial and after the exhaustion of all appeals, in favor of each and every **Insured** named in the **Claim**. In no event shall the term **"No Liability"** apply to a **Claim** made against an **Insured** for which a settlement has occurred.

(s)  **"Non-Indemnifiable Loss"** means **Loss** for which an **Organization** has neither indemnified nor is permitted or required to indemnify an **Insured Person** pursuant to law or contract of the charter, bylaws, operating agreement or similar documents of an **Organization**.

THESE FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT, HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

(t) **"Organization"** means:

   (1) the **Named Entity**;

   (2) each **Subsidiary**; and

   (3) in the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

(u) **"Outside Entity"** means any: (1) not-for-profit entity; or (2) other entity listed as an **"Outside Entity"** in an endorsement attached to this policy.

(v) **"Outside Entity Executive"** means any: (1) **Executive** of an **Organization** who is or was acting at the specific written request or direction of an **Organization** as an **Executive** of an **Outside Entity**; or (2) any other person listed as an **Outside Entity Executive** in an endorsement attached to this policy.

(w) **"Policy Period"** means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in such Item 2 or the effective date of cancellation of this policy.

(x) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and **Waste**. **"Waste"** includes, but is not limited to, materials to be recycled, reconditioned or reclaimed.

(y) **"Securities Claim"** means a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**:

   (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

      (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or

      (b) brought by a security holder of an **Organization** with respect to such security holder's interest in securities of such **Organization**; or

   (2) brought derivatively on the behalf of an **Organization** by a security holder of such **Organization**.

Notwithstanding the foregoing, the term **"Securities Claim"** shall include an administrative or regulatory proceeding against an **Organization**, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**.

(z) **"Subsidiary"** means: (1) any for-profit entity that is not formed as a partnership of which the **Named Entity** has **Management Control** ("Controlled Entity") on or before the inception of the **Policy Period** either directly or indirectly through one or more other **Controlled Entities**; and (2) any not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by an **Organization**.

(aa) **"Wrongful Act"** means:

   (1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged **Employment Practices Violation**;

IN ISSUING THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

(i) with respect to any **Executive** of an **Organization**, by such **Executive** in his or her capacity as such or any matter claimed against such **Executive** solely by reason of his or her status as such;

(ii) with respect to any **Employee** of an **Organization**, by such **Employee** in his or her capacity as such, but solely in regard to any: (a) **Securities Claim**; or (b) other **Claim** so long as such other **Claim** is also made and continuously maintained against an **Executive** of an **Organization**; or

(iii) with respect to any **Outside Entity Executive**, by such **Outside Entity Executive** in his or her capacity as such or any matter claimed against such **Outside Entity Executive** solely by reason of his or her status as such; or

(2) with respect to an **Organization**, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Organization**, but solely in regard to a **Securities Claim**.

## 3. WORLDWIDE EXTENSION

Where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world.

In regard to **Claims** brought and maintained solely in a **Foreign Jurisdiction** against an **Organization** formed and operating in such **Foreign Jurisdiction** or an **Insured Person** thereof for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claim(s)** those terms and conditions (and related provisions) of the **Foreign Policy** registered with the appropriate regulatory body in such **Foreign Jurisdiction** that are more favorable to such **Insured** than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1–4, 8–13, 15, 16, 18, 20 and 21 of this policy and the comparable provisions of the **Foreign Policy**. In addition, this paragraph shall not apply to the non–renewal or claims made and reported provisions of any policy.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the Insurer's obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

## 4. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the **Insured** was not legally entitled;

(b) arising out of, based upon or attributable to payments to an **Insured** of any remuneration without the previous approval of the stockholders or members of an **Organization**, which payment without such previous approval shall be held to have been illegal;

(c) arising out of, based upon or attributable to the committing in fact of any deliberate criminal or deliberate fraudulent act by the **Insured**;

THESE FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

75011 (2/00)

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) with respect to any **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if any **Insured**, as of such **Continuity Date**, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy;

(g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Insured Person** serving in his or her capacity as an **Executive** or an **Employee** of any entity that is not an **Organization** or an **Outside Entity**, or by reason of his or her status as an **Executive** or an **Employee** of such other entity;

(h) for bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof;

(i) which is brought by or on behalf of an **Organization** or any **Insured Person**, other than an **Employee** of an **Organization**; or which is brought by any security holder or member of an **Organization**, whether directly or derivatively, unless such security holder's or member's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Executive** of an **Organization** or any **Organization**; provided, however, this exclusion shall not apply to:

(1) any **Claim** brought by an **Insured Person** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** that is covered by this policy;

(2) any **Employment Practices Claim** brought by an **Insured Person,** other than an **Insured Person** who is or was a member of the Board of Directors (or equivalent governing body) of an **Organization**;

(3) in any bankruptcy proceeding by or against an **Organization**, any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Organization**, if any;

(4) any **Claim** brought by any past **Executive** of an **Organization** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for an **Organization** for at least four (4) years prior to such **Claim** being first made against any person; or

(5) any **Claim** brought by an **Executive** of an **Organization** formed and operating in a **Foreign Jurisdiction** against such **Organization** or any **Executive** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof);

(j) for any **Wrongful Act** arising out of the **Insured Person** serving as an **Executive** of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or by any **Executive** thereof; or which is brought by any security holder of the **Outside Entity**, whether

directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of the **Outside Entity**, any **Executive** of the **Outside Entity** or an **Organization** or any **Executive** of an **Organization**;

(k) alleging, arising out of, based upon or attributable to, directly or indirectly: (i) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (ii) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, (including but not limited to a **Claim** alleging damage to an **Organization** or its securities holders); provided, however, that this exclusion shall not apply to **Non-Indemnifiable Loss**, other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**;

"**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

(l) for emotional distress of any person, or for injury from libel, slander, defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, this exclusion shall not apply to an **Employment Practices Claim**; and

(m) for violation(s) of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto, or any similar provisions of any state, local or foreign statutory or common law.

For the purpose of determining the applicability of the foregoing Exclusions 4(a) through 4(c) and Exclusion 4(f): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Insured Person**; and (2) only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or General Counsel (or equivalent position) of an **Organization** shall be imputed to an **Organization**.

This Clause 4, Exclusions, shall not be applicable to **Crisis Loss**.

## 5. LIMIT OF LIABILITY (FOR ALL LOSS–INCLUDING DEFENSE COSTS)

The **Limit of Liability** stated in Item 3 of the Declarations is the aggregate limit of the **Insurer's** liability for all **Loss**, under Coverages A, B, C and D combined, arising out of all **Claims** first made against each and every **Insured**, and all **Crisis Loss** occurring, during the **Policy Period** and the **Discovery Period** (if applicable). The **Limit of Liability** for the **Discovery Period** and the **CrisisFund** $^{SM}$ shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period**. Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the **Policy Period** or **Discovery Period** shall also be subject to the one aggregate **Limit of Liability** stated in Item 3 of the Declarations. The limit of the **Insurer's** liability for **Crisis Loss** and **Delisting Crisis Loss** arising from all **Crises** occurring during the **Policy Period**, in the aggregate, shall be the amounts set forth as the **CrisisFund** $^{SM}$. The **CrisisFund** $^{SM}$ shall be the aggregate limit of the **Insurer's** liability for all **Crises** under this policy regardless of the number of **Crises** occurring during the **Policy Period**.

*Defense Costs are not payable by the Insurer in addition to the limit of Liability. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

75011 (2/00)                                                                 8

## 6. RETENTION CLAUSE

For each **Claim**, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amounts stated in Items 4(a), 4(b) and 4(c) of the Declarations, such Retention amounts to be borne by an **Organization** and/or the **Insured Person** and remain uninsured, with regard to all **Loss** other than **Non-Indemnifiable Loss**. The Retention amount specified in:

(i) Item 4(a) applies to **Defense Costs** that arise out of a **Securities Claim**;

(ii) Item 4(b) applies to **Loss** that arises out of an **Employment Practices Claim**; and

(iii) Item 4(c) applies to **Loss** that arises out of any **Claim** other than a **Securities Claim** or an **Employment Practices Claim**.

A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

In the event a **Claim** triggers more than one of the Retention amounts stated in Items 4(a), 4(b) and 4(c) of the Declarations, then, as to that **Claim**, the highest of such Retention amounts shall be deemed the Retention amount applicable to **Loss** (to which a Retention is applicable pursuant to the terms of this policy) arising from such **Claim**.

Further, with respect to all **Claims**, other than **Employment Practices Claims,** no Retention shall apply to **Loss** arising from such **Claims** and the **Insurer** shall reimburse **Defense Costs** otherwise covered hereunder and paid by the **Insured**, in the event of: (1) a determination of **No Liability** of each and every **Insured** against whom the same **Claim** or related **Claims** have been made; or (2) a dismissal or a stipulation to dismiss each and every **Insured** against whom the same **Claim** or related **Claims** have been made without prejudice and without the payment of any consideration by or on behalf of any **Insured**. However, in the case of (2) above, such reimbursement shall occur 90 days after the date of dismissal or stipulation as long as such **Claim** is not brought (or any other **Claim** which is subject to the same single retention by virtue of Clause 6 is not pending or brought) again within that time, and further subject to an undertaking by an **Organization** in a form acceptable to the **Insurer** that such reimbursement shall be paid back by such **Organization** to the **Insurer** in the event the **Claim** (or any other **Claim** which is subject to the same single retention by virtue of Clause 6) is brought after such 90-day period.

No Retention amount is applicable to **Crisis Loss** or **Non-Indemnifiable Loss**.

## 7. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

(a) An **Organization** or an **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of a **Claim** made against an **Insured** or a **Crisis** as soon as practicable: (i) after the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim;** or (ii) the **Crisis** commences, but in all events no later than either:

(1) the end of the **Policy Period** or the **Discovery Period** (if applicable); or

(2) within 30 days after the end of the **Policy Period** or the **Discovery Period** (if applicable), as long as such **Claim** was first made against an **Insured** within the final 30 days of the **Policy Period** or the **Discovery Period** (if applicable).

REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 7(a) above, then a **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, shall be considered related to the first **Claim** and made at the time such notice was given.

(c) If during the **Policy Period** or during the **Discovery Period** (if applicable) an **Organization** or an **Insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then a **Claim** which is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

## 8. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)

Under Coverages A, B and C of this policy, except as hereinafter stated, the **Insurer** shall advance, excess of any applicable retention amount, covered **Defense Costs** no later than ninety (90) days after the receipt by the **Insurer** of such defense bills. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or **Organization**, severally according to their respective interests, in the event and to the extent that any such **Insured** or **Organization** shall not be entitled under this policy to payment of such **Loss**.

*The **Insurer** does not, however, under this policy, assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them. The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this policy. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer** shall be entitled to effectively associate in the defense, the prosecution and the negotiation of any settlement of any **Claim** that involves or appears reasonably likely to involve the **Insurer**.*

The **Insurer** shall have the right to effectively associate with each and every **Organization** and **Insured Person** in the defense and prosecution of any **Claim** that involves, or appears reasonably likely to involve, the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Organization** and **Insured Person** shall give the **Insurer** full cooperation and such information as it may reasonably require.

Notwithstanding any of the foregoing, if all **Insured** defendants are able to dispose of all **Claims** which are subject to one retention amount (inclusive of **Defense Costs**) for an amount not exceeding any applicable retention amount, then the **Insurer's** consent shall not be required for such disposition.

No **Organization** is covered in any respect under Coverage A or Coverage C. An **Organization** is covered, subject to the policy's terms, conditions and limitations only with respect to: (1) its indemnification of its **Insured Persons** under Coverage B(ii) as respects a **Claim** against such **Insured Persons**, and (2) under Coverage B(i) for a **Securities Claim**. Accordingly, the **Insurer** has no obligation under this policy for covered **Defense Costs**

REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.   HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

incurred by, judgments against or settlements by an **Organization** arising out of a **Claim** made against an **Organization** other than a covered **Securities Claim**, or any obligation to pay **Loss** arising out of any legal liability that an **Organization** has to a claimant, except as respects a covered **Securities Claim** against such **Organization**.

With respect to: (i) **Defense Costs** jointly incurred by; (ii) any joint settlement entered into by; and/or (iii) any judgment of joint and several liability against any **Organization** and any **Insured** in connection with any **Claim** other than a **Securities Claim**, any such **Organiza-tion** and any such **Insured** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of the amounts as between any such **Organization**, any such **Insured** and the **Insurer**, taking into account the relative legal and financial exposures, and the relative benefits obtained by any such **Insured** and any such **Organization**. In the event that a determination as to the amount of **Defense Costs** to be advanced under the policy cannot be agreed to, then the **Insurer** shall advance **Defense Costs** excess of any applicable retention amount which the **Insurer** states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

This Clause 8 shall not be applicable to **Crisis Loss**. Nevertheless the **Insurer** does not, under this policy, assume any duty to defend.

## 9. PRE-AUTHORIZED SECURITIES DEFENSE ATTORNEYS

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("**Panel Counsel Firms**"). The list provides the **Insureds** with a choice of law firms from which a selection of legal counsel shall be made to conduct the defense of any **Securities Claim** made against such **Insureds**.

The **Insureds** shall select a **Panel Counsel Firm** to defend the **Securities Claim** made against the **Insureds** in the jurisdiction in which the **Securities Claim** is brought. In the event the **Claim** is brought in a jurisdiction not included on the list, the **Insureds** shall select a **Panel Counsel Firm** in the listed jurisdiction which is the nearest geographic jurisdiction to either where the **Securities Claim** is brought or where the corporate headquarters of the **Named Entity** is located. In such instance the **Insureds** also may, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, select a non-**Panel Counsel Firm** in the jurisdiction in which the **Securities Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defense of the **Securities Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select a **Panel Counsel Firm** different from that selected by another **Insured** defendant if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable. The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no firm shall be removed from the specific list attached to this policy during the **Policy Period**, without the consent of the **Named Entity**.

## 10. DISCOVERY CLAUSE

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal (the "**Discovery Period**") upon payment of the respective "**Additional Premium Amount**" described below in which to give to the **Insurer** written notice pursuant to Clause 7(a) and (c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which an **Organization** or an **Insured** shall become aware, in either

REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

The **Additional Premium Amount** for: (1) one year shall be no more than 75% of the **Full Annual Premium**; (2) two years shall be no more than 150% of the **Full Annual Premium**; and (3) three years shall be no more than 225% of the **Full Annual Premium**. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

Notwithstanding the first paragraph of Clause 5, if the **Named Entity** shall cancel or the **Insurer** or the **Named Entity** shall refuse to renew this policy, then the **Named Entity** shall also have the right, to requestan offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the end of the **Policy Period**) with an aggregate limit of liability applicable to **Claims** made against the **Insured** during such **Discovery Period** which is in addition to, and not part of, the applicable **Limit of Liability** set forth in Item 3 of the Declarations. The **Insurer** shall quote such a **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

In the event of a **Transaction** as defined in Clause 12(a), the **Named Entity** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period** together with any additional premium due is received by the **Insurer** no later than thirty (30) subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the **Named Entity** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Entity**. In the event of non-payment of premium by the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified, or other first class mail, at the **Named Entity's** address as shown in Item 1(a) of the Declarations, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Entity**, the **Insurer** shall retain the customary short rate proportion of the premium herein. If the period of limitation relating to the giving of notice as set forth in this Clause 11 is also set forth in any law controlling the construction thereof, then such period shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

75011 (2/00)

**12. ORGANIZATIONAL CHANGES**

(a) If during the **Policy Period**:

   (1) the **Named Entity** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   (2) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Entity**;

   (any of such events being a "**Transaction**"), then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in the fourth paragraph of Clause 10 of this policy.

(b) Subsidiary *Additions*: "**Subsidiary**" also means any for-profit entity that is not formed as a partnership of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and:

   (1) whose assets total less than 25% of the total consolidated assets of each and every **Organization** as of the inception date of this policy; or

   (2) whose assets total 25% or more than the total consolidated assets of each and every **Organization** as of the inception date of this policy, but such entity shall be a "**Subsidiary**" only: (i) for a period of sixty (60) days from the date the **Named Entity** first had **Management Control** of such entity; or (ii) until the end of the **Policy Period**, which ever ends or occurs first (hereinafter "**Auto-Subsidiary Period**");

   provided that the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**.

   The **Insurer** shall extend coverage for any **Subsidiary** described in 12(b)(2) above, and any **Insured Person** thereof, beyond its respective **Auto-Subsidiary Period** if during such **Auto-Subsidiary Period**, the **Named Entity** shall have provided the **Insurer** with full particulars of the new **Subsidiary** and agreed to any additional premium and amendment of the provisions of this policy required by the **Insurer** relating to such **Subsidiary**. Further, coverage as shall be afforded to any **Subsidiary** and any **Insured Person** thereof is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to such **Subsidiary**.

(c) *Insured Persons* and *Outside Entity Executives:* Coverage will automatically apply to all new **Insured Persons** of and **Outside Entity Executives** of an **Organization** following the inception date of this policy.

(d) *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Organization** and/or any **Insured Person** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Organization** became an **Organization** and such **Insured Person** became an **Insured Person**, and prior to the effective time that such **Organization** ceases to be an **Organization** or such **Insured Person** ceases to be an **Insured Person**. An **Organization** ceases to be an **Organization** when the **Named Entity** no longer maintains **Management Control** of an **Organization** either directly or indirectly through one or more of its **Subsidiaries**.

EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## 13. SUBROGATION

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of each and every **Organization's** and **Insured's** rights of recovery thereof, and each such **Organization** and **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of any and all documents necessary to enable the **Insurer** effectively to bring suit in the name of each such **Organization** and each such **Insured**. In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a deliberate criminal act, or been determined to have in fact committed a deliberate fraudulent act, or been determined to have in fact obtained any profit or advantage to which such **Insured** was not legally entitled.

## 14. OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

In the event of a **Claim** made against an **Outside Entity Executive**, coverage as is afforded by this policy, whether under Coverage B(ii) or Coverage C, shall be specifically excess of: (1) any indemnification provided by an **Outside Entity**; and (2) any insurance coverage afforded to an **Outside Entity** or its **Executives** applicable to such **Claim**. Further, in the event such other **Outside Entity** insurance is provided by the **Insurer** or any other company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a claim as required) then the **Insurer's** maximum aggregate **Limit of Liability** for all **Loss** under this policy, as respects any such **Claim**, shall be reduced by the amount of the limit of liability (as set forth on the Declarations) of the other AIG insurance provided to such **Outside Entity**.

## 15. NOTICE AND AUTHORITY

It is agreed that the **Named Entity** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of **Claim**, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under th is policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right to a **Discovery Period**.

## 16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

## 17. ALTERNATIVE DISPUTE RESOLUTION PROCESS

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be submitted to the alternative dispute resolution ("**ADR**") process set forth in this clause.

Either the **Insurer** or an **Insured** may elect the type of **ADR** process discussed below; provided, however, that such **Insured** shall have the right to reject the **Insurer's** choice of the type of **ADR** process at any time prior to its commencement, in which case such **Insured's** choice of **ADR** process shall control.

THESE FORMS, EXCLUSIONS AND TERMS, AND ALL APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

75011 (2/00)

The **Insurer** and each and every **Insured** agrees that there shall be two choices of **ADR** process: (1) non-binding mediation administered by the American Arbitration Association, in which the **Insurer** and any such **Insured** shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator or arbitrators shall also give consideration to the general principles of the law of the state where the **Named Entity** is incorporated in the construction or interpretation of the provisions of this policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the **ADR** process.

Either choice of **ADR** process may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1(a) of the Declarations as the mailing address for the **Named Entity**. The **Named Entity** shall act on behalf of each and every **Insured** in deciding to proceed with an **ADR** process under this clause.

## 18. ACTION AGAINST INSURER

Except as provided in Clause 17 of the policy, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, or until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against such **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** or **Organization** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by any **Insured Person**, their spouse, any **Organization** or any legal representative of the foregoing.

## 19. BANKRUPTCY

Bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations hereunder.

It is further understood and agreed that the coverage provided under this policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding is commenced by the **Named Entity** and/or any other **Organization** (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively "**Bankruptcy Law**") then, in regard to a covered **Claim** under this policy, the **Insureds** hereby:

(a) waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the proceeds of this policy under such **Bankruptcy Law**; and

(b) agree not to oppose or object to any efforts by the **Insurer** or any **Insured** to obtain relief from any stay or injunction applicable to the proceeds of this policy as a result of the commencement of such liquidation or reorganization proceeding.

NOTICE ... THESE POLICY FORMS AND THE APPLICABLE RATES ... TO THE EXTENT ... FROM ... FILING REQUIREMENTS ... NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

15

**20. SPOUSAL AND LEGAL REPRESENTATIVE EXTENSION**

If a **Claim** against an **Insured Person** includes a **Claim** against: (i) the lawful spouse of such **Insured Person**; or (ii) a property interest of such spouse, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Insured Person**, this policy shall cover **Loss** arising from the **Claim** made against that spouse or the property of that spouse to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse. This policy shall cover **Loss** arising from a **Claim** made against the estates, heirs, or legal representatives of any deceased **Insured Person**, and the legal representatives of any **Insured Person**, in the event of incompetency, insolvency or bankruptcy, who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claim** is based were committed.

**21. RENEWAL APPLICATION PROCEDURE**

If this policy is a renewal of, a replacement of, or succeeds in time any policy (providing similar coverage) issued by the **Insurer**, or any of its affiliates, then in granting coverage under this policy it is agreed that the **Insurer** has relied upon the **Application** as being accurate and complete in underwriting this policy. This Clause 21 together with the **Application** constitute the complete **Application** that is the basis of this policy and form a part hereof, and is material to the risk assumed by the **Insurer**. No written renewal application form need be completed by the **Named Entity** in order to receive a renewal quote from the **Insurer**, although the **Insurer** reserves the right to require specific information upon renewal.

**22. ORDER OF PAYMENTS**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this policy, then the **Insurer** shall in all events:

(a) first, pay **Loss** for which coverage is provided under Coverage A and Coverage C of this policy; then

(b) only after payment of **Loss** has been made pursuant to Clause 22(a) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of such other **Loss** for which coverage is provided under Coverage B(ii) of this policy; and then

(c) only after payment of **Loss** has been made pursuant to Clause 22(a) and Clause 22(b) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of such other **Loss** for which coverage is provided under Coverages B(i) and D of this policy.

In the event the **Insurer** withholds payment pursuant to Clause 22(b) and/or Clause 22(c) above, then the **Insurer** shall at such time and in such manner as shall be set forth in written instructions of the chief executive officer of the **Named Entity** remit such payment to an **Organization** or directly to or on behalf of an **Insured Person**.

The bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this policy pursuant to this Clause 22.

**23. HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

### ALASKA

**Davis Wright Tremaine**
*David W. Oesting*
701 W. Eighth Avenue, Suite 800, Anchorage, AK 99501–3468 (907)257–5300
Class Action Approved

**Foster Pepper & Shefelman**
*Tim J. Filer*
1007 W. Third Ave., Ste. 100, Anchorage, AK 99501 (907)222–7100
Class Action Approved

### CALIFORNIA

**Bingham McCutchen, LLP**
*David M. Balabanian / Dale E. Barnes*
3 Embarcadero Center, San Francisco, CA 94111 (415)393–2626
Class Action Approved

*Mary T. Huser*
1900 University Avenue, East Palo Alto, CA 94303–1212 (650)849–4914
Class Action Approved

*Susan L. Hoffman*
355 South Grand Avenue, Los Angeles, CA 90071–1560 (213)680–6416
Class Action Approved

**Cooley Godward Kronish, LLP**
*Paul A. Renne (415)693-2073 / John C. Dwyer (650)843-5228*
One Maritime Plaza, 20th Floor, San Francisco, CA 94111–3580 (415)693–2000
Class Action Approved

*William E. Grauer (858)550-6050 / Philip C. Tencer (858)550-6068 / Koji F. Fukumura (858)550-6008*
4401 Eastgate Mall, San Diego, CA 92121–1909 (858)550–6000
Class Action Approved

*Stephen C. Neal (650)843-5182 / William S. Freeman (650)843-5037 / John C. Dwyer (650)843-5228*
3175 Hanover Street, Palo Alto, CA 94304–1130 (650)843–5000
Class Action Approved

**Davis Wright Tremaine**
*Martin Fineman*
One Embarcadero Center, Suite 600, San Francisco, CA 94111–3834 (415)276–6500
Class Action Approved

**DLA Piper Rudnick Gray Cary US, LLP**
*Shirli Fabbri Weiss / David Priebe*
2000 University Avenue, East Palo Alto, CA 94303 (650)833–2000
Class Action Approved

*Shirli Fabbri Weiss / Robert Brownlie*
4365 Executive Drive, Suite 1100, San Diego, CA 92121 (858)677–1400
Class Action Approved

**Revised (4/08)**

Page 1

Please visit our website at www.briefbase.com to view additional firms that may have been
added to the panel counsel list since this policy was issued.

**2-14047**

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT OF FINANCIAL SERVICES PURSUANT
TO THE PROVISIONS OF SECTION 2307(b) OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Fenwick & West, LLP**
*Susan S. Muck*
Embarcadero Center West, 275 Battery Street, San Francisco, A 94111 (415)875-2300
Class Action Approved

**Gibson, Dunn & Crutcher, LLP**
*Dean J. Kitchens (213)229-7413*
333 S. Grand Avenue, Los Angeles, CA 90071-3197 (213)229-7413
Class Action Approved

*Wayne W. Smith / Meryl L. Young*
Jamboree Center, 4 Park Plaza, Suite 1400, Irvine, CA 92614-8557 (949)451-3800
Class Action Approved

**Heller, Ehrman, White & McAuliffe**
*Douglas M. Schwab / M. Laurence Popofsky / Michael J. Shepard*
333 Bush Street, San Francisco, CA 94104-2878 (415)772-6000
Class Action Approved

*Darryl L. Snider / Jerry L. Marks*
601 South Figueroa Street, 40th Floor, Los Angeles, CA 90017-5758 (213)689-0200
Class Action Approved

*Norman J. Blears*
275 Middlefield Road, Menlo Park, CA 94025-3506 (650)324-7000
Class Action Approved

*David E. Kleinfeld*
4350 La Jolla Village Drive, 7th Floor, San Diego, CA 92122-1246 (858)450-8400
Class Action Approved

**Irell & Manella, LLP**
*David Siegel / Daniel P. Lefler*
1800 Avenue of the Stars, Suite 900, Los Angeles, CA 90067-4276 (310)277-1010
Class Action Approved

**Katten Muchin Rosenman, LLP**
*Bruce Vanyo (310)788-4401*
2029 Century Park East, Suite 2600, Los Angeles, CA 90067-3012 (310)788-4400
Class Action Approved

**Latham & Watkins**
*Paul H. Dawes (650)463-2626 / John C. Tang (650)328-4600*
135 Commonwealth Drive, Menlo Park, CA 94025-1105 (650)328-4600
Class Action Approved

*Miles N. Ruthberg (213)891-8754 / Pamela S. Palmer (213)891-8435 / Mark W. Rappel (213)891-8156 / Peter W. Devereaux (213)891-8622 / Charles W. Cox (213)891-8178 / Jamie L. Wine (213)485-1234*
633 West Fifth Street, Suite 4000, Los Angeles, CA 90071 (213)485-1234
Class Action Approved

*Michael J. Weaver (619)238-3012 / Peter H. Benzian (619)236-1234 / Julia E. Parry (619)236-1234*
600 West Broadway, Suite 1800, San Diego, CA 92101-3375 (619)236-1234
Class Action Approved

Revised (4/08)

Please visit our website at www.briefbase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

*2-14047*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

Page 2

## APPENDIX A
### SECURITIES CLAIMS PANEL COUNSEL LIST

*Paul H. Dawes (650)463-2626 / Peter A. Wald (415)395-8006 / Darius C. Ogloza (415)391-0600 / James K. Lynch (415)395-8265 / Michele F. Kyrouz*
**505 Montgomery Street, Suite 1900, San Francisco, CA 94111-2562 (415)391-0600**
**Class Action Approved**

*Miles N. Ruthberg (213)891-8754 / Peter W. Devereaux (213)891-8622 / Pamela S. Palmer (213)891-8435 / Jon D. Anderson (714)755-8217 / Virginia S. Grogan (714)755-8206*
**650 Town Center Drive, 20th Floor, Costa Mesa, CA 92626 (714)540-1235**
**Class Action Approved**

**Morrison & Foerster, LLP**
*Melvin R. Goldman (415)268-7311 / Paul T. Friedman (415)268-7444 / Jordan D. Eth (415)268-7176 / Darryl P. Rains (650)813-5866*
**425 Market Street, San Francisco, CA 94105 (415)268-7000**
**Class Action Approved**

*Robert S. Stern (213)892-5484 / Mark R. McDonald (213)892-5810*
**555 West 5th Street, Suite 3500, Los Angeles, CA 90013 (213)892-5200**
**Class Action Approved**

**Munger, Tolles & Olson**
*Marc Dworsky (213)683-9256 / Robert Dell Angelo (213)683-9540 / John Spiegel (213)683-9152*
**355 South Grand Avenue, 35th Floor, Los Angeles, CA 90071-1560 (213)683-9100**
**Class Action Approved**

**O'Melveny & Myers, LLP**
*Seth Aronson (213)430-7486 / Amy J. Longo (213)430-8351*
**400 South Hope St., 15th Floor, Los Angeles, CA 90071-2899 (213)430-6000**
**Class Action Approved**

*Michael G. Yoder (949)823-7936 / Phillip R. Kaplan*
**610 Newport Center, 17th Floor, Newport Beach, CA 92660 (949)760-9600**
**Class Action Approved**

*Daniel H. Bookin (415)984-8786 / Michael F. Tubach*
**275 Battery Street, San Francisco, CA 94111 (415)984-8700**
**Class Action Approved**

**Orrick Herrington & Sutcliffe, LLP**
*W. Reece Bader*
**1000 Marsh Road, Menlo Park, CA 94025 (650)614-7400**
**Class Action Approved**

*William F. Alderman / Michael D. Torpey (415)773-5932 / James E. Burns, Jr. (415)773-5935*
**Old Federal Reserve Bank Building, 400 Sansome Street, San Francisco, CA 94111 (415)392-1122**
**Class Action Approved**

**Paul, Hastings, Janofsky & Walker, LLP**
*Howard M. Privette / William F. Sullivan / John A. Reding / Peter M. Stone / Christopher H. McGrath*
**515 South Flower Street, Twenty-Fifth Floor, Los Angeles, CA 90071 (213)683-6000**
**Class Action Approved**

**Revised (4/08)**

**Please visit our website at www.briefbase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.**

*2-14047*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

Page 5

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Pillsbury Winthrop Shaw Pittman, LLP**
*Bruce A. Ericson (415)983-1560*
50 Fremont Street, San Francisco, CA 94105 (415)983-1000
Class Action Approved

*Bruce A. Ericson (415)983-1560*
2475 Hanover Street, Palo Alto, CA 94304-1114 (650)233-4500
Class Action Approved

725 South Figueroa Street, Suite 2800, Los Angeles, CA 90017 (213)488-7100
Class Action Approved

*Richard M. Segal*
101 West Broadway, Suite 1800 (SBC Building), San Diego, CA 92101 (619)234-5000
Class Action Approved

**Shearman & Sterling**
*Jeffrey S. Facter (415)616-1205 / Stephen D. Hibbard (415)616-1174*
555 California Street, San Francisco, CA 94104 (415)616-1100
Class Action Approved

**Simpson Thacher & Bartlett**
*Chet Kronenberg / Seth A. Ribner*
1999 Avenue of the Stars, 29th Floor, Los Angeles, CA 90067 (310)407-7500
Class Action Approved

*George M. Newcombe / James G. Kreissman*
3373 Hillview Avenue, Palo Alto, CA 94304 (650)251-5000
Class Action Approved

**Skadden, Arps, Slate, Meagher & Flom, LLP and Affiliates**
*James E. Lyons (415)984-6470*
Four Embarcadero Center, San Francisco, CA 94111 (415)984-6400
Class Action Approved

**Sullivan & Cromwell**
*Robert A. Sacks*
1888 Century Park East, Los Angeles, CA 90067-1725 (310)712-6600
Class Action Approved

**Wilson, Sonsini, Goodrich & Rosati**
*Boris Feldman / Steven M. Schatz / Jerome Birn (650)320-4858 / Nicki Locker (650)320-4888 / Douglas Clark (650)320-4824 / Keith Eggleton (650)320-4893*
650 Page Mill Road, Palo Alto, CA 94304-1050 (650)493-9300
Class Action Approved

## COLORADO

**Cooley Godward Kronish, LLP**
*James E. Nesland*
380 Interlocken Crescent, Suite 900, Broomfield, C  80021-8023 (720)566-4000
Class Action Approved

**Revised (4/08)**

Page 4

Please visit our website at www.briefbase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

**2-14047**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Gibson, Dunn & Crutcher, LLP**
*George Curtis*
1801 California Street, Suite 4100, Denver, CO 80202 (303)298–5700
Class Action Approved

**Hogan & Hartson**
*Daniel F. Shea*
One Tabor Center, 1200 Seventeenth St., Suite 1500, Denver, CO 80202 (303)899–7300
Class Action Approved

## DELAWARE

**Blank Rome, LLP**
*Thomas P. Preston / Neal C. Belgam*
Chase Manhattan Centre, 1201 Market Street, Suite 800, Wilmington, DE 19801 (302)425–6473
Class Action Approved

**Wolf, Block, Schorr and Solis-Cohen, LLP**
*Barry Klayman*
Wilmington Trust Center, 1100 N. Market Street, Suite 1001, Wilmington, DE 19801
(302)777–5860
Class Action Approved

## DISTRICT OF COLUMBIA

**Arnold & Porter**
*Scott B. Schreiber (202)942-5672*
555 Twelfth Street, N.W., Washington, DC 20004–1206 (202)942–5000
Class Action Approved

**Cahill Gordon & Reindel**
*Donald J. Mulvihill*
1990 K Street, N.W., Suite 950, Washington, DC 20006 (202)862–8900
Class Action Approved

**DLA Piper Rudnick Gray Cary US, LLP**
*David Clarke, Jr. (202)861-6300 / Robert J. Mathias (410)580-4209 / James D. Mathias / Mark
Muedeking (202)861-3900 / Deborah R. Meshulam (202)861-6470*
1200 Nineteenth Street, NW, Washington, DC 20036–2412 (202)861–3900
Class Action Approved

**Fulbright & Jaworski, LLP**
*Stephen M. McNabb*
Market Square, 801 Pennsylvania Ave., NW, Washington, DC 20004–2623 (202)662–0200
Class Action Approved

**Gibson, Dunn & Crutcher, LLP**
*F. Joseph Warin / John C. Millian*
1050 Connecticut Ave., N.W., Washington, DC 20036–5306 (202)955–8500
Class Action Approved

**Greenberg Traurig, LLP**
*Joe R. Reeder / Alan Foster*
2101 L Street, NW, Suite 1000, Washington, DC 20037 (202)331–3100
Class Action Approved

Revised (4/08)

Page 5

Please visit our website at www.briefbase.com to view additional firms that may have been
added to the panel counsel list since this policy was issued.

2-14047

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, THE FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Hogan & Hartson**
*Ty Cobb*
**555 Thirteenth Street, NW, Washington, DC 20004 (202)637–5600**
**Class Action Approved**

**Latham & Watkins**
*Laurie B. Smilan (703)456-5220 / Michele E. Rose (703)456-5225 / William R. Baker, III*
*(202)637-1001 / Everett C. (Kip) Johnson, Jr. (202)637-2260 / Christian Word (703)456-5226*
**555 Eleventh Street, NW, Suite 1000, Washington, DC 20004–1304 (202)637–2200**
**Class Action Approved**

**LeBoeuf, Lamb, Greene & MacRae, LLP**
*Ralph C. Ferrara (202)986-8020 / Lyle Roberts (202)986-8029*
**1875 Connecticut Avenue, NW, Suite 1200, Washington, DC 20009–5715 (202)986–8000**
**Class Action Approved**

**O'Melveny & Myers, LLP**
*Jeffrey Kilduff (202)383-5383*
**1625 Eye Street, NW, Washington, DC 20006 (202)383–5300**
**Class Action Approved**

**Shearman & Sterling**
*Jonathan L. Greenblatt (202)508-8070 / Thomas S. Martin (202)508-8040*
**801 Pennsylvania Ave., N.W., Washington, DC 20004–2604 (202)508–8000**
**Class Action Approved**

**Sidley Austin Brown & Wood, LLP**
*Thomas C. Green (202)736-8069 / Mark D. Hopson (202)736-8188 / Michael D. Warden*
*(202)736-8080*
**1501 K Street, N.W., Washington, DC 20005 (202)736–8000**
**Class Action Approved**

**Sullivan & Cromwell**
*Daryl A. Libow / Margaret K. Pfeiffer*
**1701 Pennsylvania Avenue, N.W., Washington, DC 20006–5805 (202)956–7500**
**Class Action Approved**

**Williams & Connolly, LLP**
*John K. Villa*
**725 Twelfth Street, N.W., Washington, DC 20005 (202)434–5000**
**Class Action Approved**

**Willkie Farr & Gallagher**
*Kevin B. Clark (202)303-1105*
**1875 K Street, N.W., Washington, DC 20006–1238 (202)303–1000**
**Class Action Approved**

**WilmerHale**
*Andrew Weissman (202)663-6612 / John Valentine (202)663-6131*
**2445 M Street, N.W., Washington, DC 20037 (202)663–6000**
**Class Action Approved**

**Revised (4/08)**

Page 5

**Please visit our website at www.briefcase.com to view additional firms that may have been
added to the panel counsel list since this policy was issued.**

**2-14047**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

**FLORIDA**

**Akerman Senterfitt & Eidson, PA**
*Brian P. Miller (305)982-5626*
SunTrust International Center, 28th Floor, Miami, FL 33131 (305)374-5600
**Class Action Approved**

*J. Thomas Cardwell*
CNL Center II at City Commons, 420 South Orange Avenue, Suite 1200, Orlando, FL 32801
(407)423-4000
**Class Action Approved**

**Carlton Fields**
*Steven J. Brodie (305)539-7302 / Nancy H. Henry*
4000 International Place, 100 S.E. 2nd Street, Suite 4000, Miami, FL 33131 (305)530-0050
**Class Action Approved**

*Gary L. Sasso*
One Progress Plaza, 200 Central Avenue, Suite 2300, St. Petersburg, FL 33701-4352
(727)821-7000
**Class Action Approved**

*Steven J. Brodie (305)539-7302*
4221 West Boy Scout Boulevard, 10th Floor, Tampa, FL 33607 (813)223-7000
**Class Action Approved**

**Greenberg Traurig, LLP**
*Bradford D. Kaufman*
777 South Flagler Drive, Suite 300, East, West Palm Beach, FL 33401 (561)650-7900
**Class Action Approved**

*Hilarie Bass, Esq.*
1221 Brickell Avenue, Miami, FL 33131 (305)579-0500
**Class Action Approved**

**Holland & Knight, LLP**
*Tracy A. Nichols / George E. Schulz, Jr.*
50 North Laura Street, Suite 3900, Jacksonville, FL 32202 (904)353-2000
**Class Action Approved**

*Tracy A. Nichols / Mitchell Eliot Herr / Gregory A. Baldwin / Louise Brais*
701 Brickell Avenue, Suite 3000, Miami, FL 33131 (305)374-8500
**Class Action Approved**

*Tracy A. Nichols / Michael L. Chapman*
100 North Tampa Street, Suite 4100, Tampa, FL 33602 (813)227-8500
**Class Action Approved**

*Robert R. Feagin, III / Elizabeth L. Bevington*
315 South Calhoun Street, Suite 600, Tallahassee, FL 32301 (850)224-7000
**Class Action Approved**

**Revised (4/08)**

**Please visit our website at www.briefbase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.**

*2-14047*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. THIS POLICY IS NOT SUBJECT TO THE SUPERVISION OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

*Tracy A. Nichols / Scott Newman*
625 North Flagler Drive, Suite 700, West Palm Beach, FL 33401 (561)833–2000
Class Action Approved

*William Wilson*
200 South Orange Avenue, Suite 2600, Orlando, FL 32801 (407)425–8500
Class Action Approved

**McGuireWoods, LLP**
*David M. Wells / Stephen D. Busch (804)775-4378*
Bank of America Tower, 50 North Laura Street, Jacksonville, FL 32202 (904)798–3200
Class Action Approved

**Squire Sanders & Dempsey, LLP**
*Lewis F. Murphy (305)577-2957 / Wendy Leavitt (305)577-2894*
200 South Biscayne Boulevard, Suite 4000, Miami, FL 33131–2398 (305)577–7000
Class Action Approved

**White & Case, LLP**
*Charles C. Kline, Esq.*
Wachovia Financial Center, 200 S. Biscayne Blvd., Suite 4900, Miami, FL 33131–2352
(305)371–2700
Class Action Approved

**GEORGIA**

**Alston & Bird, LLP**
*Peter Q. Bassett (404)881-7343 / Todd R. David (404)881-7357*
One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309–3424 (404)881–7000
Class Action Approved

**King & Spalding**
*M. Robert Thornton / Michael R. Smith*
1180 Peachtree Street, Atlanta, GA 30309 (404)572–4600
Class Action Approved

**Paul, Hastings, Janofsky & Walker, LLP**
*J. Allen Maines*
600 Peachtree Street, N.E., Twenty–Fourth Floor, Atlanta, GA 30308–2222 (404)815–2400
Class Action Approved

**Smith, Gambrell & Russell, LLP**
*John G. Despriet*
Promenade II, Suite 3100, 1230 Peachtree Rd., N.E., Atlanta, GA 30309–3592 (404)815–3730
Class Action Approved

**Womble, Carlyle, Sandridge & Rice**
*Robert R. Ambler, Jr. (404)879-2424 / Nisbet S. Kendrick (404)888-7488*
One Atlantic Center, 1201 West Peachtree, Suite 3500, Atlanta, GA 30309 (404)872–7000
Class Action Approved

Revised (4/08)

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

Page 8

Please visit our website at www.briefbase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

**2-14047**

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

## ILLINOIS

**DLA Piper Rudnick Gray Cary US, LLP**
*Samuel B. Isaacson / Michael S. Poulos*
203 North LaSalle Street, Suite 1900, Chicago, IL 60601–1293 (312)368–4000
Class Action Approved

**Katten Muchin Rosenman, LLP**
*David H. Kistenbroker / Pamela G. Smith / Leah J. Domitrovic / Steven L. Bashwiner / Mary Ellen Hennessy / Bonita L. Stone*
525 W. Monroe Street, Suite 1600, Chicago, IL 60661–3693 (312)902–5200
Class Action Approved

**Kirkland & Ellis**
*Robert J. Kopecky*
200 East Randolph Drive, Chicago, IL 60601 (312)861–2000
Class Action Approved

**McDermott Will & Emery, LLP**
*Joel G. Chefitz (312)984-6484 / Steven P. Handler / Steven S. Scholes / William P. Schuman*
227 West Monroe Street, Chicago, IL 60606 (312)372–2000
Class Action Approved

**Sidley Austin Brown & Wood, LLP**
*Hillie R. Sheppard / Eugene A. Schoon / Walter C. Carlson*
1 South Dearborn Street, Chicago, IL 60603 (312)853–7734
Class Action Approved

**Sonnenschein, Nath & Rosenthal**
*Christopher Q. King*
8000 Sears Tower, Chicago, IL 60606 (312)876–8224
Class Action Approved

## MARYLAND

**DLA Piper Rudnick Gray Cary US, LLP**
*Mark Muedeking (410)580-3000*
6225 Smith Avenue, Baltimore, MD 21209 (410)580–3000
Class Action Approved

## MASSACHUSETTS

**Bingham McCutchen, LLP**
*Jordan D. Hershman*
150 Federal Street, Boston, MA 02110–1726 (617)951–8000
Class Action Approved

**Edwards Angell Palmer & Dodge, LLP**
*John D. Hughes*
101 Federal Street, Boston, MA 02110–1800 (617)951–3373
Class Action Approved

Revised (4/08)

Please visit our website at www.briefcase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

**2-14047**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW SINCE THIS POLICY WAS ISSUED TO AN INSURED EXEMPTED UNDER THE "FREE TRADE ZONE" PROVISIONS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Foley Hoag, LLP**
*Nicholas C. Theodorou (617)832-1163 / Lisa C. Wood (617)832-1117*
Seaport World Trade Center West, 155 Seaport Boulevard, Boston, MA 02210-2600
(617)832-1000
Class Action Approved

**Goodwin Procter, LLP**
*Stephen D. Poss / Brian E. Pastuszenski / R. Todd Cronan / James S. Dittmar / Carl E. Metzger*
Exchange Place, 53 State Street, Boston, MA 02109-2881 (617)570-1000
Class Action Approved

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC**
*Peter M. Saparoff / Patrick J. Sharkey*
One Financial Center, Boston, MA 02111 (617)542-6000
Class Action Approved

**Ropes & Gray**
*John D. Donovan, Jr.*
One International Place, Boston, MA 02110-2624 (617)951-7566
Class Action Approved

**Skadden, Arps, Slate, Meagher & Flom, LLP and Affiliates**
*Thomas J. Dougherty*
One Beacon Street, Boston, MA 02108 (617)573-4820
Class Action Approved

**WilmerHale**
*Jeffrey B. Rudman / William H. Paine / Andrea J. Robinson*
60 State Street, Boston, MA 02109 (617)526-6000
Class Action Approved

**MINNESOTA**

**Dorsey & Whitney, LLP**
*Edward J. Pluimer / J. Jackson / Peter W. Carter (612)340-5635 / Roger J. Magnuson*
50 South Sixth Street, Suite #1500, Minneapolis, MN 55402-1498 (612)340-2600
Class Action Approved

**Faegre & Benson, LLP**
*Robert L. Schnell / Thomas L. Kimer*
90 South Seventh Street, Minneapolis, MN 55402-3901 (612)336-3000
Class Action Approved

**Winthrop & Weinstine, PA**
*David P. Pearson (612)604-6692 / Thomas H. Boyd*
Suite 3500, 225 South 6th Street, Minneapolis, MN 55402-4629 (612)604-6400
Class Action Approved

**NEW YORK**

**Arnold & Porter**
*Kent A. Yalowitz / Scott B. Schreiber (202)942-5672*
399 Park Avenue, New York, NY 10022-4690 (212)715-1000
Class Action Approved

Revised (4/08)

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

Please visit our website at www.briefcase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

2-14047

Page 10

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Blank Rome, LLP**
*Robert J. Mittman (212)885-5555*
The Chrysler Building, 405 Lexington Avenue, New York, NY 10174 (212)885-5555
Class Action Approved

**Cadwalader, Wickersham & Taft**
*Gregory A. Markel / Howard R. Hawkins, Jr. / Jonathan M. Hoff*
One World Financial Center, New York, NY 10281 (212)504-6000
Class Action Approved

**Cahill Gordon & Reindel**
*Charles A. Gilman (212)701-3403 / David G. Januszewski (212)701-3352 / Thomas J. Kavaler (212)701-3406 / Jonathan D. Thier (212)701-3992*
Eighty Pine Street, New York, NY 10005 (212)701-3000
Class Action Approved

**Clifford Chance US, LLP**
*James B. Weidner / John K. Carroll / Mark Holland*
31 West 52nd Street, New York, NY 10019-6131 (212)878-8000
Class Action Approved

**Cravath, Swaine & Moore**
*Evan R. Chesler / Francis P. Barron / Julie A. North / Keith R. Hummel / Paul C. Saunders / Peter T. Barbur / Richard W. Clary / Robert H. Baron / Ronald S. Rolfe / Rory O. Millson / Thomas G. Rafferty*
Worldwide Plaza, 825 Eighth Avenue, New York, NY 10019-7475 (212)474-1000
Class Action Approved

**DLA Piper Rudnick Gray Cary US, LLP**
*Joseph G. Finnerty, III / Keara M. Gordon / David E. Nachman / John J. Clarke*
1251 Avenue of the Americas, New York, NY 10020-1104 (212)835-6000
Class Action Approved

**Fried, Frank, Harris, Shriver & Jacobson**
*William G. McGuinness / Alexander R. Sussman / Debra M. Torres / Douglas H. Flaum / Gregg L. Weiner / John A. Borek*
One New York Plaza, New York, NY 10004-1980 (212)859-8000
Class Action Approved

**Fulbright & Jaworski, LLP**
*Robert D. Owen*
666 Fifth Avenue, New York, NY 10103-3198 (212)318-3000
Class Action Approved

**Gibson, Dunn & Crutcher, LLP**
*Wesley G. Howell / Robert F. Serio / Mitchell A. Karlan (212)351-3827*
200 Park Avenue, New York, NY 10166-0193 (212)351-4000
Class Action Approved

**Greenberg Traurig, LLP**
*Geoffrey Berman / Karen Bitar / William Briendel / Michael Burrows / Adam Cole / Roger Kaplan / Robert A. Horowitz / Ronald Lefton / Jeffrey Mann / Alan Mansfield / Stephen Saxl / Jeffrey Sklaroff / Toby Soli / Kenneth A. Lapatine*
200 Park Avenue, New York, NY 10022 (212)801-9200
Class Action Approved

Revised (4/08)

Page 1

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

Please visit our website at www.briefbase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

**2-14047**

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Katten Muchin Rosenman, LLP**
*David H. Kistenbroker / Robert W. Gottlieb / Joel W. Sternman*
575 Madison Avenue, New York, NY 10022-2585 (212)940-8800
Class Action Approved

**Kaye Scholer, LLP**
*Fredric W. Yerman (212)836-8663 / Phillip A. Geraci (212)836-8659*
425 Park Avenue, New York, NY 10022 (212)836-8663
Class Action Approved

**Kramer Levin Naftalis & Frankel, LLP**
*Gary P. Naftalis / Alan R. Friedman / Robert N. Holtzman / Jonathan M. Wagner*
1177 Avenue of the Americas, New York, NY 10036 (212)715-9100
Class Action Approved

**Mayer, Brown Rowe & Maw**
*Richard A. Spehr / Steven Wolowitz / Joseph DeSimone*
1675 Broadway, New York, NY 10019 (212)506-2500
Class Action Approved

**Milbank, Tweed, Hadley & McCloy**
*Michael L. Hirschfeld / Scott A. Edelman*
1 Chase Manhattan Plaza, New York, NY 10005 (212)530-5149
Class Action Approved

**Morrison & Foerster, LLP**
*Anthony M. Radice (212)468-8020 / Jack C. Auspitz (212)468-8046*
1290 Avenue of the Americas, New York, NY 10104 (212)468-8000
Class Action Approved

**Paul, Hastings, Janofsky & Walker, LLP**
*Barry Sher / James D. Wareham*
Park Avenue Tower, 75 E. 55th Street, New York, NY 10022 (212)318-6000
Class Action Approved

**Paul, Weiss, Rifkind, Wharton & Garrison**
*Daniel J. Beller / Martin Flumenbaum / Claudia Hammerman / Brad S. Karp / Daniel J. Kramer /*
*Mark F. Pomerantz / Richard A. Rosen*
1285 Avenue of the Americas, New York, NY 10019-6064 (212)373-3000
Class Action Approved

**Proskauer Rose, LLP**
*Gregg M. Mashberg*
1585 Broadway, New York, NY 10036-8299 (212)969-3000
Class Action Approved

**Schulte Roth & Zabel, LLP**
*Betty Santangelo / Howard O. Godnick / Irwin J. Sugarman / Robert M. Abrahams*
919 Third Avenue, New York, NY 10022 (212)756-2000
Class Action Approved

Revised (4/08)

Please visit our website at www.briefcase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

2-14047

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW. APPLICABLE RATES MAY BE OBTAINED FROM THE RATING DEPARTMENT UNDER SECTION 2305 OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Shearman & Sterling**
*Jeremy G. Epstein (212)848-4169 / Steven F. Molo (212)848-7456 / Brian H. Polovoy (212)848-4703 / Stuart J. Baskin (212)848-4974*
599 Lexington Avenue, New York, NY 10022 (212)848-8000
Class Action Approved

**Sidley Austin Brown & Wood, LLP**
*Theodore N. Miller (213)896-6646 / Barry W. Rashkover / Steven M. Bierman / Robert Pietrzak*
787 Seventh Avenue, New York, NY 10019 (212)839-5300
Class Action Approved

**Simpson Thacher & Bartlett**
*Bruce D. Angiolillo / Michael J. Chepiga / Paul C. Curnin / Roy L. Reardon*
425 Lexington Avenue, New York, NY 10017 (212)455-2000
Class Action Approved

**Skadden, Arps, Slate, Meagher & Flom, LLP and Affiliates**
*Jonathan J. Lerner*
Four Times Square, New York, NY 10036 (212)735-2550
Class Action Approved

**Stroock & Stroock & Lavan, LLP**
*Laurence Greenwald / Melvin A. Brosterman / Robert Lewin*
180 Maiden Lane, New York, NY 10038 (212)806-5400
Class Action Approved

**Sullivan & Cromwell**
*D. Stuart Meiklejohn / Gandolfo V. DiBlasi / John L. Hardiman / John L. Warden / Philip L. Graham, Jr. / Richard H. Klapper*
125 Broad Street, New York, NY 10004-2498 (212)558-4000
Class Action Approved

**Wachtell, Lipton, Rosen & Katz**
*Paul Vizcarrondo (212)403-1208 / Ted Mirvis*
51 W. 52nd Street, 29th Floor, New York, NY 10019 (212)403-1000
Class Action Approved

**Weil, Gotshal & Manges, LLP**
*Greg A. Danilow / Irwin H. Warren / Joseph Allerhand / Jonathan D. Polkes (212)310-8881*
767 Fifth Avenue, New York, NY 10153 (212)310-8000
Class Action Approved

**Willkie Farr & Gallagher**
*Michael R. Young / Richard L. Posen / Stephen W. Greiner*
787 Seventh Avenue, New York, NY 10019-6099 (212)728-8000
Class Action Approved

**WilmerHale**
*Peter Vigeland / Robert B. McCaw*
520 Madison Ave., New York, NY 10022 (212)230-8800
Class Action Approved

Revised (4/08)

Page 13

Please visit our website at www.briefcase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

2-14047

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

## OHIO

**Jones, Day, Reavis & Pogue**
*John M. Newman, Jr. / John W. Edwards, II*
North Point, 901 Lakeside Avenue, Cleveland, OH 44114 (216)586-3939
Class Action Approved

## OREGON

**Davis Wright Tremaine**
*John F. McGrory*
2300 First Interstate Tower, 1300 S.W. Fifth Avenue, Portland, OR 97201 (503)241-2300
Class Action Approved

**Foster Pepper & Shefelman**
*Tim J. Filer / Roger D. Mellem*
101 S.W. Main Street, 15th Floor, Portland, OR 97204-3223 (503)221-0607
Class Action Approved

**Lane Powell Spears Lubersky, LLP**
*Milo Petranovich / Robert E. Maloney*
601 S.W. Second Avenue, Suite 2100, Portland, OR 97204 (503)778-2100
Class Action Approved

**Stoel Rives, LLP**
*Lois O. Rosenbaum*
900 SW 5th Avenue, Suite 2600, Portland, OR 97204 (503)224-3380
Class Action Approved

## PENNSYLVANIA

**Blank Rome, LLP**
*Ian M. Comisky / Alan J. Hoffman*
One Logan Square, Philadelphia, PA 19103 (215)569-5500
Class Action Approved

**Buchanan Ingersoll & Rooney, PC**
*John R. Leathers*
One Oxford Centre, 20th Floor, 301 Grant Street, Pittsburgh, PA 15219-8800 (412)562-8800
Class Action Approved

**Dechert, LLP**
*Jeffrey G. Weil (215)994-2538 / Seymour Kurland (215)994-2235*
4000 Bell Atlantic Tower, 1717 Arch Street, Philadelphia, PA 19103-2793 (215)994-4000
Class Action Approved

**Morgan, Lewis & Bockius, LLP**
*Marc Sonnenfeld (215)963-5572*
1701 Market Street, Philadelphia, PA 19103-2921 (215)963-5000
Class Action Approved

Revised (4/08)

Page 14

Please visit our website at www.briefbase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

**2-14047**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE ... OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**Pepper Hamilton, LLP**
*Barbara W. Mather / Jon A. Baughman / Laurence Z. Shiekman (215)981-4347 / M. Duncan*
*Grant / Robert L. Hickok (215)981-4583 / Thomas E. Zemaitis*
3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, PA 19103-2799
(215)981-4000
Class Action Approved

**Wolf, Block, Schorr and Solis-Cohen, LLP**
*Jerome J. Shestack / M. Norman Goldberger / Mark L. Alderman*
1650 Arch Street, 22nd Floor, Philadelphia, PA 19103-2097 (215)977-2058
Class Action Approved

## TEXAS

**Akin, Gump, Strauss, Hauer & Feld, LLP**
*Paul R. Bessette (512)499-6250 / Edward S. Koppman / Orrin L. Harrison, III*
1700 Pacific Avenue, Suite 4100, Dallas, TX 75201 (214)969-2800
Class Action Approved

*Paul R. Bessette (512)499-6250*
1111 Louisiana Street, 44th Floor, Houston, TX 77002-5200 (713)220-5800

**Beirne, Maynard & Parsons, LLP**
*Jeffrey R. Parsons (713)960-7302*
1300 Post Oak Boulevard, Suite 2500, Houston, TX 77056-3000 (713)623-0887
Class Action Approved

**Carrington, Coleman, Sloman & Blumenthal, LLP**
*Fletcher L. Yarbrough / Bruce W. Collins / Tim Gavin / Todd Murray*
901 Main Street, Suite 5500, Dallas, TX 75202 (214)855-3000
Class Action Approved

**Fulbright & Jaworski, LLP**
*Frank G. Jones / Robert S. Harrell / Gerard G. Pecht*
1301 McKinney, Suite 5100, Houston, TX 77010 (713)651-5151
Class Action Approved

*Karl G. Dial / Michael A. Swartzendruber*
2200 Ross Avenue, Suite 2800, Dallas, TX 75201 (214)855-8000
Class Action Approved

**King & Spalding**
*Mark K. Glasser*
1100 Louisiana, Suite 4000, Houston, TX 77002 (713)751-3212
Class Action Approved

**Thompson & Knight, LLP**
*Timothy R. McCormick*
1700 Pacific Avenue, Suite 3300, Dallas, TX 75201 (214)969-1103
Class Action Approved

*Timothy R. McCormick*
98 San Jacinto Boulevard, Suite 1200, Austin, TX 78701 (512)469-6100
Class Action Approved

Revised (4/08)

Page 55

Please visit our website at www.briefbase.com to view additional firms that may have been
added to the panel counsel list since this policy was issued.

**2-14047**

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST
MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

*Timothy R. McCormick*
**333 Clay Street, Suite 3300, Houston, TX 77002 (713)654-8111**
**Class Action Approved**

*Timothy R. McCormick*
**Burnett Plaza, Suite 1600, 801 Cherry Street, Unit #1, Fort Worth, TX 76102-6881**
**(817)347-1700**
**Class Action Approved**

**Vinson & Elkins, LLP**
*Walter B. Stuart / N. Scott Fletcher*
**First City Tower, 1001 Fannin St., Suite 2300, Houston, TX 77002-6760 (713)758-2222**
**Class Action Approved**

**Weil, Gotshal & Manges, LLP**
*Ralph I. Miller*
**100 Crescent Court, Dallas, TX 75201 (214)746-7700**
**Class Action Approved**

*Ralph I. Miller*
**700 Louisiana, Suite 1600, Houston, TX 77002 (713)546-5000**
**Class Action Approved**

## VIRGINIA

**Cooley Godward Kronish, LLP**
*Robert R. Vieth, Partner / Michael Klisch*
**One Freedom Square, Reston Town Ctr., 11951 Freedom Dr., Reston, VA 20190-5656**
**(703)456-8000**
**Class Action Approved**

**Greenberg Traurig, LLP**
*John Scalia (703)749-1300*
**1750 Tysons Boulevard, 12th Fl., Tysons Corner, VA 22102 (703)749-1300**
**Class Action Approved**

**Latham & Watkins**
*Laurie B. Smilan (703)456-5220 / Michele E. Rose (703)456-5225 / Christian Word (703)456-5226*
**Two Freedom Square, 11955 Freedom Drive, Suite 500, Reston, VA 20190-5651 (703)456-1000**
**Class Action Approved**

**McGuireWoods, LLP**
*Stephen D. Busch (804)775-4378*
**One James Center, 901 East Cary Street, Richmond, VA 23219 (804)775-1000**
**Class Action Approved**

*Stephen D. Busch (804)775-4378 / Charles McIntyre*
**1750 Tysons Boulevard, Suite 1800, McLean, VA 22102 (703)712-5000**
**Class Action Approved**

**WilmerHale**
*Andrew Weissman (202)663-6612 / John Valentine (202)6    6131*
**1600 Tysons Boulevard, 10th Floor, Tysons Corner, VA 22102 (703)251-9700**
**Class Action Approved**

**Revised (4/08)**

Page 16

**Please visit our website at www.briefbase.com to view additional firms that may have been**
**added to the panel counsel list since this policy was issued.**

**2-14047**

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

**Wilson, Sonsini, Goodrich & Rosati**
*Trevor Chaplick (703)734-3100*
2 Fountain Square, Reston Town Ct., 11921 Freedom Drive, Suite 600, Reston, VA 20190-5634
(703)734-3100
Class Action Approved

**WASHINGTON**

**Davis Wright Tremaine**
*Stephen M. Rummage / Ladd B. Leavens*
2600 Century Square, 1501 Fourth Avenue, Seattle, WA 98101-1688 (206)622-3150
Class Action Approved

**DLA Piper Rudnick Gray Cary US, LLP**
*Stellman Keehnel*
701 Fifth Avenue, Suite 7000, Seattle, WA 98104 (206)839-4800
Class Action Approved

**Foster Pepper & Shefelman**
*Tim J. Filer / Roger D. Mellem*
1111 Third Avenue, Suite 3400, Seattle, WA 98101-3299 (206)447-8998
Class Action Approved

**Heller, Ehrman, White & McAuliffe**
*George E. Greer*
701 Fifth Avenue, Suite 6100, Seattle, WA 98104-7098 (206)447-0900
Class Action Approved

**Lane Powell Spears Lubersky, LLP**
*James B. Stoetzer (206)277-9511 / Rudy A. Englund / Larry S. Gangnes / Christopher B. Wells*
1420 Fifth Avenue, Suite 4100, Seattle, WA 98101-2338 (206)223-7000
Class Action Approved

**Perkins Coie, LLP**
*Harry H. Schneider, Jr. / Ronald L. Berenstain*
1201 Third Avenue, Ste. 4800, Seattle, WA 98101-3099 (206)583-8888
Class Action Approved

**Wilson, Sonsini, Goodrich & Rosati**
*Barry M. Kaplan*
701 Fifth Avenue, Suite 5100, Seattle, WA 98104 (206)883-2500
Class Action Approved

Revised (4/08)

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE

Page 57

Please visit our website at www.briefbase.com to view additional firms that may have been added to the panel counsel list since this policy was issued.

REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**APPENDIX B**

## I. DEFINITIONS

(a)  "**Crisis**" means:

    (1)  a **Delisting Crisis**; or

    (2)  one of the following events which, in the good faith opinion of the Chief Financial Officer of an **Organization** did cause or is reasonably likely to cause a "**Material Effect on an Organization's Common Stock Price**":

        (i)  *Negative earning or sales announcement*

        The public announcement of an **Organization's** past or future earnings or sales, which is substantially less favorable than any of the following: (i) an **Organization's** prior year's earnings or sales for the same period; (ii) an **Organization's** prior public statements or projections regarding earnings or sales for such period; or (iii) an outside securities analyst's published estimate of an **Organization's** earnings or sales.

        (ii)  *Loss of a patent, trademark or copyright or major customer or contract*

        The public announcement of an unforeseen loss of: (i) an **Organization's** intellectual property rights for a patent, trademark or copyright, other than by expiration; (ii) a major customer or client of an **Organization**; or (iii) a major contract with an **Organization**.

        (iii)  *Product recall or delay*

        The public announcement of the recall of a major product of an **Organization** or the unforeseen delay in the production of a major product of an **Organization**.

        (iv)  *Mass tort*

        The public announcement or accusation that an **Organization** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof.

        (v)  *Employee layoffs or loss of key executive officer(s)*

        The public announcement of layoffs of **Employees** of an **Organization**. The death or resignation of one or more key **Executives** of the **Named Entity**.

        (vi)  *Elimination or suspension of dividend*

        The public announcement of the elimination or suspension of a regularly scheduled dividend previously being paid by an **Organization**.

        (vii)  *Write-off of assets*

        The public announcement that an **Organization** intends to write off a material amount of its assets.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

    **(viii)**   *Debt restructuring or default*

        The public announcement that an **Organization** has defaulted or intends to default on its debt or intends to engage in a debt restructuring.

    **(ix)**   *Bankruptcy*

        The public announcement that an **Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of an **Organization**; or that bankruptcy proceedings are imminent, whether voluntary or involuntary.

    **(x)**   *Governmental or regulatory litigation*

        The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against an **Organization**.

    **(xi)**   *Unsolicited takeover bid*

        An unsolicited written offer or bid by any person or entity other than an **Insured** or any affiliate of any **Insured**, whether publicly announced or privately made to an **Executive** of an **Organization**, to effect a **Transaction** (as defined in Clause 12(a) of the policy) of the **Named Entity**.

A **Crisis** shall first commence when an **Organization** or any of its **Executives** shall first become aware of such **Crisis**. A **Crisis** shall conclude once a **Crisis Firm** advises an **Organization** that such **Crisis** no longer exists or when the **CrisisFund**[SM] has been exhausted.

**(b)**   "**Crisis Firm**" means any public relations firm, crisis management firm or law firm as listed in section III of this Appendix B. Any "**Crisis Firm**" may be hired by an **Organization** to perform **Crisis Services** without further approval by the **Insurer**.

**(c)**   "**Crisis Loss**" means the following amounts incurred during the pendency of a **Crisis** for which an **Organization** is legally liable:

    **(1)**   the reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Services** for an **Organization**;

    **(2)**   the reasonable and necessary fees and expenses incurred in the printing, advertising or mailing of materials; and

    **(3)**   travel costs incurred by **Executives**, employees or agents of an **Organization** or of the **Crisis Firm**, arising from or in connection with the **Crisis**.

**(d)**   "**Crisis Services**" means those services performed by a **Crisis Firm** in advising an **Insured** or any **Employee** of an **Organization** on minimizing potential harm to an **Organization** from the **Crisis** (including but not limited to maintaining and restoring investor confidence in an **Organization**), and solely with respect to **Delisting Crisis Loss**, any legal services performed by a **Crisis Firm** in responding to a **Delisting Crisis**.

APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

(e) **"Delisting Crisis"** means written notice to an **Organization** that such **Organization's** securities will be or have been delisted from an **Exchange.**

(f) **"Exchange"** means NASDAQ, the American Stock Exchange, the New York Stock Exchange and the Singapore Exchange.

(g) **"Material Effect on an Organization's Common Stock Price"** means, within a period of 24 hours, that the price per share of an **Organization's** common stock shall decrease by the greater of $2.00, or 15% net of the percentage change in the Standard & Poor's Composite Index.

## II.   EXCLUSIONS

The term **Crisis** shall not include any event relating to:

(i) any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(ii) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, the foregoing shall not apply if the policy contains any provision or endorsement modifying or deleting, in part or in whole, exclusion (k) of the policy; or

(iii) the hazardous properties of nuclear materials; provided, however, the foregoing shall not apply to any **Crisis** arising from the ownership of, operation of, construction of, management of, planning of, maintenance of or investment in any nuclear facility.

## III.   PRE-APPROVED CRISIS FIRMS

(a) For all **Crisis** (including a **Delisting Crisis**), **Crisis Firm(s)** means any public relations firm listed in (1) – (7) below:

(1) ABERNATHY MACGREGOR SCANLON
501 Madison Avenue
New York, NY 10022
(212) 371-5999
Contact: James T. M ac Gregor

(2) BURSON-MARSTELLER
230 Park Avenue South
New York, NY 10003-1566
(212) 614-5236
Contact: Michael Claes

(3) PATTON BOGGS, LLP
2550 M Street, N.W.
Washington, D.C., 20037
(202) 457-6000
Contact: Thomas H. Boggs

(4) KEKST AND COMPANY
437 Madison Avenue
New York, NY 10022
(212) 593-2655
Contact: Andrew Baer

(5) ROBINSON LERER & MONTGOMERY
75 Rockefeller Plaza, 6 th floor
New York, NY 10019
(212) 484-7721
Contact: Michael Gross

(6) SARD VERBINNEN & CO.
630 Third Avenue
New York, NY 10017
(212) 687-8080
Contact: Paul Verbinnen or George Sard

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

75013 (2/00)

(7) **SITRICK & COMPANY**
2029 Century Park East
Suite 1750
Los Angeles, CA 90067
(310) 788–2850
Contact: Michael Sitrick

(b) Solely for **Delisting Crisis, "Crisis Firm(s)"** shall also include any **Panel Counsel Firm** (as defined in Clause 9) approved to handle **Securities Claims**.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

75013 (2/00)

4

### ENDORSEMENT# *1*

This endorsement, effective *12:01 am     April 16, 2008*     forms a part of policy number   *443-37-08*
issued to *PFIZER INC.*

by   *Illinois National Insurance Company*

### NEW YORK AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Named Corporation, Named Organization, Named Sponsor, Named Insured, Named Entity or Insured stated in the declarations page;

The policy is hereby amended as follows:

I.    The Cancellation and When We Do Not Renew provisions are deleted and replaced by the following:

(a)   CANCELLATION BY THE INSURED

This policy may be cancelled by the Insured by surrender of this policy to the Insurer or by giving written notice to the Insurer stating when thereafter such cancellation shall be effective. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

(b)   CANCELLATION, NONRENEWAL AND CONDITIONAL RENEWAL BY THE INSURER

(i)    If this policy has been in effect for sixty (60) or fewer days when cancellation notice is mailed, and this policy is not a renewal of a policy issued by the Insurer, then this policy may be cancelled by the Insurer by mailing or delivering to the Insured, and to his authorized insurance agent or broker, written notice stating when not less than twenty (20) days thereafter (fifteen (15) days thereafter if cancellation is because of one of the reasons for cancellation set forth in subsection (ii) below) the cancellation shall be effective. Notice of cancellation issued by the Insurer shall specify the grounds for cancellation.

(ii)   If this policy has been in effect for more than sixty (60) days when notice of cancellation is mailed, or if this policy is a renewal of a policy issued by the Insurer, then this policy may be cancelled by the Insurer by mailing or delivering to the Insured, and to his authorized insurance agent or broker, written notice stating when not less than fifteen (15) days thereafter the cancellation shall be effective; however, such cancellation must be based on one or more of the following:

(A)   nonpayment of premium, provided, however, that a notice of cancellation on this ground shall inform the first Named Insured of the amount due;

(B)   conviction of a crime arising out of acts increasing the hazard insured against;

(C)   discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim thereunder;

(D)   after issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current Policy Period;

NOTICE: THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. FORMS AND RATES EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAWS AND REGULATIONS.

**END 001**

**2-14047**

69898 (9/06)

**ENDORSEMENT# _1_   (continued)**

(E)   material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

(F)   required pursuant to a determination by the New York Superintendent of Insurance that continuation of the present premium volume of the Insurer would jeopardize the Insurer's solvency or be hazardous to the interests of Insureds of the Insurer, its creditors or the public;

(G)   a determination by the New York Superintendent of Insurance that the continuation of the policy would violate, or would place the Insurer in violation of, any provision of the New York Insurance Law;

(H)   revocation or suspension of an Insured's license to practice his profession; or

(I)   where the Insurer has reason to believe that there is a probable risk or danger that the Insured will destroy or permit the destruction of the insured property for the purpose of collecting the insurance proceeds, provided, however, that:

(1)   a notice of cancellation on this ground shall inform the Insured in plain language that the Insured must act within ten days if review by the department of the ground for cancellation is desired pursuant to item (3) of this subparagraph (I);

(2)   notice of cancellation on this ground shall be provided simultaneously by the Insurer to the department; and

(3)   upon written request of the Insured made to the department within ten days from the Insured's receipt of notice of cancellation on this ground, the department shall undertake a review of the ground for cancellation to determine whether or not the Insurer has satisfied the criteria for cancellation specified in this subparagraph; if after such review the department finds no sufficient cause for cancellation on this ground, the notice of cancellation on this ground shall be deemed null and void.

Notice of cancellation by the Insurer shall specify the grounds for cancellation.

(iii)

(A)   The Insurer shall mail to the Insured, and to his authorized insurance agent or broker, written notice indicating the Insurer's intention:

(1)   not to renew this policy;

(2)   to condition its renewal upon change of limits, change in type of coverage, reduction of coverage, increased deductible or addition of exclusions or upon increased premiums in excess of ten percent; (exclusive of any premium increase generated as a result of increased exposure units or as a result of experience rating, loss rating, or audit);

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAWS AND REGULATIONS.

**_2-14047_**

69898 (9/06)

END 001

Page 2 of 4

**ENDORSEMENT#** *1* (continued)

> (3) that the policy will not be renewed or will not be renewed upon the same terms, conditions or rates; such alternative renewal notice must be mailed or delivered on a timely basis and advise the Insured that a second notice shall be mailed at a later date indicating the Insurer's intention as specified in subparagraph (1) or (2) of this paragraph (A) and that coverage shall continue on the same terms, conditions and rates as expiring, until the later of the expiration date or sixty (60) days after the second notice is mailed or delivered; such alternative renewal notice also shall advise the insured of the availability of loss information and, upon written request, the request, the insurer shall furnish such loss information within ten (10) days to the insured.

(B) A nonrenewal notice as specified in subparagraph (1), a conditional renewal notice as specified in subparagraph (2), and the second notice described in subparagraph (3) of paragraph (A) of this subsection (iii) shall contain the specific reason or reasons for nonrenewal or conditional renewal, and set forth the amount of any premium increase and nature of any other proposed changes.

(C) The notice required by paragraph (A) of this subsection (iii) shall be mailed at least sixty (60) but not more than one hundred twenty (120) days in advance of the end of the Policy Period.

(D)

> (1) If the Insurer employs an alternative renewal notice as authorized by subparagraph (3) of paragraph (A) of this subsection (iii), the Insurer shall provide coverage on the same terms, conditions, and rates as the expiring policy, until the later of the expiration date or sixty (60) days after the mailing of the second notice described in such subparagraph.

> (2) Prior to the expiration date of the policy, in the event that an incomplete or late conditional renewal notice or a late nonrenewal notice is provided by the Insurer, the Policy Period shall be extended, at the same terms and conditions as the expiring policy, except that the annual aggregate limit of the expiring policy shall be increased in proportion to the policy extension, and at the lower of the current rates or the prior period's rates, until sixty (60) days after such notice is mailed, unless the Insured elects to cancel sooner.

> (3) In the event that a late conditional renewal notice or a late nonrenewal notice is provided by the insurer on or after the expiration date of the policy, coverage shall remain in effect on the same terms and conditions of the expiring policy for another required policy period, and at the lower of the current rates or the prior period's rates unless the insured during the additional required policy period has replaced the coverage or elects to cancel, in which event such cancellation shall be on a pro rata premium basis.

(iv) Nothing herein shall be construed to limit the grounds for which the Insurer may lawfully rescind this policy or decline to pay a claim under this policy.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAWS AND REGULATIONS.

**END 001**

**2-14047**

69898 (9/06)

**ENDORSEMENT#** *1*    (continued)

(v)   Notice required herein to be mailed to the Insured shall be mailed to the Insured at the address shown in Item 1 of the Declarations.

Notice required herein to be mailed by the Insurer shall be sent by registered, certified or other first class mail. Delivery of written notice shall be equivalent to mailing.

Proof of mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period shall terminate at the effective date and hour of cancellation or nonrenewal specified in such notice.

(vi)   If this policy shall be cancelled by the Insured, the Insurer shall retain the customary short rate proportion of the premium hereon.

If this policy shall be cancelled by the Insurer, the Insurer shall retain the pro rata proportion of the premium hereon.

Payment or tender of any unearned premium by the Insurer shall not be a condition of cancellation, but such payment shall be made as soon as practicable.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

NOTICE:   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 001

Page 4 of 4

*2-14047*

69898 (9/06)

## ENDORSEMENT# *2*

This endorsement, effective *12:01 am*     *April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to *PFIZER INC.*

by     *Illinois National Insurance Company*

### NEW YORK CLAIMS–MADE AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", or "Insured", means the Named Corporation, Named Organization, Named Sponsor, Named Insured, First Named Insured, Insured's Representative, Insured or equivalent term stated in Item 1 of the Declarations Page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, it is hereby understood and agreed that except as otherwise indicated, a Claim will be deemed "first made" for the purposes of this policy when the Insurer receives written notice of the Claim or suit from the Insured, an Other Insured(s) or a third party. A Claim will be also deemed "reported" to the Insurer on the date notice that it is so received. Claims reported to the Insurer alleging the same or related Wrongful Acts shall be considered reported to the Insurer at the time and during the policy period when the first such Claim was reported.

Accordingly, except as indicated below and subject to the policy's other terms and conditions, this policy shall provide coverage for Claims for which notice is first received by the Insurer during the Policy Period (or the Discovery Period, if applicable) even if such Claim was filed against, sent to or delivered to, or received by the Insured or an Other Insured(s) prior to the inception date of this policy. This policy shall not provide coverage for Claims for which notice is first received by the Insurer prior to the inception date of the policy or subsequent to the expiration date of the policy (or the Discovery Period, if applicable.)

Notwithstanding the above, in the event a Claim is filed against, sent or delivered to, or received by the Insured or an Other Insured(s) prior to the inception date of this policy but notice of which is not received by the Insurer until after the inception date of this policy (and prior to the expiration date of the policy or the Discovery Period, if applicable), coverage under this policy shall only apply (subject to the policy's other terms and conditions) only as follows:

(a)    If at the time the Claim was filed against, sent or delivered to, or received by the Insured or an Other Insured(s), there was in existence at that time a valid and collectible management liability policy, providing substantially similar coverage as is provided by this policy, issued to the Insured by the Insurer (or by any other member company of American International Group, Inc.) of which this policy is a renewal (hereinafter referred to as the "Former Policy"), then

(b)    Coverage shall be afforded under this policy in an amount not greater than the amount of coverage which would have been provided for the Claim under the Former Policy if notice of the Claim had been received by the Insurer during the policy period of such Former Policy. The foregoing sentence may result in (but not be limited to): (1) reducing the limit of liability available for such a

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.   HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END.002**

**ENDORSEMENT# *2*** (continued)

Claim to the available limit of liability applicable to the Former Policy; (2) increasing the applicable retention amount to that retention amount applicable to the Former Policy; or (3) reducing or eliminating coverage due to exclusions or other restrictions appearing in the Former Policy but eliminated, in part or in whole, in this policy. No coverage shall be afforded under this endorsement if there was not in existence a Former Policy at the time the Claim was filed against, sent or delivered to, or received by the Insured or an Other Insured(s).

Nothing in this endorsement shall be construed to provide coverage for Claims notice of which is not received by the Insurer during the Policy Period of this policy (or the Discovery Period, if applicable). Further, the Insured or the Other Insured(s) shall, as a condition precedent to the obligations of the Insurer under this endorsement, give written notice to the Insurer as soon as practicable after receiving a Claim or becoming aware that a Claim has been filed against or sent or delivered to the Insured or an Other Insured(s).

Nothing in this endorsement shall be construed to limit the rights of the Insurer under the clause in the policy entitled, DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (or any other clause bearing a similar title and addressing the same issues), as respects the defense and settlement of a Claim.

Nothing in this endorsement shall be construed to provide coverage for a Claim under the Former Policy, nor shall this endorsement ever result in providing coverage under this policy for Loss for which coverage is in fact provided (or would be provided but for the exhaustion of the limit of liability) under the Former Policy.

The Insurer's limit of liability for Claims as described in this endorsement shall be part of and not in addition to the Limit of Liability stated on the Declarations page of this policy for all Claims under this policy and nothing in this endorsement shall be construed to increase the Insurer's limit of liability as therein stated.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN UNCHANGED.**

AUTHORIZED REPRESENTATIVE

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAWS AND REGULATIONS.

END 002

*2-14047*

75027 (03/00)

## ENDORSEMENT# *3*

This endorsement, effective *12:01 am     April 16, 2008*              forms a part of
policy number    *443-37-08*
issued to *PFIZER INC.*

by     *Illinois National Insurance Company*

### NEW YORK AMENDATORY ENDORSEMENT – DISCOVERY CLAUSE

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", or "Insured", means the Named Corporation, Named Organization, Named Sponsor, Named Insured, First Named Insured, Insured's Representative, Insured or equivalent term stated in Item 1 of the Declarations Page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy. 4) "Discovery Period" or "Extended Reporting Period" means both the Automatic Discovery Period and the Optional Discovery Period described in this endorsement.

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

I.

The policy Clause labeled "DISCOVERY PERIOD," or "EXTENDED REPORTING PERIOD," to the extent applicable, is amended as follows:

Solely in regard to this endorsement the following definitions shall apply:

1)     "Termination of Coverage" means: (1) cancellation or non-renewal of this policy by the Insurer or the Insured; or (2) decrease in the limit of liability, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the Insureds.

2)     "Public Entity" means a Public Entity as defined in section 107(a)(51) of the New York Insurance Law.

Upon Termination of Coverage afforded by this policy, and only to the extent coverage is terminated, the Insured shall have the right to an Automatic Discovery Period or an Optional Discovery Period as follows:

1)     AUTOMATIC DISCOVERY PERIOD

There shall be a period of sixty (60) days (ninety (90) days if the Insured is a Public Entity) following the effective date of such Termination of Coverage (herein referred to as the Automatic Discovery Period) in which to give written notice to the Insurer of a Claims first made against the Insureds during said sixty (60) (or ninety (90) day) period for any Wrongful Act occurring prior to such Termination of Coverage and otherwise covered by this policy. The Automatic Discovery Period shall be void ab initio if the Optional Discovery Period becomes effective.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

75030 (7/02)

**END 003**
Page 1 of 3

**ENDORSEMENT#** *3*   (continued)

2)   **OPTIONAL DISCOVERY PERIOD**

The Insured shall have the right, upon payment of the required additional premium, less any return premium owed because of Termination of Coverage, plus any premium for the Policy Period which is owed and not yet paid, to a period of one year following the effective date of Termination of Coverage (herein referred to as the Optional Discovery Period) in which to give written notice to the Insurer of Claims first made against the Insured during said one year period for any Wrongful Act occurring prior to such Termination of Coverage and otherwise covered by this policy.

The right to an Optional Discovery Period shall terminate, however, unless written notice of such election together with payment of the required additional premium due, less any return premium owed because of cancellation of this policy, plus any premium for the Policy Period which is owed and not yet paid, is received by the Insurer not later than the later of: (1) sixty (60) days after the effective date of Termination of Coverage; or (2) thirty (30) days after the Insurer has mailed or delivered to the Insured a written advice of the amount of the required additional premium, if the Insurer is obligated to give such written advice.

The required additional premium for the one year Optional Discovery Period shall be the lesser of the amount stated in the policy or *200* % of the "Full Annual Premium". Full Annual Premium means the premium level in effect immediately prior to the end of the Policy Period.

Not later than thirty (30) days after the effective date of Termination of Coverage, the Insurer shall mail or deliver to the Insured a written advice of the amount of the required additional premium; however, if this policy is canceled by the Insurer due to non-payment of premium or fraud on the part of any Insureds, the Insurer shall not be required to provide such a premium quotation unless requested by the Insured.

If coverage is terminated by the Insurer because of non-payment of premium or fraud, and at the effective date of such Termination of Coverage the Insurer has provided this insurance to the Company and the Insureds on a claims-made basis without interruption for less than one year, there shall be no right to elect and purchase an Optional Discovery Period. For purposes of this paragraph, Discovery Period coverage shall not be considered as time when the Insurer was providing this coverage.

Any Other Insured(s) shall have the right to purchase the Optional Discovery Period to the extent of Termination of Coverage as respects only himself, if: (i) the Insured has been placed in liquidation or bankruptcy or permanently ceases operations; and (ii) the Insured or designated trustee does not purchase the Optional Discovery Period; and (iii) within one hundred twenty (120) days of the Termination of Coverage the Insurer has received from such Other Insured a written request for such Optional Discovery Period coverage. If such Other Insured does not pay the required additional premium when due, then such Optional Discovery Period shall be void ab initio.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END-003

**2-14047**

75030 (7/02)

ENDORSEMENT# *3* (continued)

3)  **OTHER PROVISIONS**

The additional premium for the Discovery Period or Optional Discovery Period shall be fully earned at the inception of the Discovery Period or Optional Discovery Period. The Discovery Period or Optional Discovery Period is not cancelable except for non-payment of premium. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

**II.**

The following provisions are hereby added to the policy:

- **NOTICE TO AGENT**: Notice given by or on behalf of the Insured, or written notice by or on behalf of the injured party or any other claimant, to any licensed agent of the Insurer in the state of New York, with particulars sufficient to identify the Insured, shall be deemed notice to the Insurer.

- **INSOLVENCY/BANKRUPTCY OF INSURED**: The insolvency or bankruptcy of the Insured shall not relieve the Insurer of its obligations under this Policy as long as all Policy requirements are met by Insured, its trustee or receiver in bankruptcy. Should a judgement be rendered against an insolvent or bankrupt Insured, the Insurer shall be liable for the amount of such judgement not to exceed the applicable limit of liability under this Policy.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN UNCHANGED.**

AUTHORIZED REPRESENTATIVE

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 003**

*2-14047*

75030 (7/02)

Page 3 of 3

**ENDORSEMENT# 4**

This endorsement, effective *12:01 am    April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

### STATE AMENDATORY INCONSISTENT

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.      In the event that there is an inconsistency between any: (a) state amendatory
attached to this policy, or any other wording attached to this policy to comply with
applicable law; and (b) any other term, condition or limitation of this policy; then, to
the extent permitted by law, subject to the limitations below, the Insurer will
resolve the inconsistency by applying the terms, conditions or limitations that are
more favorable to the policyholder.

2.      This endorsement shall not apply to the extent that: (a) any state amendatory or
other wording expressly limits coverage in order to comply with applicable law, or
(b) any such amendatory or other compliance wording amends language applicable
to premium. In such events, the state amendatory or other compliance wording will
govern over any other term, condition or limitation of the policy.

3.      "Policyholder" means the first Named Entity, Named Organization, Named
Corporation, Named Sponsor, Named Insured or other policyholder designated in
Item 1 of the Declarations of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

*2-14047*

END 4

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 5**

This endorsement, effective *12:01 am*     *April 16, 2008*         forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### DISCOVERY CLAUSE AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby amended to the extent necessary for the policy to provide the following:

Clause 10. DISCOVERY CLAUSE is hereby deleted in its entirety and replaced with the following:

## 10. DISCOVERY CLAUSE

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right upon payment of an **Additional Premium** of 150% of the **Full Annual Premium**, to a period of one year following the effective date of such cancellation or nonrenewal (the "**Discovery Period**"), in which to give to the **Insurer** written notice pursuant to Clause 7(a) and 7(c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which an **Organization** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

In the event of a **Transaction** as defined in Clause 12(a), the **Named Entity** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period** together with any additional premium due is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*2-14047*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

END 5

**ENDORSEMENT# 6**

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with: (i) any **Claim(s)**, notices, events, investigations or actions referred to in any of item (1) below; (hereinafter " **Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)** ; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Breach of Fiduciary Duty**, **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way related, directly or indirectly, to any **Event(s)**:

    (1)    Robert L. Garber v. Pharmacia

           (hereinafter the " **Events**")

It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to a related **Breach of Fiduciary Duty** or related **Wrongful Act** alleged in any of the item (1) above, regardless of whether or not such **Claim** involved the same or different **Insureds**, the same or different legal causes of action, or the same or different claimants, or is brought in the same or different venue, or resolved in the same or different forum.

ALL OTHER TERMS, CONDITIONS AND EXCLUSION REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 6**

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 7

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

### SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
**Insurer** shall not be liable for any **Loss** in connection with: (i) any **Claim(s)**, notices, events,
investigations or actions referred to in any of Items (1) through (16) below; (hereinafter "
**Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense
of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Breach of
Fiduciary Duty**, **Wrongful Act**, underlying facts, circumstances, acts or omissions related,
directly or indirectly, to any **Event(s)**:

### EVENTS

(1)     Sheldon Miller P.C. Defined Benefit Plan dated November 1, 2002 v. Pfizer
Inc., et al., No. ÝTBD˝, filed in the United States District Court for the
Southern District of New York;

(2)     L. Norman Showers v. Pfizer Inc., et al., No. 04-CV-09866, filed in the
United States District Court for the Southern District of New York;

(3)     Philip Morabito v. Pfizer Inc., et al., No. 04-CV-09967, filed in the United
States District Court for the Southern District of New York;

(4)     John Haggerty v. Pfizer Inc., et al., No. 04-CV-10001, filed in the United
States District Court for the Southern District of New York;

(5)     Gail Fink v. Pfizer Inc., et al., No. 04-CV-10098, filed in the United States
District Court for the Southern District of New York;

(6)     Barbara Zarowitz v. Henry A. McKinnell, et al., No. 04-CV-10075, filed in
the United States District Court for the Southern District of New York;

(7)     Doris Staehr v. Henry A. McKinnell, et al., No. 04-CV-10096, filed in the
United States District Court for the Southern District of New York;

(8)     Marvin Freeman v. Henry A. McKinnell, et al., No. 04-CV-10085, filed in the
United States District Court for the Southern District of New York;

(9)     Sanford Flinker and Sylvia G. Flinker v. Henry A. McKinnell, et al., No.
04-CV-10141, filed in the United States District Court for the Southern
District of New York;

(10)    Laurence D. Weinberg and Robert D. Steele, as trustees of the trust under
paragraph seven of the will of Abraham Weinberg v. Michael Brown, et al.,
No. 04-CC-4316, filed in the Supreme Court of the State of New York,
County of New York;

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

*2-14047*

END 7

ENDORSEMENT# 7 (Continued)

This endorsement, effective *12:01 am* *April 16, 2008* forms a part of
policy number *443-37-08*
issued to *PFIZER INC.*

by *Illinois National Insurance Company*

(11) James Baker v. Henry A. McKinnell, et al., No. 04-CV-10118, filed in the United States District Court for the Southern District of New York;

(12) Derrick Hawkins v. Pfizer Inc., et al., No. 04-CV-10071, filed in the United States District Court for the Southern District of New York;

(13) Maria Van Gelder v. Pfizer Inc., et al., No. 04-06210-DRD, filed in the United States District Court for the District of New Jersey;

(14) Arkansas Carpenters Pension Fund v. Henry A. McKinnell, et al., No. 04-CV-10257, filed in the United States District Court for the Southern District of New York;

(15) Harry M. Hoffman v. Pfizer Inc., et al., No. ÝTBD¨, filed in the United States District Court for the District of Connecticut.

(16) Uniformed Sanitation Men's Association Local 831, IBT, et al. v. Pfizer, Inc., et al., filed in the United States District Court, Southern District of New York, (06 CV 14199);

It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** alleging, arising out of, based upon, attributable to or related directly or indirectly to a related **Breach of Fiduciary Duty** or related **Wrongful Act** alleged in any of the Items (1) through (16) above, regardless of whether or not such **Claim(s)** involved the same or different **Insureds**, the same or different legal causes of action, or the same or different claimants, or is brought in the same or different venue, or resolved in the same or different forum.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

END 7

2-14047

## ENDORSEMENT# *8*

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of
policy number   *443-37-08*
issued to *PFIZER INC.*

by    *Illinois National Insurance Company*

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**COVERAGE TERRITORY ENDORSEMENT**

Payment of loss under this policy shall only be made in full compliance with all United
States of America economic or trade sanction laws or regulations, including, but not
limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury
Department's Office of Foreign Assets Control ("OFAC").

AUTHORIZED REPRESENTATIVE

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

END.008
Page 1 of 1

**2-14047**
89644 (7/05)

## ENDORSEMENT# 9

This endorsement, effective *12:01 am     April 16, 2008*          forms a part of
policy number  *443-37-08*
issued to *PFIZER INC.*

by     *Illinois National Insurance Company*

### NEW YORK RETENTION/COINSURANCE ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" mean the insurance company which issued this policy; and 2) "Company", means the Named Corporation, Named Organization, Named Entity, Named Sponsor, Named Insured, First Named Insured, Insured's Representative, Insured or equivalent term stated in Item 1 of the Declarations Page.

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

I.

(1)     The Retention section of the Declarations and the Retention Clause of the policy are hereby amended to include the following additional Retention amounts in accordance with the New York Regulation 110. The additional Retention amounts are to be applicable solely to Non-Indemnifiable Loss.

### ADDITIONAL RETENTION AMOUNTS

(a)     $[see chart below]              subject to the aggregate listed in item (b) below

(natural person Insured's retention)

(b)     $[see chart below]              for all Non-Indemnifiable Loss arising from
                                        Claims

(aggregate retention)                   alleging the same Wrongful Act or related
                                        Wrongful Acts.

Each natural person Insured's individual maximum retention amount and the total per Claim aggregate maximum retention amount shall be determined in accordance with the New York Regulation 110 Non-Indemnifiable Loss Retention Chart below on the basis of the total consolidated assets of the Company at the time the Claim was first made against the natural person Insured.

### NEW YORK REGULATION 110 NON-INDEMNIFIABLE LOSS RETENTION CHART

| Corporation's Assets | Natural Person Insured's Retention | Aggregate Retention |
|---|---|---|
| Greater than $20,000,000 | $5,000 | $50,000 |
| Greater than $10,000,000 to $20,000,000 | $4,000 | $40,000 |
| Greater than $5,000,000 to $10,000,000 | $3,000 | $30,000 |
| $5,000,000 or less | $2,000 | $20,000 |
| Not For Profit Entities | $100 | $1,000 |

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAWS AND REGULATIONS.

**2-14047**

76812 (5/06)

END 009

**ENDORSEMENT#** *9*   (continued)

(2)   In accordance with section I.(1) of this endorsement, the Insurer shall only be liable for the amount of Non–Indemnifiable Loss arising from a Claim which is in excess of the applicable Retention amount stated in the Retention Chart above, such Retention amount to be borne by the natural person Insureds and shall remain uninsured.

(3)   The Retention Clause contained in the policy is further amended by the addition of the following provisions:

- As respects the retention applicable to Non–Indemnifiable Loss, in cases where the maximum retention applies, the retention shall then be prorated among the Insureds in proportion to their respective Loss. Notwithstanding the forgoing, in no event shall the retention per natural person Insured for Non–Indemnifiable Loss be less than 75% of the retention amount listed above per natural person Insured in (a).

### II.

The policy is amended to include the following COINSURANCE CLAUSE:

- Solely with regard to Non–Indemnifiable Loss, the Insurer shall be liable to pay the "Regulated Coinsurance Percentage" of the first $1,000,000 of Non–Indemnifiable Loss, and 100% of Non–Indemnifiable Loss excess of the first $1,000,000 of such Loss, (subject to the policies terms, conditions and exclusions) excess of any applicable retention amount, if any, described in the policy, and subject to the Limit of Liability described in the policy. The "Regulated Coinsurance Percentage" will be determined in accordance with the New York Regulation 110 Non–Indemnifiable Loss Coinsurance Chart below on the bases of the total consolidated assets of the Company at the time the Claim was first made against the natural person Insured.

**NEW YORK REGULATION 110 NON–INDEMNIFIABLE LOSS COINSURANCE CHART**

| Corporation's Assets | Regulated Coinsurance Percentage |
| --- | --- |
| Greater than $20,000,000 | 99.5% |
| Greater than $10,000,000 to $20,000,000 | 99.6% |
| Greater than $5,000,000 to $10,000,000 | 99.7% |
| $5,000,000 or less | 99.8% |
| Not For Profit Entities | 99.9% |

### III.

Solely for the purposes of this endorsement the term "Non–Indemnifiable Loss" means Loss for which the Company has not indemnified nor is permitted or required to indemnify a natural person Insured pursuant to law or contract or the charter, bylaws, operating agreement or similar document of a Company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

76812 (5/06)

END-009

**ENDORSEMENT# *10***

This endorsement, effective *12:01 am      April 16, 2008*              forms a part of
policy number *443-37-08*
issued to   *PFIZER INC.*

by      *Illinois National Insurance Company*

### NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### WITH EXCEPTION FOR NON-INDEMNIFIABLE LOSS

In consideration of the premium charged, it is hereby understood and agreed that the
**Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim**
made against any **Insured**:

A.      alleging, arising out of, based upon, attributable to, or in any way involving, directly
        or indirectly, the **Hazardous Properties** of **Nuclear Material**, including but not limited
        to:

        (1)     **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or
                on behalf of, the **Organization**, or discharged or dispersed therefrom; or

        (2)     **Nuclear Material** contained in spent fuel or waste which was or is at any
                time possessed, handled, used, processed, stored, transported or disposed of
                by or on behalf of the **Organization**; or

        (3)     the furnishing by an **Insured** or the **Organization** of services, materials, parts
                or equipment in connection with the planning, construction, maintenance,
                operation or use of any **Nuclear Facility**; or

        (4)     **Claims** for damage or other injury to the **Organization** or its shareholders
                which allege, arise from, are based upon, are attributed to or in any way
                involve, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**;

B.      (1)     which is insured under a nuclear energy liability policy issued by Nuclear
                Energy Liability Insurance Association, Mutual Atomic Energy Liability
                underwriters, or Nuclear Insurance Association of Canada, or would be
                insured under any such policy but for its termination or exhaustion of its limit
                of liability; or

        (2)     with respect to which: (a) any person or organization is required to maintain
                financial protection pursuant to the Atomic Energy Act of 1954, or any law
                amendatory thereof, or (b) the **Insured** is, or had this policy not been issued
                would be, entitled to indemnity from the United States of America, or any
                agency thereof, under any agreement entered into by the United States of
                America, or any agency thereof, with any person or organization.

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

*2-14047*

**END 10**

**ENDORSEMENT# *10* (Continued)**

This endorsement, effective *12:01 am     April 16, 2008*           forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

Notwithstanding the foregoing, this exclusion shall not apply to **Non-Indemnifiable Loss**, other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**.

As used in this endorsement:

" **Cleanup Costs** " means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**, **Hazardous Properties** and **Waste**.

" **Hazardous Properties** " include radioactive, toxic or explosive properties.

" **Nuclear facility** " means:

(a)     any nuclear reactor;

(b)     any equipment or device designed or used for
        (1)   separating the isotopes of uranium or plutonium,
        (2)   processing or utilizing spent fuel, or
        (3)   handling, processing or packaging wastes;

(c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

" **Nuclear Material** " means source material, special nuclear material or byproduct material.

" **Nuclear Reactor** " means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

" **Source Material,** "   " **Special Nuclear Material,** " and   " **Byproduct Material** " have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 10

**ENDORSEMENT#** *10* **(Cor   ued)**

This endorsement, effective *12:01 am     April 16, 2008*                   forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by      *Illinois National Insurance Company*

" **Spent Fuel**" means any fuel element  or fuel component,  solid or  liquid, which has  been
used or exposed to radiation in a nuclear reactor.

" **Waste**" means any  waste material  (1)  containing byproduct  material  and (2)  resulting
from the operation by any person or organization of any **Nuclear Facility** included within the
definition of nuclear facility under paragraph (a) or (b) thereof.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

2-14047

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT.   HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.
END 10

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 11

This endorsement, effective *12:01 am*    *April 16, 2008*         forms a part of
policy number    *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

## CONDUCT EXCLUSIONS
## FINAL ADJUDICATION

In consideration of the premium charged, it is hereby understood and agreed that in Clause
4. **EXCLUSIONS**, paragraphs (a), (b) and (c)  are deleted in their entirety and  replaced with
the following:

(a)     arising out of, based upon or attributable to the  gaining of any  profit  or
advantage to which  any final  adjudication establishes  the **Insured** was not
legally entitled;

(b)     arising out of, based  upon or attributable  to payments to  an **Insured** of any
remuneration without the previous approval  of the stockholders or  members
of an **Organization**, once any such unapproved payments shall be established
by any final adjudication to have been illegal;

(c)     arising out of, based upon or attributable to the committing of any  deliberate
criminal or deliberate  fraudulent act  by the **Insured**  if any  final adjudication
establishes that such  deliberate  criminal  or  deliberate  fraudulent  act was
committed;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

2-14047

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

END 11

AUTHORIZED REPRESENTATIVE

## ENDORSEMENT# 12

This endorsement, effective *12:01 am    April 16, 2008*                forms a part of
policy number    *443-37-08*
issued to *PFIZER INC.*

by    *Illinois National Insurance Company*

### "NO LIABILITY" PROVISION DELETED
### (SECURITIES CLAIM RETENTION APPLIES TO ALL LOSS
### ARISING OUT OF A SECURITIES CLAIM)

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

(1)    The Definition of and all provisions referring to **"No Liability"** are hereby deleted in their entirety.

(2)    Clause 6 **RETENTION CLAUSE** is deleted in its entirety and replaced by the following:

**6.    RETENTION CLAUSE**

For each **Claim**, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amounts stated in Items 4(a), 4(b) and 4(c) of the Declarations, such Retention amounts to be borne by an **Organization** and/or the **Insured Person** and remain uninsured, with regard to all **Loss** other than **Non-Indemnifiable Loss**. The Retention amount specified in:

(i)    Item 4(a) applies to **Loss** that arises out of a **Securities Claim**;

(ii)   Item 4(b) applies to **Loss** that arises out of an **Employment Practices Claim**; and

(iii)  Item 4(c) applies to **Loss** that arises out of any **Claim** other than a **Securities Claim** or an **Employment Practices Claim**.

A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

In the event a **Claim** triggers more than one of the Retention amounts stated in Items 4(a), 4(b) and 4(c) of the Declarations, then, as to that **Claim**, the highest of such Retention amounts shall be deemed the Retention amount applicable to **Loss** (to which a Retention is applicable pursuant to the terms of this policy) arising from such **Claim**.

No Retention amount is applicable to **Crisis Loss** or **Non-Indemnifiable Loss**.

(3)    Item 4 of the Declarations is hereby deleted in its entirety and replaced by the following:

| 4 | RETENTION:  Not applicable to **Non-Indemnifiable Loss** | | |
|---|---|---|---|
| 4(a) | Securities Claims: *$25,000,000* | 4(b) | Employment *$25,000,000* Practices Claims: |
| 4(c) | All other **Claims**:  *$25,000,000* | | |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

**2-14047**

89371 (5/05)

END 012
Page    of 1

**ENDORSEMENT# 13**

**This endorsement, effective** *12:01 am* *April 16, 2008* forms a part of
**policy number** *443-37-08*
**issued to** *PFIZER INC.*

**by** *Illinois National Insurance Company*

### SUBSIDIARY – AUTO-SUBSIDIARY PERCENTAGE DECREASED

In consideration of the premium charged, it is hereby understood and agreed that Clause 12 (b)(1) and (2) **ORGANIZATIONAL CHANGES - Subsidiary Additions** are hereby amended by decreasing the automatic **Subsidiary** threshold from 25% to 10%.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 13

AUTHORIZED REPRESENTATIVE

2-14047

**ENDORSEMENT# 14**

This endorsement, effective    *12:01 am*    *April 16, 2008*     forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

### SUBSIDIARY – ADDITION TO THE DEFINITION OF "SUBSIDIARY"

In consideration of the premium charged, it is hereby understood and agreed that the Definition of " **Subsidiary**" is hereby amended to include the following entity(ies), subject to such entity's(ies') respective **Continuity Date**.

| SUBSIDIARY | CONTINUITY DATE |
|---|---|
| Warner-Lambert | June 19, 2000 |

For the purpose of the applicability of the coverage provided by this endorsement, the entities listed above and the **Organization** will be conclusively deemed to have indemnified the **Insureds** of the each respective entity to the extent that such entity or the **Organization** is permitted or required to indemnify such **Insureds** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an **Organization**. The entity and the **Organization** hereby agree to indemnify the **Insureds** to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

Furthermore, for the purpose of the applicability of the coverage provided by this endorsement, the **Insurer** shall not be liable for any **Loss** in connection with any **Claim**, made against any **Subsidiary** listed above or any **Insured(s)** thereof:

    (a)    alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation; or

    (b)    alleging any **Wrongful Act** occurring prior to the **Continuity Date** if an **Insured**, as of the Continuity Date knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy.

In all events, coverage as is afforded under this endorsement with respect to a **Claim** made against each respective entity listed above or any **Insureds** thereof shall only apply for Wrongful Acts committed or allegedly committed after the respective entity's **Continuity Date** and prior to the time that the **Named Entity** no longer maintains **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

*2-14047*

AUTHORIZED REPRESENTATIVE

END 14

ENDORSEMENT# 15

This endorsement, effective *12:01 am*     *April 16, 2008*     forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### DEFINITION OF EXECUTIVE AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the Definition of "Executive" is amended to include the following:

1.   Employees at staff level eighteen (18) or above of the Entity, or the foreign equivalent of such persons;

2.   Medical Directors, General Managers, Country Managers, Directors of Operations, Directors of Consumer Product Development, Directors of Chemical Development, Directors Of Operations - Services, Manufacturing and Technical Directors, Directors - Administration, Directors - Operations, Directors - Finance, Division Heads, Vice Presidents of Divisions and Divisional Functions, Divisional Controllers, Directors of Divisional Functions, Honorary Directors or Directors Emeriti of the Entity;

3.   Dr. Paul Meyer

4.   Any former or retired officer of the Entity serving as a consultant for the Entity

5.   The trustees and governors or persons holding equivalent positions with the Pfizer Foundation.

6.   The estates, heirs, legal representatives or assigns of any person described in 1. through 5. hereinabove.

7.   A lawful spouse of any person described in 1. through 5. Hereinabove (whether such status is derived by statutory or common law as recognized by the jurisdiction of the parties' domicile), but only with respect to any Claim arising solely out of his or her status as such a spouse, where such Claim seeks damages from marital community property, jointly held property, or property transferred from such director or officer to the spouse.

It is understood that no coverage is provided for any Wrongful Act of a spouse as described in 7. hereinabove.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*2-14047*



NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

END 15

ENDORSEMENT# *16*

This endorsement, effective *12:01 am    April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### PRIOR ACTS EXCLUSION FOR LISTED ENTITIES

In consideration of the premium charged, it is hereby understood and agreed that the term **Subsidiary** is amended to include the entity(ies) listed below, but only for **Wrongful Act** committed by such entity(ies) and/or any **Insureds** thereof which occurred subsequent to such entity's respective acquisition/creation date listed below and prior to the time the **Named Entity** no longer maintains **Management Control** of such entity(ies), respectively, either directly or indirectly through one or more other **Subsidiaries**. **Loss** arising from the same or related **Wrongful Act** shall be deemed to arise from the first such same or related **Wrongful Act**.

| ENTITY(IES) | ACQUISITION/CREATION DATE |
|---|---|
| Pharmacia | April 16, 2003 |

For the purpose of the applicability of the coverage provided by this endorsement, the entities listed above and the **Organization** will be conclusively deemed to have indemnified the **Insureds** of the each respective entity to the extent that such entity or the **Organization** is permitted or required to indemnify such **Insureds** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an **Organization**. The entity and the **Organization** hereby agree to indemnify the **Insureds** to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

ALL OTHER TERMS, CONDITIONS, AND LIMITATIONS REMAIN UNCHANGED.

2-14047

NOTICE:   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

END 16

**ENDORSEMENT# 77**

This endorsement, effective *12:01 am*   *April 16, 2008*   forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

## OUTSIDE ENTITY EXECUTIVE
## (NO WRITTEN REQUEST)

In consideration of the premium charged, it is hereby understood and agreed that Definition (v), **Outside Entity Executive**, is hereby deleted in its entirety and replaced by the following:

(v)   " **Outside Entity Executive** " means any: (1) **Executive** of an **Organization** who is or was acting at the specific request or direction of an **Organization** as an **Executive** of an **Outside Entity**; or (2) any other person listed as an **Outside Entity Executive** in an endorsement attached to this policy.

It is further understood and agreed that, in the event of a disagreement between the **Organization** and an **Outside Entity Executive** as to whether such **Insured** was acting "at the specific request or direction of the **Organization**," it is hereby understood and agreed that this policy shall abide by the determination of the **Organization** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** against such **Outside Entity Executive** is made. In the event no determination is made within such period, this policy shall apply as if the **Organization** determined that such **Outside Entity Executive** was not acting at the **Organization's** specific request or direction.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

2-14047

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT, HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 17

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# *18***

This endorsement, effective *12:01 am      April 16, 2008*        forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### GLOBAL EXTENSION ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that such coverage as is provided by this policy shall apply worldwide.

It is further understood and agreed that with regard to any **Claim** made outside the United States of America, Canada or their territories or possessions, and reported to the **Insurer** under the provisions of this policy, the **Insurer** shall, when requested to do so in writing by the **Named Entity:**

    a)    undertake the investigation, settlement and defense of **Claim** against any **Insured**; (the **Insured** and the **Organization** shall cooperate in the investigation and defense of such **Claim** as may be required by the **Insurer**) and the **Insureds** or the **Organization** shall not take any action which may prejudice the **Insurer** in regard to such **Claim**;

    b)    pay covered **Loss** of any **Insured** including:

        i)    damages and judgments arising from liability imposed upon the **Insured** by reason of a final judgment under law by a court of competent jurisdiction for any alleged **Wrongful Acts** to which this insurance applies, and;

        ii)    **Defense Costs** arising from any **Claim** to which this endorsement applies; and

        iii)    all sums for settlements negotiated by the **Insurer** with the approval of the **Organization** and the **Insured**, provided that if the **Organization** or the **Insured** refuse to consent to a settlement recommended by the **Insurer**, the **Insurer's** obligation and liability for defense under paragraph (a) above shall terminate and the **Insurer's** liability for payment under this paragraph (b) shall not exceed the amount of the settlement recommended and the expenses under (b) (ii) above as of the time of refusal to consent.

The amounts due under b(i), (ii), (iii) above shall be included in, and not in addition to, the **Limit of Liability** set forth on the Declarations of this policy and shall be subject to the applicable retention(s).

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 18**

*2-14047*

**ENDORSEMENT# 18 (Con'ted)**

This endorsement, effective *12:01 am   April 16, 2008*   forms a part of
policy number *443-37-08*
issued to  *PFIZER INC.*

by  *Illinois National Insurance Company*

It is further understood and agreed that the **Insurer** shall not be held responsible for any delay or failure to perform its obligation hereunder due to national, federal, state or municipal action or regulation; strikes or other labor troubles; acts of God, war, riot, insurrection or mutiny; or any other causes, contingencies, or circumstances outside the United States not subject to the Insurer's control which make the fulfillment of this endorsement impracticable; any of which shall, without liability, excuse the insurer from the obligations set forth in this endorsement.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 18

AUTHORIZED REPRESENTATIVE

2-14047

**ENDORSEMENT# 19**

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of policy number *443-37-08* issued to *PFIZER INC.*

by    *Illinois National Insurance Company*

## INVESTIGATION COSTS FOR DERIVATIVE DEMANDS

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.    Clause 1 **INSURING AGREEMENTS** is amended to add the following new insuring agreement:

**COVERAGE E: INVESTIGATION COSTS FOR DERIVATIVE DEMANDS**

This policy shall pay the **Investigation Costs** of the **Organization** arising from an **Investigation** in response to a **Derivative Demand** first made upon the **Organization** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy.

2.    Clause 5 **LIMIT OF LIABILITY (FOR ALL LOSS-INCLUDING DEFENSE COSTS)** is amended to add the following:

The maximum limit of the **Insurer's** liability for **Investigation Costs** arising from all **Investigations** combined occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be $250,000. This limit shall be the maximum limit of the **Insurer** under this policy regardless of the number of such **Investigations** occurring during the **Policy Period** or the **Discovery Period** (if applicable), or the number of **Executives** subject to such **Investigations**. Provided, however, that the **Investigation Costs** limit shall be part of and not in addition to the **Limit of Liability** stated in the Declarations of this policy, which shall, in all events, be the maximum liability of the **Insurer** for all **Loss** under this policy.

3.    There shall be no Retention amount applicable to **Investigation Costs**, and the **Insurer** shall pay such **Loss** from first dollar, subject to the other terms, conditions and limitations of this endorsement and this policy.

4.    It shall be the duty of the **Organization** and not the duty of the **Insurer** to conduct, investigate, and evaluate any **Investigation** against its own **Executives**, provided that the **Insurer** shall be entitled to effectively associate in the **Investigation** and in the evaluation and negotiation of any settlement of any such **Investigation**.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 19**

*2-14047*

**ENDORSEMENT# *79* (Con***t***ed)**

This endorsement, effective *12:01 am    April 16, 2008*                forms a part of
policy number   *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

5.  Nothing in this endorsement shall be construed to afford coverage under this policy
    for any **Claim** brought by the **Organization** against one or more of its own
    **Executives** other than **Investigation Costs** incurred in a covered **Investigation**.
    Payment of any **Investigation Costs** under this policy shall not waive any of the
    **Insurer's** rights under this policy or at law.

6.  The **Organization** shall be entitled to payment of its covered **Investigation Costs** 90
    days after: (i) it has made its final decision not to bring a civil proceeding in a court
    of law against any of its **Executives**, and (ii) such decision has been communicated
    to the **Complaining Shareholders**. Such payment shall be subject to an undertaking
    by the **Organization**, in a form acceptable to the **Insurer**, that the **Organization** shall
    return to the **Insurer** such payment in the event any **Organization** or **Complaining
    Shareholders** brings a **Claim** alleging, arising out of, based upon or attributable to
    any **Wrongful Acts** which were the subject of the **Derivative Demand**.

7.  Solely for the coverage extended by this endorsement under Coverage E, the
    following shall apply:

    "**Claim**" shall also mean any **Derivative Demand**.

    "**Complaining Shareholder**" means any shareholder or shareholders, other than any
    **Insured**, that makes a **Derivative Demand**.

    "**Derivative Demand**" means a written demand by shareholders upon the board of
    directors (or equivalent management body) of an **Organization** asking it to bring, on
    behalf of the **Organization**, a civil proceeding in a court of law against any **Executive**
    of the **Organization** for a **Wrongful Act** of such **Executive** in order to obtain relief
    from damages arising out of such **Wrongful Acts.**

    "**Investigation**" means the investigation by the **Organization** or, on behalf of the
    Organization by its board of directors (or the equivalent management body) or any
    committee of the board of directors (or the equivalent management body), as to
    whether or not the **Organization** should bring the civil proceeding demanded in the
    **Derivative Demand**.

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.
END 19

**ENDORSEMENT#** *19*   **(C _ _tinued)**

**This endorsement, effective** *12:01 am*   *April 16, 2008*   **forms a part of**
**policy number** *443-37-08*
**issued to** *PFIZER INC.*

**by** *Illinois National Insurance Company*

**"Investigation Costs"** means reasonable and necessary costs, charges, fees and expenses (including but not limited to attorney's fees and expert's fees but not including any settlement, judgment or damages and not including any regular or overtime wages, salaries or fees of the **Executives** or **Employees** of the **Organization**) incurred by the **Organization** or its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body), incurred solely in connection with an **Investigation**.
**" Loss"** shall also mean **Investigation Costs.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 19

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 20**

This endorsement, effective *12:01 am* *April 16, 2008*   forms a part of
policy number *443-37-08*
issued to *PFIZER INC.*

*all Parties letter of 7/7/08*

by   *Illinois National Insurance Company*

## SHADOW DIRECTORS COVERAGE

In consideration of the premium charged, it is hereby understood and agreed that the term " **Executive**" is amended to include any natural person who, as a consequence of being a director, officer or **Employee** of an **Organization**, is deemed a "shadow director" as defined under Section 741 of the United Kingdom's Companies Act 1985, as amended but solely for **Wrongful Acts** committed in his or her respective capacity as a "shadow director", of any **Subsidiary** of the Company that is incorporated and/or domiciled in the United Kingdom or the Republic of Ireland.

For the purpose of the applicability of the coverage provided by this endorsement, the **Organization** will be conclusively deemed to have indemnified the persons afforded coverage by this endorsement to the extent that the **Organization** is permitted or required to indemnify such persons pursuant to law (common or statutory), contract, or the charter or by-laws of the **Organization** (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The **Organization** hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

Solely for the purposes of this endorsement the term **Continuity Date** means the effective date of this endorsement.

Only as respects any additional coverage granted by this endorsement, the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** made against an **Insured**:

(1)   alleging, arising out of, based upon or attributable to any pending or prior litigation as of the **Continuity Date** listed above, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation; and

(2)   alleging any **Wrongful Act** occurring prior to the **Continuity Date** if the **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

*2-14047*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 20

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 21**

This endorsement, effective   *12:01 am*      *April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### NON-RESCINDABLE SIDE A ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the
following clause shall be added to the policy:

### NON-RESCINDABLE SIDE A ONLY

Solely with respect to any **Non-Indemnifiable Loss** of any **Insured Person**, under no
circumstances shall the coverage  provided by this policy  be deemed void, whether
by rescission  or otherwise,  but such  coverage will  be subject to all  other  terms,
conditions and exclusions of the policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT  HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS

END 21

AUTHORIZED REPRESENTATIVE

*2-14047*

**ENDORSEMENT# 22**

This endorsement, effective *12:01 am      April 16, 2008*      forms a part of

policy number   *443-37-08*

issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### CLAUSE 7(a)(2) AMENDATORY
### (45 DAYS)

In consideration of the premium charged, it is hereby understood and agreed that Clause 7(a)(2) is hereby deleted in its entirety and replaced with the following:

(2)    within 45 days after the end of the **Policy Period** or the **Discovery Period** (if applicable), as long as such **Claim** was first made against an **Insured** within the final 30 days of the **Policy Period** or the **Discovery Period** (if applicable).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

2-14047

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 22

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 23

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of
policy number    *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

### SPECIFIED FILINGS 12  MONTHS BACK

In consideration of the premium charged, it is hereby understood and agreed as follows the Definition of " **Application**" in the policy  is  deleted  in its entirety  and  replaced  with  the following:

" **Application**" means as of the inception of the **Policy Period**:

(i)     each and every  signed application,  any attachments to such  applications, any separate  written  warranty  or  representation,  or  other  materials  submitted therewith  or  incorporated  therein  and  any other documents  submitted  in connection with the underwriting of this  policy or the underwriting of  any other directors and  officers  (or equivalent)  liability policy of which  this policy is a renewal, replacement or which it succeeds in time; and

(ii)    each and every  public filing  by or on  behalf of an  **Organization** made with  the Securities  and  Exchange  Commission (SEC) including,  but not  limited  to, the **Organization's** Annual Report(s),  10Ks, 10Qs,  8Ks and proxy statements, any financial  information  in  such  filings,  and  any certifications  relating  to the accuracy  of the foregoing,  provided that  such  public filing was  filed during the period of time:

*     beginning at the start of the 12 month period immediately preceding the first submission to the **Insurer** in  connection with the underwriting of  this policy; and
*     ending at the inception of the **Policy Period**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 23

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 24**

This endorsement, effective *12:01 am      April 16, 2008*      forms a part of
policy number  *443-37-08*
issued to  *PFIZER INC.*

by    *Illinois National Insurance Company*

## SECURITIES CLAIM DEFINITION – COMMON LAW

In consideration of the premium charged, it is hereby understood and agreed that the policy's definition of " **Securities Claim**," is deleted in its entirety and replaced with the following:

(y)    " **Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**:

   (1)    alleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities), which is:

      (a)    brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or

      (b)    brought by a security holder or purchaser or seller of securities of an **Organization** with respect to such security holder's, purchaser's or seller's interest in securities of such **Organization**; or

   (2)    brought derivatively on the behalf of an **Organization** by a security holder of such **Organization**, relating to a **Securities Claim** as defined in subparagraph (1) above.

Notwithstanding the foregoing, the term " **Securities Claim**" shall:

   (1)    include an administrative or regulatory proceeding against an **Organization**, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**; and

   (2)    not include any **Claim** brought by any **Executive** or **Employee** of an **Organization** alleging, arising out of, based upon or attributable to the loss of, or failure to receive or obtain, the benefit of stock, stock warrants, stock options or other securities of an **Organization.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c)American International Group, Inc.  All rights reserved

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

*2-14047*

AUTHORIZED REPRESENTATIVE

**END 24**

**ENDORSEMENT# 25**

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of
policy number *443-37-08*
issued to *PFIZER INC.*

by *Illinois National Insurance Company*

## SUBROGATION CLAUSE
## (NO SUBROGATION AGAINST INSURED UNLESS CONDUCT EXCLUSION APPLIES)

In consideration of the premium charged, it is hereby understood and agreed that **Clause 13. SUBROGATION** shall be deleted in its entirety and replaced with the following:

## 13.    SUBROGATION

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of each and every **Organization's** and **Insured's** rights of recovery thereof, and each such **Organization** and **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of any and all documents necessary to enable the **Insurer** effectively to bring suit in the name of each such **Organization** and each such **Insured**. In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless Exclusions (a), (b) or (c) of Clause 4. EXCLUSIONS apply with regard to such **Insured**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved

2-14047

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 25

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 26

This endorsement, effective *12:01 am    April 16, 2008*                forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### SECTION 11 OR 12 ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that Clause 2.
**DEFINITIONS**, paragraph (p) " **Loss**," is amended by deleting subparagraph (6) thereof in its
entirety and replacing it with the following:

> (6)    matters which may be deemed uninsurable under  the law pursuant to which
> this policy shall be  construed.  Notwithstanding  the  foregoing subparagraph
> (6), the **Insurer** shall not  assert that, in a **Securities  Claim** alleging violations
> of Section 11 or 12 of  the Securities Act of 1933, as  amended,  the portion
> of any amounts incurred by **Insureds** which is attributable to  such violations
> constitutes  uninsurable   loss  and  shall  treat that  portion  of  all  such
> settlements, judgments and  **Defense Costs** as constituting  **Loss** under this
> policy.

It is further understood and agreed that Clause  **4. EXCLUSIONS** is amended by adding the
following at the end thereof:

Notwithstanding anything stated  in Clause 4.  **EXCLUSIONS** above, Exclusions  (a) and (b)
shall not apply, in a **Securities  Claim** alleging violations of Section 11 or 12 of the
Securities Act of 1933, as amended, to  the  portion  of any  **Loss** attributable to  such
violations.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

2-14047

**END 26**

**ENDORSEMENT# 27**

This endorsement, effective *12:01 am   April 16, 2008*   forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### EXTRADITION COVERAGE
### (2/2000 Version)

In consideration of the premium charged, it is understood and agreed that, where permitted by law:

1.     " **Claim**" also means any:

    (a)     official request for **Extradition** of any **Insured Person**; or

    (b)     the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

2.     " **Defense Costs**" also means reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

    (a)     opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

    (b)     appealing any order or other grant of **Extradition** of that **Insured Person**.

3.     " **Extradition**" means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

4.     Clause 9 does not apply to **Defense Costs** solely relating to **Extradition** even if the underlying **Wrongful Acts** relate to a **Securities Claim**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 27

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT#** *28*

This endorsement, effective *12:01 am    April 16, 2008*          forms a part of policy number   *443-37-08* issued to *PFIZER INC.*

by     *Illinois National Insurance Company*

### ADVANCEMENT OF LOSS ENDORSEMENT
### FINANCIAL INSOLVENCY

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.      Clause 6. **RETENTION CLAUSE** is amended to include the following paragraph at the end of such Clause:

   In the event an **Organization** refuses or is unable to pay an applicable Retention due to **Financial Insolvency**, then the **Insurer** shall commence advancing **Loss** within the Retention and pursuant to the other terms, conditions and exclusions of this policy, provided that the **Insurer** shall be entitled to recover the amount of **Loss** advanced within the Retention from the **Organization** pursuant to Clause 13. **SUBROGATION** as amended herein.

2.      Clause 13. **SUBROGATION** is deleted in its entirety and replaced with the following:

13.     **SUBROGATION**

   In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of each and every **Organization's** and **Insured's** rights of recovery thereof, and each such **Organization** and **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights (including, without limitation, the assertion of indemnification or contribution rights) including the execution of any and all documents necessary to enable the **Insurer** effectively to bring suit in the name of each such **Organization** and each such **Insured**. In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured Person** under this policy unless Exclusions (a), (b) or (c) of Clause 4. EXCLUSIONS apply with regard to such **Insured Person**.

   Notwithstanding the immediately preceding paragraph, in the event that the **Insurer** shall for any reason pay **Indemnifiable Loss** on behalf of an **Insured Person**, in addition to any other rights the **Insurer** may have under applicable law, the **Insurer** shall have the right hereunder to recover from the **Organization** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Organization** and shall be subrogated to the rights of the **Insured Person** hereunder.

3.      For purposes of this endorsement, the following definition shall apply:

   **"Financial Insolvency"** means the: (i) appointment by any state or federal official, agency or court of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

©American International Group, Inc.   All rights reserved

END 028

Page 1 of 2

**2-14047**

94678 (6/07)

**ENDORSEMENT# 28** (Continued)

liquidate a **Organization**; or (ii) the **Organization** becoming a debtor–in–possession pursuant to the United States bankruptcy law, and as to both (i) or (ii), the equivalent status outside the United States of America.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

© American International Group, Inc. All rights reserved

END 028
Page 2 of 2

**2-14047**
94678 (6/07)

**ENDORSEMENT# 29**

This endorsement, effective   *12:01 am*      *April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

## EXCLUSION (d) AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that in Clause
4. **EXCLUSIONS**, paragraph (d) is deleted in its entirety and replaced with the following:

(d)      alleging, arising out of, based upon  or attributable to the facts alleged,  or to
the same or related  **Wrongful Acts** alleged or  contained in any  **Claim** which
has been reported, or in any  circumstances of which notice has  been given,
under any directors and officers liability policy, employment practices liability
policy or employee  benefit plan  fiduciary liability  insurance policy  of which
this policy is a renewal or replacement or which it may succeed in time;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

*2-14047*

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

**END 29**

**ENDORSEMENT# 30**

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of
policy number  *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### 3/01 EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY INSURANCE ENDORSEMENT

In consideration of the premium charged, and in reliance upon the statements in the application made a part hereof, it is hereby understood and agreed that this policy shall provide **EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY INSURANCE** coverage pursuant to the terms and conditions contained in this endorsement.

**NOTICE:**    **EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS ENDORSEMENT IS LIMITED GENERALLY TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE ENDORSEMENT CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE:**    **THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE:**    **THE INSURER HAS THE DUTY TO DEFEND; HOWEVER, THE INSURED MAY ELECT TO ASSUME THE DUTY TO DEFEND. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

**NOTICE:**    **TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING.    SEE CLAUSE 3 OF THIS ENDORSEMENT.**

### ENDORSEMENT DECLARATIONS

| ITEMS | | | |
|---|---|---|---|
| 1 | **NAMED SPONSOR:** | PFIZER INC | (herein " **Named Sponsor**") |
| 1(a) | MAILING ADDRESS: | 235 EAST 42ND STREET NEW YORK, NY 10017-5703 | |
| 1(b) | **SUBSIDIARY** COVERAGE: | Any past, present or future **Subsidiary** of the **Named Sponsor** | |
| 1(c) | PLAN COVERAGE: | Any past, present or future **Plan** | |
| 2 | **POLICY PERIOD:**   From:   April 16, 2008      To:    April 16, 2009 12:01 A.M. standard time at the address stated in Item 1(a) of the Declarations. | | |

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
**END 30**

2-14047

**ENDORSEMENT# 30   (Continued)**

This endorsement, effective *12:01 am*   *April 16, 2008*   forms a part of policy number *443-37-08* issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

| ITEMS | (Continued) | | |
|---|---|---|---|
| 3(a) | **POLICY AGGREGATE LIMIT OF LIABILITY** (herein " **Limit of Liability**") | | |
| | For all **Loss**, in the aggregate, under this policy including **Defense Costs** (other than **Defense Costs** (if any) set forth in Item 3(b) of the Declarations): | | **$25,000,000** |
| 3(b) | ADDITIONAL LIMIT OF LIABILITY FOR DEFENSE COSTS : | $ | |
| 3(c) | **SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS** | | |
| | For all **Voluntary Compliance Loss**, in the aggregate, under this policy including **Defense Expenses** | | **(X)** See endorsement #32 ( None |
| | This Sublimit of Liability shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 3(a) of the Declarations. | | |
| 4 | **RETENTION:** | Not applicable to: (i) non- **Indemnifiable Loss** of a **Natural Person Insured**; (ii) judgments and settlements (all Coverages); and (iii) **Voluntary Compliance Loss** | |
| 4(a) | **Defense Costs:** | $25,000,000 ( None | |
| 5 | **CONTINUITY DATE:**  N/A | | |

I.

The aggregate Limit of Liability stated in Item 3 of the Endorsement Declarations is for all coverages under this endorsement (including Defense Costs) for EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY INSURANCE and is PART OF AND NOT IN ADDITION TO the aggregate Limit of Liability stated in Item 3 of the policy Declarations which is for Coverages A, B, C and D of the policy and Coverage E of this endorsement (including Defense Costs) combined.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

*END 30*

2-14047

**ENDORSEMENT# *30*   (C    tinued)**

This endorsement, effective  *12:01 am      April 16, 2008*      forms a part of
policy number  *443-37-08*
issued to  *PFIZER INC.*

by      *Illinois National Insurance Company*

**II.**

All the terms and conditions of the policy are hereby incorporated herein  and shall apply to
coverage as is afforded by this  endorsement unless specifically stated otherwise herein  or
in an endorsement(s) attached hereto.

**III.**

Solely in regard  to the coverage  provided by this  endorsement, Clause  1 of the policy is
amended by adding the following additional coverage section:

COVERAGE E: EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY INSURANCE

**1.   INSURING AGREEMENTS**

(a)   Solely with respect to **Claims** first made against  an **Insured** during the **Policy
Period** or the **Discovery Period** (if applicable) and reported to the **Insurer**
pursuant to the terms  of this policy,  and subject to the other terms,
conditions and limitations of this policy, this policy shall pay the **Loss** of each
and every **Insured** arising  from a **Claim**  against an **Insured**  for any actual  or
alleged **Wrongful  Act** by any such  **Insured** (or by any employee for  whom
such **Insured** is legally responsible).

(b)   Solely with respect to **CAP Penalties** and **Delinquent  Filer Penalties** assessed
against an **Insured**,  and **Voluntary  Fiduciary Correction Loss**  incurred by an
**Insured**, during the  **Policy Period** or  the **Discovery Period** (if applicable) and
reported to the **Insurer** during  the **Policy Period** or the **Discovery Period** (if
applicable) or within thirty (30) days after the end of the  **Policy Period** or the
**Discovery Period** (if  applicable), and subject  to the other terms, conditions
and limitations of this policy, this policy shall:

(i)   pay the **CAP Penalties** and **Delinquent Filer Penalties**; and

(ii)   reimburse the **Voluntary Fiduciary Correction Loss**,

of each and every **Insured**,  collectively not to  exceed the amount of  the
**Sublimit of Liability** set  forth in Item  3(c) of the  Declarations; provided that
the **Insured** shall select a  **Panel Counsel Firm** as provided  in Clause 9 of  the
policy

**NOTICE:**   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

**END 30**

**ENDORSEMENT# 30 (Cont'ed)**

This endorsement, effective *12:01 am   April 16, 2008*   forms a part of policy number *443-37-08* issued to *PFIZER INC.*

by      *Illinois National Insurance Company*

The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

IV.

Solely with respect to the coverage afforded by this endorsement under Section III above of this endorsement, the policy is hereby amended as follows:

(1)     Clause 3 through Clause 9, Clause 13 and Clause 20 are hereby deleted in their entirety and replaced by the following:

**3.     DEFINITIONS**

" **Administrator**" means an **Insured** with respect to any **Wrongful Act** described in subparagraph (2) of the Definition of **Wrongful Act**.

" **Benefits**" means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

" **Breach of Fiduciary Duty**" means a violation of the responsibilities, obligations or duties imposed upon **Insureds** by **ERISA**.

" **Cafeteria Plan**" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

" **CAP Penalties**" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement to correct such **Plan** defect was entered into in writing by the **Insured** with the IRS during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 30**

**ENDORSEMENT#** *30*   **(C    inued)**

This endorsement, effective *12:01 am      April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by      *Illinois National Insurance Company*

" **Claim**" means:

(1)     a written demand for monetary, non-monetary or injunctive relief; or

(2)     a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:

    (i)     service of a complaint or similar pleading; or

    (ii)    return of an indictment, information or similar document (in the case of a criminal proceeding); or

    (iii)   receipt or filing of a notice of charges; or

(3)     a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject; or

(4)     any fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

" **Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

" **Consulting Fees**" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs or expenses associated with: (i) a **Plan** audit; or (ii) identifying, finding or assessing such **Breach of Fiduciary Duty**.

" **Defense Costs**" means reasonable and necessary fees, costs and expenses consented to in writing by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding any compensation of **Natural Person Insureds** or employees of an **Insured**.

*2-14047*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
**END 30**

**ENDORSEMENT# 30 (Continued)**

This endorsement, effective *12:01 am April 16, 2008* forms a part of policy number *443-37-08* issued to *PFIZER INC.*

by *Illinois National Insurance Company*

" **Defense Expenses** " means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the **Insurer** resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs and expenses associated with finding or assessing such **Breach of Fiduciary Duty** and any compensation of **Natural Person Insureds** or employees of an **Insured**.

" **Delinquent Filer Penalties** " means penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

" **Dependent Care Assistance Program** " means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

" **Domestic Partner** " means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Named Sponsor** or any **Subsidiary**.

" **Employee Benefit Law** " means **ERISA** or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject. Except to the extent set forth in subparagraph (2) of the Definition of **Wrongful Act**, **Employee Benefit Law** shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

" **ERISA** " means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 30**

**ENDORSEMENT# *30*   (C   tinued)**

This endorsement, effective *12:01 am   April 16, 2008*                forms a part of
policy number  *443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

" **ESOP**" means any employee stock ownership plan  as defined in **ERISA**, or
any other **Plan**  under which investments  are made primarily  in securities  of
the **Sponsor Organization** or whose assets at any time within  twelve months
prior to the inception date of  this policy were comprised of  20% or more of
securities of the **Sponsor Organization**.

" **Fiduciary**" means a fiduciary as defined  in  an  **Employee Benefit Law**  (if
applicable), with  respect to a **Plan**, or  a person or entity who exercises
discretionary control as respects the management of a **Plan** or the disposition
of its assets.

" **Foreign Jurisdiction**" means any jurisdiction, other than the United States or
any of its territories or possessions.

" **Foreign Policy**" means the **Insurer's**  or any other member  company  of
American International Group, Inc.'s (AIG) standard fiduciary or pension trust
liability policy (including all mandatory endorsements, if any)  approved by
AIG to be  sold within a **Foreign Jurisdiction,**  that provides  coverage
substantially similar to the coverage  afforded under this policy. If  more than
one such policy exists,  then **Foreign Policy**  means the standard  policy most
recently registered in the  local language of the  **Foreign Jurisdiction**, or  if no
such policy has been  registered, then the  policy most recently  registered in
that **Foreign Jurisdiction**. The term  **Foreign Policy** shall  not include any
directors and  officers,  partnership,  managerial,  comprehensive  general
liability, employment practices liability or professional liability coverage.

" **Fringe Benefit**" means any plan or benefit  described in Section  132 of the
Internal Revenue Code of 1986, as amended.

" **Indemnifiable Loss**" means **Loss**  for  which the  **Sponsor  Organization** has
indemnified  or  is permitted  or required  to  indemnify  any  natural  person
**Insured**.

" **Insured(s)**" means:

(1)     any **Natural Person Insured**;

(2)     any **Plan(s)**;

(3)     the **Sponsor Organization**; and

**NOTICE:**   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

**END 30**

2-14047

**ENDORSEMENT# 30   (Cont'ed)**

This endorsement, effective  *12:01 am     April 16, 2008*                forms a part of
policy number    *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

(4)    any other person or entity in his, her or its capacity as a **Fiduciary**, **Administrator** or trustee of a **Plan** and included in the Definition of **Insured** by specific written endorsement attached to this policy.

**"Loss"** means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and **Defense Costs**; however, **Loss** shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 3(c) of the Declarations page for **Voluntary Compliance Loss**, (ii) **UK Fines and Penalties**, (iii) the five percent or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**, and (iv) the 20 percent or less penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an **Insured** is not financially liable or which is without legal recourse to the Insured; (5) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of a **Natural Person Insured**; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Where permitted by law, **Loss** shall include punitive or exemplary damages imposed upon any **Insured** (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to profit, deliberate fraud or criminal acts and knowing or willful violation of any statute, rule or law, including but not limited to **Employee Benefit Law**).

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (1)-(6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall include **Voluntary Compliance Loss**.

" **Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; the general partners of a limited partnership; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the **Named**

NOTICE:   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 30**

**ENDORSEMENT# *30*   (Continued)**

This endorsement, effective *12:01 am    April 16, 2008*   forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

**Sponsor**, to elect, appoint or designate a majority of the Board of Directors of a corporation, the management committee of a joint venture, the general partners of a limited partnership, or the management board of a limited liability company.

"**Natural Person Insured**" means any:

(1)   past, present or future natural person director, officer, governor, general partner, management committee member, member of the board of managers or employee of a **Sponsor Organization** or if applicable, of a **Plan**, and as to all of the above in his or her capacity as a **Fiduciary**, **Administrator** or trustee of a **Plan**; or

(2)   past, present or future natural person in a position equivalent to a position listed in subparagraph (1) of this Definition in the event that the **Sponsor Organization** is operating in a **Foreign Jurisdiction**.

"**Non-qualified Plan**" means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan.

"**Pension Plan**" means a pension plan as defined in any **Employee Benefit Law**.

"**Plan**" means automatically, any qualified plan, fund, trust or program (including, but not limited to, any **Pension Plan**, **Welfare Plan**, **Cafeteria Plan**, **Dependent Care Assistance Program**, **Fringe Benefit**, and **VEBA**) or **Non-qualified Plan**, established anywhere in the world, which was, is or shall be sponsored solely by the **Sponsor Organization**, or sponsored jointly by the **Sponsor Organization** and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the **Sponsor Organization**, subject to the following provisions:

(1)   if such **Plan** is a **Pension Plan(s)**, other than an **ESOP**, stock option plan or **Pension Plan** described in subparagraphs (5)(a) and 5(b) below, then the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** prior to the inception date of this policy, unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal;

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 30**

*2-14047*

**ENDORSEMENT# 30  (Continued)**

This endorsement, effective *12:01 am    April 16, 2008*                forms a part of
policy number   *443-37-08*
issued to    *PFIZER INC.*

by      *Illinois National Insurance Company*

> (2)    if such **Plan** was sold, spun-off or terminated prior to the inception
> date of this policy the **Named Sponsor** shall provide written notice of
> such sale, spin-off or termination to the **Insurer** prior to the inception
> date of this policy, unless such sale, spin-off or termination had
> already been reported to the **Insurer** under a policy issued by the
> **Insurer** of which this policy is a continuous renewal;
>
> (3)    if such **Plan** is sold, spun-off or terminated during the **Policy Period**,
> the **Named Sponsor** shall provide written notice of such sale, spin-off
> or termination to the **Insurer** prior to the end of the **Policy Period**;
>
> (4)    if such **Plan** is an **ESOP** or stock option plan, the **Named Sponsor** shall
> provide written notice of such **Plan** to the **Insurer** unless such **Plan**
> was already covered under a policy issued by the **Insurer** of which
> this policy is a continuous renewal and such **Plan** is added to the
> Definition of **Plan** by specific written endorsement attached to this
> policy; or
>
> (5)    if such **Plan** is a **Pension Plan** (other than an **ESOP**, or stock option
> plan) and:
>
>> (a)    is acquired during the **Policy Period** as a result of the **Sponsor
>> Organization**'s acquisition of a **Subsidiary** whose assets total
>> more than 25% of the total consolidated assets of the **Sponsor
>> Organization** as of the inception date of this policy; or
>> (b)    is acquired during the **Policy Period** and such **Plan's** assets
>> total more than 25% of the total consolidated assets of all
>> covered **Pension Plans** as of the inception date of this policy,
>>
>> then, this policy shall apply to such **Plan** (but solely with
>> respect to a **Wrongful Act(s)** occurring after the date of such
>> acquisition), but only upon the condition that within 90 days of
>> its acquisition, the **Named Sponsor** shall have provided the
>> **Insurer** with a completed application for such new **Plan** and
>> agreed to any additional premium or amendment of the
>> provisions of the policy required by the **Insurer** relating to such
>> new **Plan**. The 90 day reporting condition shall not apply if
>> such new **Plan** does not constitute one of the five largest
>> **Pension Plans** of the **Sponsor Organization** and the failure to

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

*2-14047*

END 30

**ENDORSEMENT#** *30*   (C  tinued)

This endorsement, effective *12:01 am*   *April 16, 2008*   forms a part of
policy number  *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

report such **Plan** within the 90 day reporting period was due to inadvertent omission by the **Named Sponsor** and upon discovery of such **Plan**, the **Named Sponsor** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include: (i) the following government-mandated programs: unemployment insurance, Social Security, or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the Definition of **Wrongful Act** in this policy; (ii) any **Pension Plan** (other than an **ESOP** or stock option plan) considered or created by the **Sponsor Organization** during the **Policy Period**; or (iii) any other plan, fund or program, which is included in the Definition of **Plan** by specific written endorsement attached to this policy.

In no event, however, shall the Definition of **Plan** include any multiemployer plan as defined in **Employee Benefit Law**.

"**Policy Period**" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

"**Pollutants**" include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

"**Sponsor Organization**" means the **Named Sponsor** designated in Item 1 of the Declarations and any **Subsidiary** thereof; and, in the event any bankruptcy proceeding shall be instituted by or against the **Named Sponsor** or any **Subsidiary** thereof, the resulting debtor in possession (or equivalent status outside the United States), if any.

"**Subsidiary**" means any past, present or future: (1) for-profit entity of which the **Named Sponsor** has **Management Control** either directly or indirectly through one or more other **Subsidiaries**; and (2) not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the **Named Sponsor**. The term **Subsidiary** shall automatically apply to any new **Subsidiary** acquired or created during the **Policy Period**.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 30**

2-14047

**ENDORSEMENT# 30** **(Continued)**

This endorsement, effective *12:01 am* *April 16, 2008* forms a part of policy number *443-37-08* issued to *PFIZER INC.*

by *Illinois National Insurance Company*

A for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer maintains **Management Control** of such **Subsidiary**. A not-for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer exclusively sponsors such **Subsidiary**.

"**UK Fines and Penalties**" means civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

"**VEBA**" means a voluntary employees' beneficiary association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and the regulations thereunder, the purpose of which is to provide for life, sickness, accident or other benefits and that is funded solely by the **Sponsor Organization**, and provides benefits for voluntary members who are employees or former employees of the **Sponsor Organization** and/or their beneficiaries.

"**Voluntary Compliance Loss**" means **CAP Penalties**, **Delinquent Filer Penalties** and **Voluntary Fiduciary Correction Loss**.

"**Voluntary Fiduciary Correction Loss**" means damages, **Defense Expenses** and **Consulting Fees** incurred in connection with the U.S. Department of Labor's ("DOL") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent **Breach of Fiduciary Duty** occurring during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal), provided that such compliance with the DOL's Voluntary Fiduciary Correction Program results in the **Insured** obtaining a "No Action" letter from the DOL; however, **Voluntary Fiduciary Correction Loss** shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (6) **Benefits**, or that portion of damages equal to such **Benefits**; (7) matters of which the **Insured** had knowledge prior to the inception date of this policy or the first policy issued by the **Insurer** to the **Named Sponsor** of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 30

**ENDORSEMENT# 30** (Continued)

This endorsement, effective *12:01 am     April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by       *Illinois National Insurance Company*

"**Welfare Plan**" means a welfare plan as defined in **Employee Benefit Law**.

"**Wrongful Act**" means:

(1)    as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**; and

(2)    as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:

   (i)    counseling employees, participants and beneficiaries; or

   (ii)    providing interpretations; or

   (iii)    handling of records; or

   (iv)    activities affecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**,

or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**;

(3)    as respects a **Natural Person Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured**.

4.    **WORLDWIDE EXTENSION**

Where legally permissible, this policy shall apply to a **Claim** made against any **Insured**, anywhere in the world.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

*END 30*

**ENDORSEMENT# 30   (Cont'd)**

This endorsement, effective  *12:01 am      April 16, 2008*                forms a part of
policy number  *443-37-08*
issued to   *PFIZER INC.*

by     *Illinois National Insurance Company*

> With regard to a **Claim(s)** brought and maintained solely in a **Foreign Jurisdiction** against an **Insured** formed and operating in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claim(s)** those terms and conditions (and related provisions) of the **Foreign Policy** registered with the appropriate regulatory body in such **Foreign Jurisdiction** that are more favorable to such **Insured** than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1, 3-5, 9-13, and 16-19 of this policy and the comparable provisions of the **Foreign Policy**. In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.
>
> All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Sponsor**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

5.    **EXCLUSIONS**

> The **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Insured(s)**:
>
> (a)    arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an **Insured** was not legally entitled;
>
> (b)    arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law**;
>
> Ý The **Wrongful Act** of any **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b);

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 30

*2-14047*

**ENDORSEMENT#** *30* **(C** tinued)

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of policy number    *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

(c)    for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of **Employee Benefit Law**;

(d)    alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)    alleging, arising out of, based upon or attributable to, as of the **Continuity Date,** any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f)    for failure to fund a **Plan** in accordance with **Employee Benefit Law** or the **Plan** instrument, or the failure to collect contributions owed to the **Plan**; except that this exclusion shall not apply to **Defense Costs**;

(g)    alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a Fiduciary or Administrator of any plan, fund or program, other than a **Plan** as defined in this policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program;

(h)    for bodily injury, sickness, disease, or death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof; except that this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for **Breach of Fiduciary Duty**;

(i)    alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Sponsor Organization** did not sponsor such **Plan** or when the **Natural Person Insured** was not a **Fiduciary**, **Administrator**, trustee, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Sponsor Organization** or if applicable, a **Plan**;

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 30**

*2-14047*

**ENDORSEMENT# 30   (Continued)**

This endorsement, effective *12:01 am     April 16, 2008*               forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

(j)   alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, that this exclusion shall not apply to non-**Indemnifiable Loss** arising from a **Claim** alleging damage to a **Plan**, other than non-**Indemnifiable Loss** constituting **Cleanup Costs**;

6.   **LIMIT OF LIABILITY  (FOR ALL LOSS - INCLUDING DEFENSE COSTS)**

The **Limit of Liability** stated in Item 3(a) of the Declarations is the limit of the **Insurer's** liability for all **Loss**, including **Defense Costs**, under this policy arising out of all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** stated in Item 3(b) of the Declarations, if any, shall be an additional **Limit of Liability** for that part of **Loss** constituting **Defense Costs** incurred in connection with all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** for **Defense Costs** stated in Item 3(b) shall be in addition to and not part of the **Limit of Liability** stated in Item 3(a) of the Declarations.  **Loss** constituting **Defense Costs** shall first reduce the additional **Limit of Liability** stated in Item 3(b). Should the **Limit of Liability** stated in Item 3(b) of the Declarations become exhausted,  or should the **Limit of Liability** stated in Item 3(b) of the Declarations be stated as "none", then subsequent **Defense Costs** will reduce the **Limit of Liability** stated in Item 3(a).

The **Sublimit of Liability** set forth in Item 3(c) of the Declarations shall be part of and not in addition to the **Limit of Liability** set forth in Item 3(a).

The **Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period**. Further, any **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable), which pursuant to Clause 8(b) or 8(c) is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the aggregate **Limit(s) of Liability** stated in Item 3 of the Declarations.

NOTICE:  THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
END 30

*2-14047*

**ENDORSEMENT# *30*  (Cntinued)**

This endorsement, effective *12:01 am     April 16, 2008*          forms a part of
policy number  *443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

Defense Costs, whether incurred under  Clause 2(a), (b) or  (c) of this policy,
are not payable by the Insurer in addition to the Limit of Liability; except that
the separate limit,  if any, listed in Item 3(b) of the Declarations shall be in
addition to the aggregate Limit of  Liability stated in Item  3(a) of  the
Declarations.  Defense Costs are part of Loss and as  such are subject to the
Limit of Liability for Loss.

8.    **DEFENSE AGREEMENT**

(a)    **INSURER'S DUTY TO DEFEND**

Except as hereinafter stated, the **Insurer** shall have both  the right and
duty to defend any **Claim** against  an **Insured** alleging a **Wrongful Act**,
even if such **Claim** is groundless, false or fraudulent.

The **Insured** shall have  the  right to effectively associate  with  the
**Insurer** in the  defense of any **Claim**, including, but not limited  to,
negotiating a settlement, subject to  the provisions  of this Clause  2.
The **Insurer** shall not, however, be obligated to defend any  **Claim** after
either: (1) the **Limit of  Liability** and any  additional **Defense  Costs** (if
any) indicated in Item  3(b) of the Declarations  have been exhausted;
or (2) after the rejection  of a settlement offer,  pursuant to the terms
of subparagraph (c) of this Clause 2.

(b)    **INSURED'S OPTION TO ASSUME DEFENSE**

Notwithstanding the above, the **Insureds** shall have the  right to
assume the defense of any **Claim** made against them.  This right shall
be exercised in writing by the **Named Sponsor** on the behalf of all
**Insureds** within sixty (60) days of the reporting of  the **Claim** to the
**Insurer** pursuant to Clause 8 of the policy.  Upon receipt of such
written request, the **Insurer** shall tender  the defense of  the **Claim** to
the **Insureds**.  Once the defense has been so tendered, the **Insurer**
cannot re-assume the  defense of the **Claim**. The **Insurer** shall have
the right to effectively  associate with the  **Insureds** in the  defense of
any **Claim**, including but not limited  to negotiating a settlement.
Provided that  the **Insurer**  shall be  permitted to  effectively associate
with the **Insureds** in the  defense of any **Claim**, including but not
limited to negotiating a settlement of any **Claim**, the **Insurer's** consent
to settlements, stipulated judgments and **Defense Costs** shall not be
unreasonably withheld.

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.
*END 30*

**ENDORSEMENT# 30   (Cont'ed)**

This endorsement, effective *12:01 am    April 16, 2008*                      forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by      *Illinois National Insurance Company*

(c)   **GENERAL PROVISIONS (applicable to both (a) and (b) above)**

The Insurer shall advance **Defense Costs** prior to the  final disposition
of a **Claim**, subject to the other provisions of this policy.   Such
advance payments by the **Insurer** shall be repaid to  the **Insurer** by the
**Insureds**, severally according to their respective interests, in the event
and to  the extent  that the  **Insureds**  shall not  be entitled  under the
terms and conditions of this policy to payment of such **Loss**.

The **Insured(s)** shall  not admit or  assume any liability,  enter into any
settlement  agreement,  stipulate  to  any judgment,  or incur  any
**Defense Costs** without the  prior written consent of  the **Insurer**. Only
those settlements,  stipulated judgments and  **Defense Costs** which
have been consented to in writing  by the **Insurer** shall be  recoverable
as **Loss** under the terms of this policy.

The **Insured(s)** shall  give the  **Insurer** full cooperation  and such
information as the  **Insurer** may reasonably require. The  **Insurer** may
make any settlement of any **Claim** it deems expedient with respect to
any **Insured**, subject to such **Insured's** written consent. If any **Insured**
withholds consent  to such settlement, the  **Insurer's** liability  for all
**Loss** on account of such **Claim** shall not exceed the amount for which
the **Insurer** could  have  settled such  **Claim,** plus **Defense Costs**
incurred as of  the date  such settlement was  proposed in  writing by
the **Insurer**.   Further, in  the  event the **Insurer** is defending the **Claim**
pursuant to Clause 2(a) above, then the **Insurer** shall tender the **Claim**
to the **Insureds** who shall thereafter at their own expense and on their
own behalf  negotiate  and defend such  **Claim**  independently of  the
**Insurer**.

Selection of counsel  to defend the  **Claim** made  against the **Insureds**
shall be governed by Clause 9 of the policy (if applicable).

9.   **PRE-AUTHORIZED DEFENSE ATTORNEYS**

This Clause 9 applies only to: (1) a **Claim** brought  by any government entity;
(2) a request    coverage for  a **Voluntary Compliance  Loss**; or (3)  a **Claim**
brought in the    m of a class or representative action.

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

END 30

**ENDORSEMENT# *30*  (C   tinued)**

This endorsement, effective   *12:01 am     April 16, 2008*        forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by      *Illinois National Insurance Company*

Affixed as Appendix A hereto and made a part of this policy is a list of Panel
Counsel law firms (" **Panel Counsel Firm(s)** ") from which a selection of legal
counsel shall be made to conduct the defense of any **Claim** against an
**Insured** to which this Clause 9 applies and pursuant to the terms set forth
below:

In the event the **Insurer** is operating under a duty to defend pursuant to
Clause 2(a) of this policy, then the **Insurer** shall select a **Panel Counsel Firm**
to defend the **Insureds**. Upon the written request of the **Named Sponsor**, the
**Insurer** may consent to a different **Panel Counsel Firm** selected by the
**Named Sponsor** to defend the **Insureds**, which consent shall not be
unreasonably withheld.

In the event the **Insureds** have assumed the defense of the **Claim** pursuant to
Clause 2(b) of the policy, then the **Insureds** shall select a **Panel Counsel Firm**
to defend the **Insured**. In addition, with the express prior written consent of
the **Insurer**, which consent shall not be unreasonably withheld, the **Insured**
may select a **Panel Counsel Firm** different from that selected by other
**Insureds** if such selection is required due to an actual conflict of interest or is
otherwise reasonably justifiable.

The selection of a **Panel Counsel Firm** from the attached list to defend the
**Claim** against the **Insureds** shall not be restricted to the jurisdiction in which
the **Claim** is brought.

The list of **Panel Counsel Firms** may be amended from time to time by the
**Insurer**. However, no change shall be made to the specific list attached to
this policy during the **Policy Period** without the consent of the **Named
Sponsor**. At the request of the **Named Sponsor**, the **Insurer** may in its
discretion add one or more law firms to the attached list of **Panel Counsel
Firms** for the purposes of defending the **Claim** made against the **Insureds**.
The list of **Panel Counsel Firms** may also be amended to add, at the sole
discretion of the **Insurer**, a non- **Panel Counsel Firm** for the purpose of acting
as "local counsel" to assist an existing **Panel Counsel Firm**, which **Panel
Counsel Firm** will act as "lead counsel" in conducting the defense of the
**Claim**, for **Claims** brought in a jurisdiction in which the chosen **Panel Counsel
Firm** does not maintain an office.

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

**END 30**

ENDORSEMENT# 30   (Cont' ed)

This endorsement, effective *12:01 am    April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*


by     *Illinois National Insurance Company*


### 13.   SUBROGATION AND WAIVER OF RECOURSE

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery thereof, and the **Insureds** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of the **Insureds**. In no event shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a criminal act, or been determined to have in fact committed a deliberate fraudulent act or knowingly or willingly violated any statute, rule or law (including but not limited to **Employee Benefit Law**), or been determined to have in fact obtained any profit or advantage to which such **Insured** was not legally entitled.

In the event this policy has been purchased by an **Insured** other than a **Plan** , the **Insurer** shall have no right of recourse against an **Insured**. Notwithstanding the foregoing, the **Insurer** shall have a right of recourse against an **Insured** arising out of a **Claim** by an **Insured** against another **Insured** unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the **Insured** claimed against.

It is further provided that in the event of any recovery under this Clause 13, the **Limit of Liability** of this policy shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the **Insurer** in connection therewith.

(2)   Clauses 8, 12, 14, 15 and 18 are hereby modified as follows:

A.   Clause 8. **NOTICE/CLAIM REPORTING PROVISIONS** , is hereby amended as follows:

(i)   The phrase " **Organization** or an" is deleted from paragraph (a) and (c);

(ii)   The term " **Named Entity**" is replaced with the phrase " **Named Entity** or **Named Sponsor**";

NOTICE:   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 30

**ENDORSEMENT# 30   (Continued)**

This endorsement, effective *12:01 am     April 16, 2008*       forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by     *Illinois National Insurance Company*

B.  Clause 12. **ORGANIZATIONAL CHANGES**, is hereby amended in part as follows:

 (i)  The term " **Named Entity**" is replaced with  the phrase " **Named Entity or Named Sponsor**" wherever it may appear in the clause.;

 (ii)  Paragraphs (b), (c) and (d)  are deleted in  their entirety  and replaced with the following:

  *Other Organizational Changes:*  In all events, coverage as  is afforded under this policy  with respect to a **Claim** made  against any **Sponsor Organization** and/or any **Insured** thereof  shall only apply for  **Wrongful Acts** committed or allegedly committed after the effective  time such **Sponsor Organization** became a **Sponsor  Organization** and such **Insured** became an **Insured**, and prior to the  effective time that  such **Sponsor Organization** ceases to be a **Sponsor  Organization** or such **Insured** ceases to be an **Insured**.

  With regard to any **Plan** that was sold, spun-off or  terminated either prior to the  inception date  of this policy  or during  the **Policy Period**, this policy  shall apply but solely with respect  to a **Wrongful Act(s)** that occurred prior  to the date of such  sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural  Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final  date of asset distribution of such **Plan**, provided that notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

C.  Clause 14. **OTHER INSURANCE AND INDEMNIFICATION**  is hereby amended as follows:

  The second paragraph of Clause 14 is hereby deleted in its entirety.

D.  Clause 15. **NOTICE AND AUTHORITY**, is hereby amended in part as follows:

  The term  " **Named Entity**" is  replaced  with " **Named Sponsor**" wherever it appears.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 30**

**ENDORSEMENT# 30   (Continued)**

This endorsement, effective *12:01 am     April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

 

E.   Clause 18. **ACTION AGAINST INSURER**, is hereby amended in part as
follows:

The phrase "or the **Organization**" and "any **Organization**" are deleted
wherever they appear.

(3)   Clause 10. **DISCOVERY CLAUSE**, and Clause 11. **CANCELLATION CLAUSE**, are not
amended and apply as stated to the coverage as is afforded by this endorsement.
Clause 10 and Clause 11 shall apply to the entire policy. They neither apply nor
can be elected separately to the coverage as is afforded by this policy and by this
endorsement.

(4)   Clauses 16, 17 and 23 are not amended and apply as stated to the coverage as is
afforded by this endorsement.

(5)   The following Clauses are hereby added to the policy.

**24.   RETENTION CLAUSE**

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim**
which is in excess of the Retention amount stated in Item 4 of the
Declarations, such Retention amount to be borne by the **Insured** and shall
remain uninsured, with regard to all **Defense Costs** other than: (1) non-
**Indemnifiable Loss** of a **Natural Person Insured**; and (2) **Voluntary
Compliance Loss**. A single Retention amount shall apply to **Loss** arising from
all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

**25.   REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this endorsement to any one of the Insureds, the
Insurer has relied upon the declarations and statements in the application or
request for coverage. All such declarations and statements are the basis of
coverage and shall be considered incorporated in and constitute part of this
endorsement and the policy. The application or request for coverage shall be
construed as a separate application or request by each of the Insureds. With
respect to such declarations and statements, no statements made or
knowledge possessed by any Insured other than knowledge or information
possessed by the **Insured**(s) actually executing the application or request)

**NOTICE:**   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

**END 30**

**ENDORSEMENT# 30   (Continued)**

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

shall be imputed to any other Insured to determine whether coverage is available for any **Claim** made against such other **Insured** under this endorsement.

26.   **SPOUSAL, DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION**

If a **Claim** against a **Natural Person Insured** includes a **Claim** against: (i) the lawful spouse **or Domestic Partner** of such **Natural Person Insured**; or (ii) a property interest of such spouse or **Domestic Partner**, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Natural Person Insured**, this policy shall cover **Loss** arising from the **Claim** made against that spouse or **Domestic Partner** or the property of that spouse or **Domestic Partner** to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse or **Domestic Partner**. This policy shall cover **Loss** arising from a **Claim** made against the estate, heirs, or legal representatives of any deceased **Natural Person Insured**, and the legal representatives of any **Natural Person Insured,** in the event of incompetency, insolvency or bankruptcy, who was a **Natural Person Insured** at the time the **Wrongful Act(s)** upon which the **Claim** is based was committed.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

**END 30**

**ENDORSEMENT# 31**

**This endorsement, effective** *12:01 am     April 16, 2008*     forms a part of
**policy number** *443-37-08*
**issued to** *PFIZER INC.*

**by** *Illinois National Insurance Company*

### ADDITIONAL LISTED PLANS

In consideration of the premium charged, it is hereby understood and agreed that the Definition of " **Plan**" shall also include the following listed **Plan(s)**, subject to the corresponding Continuity Date:

| PLAN(S) | CONTINUITY DATE |
|---------|-----------------|
| Pfizer Savings Plan | N/A |
| Pharmacia Savings Plan | N/A |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 31**

AUTHORIZED REPRESENTATIVE

2-14047

**ENDORSEMENT# 32**

This endorsement, effective  *12:01 am*      *April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by      *Illinois National Insurance Company*

### SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS

In consideration of the premium charged, it is hereby understood and agreed that the **Sublimit of Liability** for all **Voluntary Compliance Loss** in the aggregate, including **Defense Expenses,** is $100,000.

This **Sublimit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 3(a) of the Declarations and in no way shall serve to increase such **Policy Aggregate Limit of Liability**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*2-14047*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

END 32

ENDORSEMENT# 33

This endorsement, effective *12:01 am*    *April 16, 2008*        forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### HIPAA EXTENSION

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

**I.**

Clause 3. DEFINITIONS, **" Wrongful Act"** is amended  by adding  the  following to  the end
thereof:

> " **Wrongful Act** shall also mean the failure to  comply with the privacy  provisions of
> the Health Insurance  Portability and  Accountability Act  of 1996  and any  rules or
> regulations promulgated thereunder (" **HIPAA**").

**II.**

Solely for the purpose of this endorsement, Clause 3. DEFINITIONS, " **Loss"** is amended by
adding the following to the end thereof:

> " **Loss"** shall also include civil money penalties imposed upon an **Insured** for violation
> of the privacy provisions  of **HIPAA** (" **HIPAA Penalties"**). The maximum limit of  the
> **Insurer's** liability for all **HIPAA** Penalties in the aggregate  shall be $50,000 (" **HIPAA
> Sublimit of Liability"**).   The **HIPAA Sublimit of  Liability** shall  be part of  and not  in
> addition to  the  Policy Aggregate Limit  of Liability set forth  in Item  3(a) of the
> Declarations and shall  in no way  serve to increase  such Policy Aggregate  Limit of
> Liability.

**III.**

It is  further  understood  and agreed that  no Retention  amount  is  applicable to  **HIPAA
Penalties.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 33

AUTHORIZED REPRESENTATIVE

2-14047

**ENDORSEMENT# 34**

This endorsement, effective *12:01 am*    *April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

### CONDUCT EXCLUSIONS AMENDED (PTL)

In consideration of the premium charged, it is hereby understood and agreed that in Clause
5. **EXCLUSIONS**, paragraphs (a) and (b)  are deleted in their entirety and  replaced with the
following:

    (a)    arising out of, based upon or attributable to the gaining of any profit or
advantage if any final adjudication establishes  the **Insured(s)** was not legally
entitled to such profit or advantage;

    (b)    arising out of, based upon or attributable to the committing of any criminal or
deliberate fraudulent act, or  knowing or willful  violation of any  statute, rule
or law, including, but not limited to **Employee Benefit Law** if any final
adjudication establishes such deliberate criminal or  deliberate fraudulent act,
or knowing or  willful violation of  any statute, rule  or law, including  but not
limited to **Employee Benefit Law**;

{The **Wrongful Act** of any **Insured** shall not be imputed to any other **Insured** for the purpose
of determining the applicability of the foregoing exclusions 5(a) and 5(b).}

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*2-14047*

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

**END 34**

**ENDORSEMENT# 35**

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of
policy number  *443-37-08*
issued to  *PFIZER INC.*

by  *Illinois National Insurance Company*

### SEVERABILITY OF THE APPLICATION
### (FULL INDIVIDUAL SEVERABILITY; TOP FOUR NAMED SPONSOR POSITIONS AND SIGNER IMPUTED TO SPONSOR ORGANIZATION AND PLAN; AND NON-RESCINDABLE COVER FOR NON-INDEMNIFIABLE LOSS)

In consideration of the premium charged, it is hereby understood and agreed that the following Clause is added to the policy at the end thereof:

**SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements, warranties and representations contained in the **Application** as being accurate and complete. All such statements, warranties and representations are the basis for this policy and are to be considered as incorporated into this policy.

The **Insureds** agree that in the event that the statements, warranties and representations contained in the **Application** are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then the coverage provided by this Policy shall be deemed void *ab initio* solely with respect to any of the following **Insureds**:

(1)  solely with respect to **Loss** other than non-**Indemnifiable Loss**, any **Natural Person Insured** who knew as of the inception date of the **Policy Period** the facts that were not accurately and completely disclosed in the **Application**, and

(2)  any **Sponsor Organization** and **Plan**, if:

   (i)  the person who executed the **Application**; or
   (ii)  any past or present chief executive officer, chief financial officer, chief operating officer or General Counsel of the **Named Sponsor**;

   knew as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed in the **Application**,

whether or not such **Natural Person Insured** knew that such facts were not accurately and completely disclosed in the **Application**.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 35**

**ENDORSEMENT# 35** (Continued)

This endorsement, effective *12:01 am    April 16, 2008*    forms a part of policy number  *443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

Solely with respect to any non- **Indemnifiable Loss** of any **Natural Person Insured**, under no circumstances shall the coverage provided by this Policy be deemed void, whether by rescission or otherwise, but such coverage will be subject to all other terms, conditions and exclusions of the Policy.

It is understood and agreed that this endorsement supersedes any inconsistent language contained in the **Application**.

For purposes of this endorsement, the term " **Application**" means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein any other documents submitted in connection with the underwriting of this policy or the underwriting of any other fiduciary liability policy (or equivalent policy), any public documents filed by the **Sponsor Organization** with any federal, state, local or foreign regulatory agency (including but not limited to the Securities and Exchange Commission (SEC) and the Department of Labor (DOL)), CPA-audited financial statements for all **Plans**, with investment portfolios, and Form 5500 for all **Plans**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT, HOWEVER SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

END 35

*2-14047*

**ENDORSEMENT# 36**

This endorsement, effective *12:01 am     April 16, 2008*     forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by   *Illinois National Insurance Company*

### INVESTMENT LOSS COVERAGE ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that, subject to all other terms, conditions and limitations of the Policy, Clause 3. DEFINITIONS is amended by deleting the first paragraph of the definition of " **Loss**" in its entirety and replacing it with the following:

> **"Loss"** means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and Defense Costs; however, **Loss** shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in item 3(c) of the Declarations page for **Voluntary Compliance Loss**, (ii) **UK Fines and Penalties**, (iii) the five per cent or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**, and (iv) the 20 per cent or less penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an Insured is not financially liable or which is without legal recourse to an the **Insured**; (5) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of a **Natural Person Insured**; provided however, that **Loss** shall include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual accounts of participants in a **Plan** by reason of a change in value of the investments held by that **Plan**, including, but not limited to, the securities of the **Sponsor Organization**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits"; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

(c) American International Group, Inc.  All rights reserved.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END 36

AUTHORIZED REPRESENTATIVE

2-14047

**ENDORSEMENT# 37**

This endorsement, effective  *12:01 am      April 16, 2008*        forms a part of
policy number  *443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

### HAMMER CLAUSE AMENDED

In consideration of the premium charged, it is hereby understood and agreed that in Clause
2(c), GENERAL PROVISIONS, the third paragraph is deleted in its entirety and replaced
with the following:

> The Insureds shall give the Insurer full cooperation and such information as the
> Insurer may reasonably require. The Insurer may make any settlement of any Claim
> it deems expedient with respect to any Insured, subject to such Insured's written
> consent. If any Insured withholds consent to such settlement, the Insurer's liability
> for all Loss on account of such Claim shall not exceed: (1) the amount for which the
> Insurer could have settled such Claim plus Defense Costs incurred as of the date
> such settlement was proposed in writing by the Insurer (herein, the "Settlement
> Opportunity Amount"), plus (2) 70% of covered Loss in excess of such Settlement
> Opportunity Amount, it being a condition of this insurance that the remaining 30%
> of such Loss excess of the Settlement Opportunity Amount shall be carried by the
> Insureds at their own risk and be uninsured.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*2-14047*

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

END 37

**ENDORSEMENT# 38**

This endorsement, effective *12:01 am     April 16, 2008*     forms a part of
policy number    *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

## ADVANCEMENT OF LOSS (applicable to PTL coverage)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.      Clause 7. **RETENTION CLAUSE** is amended to include the following paragraph at the end of such Clause:

    In the event a **Sponsor Organization** refuses or is unable to pay an applicable Retention due to **Financial Insolvency**, then the **Insurer** shall commence advancing **Loss** within the Retention and pursuant to the other terms, conditions and exclusions of this policy, provided that the **Insurer** shall be entitled to recover the amount of **Loss** advanced within the Retention from the **Sponsor Organization** pursuant to Clause 13. **SUBROGATION** as amended herein.

2.      Clause 13. **SUBROGATION AND WAIVER OF RECOURSE** is deleted in its entirety and replaced with the following:

    13.      **SUBROGATION AND WAIVER OF RECOURSE**

    In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of each and every **Sponsor Organization's** and **Insured's** rights of recovery thereof, and each such **Sponsor Organization** and **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights (including, without limitation, the assertion of indemnification or contribution rights) including the execution of any and all documents necessary to enable the **Insurer** effectively to bring suit in the name of each such **Sponsor Organization** and each such **Insured**. In no event, however, shall the **Insurer** exercise its rights of subrogation against a **Natural Person Insured** under this policy unless Exclusions (a) or (b) of Clause 5. EXCLUSIONS apply with regard to such **Natural Person Insured**.

    Notwithstanding the immediately preceding paragraph, in the event that the **Insurer** shall for any reason pay **Indemnifiable Loss** on behalf of a **Natural Person Insured**, in addition to any other rights the **Insurer** may have under applicable law, the **Insurer** shall have the right hereunder to recover from the **Sponsor Organization** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Sponsor Organization** and shall be subrogated to the rights of the **Natural Person Insured** hereunder.

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**END 38**

**ENDORSEMENT# *38* (C****nued)**

This endorsement, effective *12:01 am    April 16, 2008*        forms a part of
policy number   *443-37-08*
issued to    *PFIZER INC.*

by    *Illinois National Insurance Company*

3.    For purposes of this endorsement, the following definition shall apply:

"**Financial Insolvency**" means the: (i) appointment by any state or federal official,
agency or court of a receiver, conservator, liquidator, trustee, rehabilitator or similar
official to take control of, supervise, manage or liquidate a **Sponsor Organization**; or
(ii) the **Sponsor Organization** becoming a debtor-in-possession pursuant to the
United States bankruptcy law, and as to both (i) or (ii), the equivalent status outside
the United States of America.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

END 38

This endorsement, effective *12:01 am*   *April 16, 2008*      forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by      *Illinois National Insurance Company*

### EXCLUSION (d) AMENDATORY ENDORSEMENT (PTL)

In consideration of the premium charged, it is hereby understood and agreed that in Clause
5. **EXCLUSIONS**, paragraph (d) is deleted in its entirety and replaced with the following:

(d)      alleging, arising out of, based upon or attributable to the facts alleged, or to
the same or related **Wrongful Act** alleged or contained, in any claim which
has been reported prior to the inception of this policy, or in any
circumstances of which notice has been given, under any employee benefit
plan fiduciary liability insurance policy issued to an **Insured** of which this
policy is a renewal or replacement or which it may succeed in time;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

*END* 39

**ENDORSEMENT# *40***

This endorsement, effective  *12:01 am*     *April 16, 2008*          forms a part of
policy number   *443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

### COMBO ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that
Endorsement #'s 9 to 29 are applicable to Form  75011 (2/00) and Endorsement #'s 31 to
39 are applicable to Endorsement #30 (Fiduciary coverage).

Please note that Endorsement #'s 1-8, 40 and 41 are applicable to this policy in its
entirety.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

2-14047

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

**END 40**

## ENDORSEMENT# 41

This endorsement, effective *12:01 am    April 16, 2008*                    forms a part of
policy number  *443-37-08*
issued to *PFIZER INC.*


by     *Illinois National Insurance Company*

### FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| MNSCPT | | OUTSIDE ENTITY EXECUTIVE |
| MNSCPT | | GLOBAL EXTENSION ENDORSEMENT |
| MNSCPT | | INVESTIGATION COSTS FOR DERIVATIVE DEMANDS |
| MNSCPT | | SHADOW DIRECTORS COVERAGE |
| MNSCPT | | NON-RESCINDABLE SIDE A ENDORSEMENT |
| MNSCPT | | CLAUSE 7(a)(2) AMENDATORY |
| MNSCPT | | SPECIFIED FILINGS 12 MONTHS BACK |
| MNSCPT | | SECURITIES CLAIM DEFINITION - COMMON LAW |
| MNSCPT | | SUBROGATION CLAUSE |
| MNSCPT | | SECTION 11 OR 12 ENDORSEMENT |
| MNSCPT | | EXTRADITION COVERAGE |
| 94678 | 06/07 | ADVANCEMENT OF LOSS ENDORSEMENT FINANCIAL INSOLVENCY |
| MNSCPT | | EXCLUSION (d) AMENDATORY ENDORSEMENT |
| MNSCPT | | 3/01 EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY INSURANCE ENDORSEMENT |
| MNSCPT | | ADDITIONAL LISTED PLANS |
| MNSCPT | | SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS |
| MNSCPT | | HIPAA EXTENSION |
| MNSCPT | | CONDUCT EXCLUSIONS AMENDED (PTL) |
| MNSCPT | | SEVERABILITY OF THE APPLICATION |
| MNSCPT | | INVESTMENT LOSS COVERAGE ENDORSEMENT |
| MNSCPT | | HAMMER CLAUSE AMENDED |
| MNSCPT | | ADVANCEMENT OF LOSS (applicable to PTL coverage) |
| MNSCPT | | EXCLUSION (d) AMENDATORY ENDORSEMENT (PTL) |

NOTICE:   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

END-041

**2-14047**

78859 (10/01)

## ENDORSEMENT# *41*

This endorsement, effective *12:01 am*   *April 16, 2008*   forms a part of
policy number   *443-37-08*
issued to *PFIZER INC.*


by   *Illinois National Insurance Company*

### FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| ✓ 75010 | 02/00 | D00200 ADMITTED – DEC |
| ✓ 81285 | 01/03 | TRIA DEC DISCLOSURE FORM |
| ✓ 75029 | 07/02 | NEW YORK REG. 121 DEC. DISCLOSURE |
| ✓ 75011 | 02/00 | D00200 ADMITTED – POLICY |
| ✓ | 04/08 | SECURITIES CLAIM PANEL COUNSEL LIST (PLEASE SEE WWW.BRIEFBASE.COM FOR THE CURRENT LIST OF PANEL COUNSEL FIRMS.) |
| ✓ 75013 | 02/00 | APPENDIX B CRISISFUND |
| ✓ 69898 | 09/06 | NEW YORK AMENDATORY – CANCELLATION/NONRENEWAL |
| ✓ 75027 | 03/00 | NEW YORK CLAIMS MADE AMENDATORY |
| ✓ 75030 | 07/02 | NEW YORK DISCOVERY ENDORSEMENT |
| ✓ MNSCPT | | STATE AMENDATORY INCONSISTENT |
| ✓ MNSCPT | | DISCOVERY CLAUSE AMENDED |
| ✓ MNSCPT | | SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION |
| ✓ MNSCPT | | SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION |
| ✓ 89644 | 07/05 | COVERAGE TERRITORY ENDORSEMENT (OFAC) |
| ✓ 76812 | 05/06 | NEW YORK REG. 110 RETENTION COINSURANCE ENDORSEMENT |
| ✓ MNSCPT | | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
| ✓ MNSCPT | | CONDUCT EXCLUSIONS |
| ✓ 89371 | 05/05 | "NO LIABILITY" PROVISION DELETED (SECURITIES CLAIM RETENTION APPLIES TO ALL LOSS ARISING OUT OF A SECURITIES CLAIM) |
| ✓ MNSCPT | | SUBSIDIARY – AUTO-SUBSIDIARY PERCENTAGE DECREASED |
| ✓ MNSCPT | | SUBSIDIARY – ADDITION TO THE DEFINITION OF "SUBSIDIARY" |
| ✓ MNSCPT | | DEFINITION OF EXECUTIVE AMENDED |
| ✓ MNSCPT | | PRIOR ACTS EXCLUSION FOR LISTED ENTITIES |

NOTICE-

APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

**END-041**

## ENDORSEMENT# *41*

This endorsement, effective *12:01 am*      *April 16, 2008*                    forms a part of
policy number   *443-37-08*
issued to *PFIZER INC.*

by      *Illinois National Insurance Company*

### FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| √ MNSCPT | | COMBO ENDORSEMENT |
| √ 78859 | 10/01 | FORMS INDEX ENDORSEMENT |
| √ 75031 | 07/02 | NEW YORK REG. 121 APPLICATION DISCLOSURE |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

NOTICE:   THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT  HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW **END 041**ATIONS.

*2-14047*

78859 (10/01)

**NEW YORK REGULATION 121**
**APPLICATION DISCLOSURE SUPPLEMENT**

Solely for the purposes of this supplement, "Claims-made relationship" means that period of time between the effective date of the first claims made policy between us (the Insured) and you (the policy holder) and the cancellation or nonrenewal of the last consecutive claims-made policy between such parties, where there has been no gap in coverage, but does not include any period covered by tail coverage.

### Retroactive Date/Prior Acts Exclusion Date/"Nose" Coverage

Coverage for events that occurred prior to the beginning of the policy period is referred to in this supplement as "nose" coverage. If the policy has a retroactive date feature or an exclusion or other wording deleting coverage for events that occurred before a certain date (a prior acts exclusion), then nose coverage is limited (or non existent) and **THERE WILL BE NO COVERAGE FOR CLAIMS ARISING OUT OF SUCH EVENTS THAT OCCURRED PRIOR TO THAT DATE.**

### Extended Reporting Period/Discovery Period/"Tail" Coverage

The Extended Reporting Period, or Discovery Period as it may be called, will increase the time within which a claim may be eligible for the policy's coverage. This is referred to in this supplement as "tail" coverage. Tail coverage helps to prevent the situation of a claim going uncovered because of cancellation or nonrenewal of the policy or other termination of coverage. Tail coverage provides for a period of time after termination of coverage during which claims first made against you and reported to us in writing, events that occurred before the termination of coverage and otherwise covered by the policy, will be covered. Generally, this optional tail coverage can be purchased if coverage is terminated either by us or by you. If such optional tail coverage is not purchased, an automatic tail coverage goes into effect upon termination of coverage, however, this automatic tail coverage lasts for only 60 days, (90 days if the policyholder is a public entity as defined in section 107(a)(51) of the New York Insurance Law). After the expiration of the tail coverage, you will have a gap in your insurance coverage, unless you have obtained appropriate coverage to fill the gap. **UPON TERMINATION OF COVERAGE IT IS VERY IMPORTANT THAT YOU CONSULT WITH YOUR INSURANCE AGENT, BROKER OR OTHER PROFESSIONAL INSURANCE ADVISER.**

The length of the optional tail offered in the policy is one (1) year generally, but, this option will not be available in some circumstances. It will not be available if coverage is terminated by us because of non-payment of premium or fraud and at the effective date of such termination of coverage a claims-made relationship has continued for less than one year.

### Future Premium Increases As Claims-Made Relationship Matures

During the first several years of being covered on a claims-made basis, claims-made rates are generally comparatively lower than rates on other types of policies generally known as occurrence policies, especially if there is no nose coverage initially, and you can expect substantial annual premium increases, independent of overall rate level increases, until the claims-made relationship reaches maturity.

### Length of Optional Tail and Premium Charged For it

The length of the optional tail offered in this policy and the premium charged for it is as follows (please see the policy form and endorsements for complete details):

APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2-14047**

75031 (7/02)

| Length Of Optional Tail | Premium Charge For Optional Tail |
|---|---|
| One Year | *200* % |

**THIS DISCLOSURE SUPPLEMENT GENERALLY DISCUSSES CERTAIN IMPORTANT FEATURES OF THE POLICY. PLEASE READ THE ENTIRE POLICY CAREFULLY AND DISCUSS IT WITH YOUR INSURANCE AGENT OR BROKER OR OTHER PROFESSIONAL INSURANCE ADVISER. THE PROVISIONS OF THE POLICY FORM AND ENDORSEMENTS THERETO ARE CONTROLLING.**

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

*2-14047*

75031 (7/02)

This endorsement, effective *12:01 am     April 16, 2008*     forms a part of
policy number   *00-443-37-08*
issued to   *PFIZER INC.*

by     *Illinois National Insurance Company*

## CANCELLATION CLAUSE AMENDED ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that Clause
11. **Cancellation Clause** of this policy is amended by adding the following paragraph to the
end thereof:

> Notwithstanding the foregoing, in the event that a financial strength rating is issued
> (1) below A- by A.M. Best Co., or (2) below BBB by Standard & Poor's Ratings
> Services, for the **Insurer** (hereinafter "Credit Rating Downgrade"), this policy may be
> canceled by the **Named Entity** by mailing written prior notice to the **Insurer** or by
> surrender of this policy to the **Insurer** or its authorized agent. If this policy is
> canceled by the **Named Entity** within 30 days after such Credit Rating Downgrade,
> the **Insurer** shall retain the pro rata proportion of the premium herein.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.
American International Group, Inc. All rights reserved.

END 42

**ENDORSEMENT# *43***

This endorsement, effective *12:01 am*    *April 16, 2008*    forms a part of
policy number  *00-443-37-08*
issued to   *PFIZER INC.*

by    *Illinois National Insurance Company*

### ADDITIONAL INSURED ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the definition of "Insured" in Clause 3 of the policy is amended in part by the addition of the following paragraph (5) to the end thereof:

    (5)    Embrex Inc.

It is further understood and agreed that coverage afforded by this endorsement shall apply excess of any other existing valid insurance. Further, if said other insurance is provided by the Insurer or any member company of American International Group, Inc. (or would be provided but for the application of the retention amount or the exhaustion of the **Limit of Liability** or the failure to submit a **Claim**), then the **Limit of Liability** provided by virtue of this policy shall be reduced by the limit of liability provided by said other AIG policy.

Notwithstanding the above, in the event such other AIG policy contains a provision which is similar in intent to the foregoing paragraph, then the foregoing paragraph will not apply, but instead:

    1)    the **Insurer** shall not be liable under this policy for a greater proportion of the **Loss** than the applicable **Limit of Liability** under this policy bears to the total limit of liability of all such policies, and

    2)    the maximum amount payable under all such policies shall not exceed the limit of liability of the policy that has the highest available limit of liability.

Nothing contained in this endorsement shall be construed to increase the **Limit of Liability** of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*2-14047*



NOTICE: THESE POLICY TERMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE REQUIREMENTS OF THE NEW YORK STATE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
American International Group, Inc. All rights reserved.

AUTHORIZED REPRESENTATIVE

END 43

EXHIBIT B

# POLICYHOLDER
# DISCLOSURE NOTICE OF
# TERRORISM INSURANCE COVERAGE
### (for policies with no terrorism exclusion or sublimit)

You are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), effective December 26, 2007, this policy makes available to you insurance for losses arising out of certain acts of terrorism.  Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act.  Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage.

However, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Act exceed
$100 billion in a Program Year (January 1 through December 31) and we have met our
insurer deductible under the Act, we shall not be liable for the payment of any portion of
the amount of such losses that exceeds $100 billion, and in such case insured losses up
to that amount are subject to pro rata allocation in accordance with procedures
established by the Secretary of the Treasury.

The portion of your policy's annual premium that is attributable to insurance for such acts
of terrorism is: $ **-0-.**

If you have any questions about this notice, please contact your agent or broker.

# IMPORTANT NOTICE TO POLICYHOLDERS

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers").  Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478.  Additional information may be available from your producer.

Thank you for choosing Chubb.

10-02-1295 (ed. 6/2007)

# *EXCESS POLICY*

**DECLARATIONS**

Policy Number   8209-9878

**Federal Insurance Company**,
a stock insurance company,
incorporated under the laws of
Indiana, herein called the
Company.

---

Item 1.   **Parent Organization**:   Pfizer, Inc.

Item 2.   Principal Address:   235 East 42nd Street
New York, NY  10017

Item 3   Limit of Liability:

Each **Policy Period**   $5,000,000

Item 4.   **Underlying Insurance**:

(A)   **Primary Policy**

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| National Union Fire Insurance Company of Pittsburgh, PA. | 443-37-08 | $25,000,000.00 | April 16, 2008 To April 16, 2009 |

(B)   Other Policies

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| See attached endorsement No. 3 | | | To |

Item 5.   **Policy Period**:   From:   12:01 a.m. on April 16, 2008
To:   12:01 a.m. on April 16, 2009

Item 6.   Endorsements Effective at Inception:   See Schedule of Forms Attached

Item 7.   Termination of Prior Policies:   X New Business

Item 8.   Pending or Prior Date:   Not Applicable

The Company issuing this policy has caused this policy to be signed by its authorized officers, but it shall not be valid unless also signed by a duly authorized representative of the Company.

**FEDERAL INSURANCE COMPANY**

_____
Secretary

_____
President

08/15/2008
_____
Date

_____
Authorized Representative

# *Excess Policy*

In consideration of the payment of the premium and subject to the Declarations, limitations, conditions, provisions and other terms of this policy, the Company agrees as follows:

| | | |
|---|---|---|
| **Insuring Clause** | 1. | The Company shall provide the **Insureds** with insurance during the **Policy Period** excess of the **Underlying Limit**. Coverage hereunder shall attach only after the insurers of the **Underlying Insurance** shall have paid in legal currency the full amount of the **Underlying Limit** for such **Policy Period**. Coverage hereunder shall then apply in conformance with the terms and conditions of the **Primary Policy** as amended by any more restrictive terms and conditions of any other policy designated in Item 4(B) of the Declarations, except as otherwise provided herein. |
| *Maintenance of Underlying Insurance* | 2. | All **Underlying Insurance** shall be maintained in full effect during the **Policy Period** and shall afford the same coverage provided by all **Underlying Insurance** in effect upon inception of this **Policy Period**, except for any depletion or exhaustion of the **Underlying Limit** solely by reason of payment of losses thereunder. |
| *Depletion of Underlying Limit* | 3. | Only in the event of exhaustion of the **Underlying Limit** by reason of the insurers of the **Underlying Insurance**, or the **Insureds** in the event of financial impairment or insolvency of an insurer of the **Underlying Insurance**, paying in legal currency loss which, except for the amount thereof, would have been covered hereunder, this policy shall continue in force as primary insurance, subject to its terms and conditions and any retention applicable to the **Primary Policy**, which retention shall be applied to any subsequent loss in the same manner as specified in the **Primary Policy**.

The risk of uncollectability of any **Underlying Insurance**, whether because of financial impairment or insolvency of an underlying insurer or any other reason, is expressly retained by the **Insureds** and is not in any way insured or assumed by the Company. |
| **Underlying Sublimits** | 4. | If any **Underlying Limit** is subject to a **Sublimit**:

a.   coverage hereunder shall not apply to any claim which is subject to such **Sublimit**, however,

b.   the **Underlying Limit** shall be recognized hereunder as depleted to the extent of any payment of such claim subject to such **Sublimit**. |
| *Limit of Liability* | 5. | The Company's maximum liability for loss shall be the amount set forth in Item 3 of the Declarations. |
| *Claim Participation* | 6. | The Company may, at its sole discretion, elect to participate in the investigation, settlement or defense of any claim covered by this policy even if the **Underlying Insurance** has not been exhausted. |

| | | |
|---|---|---|
| **Pending or Prior Matters** | 7. | The Company shall not be liable under this policy for any loss which is based upon, arises from or is in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered against any **Insured** on or prior to the Pending or Prior Date set forth in Item 8 of the Declarations, or the same or any substantially similar fact, circumstance or situation underlying or alleged therein. |
| **Subrogation - Recoveries** | 8. | In the event of any payment under this policy, the Company shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery and the **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Company effectively to bring suit in the name of the **Insured**. |
| | | Any amounts recovered after payment of loss hereunder shall be apportioned in the inverse order of payment to the extent of actual payment. The expenses of all recovery proceedings shall be apportioned among the recipients of the recovery in the ratio of their respective recoveries. |
| **Notice** | 9. | The **Insureds** shall, as a conditions precedent to exercising their rights under this policy, give to the Company written notice as soon as practicable of the cancellation of any **Underlying Insurance**, any notice given under any **Underlying Insurance** and additional or return premiums charged or paid in connection with any **Underlying Insurance**. |

Notice to the Company under this policy shall be given in writing addressed to:

Notice of claim: Home Office Claims Department
Chubb Group of Insurance Companies
15 Mountain View Road
Warren, New Jersey 07059

All other notices: Executive Protection Practice
Chubb Group of Insurance Companies
15 Moutain View Road
Warren, New Jersey 07059

Such notice shall be effective on the date of receipt by the Company at such address.

| | | |
|---|---|---|
| **Company Authorization Clause** | 10. | By acceptance of this policy, the **Parent Organization** named in Item 1 of the Declarations agrees to act on behalf of all the **Insureds** with respect to the giving and receiving of notice of claim or termination, the payment of premiums and the receiving of any return premiums that may become due under this policy, the negotiation, agreement to and acceptance of endorsements, and the giving or receiving of any notice provided for under this policy (except the giving of notice to apply for any extended reporting period), and the **Insureds** agree that the **Parent Organization** shall act on their behalf. |
| **Alteration** | 11. | No change in, modification of, or assignment of interest under this policy shall be effective except when made by written endorsement to this policy which is signed by an authorized representative of the Company. |

# *Excess Policy*

| | | |
|---|---|---|
| ***Policy Termination*** | 12. | This policy shall terminate at the earliest of the following times: |

    (a)    sixty days after the receipt by the **Parent Organization** of a written notice of termination from the Company;

    (b)    upon the receipt by the Company of written notice of termination from the **Parent Organization**;

    (c)    upon expiration of the **Policy Period**;

    (d)    thirty days after the effective date of any alteration or termination of any **Underlying Insurance**, whether by the **Insureds** or any insurer of the **Underlying Insurer**, unless the Company (i) receives written notice of such alteration or termination from the **Parent Organization**, (ii) receives such information as the Company reasonably requests, and (iii) agrees, pursuant to an endorsement, not to terminate this policy; or

    (e)    at such other time as may be agreed upon by the Company and the **Parent Organization**.

Notice of cancellation or non-renewal of the **Primary Policy** duly given by the primary insurer shall serve as notice of the cancellation or non-renewal of this policy by the Company.

The Company shall refund the unearned premium computed at customary short rates if the policy is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata.

| | | |
|---|---|---|
| ***Termination of Prior Policies*** | 13. | Any policies specified in Item 7 of the Declarations shall terminate, if not already terminated, as of the inception date of this policy. |

| | | |
|---|---|---|
| ***Policy Definitions*** | 14. | When used in this policy: |

**Insureds** means those persons or organizations insured under the **Primary Policy**.

**Parent Organization** means the organization designated in Item 1 of the Declarations.

**Primary Policy** means the policy scheduled in Item 4(A) of the Declarations or any policy of the same insurer replacing or renewing such policy.

**Policy Period** means the period of time specified in Item 5 of the Declarations, subject to prior termination in accordance with Section 12 above. If any extended reporting period is exercised, such extension shall be treated as set forth in the **Primary Policy**.

**Sublimit** means any **Underlying Insurance** limit of liability which:

    a.    applies only to a particular grant of coverage under such **Underlying Insurance**, and

    b.    reduces and is part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in Item 4 of the Declarations.

## *Policy Definitions*
*(continued)*

**Underlying Insurance** means all policies scheduled in Item 4 of the Declarations and any policies of the same insurers replacing or renewing them.

**Underlying Limit** means the amount equal to the aggregate of all limits of liability as set forth in Item 4 of the Declarations for all **Underlying Insurance**, subject to any **Sublimits**, plus the applicable uninsured retention, if any, under the **Primary Policy**.

*Directors and Officers Liability Excess Chubb*

# Schedule of Forms

To be attached to and form part of                    Company:    Federal Insurance Company
Policy No.    8209-9878

Issued to:    Pfizer, Inc.


14-02-10840 (4/05 ed.)

14-02-3756 (10/01 ed.)

14-02-4489 (10/07 ed.)

14-02-7266 (8/02 ed.)

14-02-9228 (4/04 ed.)

14-02-9291 (5/04 ed.)

**ENDORSEMENT**

Effective date of
this endorsement: April 16, 2008

Company:  Federal Insurance Company

Endorsement No. 1

To be attached to and
form a part of Policy No. 8209-9878

Issued to:  Pfizer, Inc.

RELIANCE ENDORSEMENT

In consideration of the premium charged, it is agreed that in granting coverage under this policy the Company has relied upon the statements and representations contained in the Application (as that term is defined in the **Primary Policy's** Endorsement No. 23) as being true and complete; that such statements and representations are the basis of the Company's decision to insure the risk to which this policy applies; and that the Application (as that term is defined in the **Primary Policy's** Endorsement No. 23) shall be deemed attached to, incorporated into and made a part of this policy.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

Authorized Representative

14-02-10840 (04/2005)                  Page 1

**ENDORSEMENT**

Effective date of
this endorsement:  April 16, 2008

Company:  Federal Insurance Company

Endorsement No. 2

To be attached to and
form a part of Policy No. 8209-9878

Issued to:  Pfizer, Inc.

---

NEW YORK AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1)     If judgment against any person or entity entitled to coverage under the policy remains unsatisfied
        thirty (30) days after the serving of notice of entry of judgment upon such person or entity (or his,
        her or its attorney) and upon the Company, then, except during a stay or limited stay of execution
        against such person or entity on such judgment, an action may be maintained against the
        Company under the policy for the amount of such judgment.  Nothing herein is intended,
        however, nor shall it be construed, to obligate the Company to make any payment it would not
        otherwise be obligated to make under the terms, conditions, limitations and endorsements of the
        policy, or to pay any Loss in excess of the then-available Limit of Liability under the policy.

(2)     Notice of any claim or of any circumstances which may give rise to a claim, whether by or on
        behalf of any person or entity entitled to coverage under this policy or by or on behalf of any
        claimant against any such person or entity, will be deemed written notice to the Company if given
        to any licensed agent of the Company in the State of New York, with particulars sufficient to
        identify the person or entity entitled to coverage.

(3)     Failure by any person or entity entitled to coverage under the policy to give any notice required to
        be given within any prescribed time will not invalidate any coverage that would otherwise have
        been available if it is shown that (a) it was not reasonably possible to give such notice within the
        prescribed time, and (b) notice was given as soon as reasonably possible.

(4)     Section 12.  Policy Termination is deleted and replaced with the following:

        "Policy Termination
        12.  This policy shall terminate in accordance with the following provisions:

        (a) The Parent Organization may cancel this policy at any time by written notice stating when
            thereafter such cancellation is to be effective.  Except as set forth in 12.(g) below, the
            Company may cancel this policy only for non-payment of premium, and only by delivering or
            mailing to the Parent Organization, with a copy to the agent or broker of record, if any, written
            notice stating when, not less than fifteen (15) days thereafter, such cancellation will become
            effective and stating the reason for such cancellation.  Proof of mailing of such notice will be

14-02-3756 (10/2001 ed.)                    Page 1

sufficient proof that the notice was given and this policy will terminate at the date and hour specified in such notice.

(b) The Company will refund the unearned premium computed at the customary short rate if this policy is cancelled by the Parent Organization.

(c) The Company may

    (i) non-renew this policy, or

    (ii) condition its renewal upon a change in limits, change in the type of coverage, reduction of coverage, increased deductibles or retentions or addition of exclusions, or upon increased premiums in excess of ten percent (10%) of the expiring rate (exclusive of premiums commensurate with insured value added subsequent to issuance of this policy or at the request of the Parent Organization or as a result of experience rating or retrospective rating);

    (iii) condition its renewal upon requirements relating to the Underlying Insurance, in which event the conditional renewal notice shall be treated as an effective notice of nonrenewal if such requirements are not satisfied as of the later of the Expiration Date in ITEM 5 of the Declarations or sixty days after the mailing or delivery of such notice;"

by mailing or delivering to the Parent Organization, at least sixty (60) days but not more than one hundred twenty (120) days before the end of the Policy Period as set forth in Item 5 of the Declarations, written notice containing the specific reason or reasons for non-renewal or conditional renewal, and setting forth the amount of any premium increase and the nature of any other proposed changes.  Any notice of non-renewal will advise the Parent Organization of any rights to coverage and the duration thereof.  Copies of notices required under this paragraph will also be mailed or delivered to the authorized insurance agent or broker of record, if any.  This requirement will not apply when the Parent Organization or an agent or broker authorized by such entity has mailed or delivered written notice that this policy has been replaced or is no longer desired.  If the Company provides notice of non-renewal and subsequently extends the Policy Period for ninety (90) days or less, no additional notice of non-renewal will be required.

(d) If before the end of the Policy Period as set forth in Item 5 of the Declarations the Company provides an incomplete or late conditional renewal notice, coverage hereunder will remain in effect on the same terms and conditions and at the lower of the current rates or the rates for the prior period until sixty (60) days after proper notice is mailed, unless the Parent Organization elects to cancel sooner; provided, however, that if the Parent Organization elects to accept the terms, conditions and rates of the conditional renewal notice and renews this policy on that basis, such terms, conditions and rates will govern upon expiration of such sixty (60) day period.

(e) If before the end of the Policy Period as set forth in Item 5 of the Declarations the Company fails to provide timely or substantially complete notice of non-renewal or conditional renewal, coverage will remain in effect on the same terms and conditions as this policy for another Policy Period at the lower of the proposed or existing Policy Period premium rates.

(f) The Limit of Liability set forth in Item 3 of the Declarations will not be increased by any non-renewal or conditional renewal notification requirements except that it will be increased in proportion to the extension of the policy.

(g) Notwithstanding anything to the contrary in this policy, this policy may be cancelled by the Company for acts or omissions by the Parent Organization or its representative constituting fraud or material misrepresentation in obtaining the policy or in presenting a claim under the

policy. Such cancellation will be with respect solely to the coverage afforded under this policy for the Underlying Insurance under which the fraud or material misrepresentation occurred. Written notice stating when, not less than fifteen (15) days thereafter, such cancellation shall be effective, will be mailed or delivered to the Parent Organization at the last address known to the Company and its authorized agent or broker, if any. Such notice shall state the specific reason(s) for the cancellation. Proof of mailing is sufficient proof that the proper notice has been given."

(5)    The bankruptcy or insolvency of the Insureds, or the Insureds estate(s), shall not relieve the Company of its obligations nor deprive the Company of its rights under this policy.

(6)    It is hereby understood and agreed that, notwithstanding anything in the policy to the contrary, with respect to such insurance as is afforded by the policy, the terms of the policy, as respects coverage for operations in the State of New York, shall conform to the coverage requirements of the applicable insurance laws of the State of New York, or the applicable regulations of the New York Insurance Department; provided, however, that the Company's Limit of Liability, as set forth in Item 3 of the Declarations, shall be excess of the limits of liability of any Underlying Insurance, or self-insurance, as stated in Item 3 of the Declarations, or in any endorsement attached hereto.

(7)    The policy will be deemed to have been amended to the extent necessary to effect the purposes of this Amendatory Endorsement.

The regulatory requirements of this Amendatory Endorsement shall supersede and take precedence over any provisions of the policy or any endorsement to the policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such policy or endorsement provisions comply with the applicable insurance laws of the State of New York.


All other terms, conditions and limitations of this policy shall remain unchanged.


_____
Authorized Representative

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: April 16, 2008

Federal Insurance Company

Endorsement/Rider No. 3

To be attached to and
form a part of Policy No. 8209-9878

Issued to: Pfizer, Inc.

## AMEND ITEM 4(B) OF THE DECLARATIONS ENDORSEMENT

In consideration of the premium charged, it is agreed that Item 4(B), Other Policies, of the Declarations is amended to include the following policies:

(B)      Other Policies

| | | | |
|---|---|---|---|
| Twin City Fire Insurance Co. | 00 DA 0218117 08 | $15,000,000 | April 16, 2008 to April 16, 2009 |
| Zurich American Insurance Company | DOC-5967227-00 | $15,000,000 | April 16, 2008 to April 16, 2009 |
| CODA | PFE-1297C | $25,000,000 | April 16, 2008 to April 16, 2009 |
| US Specialty Insurance Company | 24-MGU-08-A16531 | $15,000,000 | April 16, 2008 to April 16, 2009 |

*1439 - to be amended*

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*[signature] Robert Hamburger*

_____
Authorized Representative

**ENDORSEMENT**

Effective date of
this endorsement: April 16, 2008

Company:  Federal Insurance Company

Endorsement No. 4

To be attached to and
form a part of Policy No. 8209-9878

Issued to:  Pfizer, Inc.

FOLLOW FORM OF UNDERLYING INSURANCE ENDORSEMENT

In consideration of the premium charged, it is agreed that:

(1) Coverage afforded under this Policy shall conform to the terms and conditions set forth in Endorsement No. 5 of the **Underlying Insurance** policy Directors and Officers 00 DA 0218117 08 issued by Twin City Fire Insurance Co..

(2) To the extent that the terms and conditions of the **Primary Policy** differ from the terms and conditions of Endorsement No. 5 of the **Underlying Insurance** policy identified in paragraph (1) above, the terms and conditions of Endorsement No. 5 of the **Underlying Insurance** policy identified in paragraph (1) above shall govern and this Policy shall not follow form of the **Primary Policy**.

(3) This Policy shall be deemed to have been amended to the extent necessary to effect the purposes of this endorsement.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

Authorized Representative

14-02-7266 (8/2002)          Page 1

**ENDORSEMENT/RIDER**

Effective date of
this endorsement/rider: April 16, 2008

Federal Insurance Company

Endorsement/Rider No. 5

To be attached to and
form a part of Policy No. 8209-9878

Issued to:  Pfizer, Inc.

## COMPLIANCE WITH APPLICABLE TRADE SANCTION LAWS

It is agreed that this insurance does not apply to the extent that trade or economic sanctions or other laws
or regulations prohibit the coverage provided by this insurance.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

*Robert Hamburger*

_____
Authorized Representative

**ENDORSEMENT**

Effective date of
this endorsement: April 16, 2008

Company:  Federal Insurance Company

Endorsement No. 6

To be attached to and
form a part of Policy No. 8209-9878

Issued to:  Pfizer, Inc.

---

QUOTA SHARE ENDORSEMENT

In consideration of the premium charged, it is agreed that:

1.    Section 14 Policy Definitions of the policy is amended to include the following term:

**"Underwriter"** means each Insurer listed in the schedule in paragraph 2 of this endorsement.

2.    Section 5 Limit of Liability of the policy is amended to read in its entirety as follows:

With respect to any claim covered under this policy, each **Underwriter** shall be liable only for the proportion that the Limit of Liability underwritten by each **Underwriter**, as specified in the schedule below, bears to the Total Liability of all Insurers, as specified in paragraph 3 of this endorsement.  The Limit of Liability underwritten by each **Underwriter**, as specified in the schedule below, shall be the maximum amount payable for all claims by such **Underwriter**.

| INSURER | LIMIT OF LIABILITY |
|---|---|
| State National Insurance Company | $5,000,000 part of $10,000,000 |

*will be corrected to above X/S of 95-A; 70-0,5,M,A*

3.    The Total Liability for all Insurers shall be $70,000,000. The Total Liability of all Insurers shall be the maximum amount payable for all claims by all **Underwriters**.

4.    Section 6 Claim Participation of the policy is amended to include the following:

In no event shall the Company be liable for more than its proportionate share of any claim, as specified in this endorsement, regardless of any changes in circumstances, including, but not limited to change in terms, cancellation, removal or bankruptcy of any **Underwriter**.  Any change in **Underwriters**, including incomplete placements, are permitted without notice but loss of coverage resulting from any incomplete placement is assumed by the **Insured** and shall not cause the layer of coverage in which the Company participates to drop to a lower level of coverage or increase the Company's participation in the layer of coverage specified in this endorsement.

5.      The following section is added to the policy as Section 15 Premiums:

      The **Insured** shall pay the premiums for this policy on a pro rata basis to each
      **Underwriter**.  This section shall apply even in the absence of a request from each
      **Underwriter** to pay the premiums.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and
conditions of coverage.

All other terms, conditions and limitations of this policy shall remain unchanged.

_Robert Hamburger_

_____
Authorized Representative

# EXHIBIT C

**Crum & Forster**

305 Madison Avenue Morristown, NJ 07962

**Policy Number**: 5560050006

☒ **North River Insurance Company  (Free Trade Zone)**
☐ **United States Fire Insurance Company**
☐ _____

## PLATINUM MANAGEMENT PROTECTION
### Excess Liability Declarations

NOTICE: THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY PROVIDES COVERAGE FOR *CLAIMS* FIRST MADE AGAINST THE *INSUREDS* DURING THE *POLICY PERIOD*. *DEFENSE COSTS* ARE INCLUDED WITHIN THE LIMIT OF LIABILITY AND REDUCE THE LIMIT OF LIABILITY FOR THIS POLICY. PLEASE READ CAREFULLY. WORDS AND PHRASES WHICH ARE PRINTED IN BOLD ITALIC TYPEFACE HAVE SPECIFIC MEANING AND ARE DEFINED IN SECTION I I. OF THE POLICY.

Item 1. **Corporation**: Pfizer, Inc.

      **Street Address**: 235 East 42nd Street
                     New York, NY 10017

Item 2. **Policy Period**: From  04/16/2008   (Effective) To  04/16/2009   (Expiration)
                        (12:01 a.m. local time at the address given in Item 1)

Item 3. **Limit of Liability**: $ 10,000,000. (40% quota share part of $ 25,000,000.)
        (Aggregate Limit of Liability for all *Loss*)

Item 4. **Premium**: $ 230,000.

Item 5. **Pending or Prior Litigation Date**: 06/28/2004

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

Item 6.  **The following endorsements are made a part of this policy at policy issuance:**
FM206.0.12 01 07, FM206.0.33 02 03, OFAC Notice, Manuscript

Item 7.  **Schedule of Underlying Insurance:**

| | Insurer | Limit of Liability | Policy Number |
|---|---|---|---|
| | **BLENDED D&O (ABC) & FIDUCIARY** | | |
| A. Primary Insurer: | Illinois National Insurance Company | $ 25,000,000. | 004433708 |
| B. 1st Underlying Insurer | Twin City Fire Insurance Company | $ 15,000,000. | 00 DA 0218117 08 |
| C. 2nd Underlying Insurer | Zurich American Insurance Company | $ 15,000,000. | DOC-5967227-00 |
| | **EXCESS SIDE A ONLY (DIC)** | | |
| D. 3rd Underlying Insurer | Corporate Directors and Officers Assurance, Ltd. | $ 25,000,000. | PFE1297C 1439 |
| | **BLENDED XS SIDE A AND BC/FIDUCIARY** | | |
| E. 4th Underlying Insurer | U.S. Specialty Insurance Company | $ 15,000,000. | 24-MGU-08-A16531 |
| F. 5th Underlying Insurer | Ironshore Insurance Services | $ 5,000,000. part of $ 10,000,000. | IRH 00GL40802001 |

MP427.1 (04/04)
214057

| G. 5th Underlying Insurer | Federal Insurance Company | $ 5,000,000.<br>part of<br>$ 10,000,000. | 8209-9878 |
| H. 6th Underlying Insurer | AIG Excess Liability Insurance International Limited | $ 20,000,000. | 7536322 |
| I. 7th Underlying Insurer | ACE Bermuda Insurance Limited | $ 15,000,000. | PFE-11909D |
| J.  8th Underlying Insurer | Darwin National Assurance Company | $ 10,000,000. | 0303-5613 |
| K. 9th Underlying Insurer | Liberty Mutual Insurance Company | $ 15,000,000. | 078379-018 |
| L. 10th Underlying Insurer | Allied World Assurance Company | $ 10,000,000. | C005845/003 |
| M. 11th Underlying Insurer | AXIS Insurance Company | $ 10,000,000. | MNN732035/01/2008 |
| N. 12th Underlying Insurer | AIG Excess Liability Insurance International Limited | $ 15,000,000. | 7536323 |
| O. 13th Underlying Insurer | RSUI Indemnity Company | $ 15,000,000.<br>part of<br>$ 25,000,000. | NHS628836 |

*- see end. 1*

These Declarations, the application, and the policy with endorsements attached thereto, constitute the entire agreement between the *Insurer* and the *Insureds*.

Countersigned (if required by law):_____   Date:_____

# PLATINUM MANAGEMENT PROTECTION

## Excess Liability

In consideration of the payment of the premium, in reliance upon application attached hereto and all the information provided to the *Insurer* and subject to the Declarations, definitions, terms, conditions, limitations, representations, exclusions and endorsements herein and/or attached hereto, the *Insurer* and the *Insureds* agree as follows:

### Section I.    INSURING AGREEMENTS

The *Excess Insurer* shall provide the *Insured(s)* coverage for *Claims* first made during the *Policy Period* and during the Extended Reporting Period, if exercised, (1) only in excess of all *Underlying Insurance*, (2) only after all *Underlying Insurance* has been exhausted by payment of the underlying Limit of Liability by each Underlying Insurer for the Limit of Liability shown in the Schedule of *Underlying Insurance* in Item 7 of the Declarations, and (3) only if such total Limit of Liability is exhausted as a result of *Loss* resulting from *Claims*. The insurance coverage afforded herein shall apply in conformance with the definitions, terms, conditions, limitations, warranties, representations, exclusions and endorsements of the *Primary Policy* except as otherwise provided by the definitions, terms, conditions, limitations, warranties, representations, exclusions and endorsements contained in any *Underlying Insurance*, or herein.

### Section II.    DEFINITIONS

*Claim* means as such term is defined in the *Primary Policy*, except as amended by any *Underlying Insurance*, or herein.

*Defense Costs* (or Defense Expenses) means as such term is defined in the *Primary Policy*.

*Excess Insurer* means the company providing this insurance whose name is shown on the Declarations Page.

*Insured* means as such term is defined in the *Primary Policy*, except as amended by any *Underlying Insurance*, or herein.

*Loss* means as such term is defined in the *Primary Policy*, except as amended by any *Underlying Insurance*, or herein.

*Policy Period* means the period of time shown in Item 2 of the Declarations.

*Primary Policy* means the policy of Insurance issued by the Primary Insurer scheduled in Item 7 A of the Declarations.

*Underlying Insurance* means all policies scheduled in Item 7 of the Declarations.

### Section III.  APPLICATION OF UNDERLYING INSURANCE

As a condition precedent to the coverage afforded hereunder, the *Underlying Insurance* shall remain in full force and effect and unchanged (unless specifically endorsed herein) during the *Policy Period* except for reduction or exhaustion of the Limit of Liability by reason of payment of *Loss*.

In the event of bankruptcy, liquidation or insolvency of any Underlying Insurer, this policy shall not replace the *Underlying Insurance* provided by such Underlying Insurer, but shall apply in the same manner as though such *Underlying Insurance* were available and collectible. The *Insured(s)* shall be responsible for the amount of the Limit of Liability which is not paid by any such Underlying Insurer as a result of its bankruptcy, liquidation or insolvency.

### Section IV.   LIMITS OF LIABILITY

MP427.1 (04/04)
214057

Page 3 of 4

The amount shown in Item 3 of the Declarations shall be the aggregate Limit of Liability of the *Excess Insurer* for all *Loss*, inclusive of *Defense Costs*, arising from all *Claims* first made during the *Policy Period*, or during any applicable Extended Reporting Period. *Defense Costs* shall be part of and reduce the Limit of Liability of the *Excess Insurer*.

If the Limit of Liability of the *Underlying Insurance* is depleted solely as the result of actual payment of *Loss* by the applicable Underlying Insurers, this policy shall, subject to the *Excess Insurer's* Limit of Liability and other terms of this policy, continue to apply as excess insurance over the remaining Limit of Liability of the *Underlying Insurance*.

If the Limit of Liability of the *Underlying Insurance* is exhausted solely as a result of actual payment of *Loss* by the Underlying Insurers, this policy shall apply to subsequent *Claims* subject to the remaining Limit of Liability of this policy and in accordance with the definitions, terms, conditions, limitations, warranties, representations, exclusions and endorsements of the *Primary Policy* except as otherwise provided in the definitions, terms, conditions, limitations, warranties, representations, exclusions and endorsements contained in any *Underlying Insurance*, or herein.

## Section V.   EXCLUSIONS

Notwithstanding anything to the contrary in the *Underlying Insurance*, the coverage afforded herein shall not apply to any *Claim* made against any *Insured* based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving;

1.  any litigation, case, proceeding, demand letter, governmental investigation, or inquiry, or any investigation or inquiry into or against any *Insured* which commenced prior to or is pending at the applicable date shown in Item 5 of the Declarations;
2.  any extension or amendment of such pending or prior litigation, case or proceeding; or
3.  any facts, circumstances, situations, transactions, or events, which in whole or in part, are the subject of, are related to, or which have as a common nexus any such fact, circumstance, situation, transaction, or event underlying such pending or prior litigation, case or proceeding.

## Section VI.   NOTICE

A.  Notice of a *Claim* given to any *Underlying Insurer* shall not constitute notice to the *Excess Insurer*. As a condition precedent to the coverage afforded by this policy, notice of a *Claim* must be provided to the *Excess Insurer* in accordance with the notice of *Claim* provisions in the *Primary Policy*.

B.  Written notice must be given to the *Excess Insurer* at:

Crum & Forster
Claims Department
305 Madison Avenue
Morristown, NJ 07962

C.  The corporation shall give the *Excess Insurer* written notice as soon as practicable but in no event more than thirty (30) days after:
1.  cancellation of any *Underlying Insurance*;
2.  the depletion or exhaustion of the Limit of Liability of any *Underlying Insurance*;
3.  any additional or return premium in connection with any *Underlying Insurance*;
4.  any amendments or endorsements to the *Underlying Insurance*; or
5.  the insolvency, bankruptcy, conservatorship, or rehabilitation of any Underlying Insurer.

**The North River Insurance Company**
**A New Jersey Corporation**
**Home Office: Township of Morris, NJ**

(A Capital Stock Company)

SIGNATURE

Joseph F. Braunstein, Jr.
President

SIGNATURE

Felicia Garland
Secretary

FM 206.0.12 09 07

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN
RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK
INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR
CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## NO PREMIUM CHARGE

No additional premium charge is applicable for this policy term.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to
provide you with a notice disclosing the portion of your premium, if any, attributable to
coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The
portion of your premium attributable to such coverage is shown in the Schedule of
this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of
terrorism losses insured under the federal program. The federal share equals 85% of
that portion of the amount of such insured losses that exceeds the applicable insurer
retention. However, if aggregate insured losses attributable to terrorist acts certified
under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year
(January 1 through December 31), the Treasury shall not make any payment for any
portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism
Risk Insurance Act exceed $100 billion in a Program Year (January 1 through
December 31) and we have met our insurer deductible under the Terrorism Risk
Insurance Act, we shall not be liable for the payment of any portion of the amount of
such losses that exceeds $100 billion, and in such case insured losses up to that
amount are subject to pro rata allocation in accordance with procedures established
by the Secretary of the Treasury.

**MP TERR P 01-08**

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

## THIS ENDORSEMENT C HANGES THE POLICY, READ IT CAREFULLY.

**To be attached to and form part of Policy No: 5560050006**

**Effective Date of Endorsement: 04/16/2008**

**Issued to: Pfizer, Inc.**

**Endorsement No: 1**

---

### QUOTA SHARE ENDORSEMENT

It is agreed that the 14th Underlying Carrier (Item 7 of the Declarations) is a participating quota share layer incorporating the following insurers, limit and policy numbers:

| Insurer | % Participation of $25,000,000. | Limit | Policy Number |
|---------|--------------------------------|-------|---------------|
| RSUI Indemnity Company | 60 | $ 15,000,000. | NHS 628836 |
| North River Insurance Company | 40 | $ 10,000,000. | 5560050006 |

All other terms, conditions and limitations of the policy remain unaltered.

_____
Authorized Representative

_____
Date

# EXHIBIT D

# EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY DECLARATIONS

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| N | HS628836 | NHS624772 |

●THIS IS A CLAIMS MADE POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI INDEMNITY COMPANY (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED'S NAME AND MAILING ADDRESS                    PRODUCER'S NAME AND ADDRESS

PFIZER INC
235 EAST 42ND STREET
NEW YORK, NY 10017

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

## ITEM 2. POLICY PERIOD:

FROM      04/16/2008      TO      04/16/2009      12:01 AM Standard Time at the Insured's address as stated herein

## ITEM 3. LIMIT OF LIABILITY:

$      15,000,000            (A)      Aggregate Limit of Liability each policy period

$      175,000,000          (B)      Underlying Limits of Liability

## ITEM 4. PREMIUM:

$      345,000.00

## ITEM 5. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:

SEE RSG 230005 0204 - SUPPLEMENTAL DECLARATIONS - SCHEDULE OF UNDERLYING INSURANCE; RSG 230004 0204 - SUPPLEMENTAL DECLARATIONS - SCHEDULE OF ENDORSEMENTS; RSG 231003 0504 - EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

| Countersigned: | 05/14/2008 | *(signature)* |
|---|---|---|
| | DATE | AUTHORIZED REPRESENTATIVE |

**\*New York Free Trade Zone Class Code 2-14177**

RSG 230003 0204

A member of Alleghany Insurance Holdings LLC

# EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY
## SUPPLEMENTAL DECLARATIONS



**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS**

POLICY NUMBER:   NHS628836

### SCHEDULE OF UNDERLYING INSURANCE

| INSURER | POLICY NUMBER | LIMIT OF LIABILITY | PREMIUM |
|---|---|---|---|
| Illinois National Insurance Company | 004433708 | $25,000,000 | $3,000,000.00 |
| Twin City Fire Insurance Company | 00 DA 0218117 08 | $15,000,000 xs $25,000,000 | $1,210,000.00 |
| Zurich American Insurance Company | DOC-5967227-00 | $15,000,000 xs $40,000,000 | $930,000.00 |
| CODA | PFE-1207C 1439 | $25,000,000 xs $55,000000 Side A | $29,980.00 |
| U. S. Specialty Insurance Company | 24-MGU-08-A16531 | $15,000,000 xs $80,000,000 | $900,000.00 |
| State National Insurance Company | IRH 00GL40802001 | $5,000,000 part of $10,000,000 xs $95,000,000 | $265,000.00 |
| Federal Insurance Company | 8209-9878 | $5,000,000 part of $10,000,000 xs $95,000,000 | $265,000.00 |
| AIG Excess Liability Insurance International Limited | 7536322 | $20,000,000 xs $105,000,000 | $850,000.00 |
| ACE Bermuda Insurance Limited | PFE-11909D | $15,000,000 xs $125,000,000 | $574,121.00 |
| Darwin National Assurance Company | 0303-5613 | $10,000,000 xs $140,000,000 | $310,500.00 |
| Liberty Mutual Insurance Company | 078379-018 | $15,000,000 xs $150,000,000 | $445,000.00 |
| Allied World Assurance Company | C005845/003 | $10,000,000 xs $165,000,000 to be deleted | $285,000.00 |
| Axis Insurance Company | MMN732035/01/2008 | $10,000,000 part of $25,000,000 xs $175,000,000 | $282,000 |
| AIG Excess Liab. Ao. Intl Ltd. | 7536323 | 15 x/s 185 | 399,000 |
| | | | |

**\*New York Free Trade Zone Class Code 2-14177**

RSG 230005 0204

# EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY
## SUPPLEMENTAL DECLARATIONS



**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS**

POLICY NUMBER:   NHS628836

### SCHEDULE OF ENDORSEMENTS

| TITLE | FORM NUMBER |
|---|---|
| Disclosure Pursuant to Terrorism Risk Insurance Act | RSG 204123 0108 |
| Amended Primary and Underlying Insurance Clause | RSG 234021 1006 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204081 0108 |
| Conflicts Endorsement | RSG 234024 0407 |
| Exclusion - Prior and or Pending Litigation Backdated | RSG 236008 0204 |
| Exhaustion of Underlying Limits endt | |
| Underwriting Participation Endorsement | |

**\*New York Free Trade Zone Class Code 2-14177**
RSG 230004 0204

**RSUI INDEMNITY COMPANY**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

| | | |
|---|---|---|
| Terrorism Premium (Certified Acts) | $ | Waived |
| Additional information, if any, concerning the terrorism premium: | | |

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.

A. **Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

B. **Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals eighty-five percent (85%) of that portion of the amount of such insured losses that exceeds the applicable **Insurer's** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

*New York Free Trade Zone Class Code 2-14177          Policy No.: NHS628836      Effective: 04/16/2008

RSG 204123 0108

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**RSUI INDEMNITY COMPANY**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED PRIMARY AND UNDERLYING INSURANCE CLAUSE

This endorsement modifies insurance provided under the following:

### EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY

SECTION III. – PRIMARY AND UNDERLYING INSURANCE is amended to include the following:

Insofar as **Underlying Limits of Liability** are not paid for **Covered Claims** solely due to an underlying insurer's insolvency, receivership, or inability to pay for financial reasons independent of any **Insured**, or the facts and circumstances of any claim, or the terms and conditions of any **Underlying Insurance**, the **Insurer** shall recognize any **Insured's** actual payment of such amounts otherwise payable as **Underlying Insurance** in calculating the reduction or exhaustion of **Underlying Limits of Liability**.  In no event shall the **Insurer** drop down to cover underlying insurers' obligations, however, and except as provided otherwise in this endorsement, the **Insurer** shall be obligated to pay only after underlying insurers' actual payment of **Underlying Limits of Liability** for **Covered Claims**.

All other terms and conditions of this policy remain unchanged.

*[handwritten: will be deleted & will follow Hartford sharing of limits wording]*

---

**RSUI INDEMNITY COMPANY**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS LIABILITY POLICY – NOT FOR PROFIT ORGANIZATIONS
DIRECTORS AND OFFICERS LIABILITY POLICY - PUBLIC COMPANY
DIRECTORS AND OFFICERS LIABILITY POLICY - PRIVATE COMPANY
EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY
EXCESS LIABILITY POLICY**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions of this policy remain unchanged.

**\*New York Free Trade Zone Class Code 2-14177**      **Policy No.:** NHS628836      **Effective:** 04/16/2008

RSG 204081 0108

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**RSUI INDEMNITY COMPANY**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS

*This Endorsement Changes The Policy. Please Read It Carefully.*

# CONFLICTS ENDORSEMENT

This endorsement modifies insurance provided under the following:

### EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY

Notwithstanding any other provision of this policy or any endorsement hereto (whether it proceeds this endorsement or follows it in order) to the contrary, this policy follows the insuring clauses, warranties, definitions, terms, conditions, exclusions, and other provisions of the **Primary Policy** except as regards the premium and limit of liability.

It is further agreed that if this excess policy contains an effective date for a Prior and Pending Litigation Exclusion that is different than the date in the **Primary Policy**, then the date in this excess policy shall prevail.

All other terms and conditions of this policy remain unchanged.

---

**\*New York Free Trade Zone Class Code 2-14177     Policy No.: NHS628836     Effective: 04/16/2008**

RSG 234024 0407

**RSUI INDEMNITY COMPANY**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS

*This Endorsement Changes The Policy. Please Read It Carefully.*

# EXCLUSION – PRIOR AND/OR PENDING LITIGATION BACKDATED

This endorsement modifies insurance provided under the following:

**EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY**
**EXCESS LIABILITY POLICY**

The **Insurer** shall not be liable to make any payment for loss in connection with any claim made against any **Insured** alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or pending as of 6/28/2004, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation.

All other terms and conditions of this policy remain unchanged.

*New York Free Trade Zone Class Code 2-14177      **Policy No.:** NHS628836      **Effective:** 04/16/2008

RSG 236008 0204

**RSUI INDEMNITY COMPANY**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXHAUSTION OF UNDERLYING INSURANCE

This endorsement modifies insurance provided under the following:

**EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY**

**SECTION IV.- LIMIT OF LIABILITY** is modified by the addition of the following subsection C:

**C.** If the **Insured** shall pay, in the applicable legal currency, some or all of the **Underlying Limits** of **Liability** in satisfaction of an otherwise **Covered Claim**, then the **Insurer** shall recognize such payment as reduction or exhaustion for the depletion of the respective limits of liability of the **Underlying Insurance**.  In no way shall such payment by the **Insured** constitute a waiver of any terms, conditions or exclusions of the **Underlying Insurance** or this policy.  The **Insurer** shall then be liable to pay only such additional amounts up to the Limit of Liability set forth in Item 3. of the Declarations Page, which shall be the maximum liability of the **Insurer** in each **Policy Period**.

All other terms and conditions of this policy remain unchanged.

*will be deleted & will follow Hartford sharing of limits wording*

**RSUI INDEMNITY COMPANY**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# UNDERWRITING PARTICIPATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

### EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY

It is agreed that:

1.  This policy is part of an underwriting participation arrangement (the "Program") to provide a $25,000,000 Limit of Liability excess $175,000,000 involving the following:

| Participating Insurer | Participating Insurance Policy No. | Participating Insurer's Limit of Liability | Participating Insurer's Percentage |
|---|---|---|---|
| Axis Insurance Company | MNN732035/01/2008 | $10,000,000 | 40% |
| RSUI Indemnity Company | NHS628836 | $15,000,000 | 60% |

*[handwritten annotations: "S/B North River" and "S/B 556005 0006"]*

2.  Except for each Participating Insurer's premium, limit of liability, participation percentage, and as otherwise agreed, coverage under the Program is intended to follow the terms, conditions, and exclusions of this policy.

3.  Each Participating Insurer shall be liable for its limit of liability only.

4.  Not withstanding any other provision of this policy to the contrary, each Participating Insurer shall be liable for its percentage of each covered loss only.

5.  The liability of each Participating Insurer shall be several and not joint.  The failure, refusal or inability of any Participating Insurer to pay covered loss, including, without limitation, an inability based upon insolvency, shall not increase or otherwise affect the liability of any other Participating Insurer.

6.  It is understood that each Participating Insurer shall:

    A.  receive notice of any claim submitted for coverage under the Program.

    B.  make its own determination of whether loss is covered under the Program; and

    C.  elect whether to participate in the investigation, settlement or defense of any claim.

All other terms and conditions remain unchanged.



**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA  30326-1160

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK STATE INSURANCE LAW AND REGULATIONS

# EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY

**NOTICE:**  THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE CLAIMS FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** AND REPORTED TO THE **INSURER** DURING THE **POLICY PERIOD**. THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE EXPENSES.

PLEASE READ YOUR POLICY CAREFULLY

## CLAIM NOTICE

| | |
|---|---|
| **Mail notices to:** | **RSUI Group, Inc.**<br>**945 East Paces Ferry Rd.**<br>**Suite 1800**<br>**Atlanta, GA 30326-1160** |
| **Fax notices to:** | **(404) 260-3997**<br>**Attn: Claims Department** |

**\*New York Free Trade Zone Class Code 2-14177**

*A member of Alleghany Insurance Holdings LLC*

# TABLE OF CONTENTS
## EXCESS DIRECTORS AND OFFICERS LIABILITY POLICY
### PLEASE READ YOUR POLICY CAREFULLY

**DECLARATIONS PAGE**

Item 1. – Named Insured and Address

Item 2. – Policy Period

Item 3. – Limit of Liability

Item 4. – Premium

Item 5. – Endorsements Attached

**SECTIONS**

I.    INSURING AGREEMENT ................................................................................................3

II.   DEFINITIONS ...............................................................................................................3

III.  PRIMARY AND UNDERLYING INSURANCE ................................................................3

IV.   LIMIT OF LIABILITY .....................................................................................................3

V.    DEFENSE EXPENSES AND SETTLEMENT ...............................................................4

VI.   GENERAL CONDITIONS .............................................................................................4

      Recoveries..................................................................................................................4

      Authorization...............................................................................................................4

      Notice and Reporting of Claim....................................................................................4

      Cooperation.................................................................................................................4

      Subrogation.................................................................................................................4

      Cancellation.................................................................................................................4

      Discovery Period .........................................................................................................4

      Representations ..........................................................................................................4

      Prior Insurance ...........................................................................................................5

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION II. - DEFINITIONS.

In consideration of the payment of premium and in reliance upon all statements made to the **Insurer** by application and any prior application forming a part hereof and its attachments and the material incorporated therein, the **Insurer** agrees as follows:

## SECTION I. - INSURING AGREEMENT

This policy shall provide the **Insured** with insurance during the **Policy Period** excess of all applicable **Underlying Insurance**. Except as specifically set forth in the provisions of this policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable **Primary Policy** or, to the extent coverage is further limited or restricted thereby, any other applicable **Underlying Insurance**. In no event shall this policy grant broader coverage than would be provided by the most restrictive policy included in the **Underlying Insurance**.

## SECTION II. - DEFINITIONS

A. **Covered Claim** means a claim for which coverage has been accepted by the **Underlying Insurance** in accordance with terms, conditions and exclusions contained in the **Underlying Insurance**.

B. **Insured** means any person or any organization that may be entitled to coverage pursuant to the declarations, terms and conditions of the **Underlying Insurance**.

C. **Insurer** means the Company providing this insurance as shown on the Declarations Page.

D. **Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or any earlier cancellation or termination date.

E. **Primary Policy** means the first policy listed as **Underlying Insurance**.

F. **Underlying Insurance** means each insurance policy listed in the Schedule of Underlying Insurance attached to and made a part of this policy.

G. **Underlying Limits of Liability** means the aggregate of all Limit(s) of Liability of all policies listed as **Underlying Insurance**.

## SECTION III. - PRIMARY AND UNDERLYING INSURANCE

Except as otherwise provided herein, this policy is subject to the same warranties, terms, conditions, exclusions and definitions as are contained in or as may be added to the **Primary Policy** and/or any other **Underlying Insurance**.

It is a condition precedent to coverage under this policy that the **Underlying Insurance** be maintained in full force and effect during the **Policy Period** except for any reduction of such **Underlying Insurance** solely as the result of actual payment of **Underlying Limits of Liability** on account of or in connection with a **Covered Claim**. If the **Underlying Insurance** contains a sublimit, then coverage hereunder shall not apply to any **Covered Claim** which is subject to such sublimit; provided however, that the **Underlying Limits of Liability** shall be recognized hereunder as reduced to the extent of any payment made by the **Underlying Insurance** which was subject to such sublimit.

The **Insurer's** obligation under this policy shall not be increased, expanded or otherwise modified or changed as a result of the receivership, insolvency, inability or refusal to pay any **Underlying Insurance**. It is agreed that the **Insurer** shall not pay any amount until all retentions and all **Underlying Limits of Liability** have actually been paid.

## SECTION IV. - LIMIT OF LIABILITY

A. Subject to the Limit of Liability set forth in Item 3. (A) of the Declarations Page, it is agreed that in the event and only in the event of a reduction or exhaustion of the **Underlying Limits of Liability**, solely as the result of actual payment of a **Covered Claim** pursuant to the terms and conditions of the **Underlying Insurance** thereunder, this policy shall:

1. In the event of reduction, pay excess of the reduced **Underlying Limits of Liability**; and

2. In the event of total exhaustion, continue in force as insurance excess of the retention stated in the **Primary Policy**, which retention shall be applied to any subsequent **Covered Claim** under the terms and conditions of the **Primary Policy**.

B. Any payment of **Underlying Limits of Liability** which is made in exchange for, or as consideration for, the receipt of premium or compensation for insurance other than **Underlying Insurance**, including but not limited to an alternate risk transfer product that provides coverage which is excess of or in addition to this policy, shall not be considered in calculating the reduction or exhaustion of the **Underlying Limits of Liability**.

## SECTION V. - DEFENSE EXPENSES AND SETTLEMENT

No defense expenses shall be incurred and no settlement of any **Covered Claim** shall be made without the **Insurer's** consent; such consent not to be unreasonably withheld. Any defense expenses incurred or settlements made without the consent of the **Insurer** will not be covered under this policy.

In the event a **Covered Claim** is made, the **Insurer** shall have the right to associate itself in the investigation and defense, and to participate in the negotiation and settlement of any **Covered Claim** that appears reasonably likely to involve the **Insurer**.

## SECTION VI. - GENERAL CONDITIONS

### A. Recoveries

All recoveries or payments recovered or received subsequent to a loss settlement under this policy shall be applied as if recovered or received prior to such settlement and all necessary adjustments shall then be made between the **Insured** and the **Insurer**, provided always that this policy requires an ultimate net loss to be ascertained as to the **Insured** before any funds are payable by the **Insurer**.

### B. Authorization

Each **Insured** agrees that the corporation or entity named in the declarations page of the **Primary Policy** shall be authorized to act on behalf of each and every individual **Insured** with respect to the giving and receiving of notice of claim or cancellation, the payment of premiums and the receiving of any return premiums that may be become due under this policy.

### C. Notice and Reporting of Claim

The **Insured** must give the **Insurer** written notice of a **Covered Claim** in the same manner as required by the **Underlying Insurance**.

### D. Cooperation

In the event of a **Claim** or notice of circumstances, the **Insured** will provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests, and will take no action, without the **Insurer's** prior written consent, that might prejudice the **Insured's** or the **Insurer's** position, potential or actual rights, or defense under this policy.

### E. Subrogation

In the event the **Insurer** makes any payment under this policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured**, who shall execute all papers and take all necessary actions to secure such rights, including the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of an **Insured**.

### F. Cancellation

This policy may be cancelled in the same manner as provided by the terms and conditions of the **Underlying Insurance**.

### G. Discovery Period

The Discovery Period may be elected in the same manner as provided by the terms and conditions of the **Underlying Insurance**.

### H. Representations

The **Insured** represents that as of the inception date of this policy, the information, particulars, documents, representations and statements contained in, attached or referred to in the application are: complete, true and correct; are the basis of this policy; are deemed incorporated into and constituting part of this policy; and are material to the acceptance of the risk assumed by the **Insurer**.

I. **Prior Insurance**

The **Insurer** shall not be liable to make any payment in connection with any claim made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a claim, or a potential or threatened claim, or an occurrence or circumstances that might give rise to a claim under any policy of which this insurance is a renewal or replacement or which it may succeed in time.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of **the Insurer**.

Secretary                                                    President

# EXHIBIT E

## THE HARTFORD
## UNIVERSAL EXCESS™ POLICY


THE HARTFORD

**Policy Number**  00 DA 0218117-08

TWIN CITY FIRE INSURANCE CO.
INDIANAPOLIS, IN 46268-0930
a stock insurance company, herein called
the Insurer

Agency Code, Name & Address
80004
MARSH USA INC
1166 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-2774

NOTICE:  THIS IS A CLAIMS MADE POLICY. EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ACTS COVERED BY UNDERLYING INSURANCE (ITEM D.) FOR WHICH CLAIMS ARE FIRST MADE AGAINST THE INSURED(S) WHILE THE POLICY IS IN FORCE. THIS POLICY DOES NOT PROVIDE FOR THE UNDERWRITERS TO DEFEND THE INSURED, AND ANY DEFENSE COSTS AND OTHER CLAIM EXPENSE COVERED UNDER THE POLICY IS PART OF, AND NOT IN ADDITION TO THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

*(stamp overlay:)* NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM FILING WITH THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## DECLARATIONS

**ITEM A.** Name of Insured: (hereinafter called the "Insured")

    PFIZER, INC.
Address of Insured:  235 EAST 42ND STREET
    NEW YORK, NY 10017

**ITEM B.** Policy Period:  From 12:01 a.m. on   4/16/08     To 12:01 a.m. on   4/16/09
    (Standard Time at the address stated in Item A)

**ITEM C. LIMIT OF LIABILITY:**   $15,000,000     Aggregate each Policy Period, including claim expense.

**ITEM D. SCHEDULE OF UNDERLYING INSURANCE:**

(1)   Primary Policy:   DIRECTORS AND OFFICERS LIABILTY

    Company:   ILLINOIS NATIONAL INSURANCE COMPANY

    Policy Number:   443-37-08

    Limit of Liability:   $25,000,000

(2)   Underlying Excess Policy(ies):   N/A

**ITEM E. ENDORSEMENTS EFFECTIVE AT INCEPTION:**   SEE FORM GU207  (SCHEDULE OF ENDORSEMENTS)

**ITEM F. TERMINATION OF PRIOR POLICY(IES):**   00 DA 0218117-07

**ITEM G. DISCOVERY CLAUSE:**

(1) Additional Premium:   150% OF THE ANNUAL PREMIUM

(2) Additional Period:   TWELVE (12) MONTHS

**ITEM H. POLICY PERIOD PREMIUM:**   $1,210,000.00

_____   _____
Authorized Representative      Date  7/8/08

UE 00 H001 00 1004
2-13000

GU 207
(6-78)

# ENDORSEMENT

This endorsement, effective on    4/16/08                          at 12:01 A.M. standard time, forms a part of

Policy No.  00 DA 0218117-08        of the        TWIN CITY FIRE INSURANCE CO.

Issued to   PFIZER, INC.

David Zwiener, President

### SCHEDULE OF FORMS AND ENDORSEMENTS

|   |   |   |   |   |
|---|---|---|---|---|
| ✗ |   | RN00N02600 | 05/93 | IN WITNESS PAGE |
| ✗ | 1 | HG00H00900 | 03/02 | MAILING ADDRESS FOR NOTICE ENDORSEMENT |
| ✗ | 2 | HG00H06800 | 02/08 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| ✗ | 3 | UE00H06400 | 12/04 | EXCESS RELIANCE ON PROPOSAL - PUBLIC COMPANY |
| ✗ | 4 | UE00H07400 | 09/05 | STATE AMENDATORY INCONSISTENCY ENDORSEMENT |
| ✗ | 5 | UE00H08201 | 12/06 | EXHAUSTION OF UNDERLYING INSURANCE |
| ✗ | 6 | UE00H10200 | 09/07 | AMENDED EXCESS ODL ENDORSEMENT - RECOGNIZE DEPLETION |
| ✗ | 7 | UE31H01600 | 12/04 | NEW YORK CANCELLATION AND NONRENEWAL ENDORSEMENT |
| ✗ | 8 | UE31H06801 | 04/07 | NEW YORK AMENDATORY ENDORSEMENT |
| ✗ | 9 | UE31H06900 | 02/05 | DEFENSE COST ACKNOWLEDGMENT - NEW YORK |
| ✗ |   | HG00H00103 | 02/08 | CONFIRMATION OF ACCEPTANCE OF CERTIFIED ACTS OF TERRORISM |
| ✗ |   | HR00H09300 | 02/07 | PRODUCER COMPENSATION NOTICE |

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

Rev. Ed. Date (04/02)
GU 207 (6-78)
          2-13000

# The Hartford

## UNIVERSAL EXCESS™ POLICY

### I.   INSURING AGREEMENT

The Insurer designated in the Declarations (a Stock Insurance Company herein called the "Underwriters"), in consideration of the payment of the premium and in reliance upon any application, materials or information made available by or on behalf of the Insured(s) to the Underwriters during the application or proposal process, and subject to all of the terms, conditions and exclusions of this policy, agrees with the Insured(s) as follows:

The Underwriters shall provide the Insured(s) with insurance during the Policy Period which is in excess of the total limits of liability and any retention/deductible under all Underlying Insurance, as set forth in Item D of the Declarations, whether collectible or not.

### II.   LIMIT OF LIABILITY

A.   It is expressly agreed that liability for any loss shall attach to the Underwriters only after the Primary and Underlying Excess insurers shall have paid the full amount of their respective liability (hereinafter referred to as the "Underlying Insurance") or the Insured(s) shall have paid the full amount of such liability due to the financial insolvency of an insurer of the Underlying Insurance. The Underwriters shall then be liable to pay only such additional amounts up to the Limit of Liability set forth in Item C of the Declarations, which shall be the maximum liability of the Underwriters in each Policy Period.

B.   In the event of the reduction or exhaustion of the aggregate limits of liability under the Primary and Underlying Excess Policy(ies) by reason of losses paid thereunder for claims first made while this policy is in force, this policy shall:

   (1)   in the event of such reduction, continue in force excess of the reduced Primary and Underlying Insurance; or

   (2)   in the event of exhaustion, continue in force as primary insurance, subject to the Underwriters' Limit of Liability and to the other terms, conditions and exclusions of this policy,

provided always that in the latter event this policy shall only pay excess of the retention/deductible applicable to such primary insurance as set forth in the Primary Policy, which shall be applied to any subsequent loss in the same manner specified in such primary insurance. Notice of exhaustion of Underlying Insurance shall be given the Underwriters upon such exhaustion. Nothing herein shall be construed to provide for any duty on the part of the Underwriters to defend any Insured or to pay defense or any claim expenses in addition to the Limit of Liability set forth in Item C of the Declarations.

C.   If the Primary Policy contains a specific grant of coverage that is subject to a sub-limit of liability, then coverage under this policy shall not apply to any claim which is subject to such sub-limit of liability. However, any such claim shall be recognized under this policy solely for purposes of reducing or exhausting, to any extent, the Underlying Insurance.

### III.   PRIMARY AND UNDERLYING INSURANCE

A.   This policy is subject to the same warranties, terms, conditions, definitions, exclusions and endorsements (except as regards the premium, the amount and limits of liability, and duty to defend, and except as otherwise provided herein) as are contained in or as may be added to the Primary Policy, together with all the warranties, terms, conditions, exclusions and limitations contained in or added by endorsement to any Underlying Excess Policy(ies). In no event shall this policy grant broader coverage than is provided by the most restrictive Primary or Underlying Excess Policy(ies).

B.   It is a condition precedent to this policy that the policy(ies) of the Primary and Underlying Excess Insurers shall be maintained in full effect while this policy is in force except for any reduction of the aggregate limits contained therein (as provided for in Section II., B. above).

E.   Notice

The Underwriters shall be given notice in writing as soon as practicable: (a) in the event of the cancellation or non-renewal of any Underlying Insurance; and (b) of any additional or return premiums charged or paid in connection with any Underlying Insurance.

Any changes in coverage in the Underlying Insurance or any changes in the Insured(s) that would require notice under the Underlying Insurance shall be reported to the Underwriters as soon as practicable and the Insured(s) shall, upon request, furnish the Underwriters with copies of such changes. The Underwriters shall not be subject to such changes without the Underwriter's consent, such consent not to be unreasonably withheld.

In the event any claim is made against any Insured, written notice shall be given to the Underwriters in the same manner as given to the Primary Policy at 2 Park Ave, 5th Floor, New York, NY 10016, ATTN:  Hartford Financial Products Claims Division [Fax # (917) 464-5972], and otherwise pursuant to all appropriate notice provisions contained in the Underlying Insurance.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.



## THE HARTFORD

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

**TWIN CITY FIRE INSURANCE COMPANY**
HOME OFFICE - INDIANAPOLIS, INDIANA
ADMINISTRATIVE OFFICES - HARTFORD, CONNECTICUT
(A STOCK INSURANCE COMPANY MEMBER OF THE HARTFORD)

Brian S. Becker, Secretary

David Zwiener, President

RN 00 N026 00 0593
ILBP 83 01 05 89 RN
        00 DA 0218117-08    4/16/08    2-13000

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| | |
|---|---|
| **ENDORSEMENT NO.:** | 1 |
| **This endorsement effective on at 12:01 A.M. standard time** | 4/16/08 |
| **Forms part of Policy Number:** | 00 DA 0218117-08 |
| **Issued to:** | PFIZER, INC. |
| **By:** | TWIN CITY FIRE INSURANCE CO. |

## MAILING ADDRESS FOR NOTICE ENDORSEMENT

**I.**   **Notice of Claim or Wrongful Act**

A. It is hereby understood and agreed that a notice of any claim or wrongful act shall be given in writing to the following:

> *THE HARTFORD*
> *CLAIMS DEPARTMENT*
> *HARTFORD FINANCIAL PRODUCTS*
> *2 PARK AVENUE*
> *5TH FLOOR*
> *NEW YORK, NEW YORK 10016*
>
> *FACSIMILE:  (212) 277-0915*

B. It is hereby understood and agreed that where it is stated in the policy or declarations page that a notice of any claim or wrongful act shall be given in writing to The Hartford, Hartford Plaza, Hartford CT 06115 shall be deleted in its entirety and replaced with the following:

Notice of any claim or wrongful act shall be given in writing to the following:

> *THE HARTFORD*
> *CLAIMS DEPARTMENT*
> *HARTFORD FINANCIAL PRODUCTS*
> *2 PARK AVENUE*
> *5TH FLOOR*
> *NEW YORK, NEW YORK 10016*
>
> *FACSIMILE:  (212) 277-0915*

ENDORSEMENT NO:    2

This endorsement, effective 12:01 am,    4/16/08    forms part
of policy number    00 DA 0218117-08

issued to:    PFIZER, INC.

by:    TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under all lines of insurance in this policy subject to the Terrorism Risk Insurance Act.

**A.    Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Department of the Treasury will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of such insured losses that exceed the applicable insurer deductible. However, if aggregate insured losses attributable to "certified acts of terrorism" under the Terrorism Risk Insurance Act, as amended (TRIA), exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of such losses that exceeds $100 billion.

**B.    Cap On Certified Terrorism Losses**

A "certified act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism. The criteria contained in TRIA, for a "certified act of terrorism" include the following:

1.    The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2.    The act resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

3.    The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to "certified acts of terrorism" under TRIA, exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under TRIA, we shall not be liable for the payment of any portion of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C.    Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion, War Exclusion or the War And Military Action Exclusion.

All other terms and conditions remain unchanged.

David Zwiener, President

G-3435-0    © 2008, The Hartford    Page 1 of 1
HG 00 H068 00 0208
(Includes copyrighted material of the Insurance Services Office, Inc., with its permission.)

2-13000

ENDORSEMENT NO:   3

This endorsement, effective 12:01 am,   4/16/08                   forms part
of policy number   00 DA 0218117-08

issued to:      PFIZER, INC.

by:        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCESS RELIANCE ON PROPOSAL – PUBLIC COMPANY

This endorsement modifies insurance provided under the following:

UNIVERSAL EXCESS POLICY

I.    The Underwriters have issued this policy in reliance upon the Proposal.

II.   For the purposes of this endorsement, section **V. GENERAL CONDITIONS, A.** Definitions, is amended to include the following:

    6.   Proposal means:

        (1)   any materials or information submitted to the Underwriters by or on behalf the Insured during the application process for this policy;

        (2)   any application, including any materials or information submitted therewith, for any policy in an uninterrupted series of policies issued by the Underwriters, or any insurance company controlling, controlled by or under common control with the Underwriters, of which this policy is a renewal or replacement;

        (3)   any application for any Underlying Insurance, including any materials or information submitted therewith; and

        (4)   any publicly available information filed by the Insured within the last   1   years with the United States Securities and Exchange Commission.

All other terms and conditions remain unchanged.

David Zwiener, President

ENDORSEMENT NO:     4

This endorsement, effective 12:01 am,     4/16/08                                    forms part
of policy number     00 DA 0218117-08

issued to:     PFIZER, INC.

by:     TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## STATE AMENDATORY INCONSISTENCY ENDORSEMENT

This endorsement modifies insurance provided under the following:

UNIVERSAL EXCESS POLICY

Section V. GENERAL CONDITIONS is amended by the addition of the following:

State Amendatory Inconsistency

In the event that there is an inconsistency between the terms and conditions of a state amendatory endorsement attached to this policy and any term or condition of this policy, then it is understood and agreed that, where permitted by law, the Underwriter shall apply those terms and conditions of either the state amendatory endorsement or the policy which are more favorable to the Insured.

All other terms and conditions remain unchanged.

NOTICE. THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

David Zwiener, President

**ENDORSEMENT NO:**      5

**This endorsement, effective 12:01 am,**      4/16/08                                              **forms part**
**of policy number**      00 DA 0218117-08

**issued to:**      PFIZER, INC.

**by:**      TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXHAUSTION OF UNDERLYING INSURANCE

This endorsement modifies insurance provided under:

**UNIVERSAL EXCESS POLICY**

Section **II. LIMIT OF LIABILITY**, A., is deleted and replaced by the following:

A.   It is expressly agreed that liability for any covered Loss shall attach to the Underwriters only after the Primary and Underlying Excess insurers or the Insured shall have paid the full amount of their respective liability for such covered Loss. If the Insured shall pay, in the applicable legal currency, any such covered Loss, then the Underwriters shall recognize such payment for the depletion of the respective limits of liability of the Underlying Insurance. In no way shall such payment by the Insured constitute a waiver of any terms, conditions or exclusions of the Underlying Insurance or this policy. The Underwriters shall then be liable to pay only such additional amounts up to the Limit of Liability set forth in Item C of the Declarations, which shall be the maximum liability of the Underwriters in each Policy Period.

All other terms and conditions remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

David Zwiener, President

ENDORSEMENT NO:    6

This endorsement, effective 12:01 am,      4/16/08                                    forms part
of policy number      00 DA 0218117-08

issued to:           PFIZER, INC.

by:                  TWIN CITY FIRE INSURANCE CO.


### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDED EXCESS ODL ENDORSEMENT – RECOGNIZE DEPLETION

This endorsement modifies insurance provided under the following:

UNIVERSAL EXCESS POLICY

Section **II., LIMIT OF LIABILITY**, is amended to include the following:

<u>D</u>   .     With respect to coverage extended to directors and/or officers of the Insured in their capacity(ies) as directors and/or officers with any outside entity (herein "ODL Coverage") as provided for in endorsement(s) <u>17 & 20</u> of the Primary Policy, it is agreed that if other directors and officers liability insurance is in force for any such outside entity and is provided by the Underwriters or any subsidiary or affiliate company of The Hartford (or would be provided but for the application of the retention amount or the exhaustion of the limit of liability) then the Limit of Liability under this policy for all loss covered by virtue of ODL Coverage with respect to any such outside entity shall be reduced by the limit of liability (as set forth in the Declarations) of such other directors and officers liability insurance provided to such outside entity.

Where the Limits of Liability of the Underlying Insurance are depleted pursuant to the provision of ODL Coverage, such depletion shall be recognized under this policy solely for purposes of exhausting, to any extent, the Underlying Insurance.


All other terms and conditions remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

David Zwiener, President

**ENDORSEMENT NO:**      7

forms part

| | |
|---|---|
| **This endorsement, effective 12:01 am,** | 4/16/08 |
| of policy number | 00 DA 0218117-08 |

**issued to:**        PFIZER, INC.

**by:**        TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NEW YORK CANCELLATION AND NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

The Cancellation provision of this Policy is deleted and replaced with the following:

NOTICE OF CANCELLATION

The **Insurer** may cancel this policy for non-payment of premium by sending not less than fifteen (15) days notice to the **Insured(s)** at their last known address. The Insurer may not otherwise cancel this policy. This policy may be cancelled by the Insured(s) in accordance with the conditions of the Underlying Insurance. If the policy shall be cancelled by the **Insured(s)**, the **Insurer** shall retain the customary short rate proportion of the premium hereon.

NOTICE OF NONRENEWAL

A.   The **Insurer** will mail to the **Insured**, and to the authorized insurance agent or broker, written notice indicating the **Insurer's** intention not to renew this Policy at least thirty (30) days, yet no more than one hundred and twenty (120), days in advance of the expiration date of the Policy.

B.   Notice of Nonrenewal shall be mailed to the **Insured** at the last address known to the **Insurer** and to the authorized agent or broker. The Notice of Nonrenewal will contain the reason for non-renewal.

C.   In the event that the Notice of Nonrenewal is provided by the **Insurer** less than thirty (30) days prior to the expiration date of this Policy, coverage shall remain in effect on the same terms and conditions of the expiring policy for thirty (30) days beyond the date such notice is mailed or delivered to the **Insured** at the lower of the current rates or the prior **Policy Period's** rates.

D.   All of the above provisions regarding notice of cancellation or non-renewal shall not apply if the **Insured**, such **Insured's** authorized agent or broker, or another insurer of the **Insured** has mailed or delivered written notice to the **Insurer** that this Policy has been replaced or is no longer desired.

NOTICE OF CONDITIONAL RENEWAL

A.   The **Insurer** will send a Notice of Conditional Renewal thirty (30) days, but not more than one hundred and twenty (120) days prior to the expiration date of this Policy to the **Insured** and the **Insured's** agent or broker at the last address known to the **Insurer**, if the **Insurer**:

   1.   changes the Limits of Liability ;

   2.   changes the type of coverage under this Policy;

   3.   reduces coverage under this Policy;

   4.   increases deductible of this Policy;

   5.   adds an exclusion to this Policy; or

   6.   increases the premiums in excess of ten percent (10%) (exclusive of any premium increase generated as a result of increased exposure units or as a result of experience rating, loss rating, retrospective rating or audit).

B.   The Notice of Conditional Renewal will contain the reason(s) for conditional renewal as stated in paragraph (A) (1-6) of this Section.

**ENDORSEMENT NO:**    8

forms part

**This endorsement, effective 12:01 am,**      4/16/08
**of policy number**      00 DA 0218117-08

**issued to:**      PFIZER, INC.

**by:**      TWIN CITY FIRE INSURANCE CO.

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
## NEW YORK AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

UNIVERSAL EXCESS POLICY

**I.   CLAIMS MADE NOTIFICATION:**

The following Notice is added to Declarations page of this policy.

**CLAIMS MADE RELATIONSHIP MEANS THAT PERIOD OF TIME BETWEEN THE EFFECTIVE DATE OF THE FIRST CLAIMS MADE RELATIONSHIP BETWEEN THE UNDERWRITER AND THE INSURED AND THE CANCELLATION OR NONRENEWAL OF THE LAST CONSECUTIVE CLAIMS MADE POLICY BETWEEN SUCH PARTIES, WHERE THERE HAS BEEN NO GAP IN COVERAGE, BUT DOES NOT INCLUDE ANY PERIOD COVERED BY THE EXTENDED REPORTING PERIOD.**

**THIS POLICY PROVIDES NO COVERAGE FOR CLAIMS ARISING OUT OF WRONGFUL ACTS WHICH OCCURRED PRIOR TO ANY APPLICABLE RETROACTIVE DATE. THE INSURED WILL HAVE THE OPTION TO PURCHASE AN OPTIONAL EXTENDED REPORTING PERIOD. THE PREMIUM FOR AND THE LENGTH OF THE OPTIONAL EXTENDED REPORTING PERIOD SHALL BE STATED ON THE DECLARATIONS PAGE OF THIS POLICY.**

**COVERAGE GAPS MAY ARISE AT THE EXPIRATION OF THE POLICY, AUTOMATIC EXTENDED REPORTING PERIOD OR OPTIONAL EXTENDED REPORTING PERIOD. DURING THE FIRST SEVERAL YEARS OF THE CLAIMS MADE RELATIONSHIP, CLAIMS-MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED PERSON CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF THE OVERALL RATE LEVEL INCREASES, UNTIL THE CLAIMS-MADE RELATIONSHIP REACHES MATURITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**THIS POLICY IS WRITTEN ON A DEFENSE WITHIN THE LIMITS BASIS. THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS, INCLUDING JUDGMENT OR SETTLEMENT AMOUNTS, SHALL BE REDUCED OR MAY BE COMPLETELY EXHAUSTED BY AMOUNTS INCURRED FOR LEGAL DEFENSE COSTS AND OTHER CLAIMS EXPENSES.  ONCE THE LIMIT OF LIABILITY IS EXHAUSTED, THE UNDERWRITER SHALL NOT BE LIABLE FOR LEGAL DEFENSE COSTS, OTHER CLAIM EXPENSES OR FOR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT.**

**EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ACTS COVERED BY UNDERLYING INSURANCE (ITEM D IN THE DECLARATIONS.) FOR WHICH CLAIMS ARE FIRST MADE AGAINST THE INSURED(S) WHILE THE POLICY IS IN FORCE. THIS POLICY DOES NOT PROVIDE FOR THE UNDERWRITERS TO DEFEND THE INSURED, AND ANY DEFENSE COSTS AND OTHER CLAIM EXPENSE COVERED UNDER THE POLICY IS PART OF AND NOT IN ADDITION TO THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**II.   EXTENDED REPORTING PERIOD**

1.   Section **V.**, **GENERAL CONDITIONS**, paragraph B., Discovery Clause is amended to include the following:

   1.   Automatic Sixty (60) Day Extended Reporting Period

      Upon cancellation or nonrenewal of this policy, the insurance afforded by the policy shall be extended to apply to claims first made against the Insured during the period of sixty (60) days immediately following the effective date of cancellation or nonrenewal, but only with respect to wrongful acts committed prior to such date and otherwise covered by this policy. If other valid and collectible insurance exists, this extended

© 2007, The Hartford

ENDORSEMENT NO:    8

## III.   BANKRUPTCY OR INSOLVENCY

Section **V., GENERAL CONDITIONS**, is amended to include the following:

(**F** )   Bankruptcy or insolvency of any Insured or their estate shall not relieve the Underwriter of any of its obligations under this policy.

All other terms and conditions remain unchanged.

*David Zwiener, President*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**ENDORSEMENT NO:**   9

| | |
|---|---|
| **This endorsement, effective 12:01 am,**   4/16/08 | **forms part** |
| **of policy number**   00 DA 0218117-08 | |

**issued to:**   PFIZER, INC.

**by:**   TWIN CITY FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### DEFENSE COST ACKNOWLEDGMENT

### NEW YORK

This endorsement modifies insurance provided under the following:

UNIVERSAL EXCESS POLICY

The undersigned Insured acknowledges and agrees that the limits of liability available to pay claims, judgments or settlements will be reduced by the costs of legal defense. Any defense costs and other claim expenses covered under the policy is part of and not in addition to the Limit of Liability.

*Sent to Paula*
*9/29/08*

*Pfizer Inc*

Name of Insured

By: *William Getreuer*

Name: *William Getreuer*

Title: *Senior Risk Manager*

Date Signed: *9/29/08*

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

© 2005, The Hartford

Endorsement No.:   **10**

This endorsement, effective on         **4/16/08**         at 12:01 A.M. standard time, forms a part of

Policy No.   **00 DA 0218117-08**         of the   **TWIN CITY FIRE INSURANCE CO.**

Issued to   **PFIZER, INC.**

David Zwiener, President

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### POLICY CHANGE

| | | | | |
|---|---|---|---|---|
| 1. ☐ | Policy Premium Changed To: $ | | 9. ☐ | Deductible/Retention Changed To: |
| 2. ☐ | Insured's Name Changed To: (see description or endorsement listed below) | | 10. ☐ | Expiration Date Is Changed To: |
| 3. ☐ | Insured's Address Changed To: (see description or endorsement listed below) | | 11. ☐ | Additional Insured(s) or Subject(s) of coverage deleted |
| | | | 12. ☐ | Policy Provision(s) Added |
| 4. ☐ | Anniversary Date Is Changed To: | | 13. ☐ | Policy Provision(s) Deleted |
| 5. ☐ | Additional Insured(s) or Subject(s) of coverage added | | 14. ☐ | Exercise Discovery Period, Extended Reporting Period or Tail Coverage Option |
| 6. ☐ | Additional Premium: $ | | 15. ☒ | Other (see description or endorsement listed below) |
| 7. ☐ | Return Premium: $ | | | |
| 8. ☐ | Limit of Liability Changed To: $ | | | |

**Description of Policy Changes:**

ENDORSEMENT NO. 6 (AMENDED EXCESS ODL ENDORSEMENT - RECOGNIZE DEPLETION) IS
CORRECTED TO REFLECT SOLELY ENDORSEMENT NO. 17 OF THE PRIMARY POLICY.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**Name and number of Endorsement(s) made part of the policy:**

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE
FILING REQUIREMENTS OF THE NEW YORK
STATE INSURANCE DEPARTMENT. HOWEVER,
SUCH FORMS AND RATES MUST MEET THE
MINIMUM STANDARDS OF THE NEW YORK
INSURANCE LAW AND REGULATIONS.

**Named Insured:**    PFIZER, INC.

**Policy Number:**    00 DA 0218117-08

**Effective Date:**    4/16/08

**Insurer:**    TWIN CITY FIRE INSURANCE CO.

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## CONFIRMATION OF ACCEPTANCE OF CERTIFIED ACTS OF TERRORISM

We previously notified you that in accordance with the federal Terrorism Risk Insurance Act, as amended (TRIA), we must make "certified acts of terrorism" coverage available in the policies we offer.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism. The criteria contained in TRIA for "certified act of terrorism" include the following:

1.    The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2.    The act resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

3.    The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Any coverage for terrorist acts certified under TRIA made available in our policies is partially reinsured by the United States Department of the Treasury under a formula established by the Act. Under this formula, the federal share equals 85% of that portion of such insured losses that exceeds the applicable insurer deductible. However, if aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Program Year (January 1 through December 31) the Treasury will not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion and, in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

At that time we advised you that you will not be required to pay a premium for "certified acts of terrorism" coverage at this time. As a result of our notification, you have accepted "certified acts of terrorism" coverage. If, upon renewal of your policy, a premium is going to be charged for "certified acts of terrorism" coverage, we will provide you with notification of what that premium will be.

By accepting coverage for "certified acts of terrorism", we reserve the right to exclude coverage for losses that are not eligible for federal reinsurance under the Act.



**Producer Compensation Notice**

You can review and obtain information on The Hartford's
producer compensation practices at www.thehartford.com
or at 1-800-592-5717.



# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ──────────────────────── x | | |
| MARY K. JONES, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:10-cv-03864-AKH |
| | : | CLASS ACTION |
| Plaintiff | : : | |
| | : | FIRST AMENDED CONSOLIDATED |
| vs. | : : | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL |
| PFIZER INC., HENRY A. McKINNELL, JEFFREY B. KINDLER, FRANK D'AMELIO, DAVID L. SHEDLARZ, ALAN G. LEVIN, IAN C. READ, JOSEPH FECZKO, KAREN KATEN, J. PATRICK KELLY and ALLEN WAXMAN, | : : : : : : : | SECURITIES LAWS |
| Defendants. | : : : | |
| ──────────────────────── x | | DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page

SUMMARY OF THE ACTION .................................................................................... 1

INTRODUCTION .......................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 8

THE PARTIES ............................................................................................................... 8

DEFENDANTS' ILLEGAL MARKETING PRACTICES ........................................ 13

DEFENDANTS ISSUED FALSE AND MISLEADING STATEMENTS THAT
    PFIZER LAWFULLY PROMOTED ITS DRUGS ........................................ 26

PFIZER'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY
    MISSTATED IN VIOLATION OF GAAP ................................................... 38

DEFENDANTS' ASSURANCES REGARDING PFIZER'S DIVIDEND PAYMENTS
    WERE FALSE AND MISLEADING ............................................................ 43

DEFENDANTS' STATEMENTS REGARDING REVENUE GROWTH AND
    PFIZER'S DRUGS' EFFICACY WERE FALSE AND MISLEADING ....... 44

THE TRUTH IS REVEALED ...................................................................................... 50

POST-CLASS PERIOD REVELATIONS .................................................................. 51

ADDITIONAL ALLEGATIONS OF SCIENTER ..................................................... 57

    Pfizer's Corporate Integrity Agreements Evidence Scienter ........................... 57

    The Scope and Content of the Criminal Plea Agreement Adds to Scienter ..... 59

    Defendants' Treatment of the Blue Book as a Sham Bolsters Scienter ........... 61

    Defendants' Compensation and Insider Trading in Excess of $150 Million
        Support Scienter .................................................................................. 63

NO SAFE HARBOR .................................................................................................... 64

PROXIMATE LOSS CAUSATION/ECONOMIC LOSS ........................................... 65

APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET ........ 70

CLASS ACTION ALLEGATIONS ............................................................................ 71

**Page**

PRAYER FOR RELIEF ............................................................................................75

JURY DEMAND ....................................................................................................75

## SUMMARY OF THE ACTION

1.     This securities fraud class action is brought pursuant to §§10(b) and 20(a) of the

Securities Exchange Act of 1934 ("1934 Act") on behalf of all persons who purchased Pfizer Inc.

("Pfizer" or the "Company") securities between 1/19/06 and 1/23/09 (the "Class Period") against

Pfizer and certain of its senior executives arising out of defendants' false statements to investors

concerning Pfizer's unlawful off-label marketing of Pfizer's pharmaceutical products, including

Bextra, Geodon, Lyrica and Zyvox, and the illegal payment of kickbacks to physicians to promote

the sale of these drugs.[1]  Defendants' false and misleading statements about Pfizer's financial

performance and sales practices caused Pfizer stock to trade at artificially inflated prices throughout

the Class Period.  On 1/26/09, the price of Pfizer stock dropped when defendants were forced to

reveal Pfizer's illegal marketing and sales practices and the fees that the Company had agreed to pay

a record $2.3 billion in criminal and civil fines and penalties as a result thereof.

## INTRODUCTION

2.     This is not the first time that Pfizer has faced criminal sanction for the unlawful

marketing of its drugs.  In 2004, Pfizer paid $430 million to settle criminal charges for its illegal off-

---

[1]     The individual defendants include: Jeffrey B. Kindler ("Kindler") (Chief Executive Officer
("CEO") of the Company from 2006 to 12/5/10 and Chairman of the Board from 2/07 to 12/5/10);
Henry A. McKinnell ("McKinnell") (CEO from 2001 to 2006 and Chairman of the Board from 2001
until his retirement in 2/07); Frank D'Amelio ("D'Amelio") (Chief Financial Officer ("CFO") since
9/07); David L. Shedlarz ("Shedlarz") (Executive Vice President and CFO from 1/99 to 7/05, and
Vice Chairman from 3/05 until his retirement in 12/07); Alan G. Levin ("Levin") (Senior Vice
President and CFO of the Company from 3/05 until his retirement in 9/07); Ian C. Read ("Read")
(Senior Vice President and Group President, Worldwide Biopharmaceutical Operations of the
Company from 2006 to 12/5/10 and current CEO); Joseph Feczko ("Feczko") (Chief Medical
Officer until his retirement in 12/08); Karen Katen ("Katen") (Vice Chairman of Pfizer and President
of Pfizer Human Health until her retirement in 3/07); Allen Waxman ("Waxman") (General Counsel
until his retirement in 3/08); and J. Patrick Kelly ("Kelly") (Vice President of Pfizer and President of
U.S. Pharmaceuticals).

- 1 -

label promotion of Neurontin. As it was finalizing that settlement, and throughout the Class Period, Pfizer continued to illegally market drugs off-label. Ultimately, this misconduct resulted in the Company being forced to pay the largest criminal fine in the history of the United States.

3. During the Class Period, Pfizer's business strategy was built around a growth strategy that aggressively marketed drugs to doctors for purposes for which the drugs were not approved by the U.S. Food and Drug Administration ("FDA") or scientifically proven to benefit patients. Under the U.S. Food, Drug and Cosmetic Act ("FDCA"), pharmaceutical companies must seek approval from the FDA to market a drug to physicians by providing clinical data proving that the drug is safe and effective for particular indications. The purpose of the FDCA and relevant FDA regulations is to protect patients from medications that have not been demonstrated to be effective and safe.

4. The FDA expressly forbids drug companies from promoting unapproved drugs, approved drugs for unapproved indications and approved drugs for unapproved doses or unapproved patient populations. For example, a drug manufacturer cannot promote a drug approved for adults to children or adolescents. The practice of promoting drugs for unapproved uses is referred to as "off-label" marketing. Since 2004, the practice of illegally promoting drugs off-label has received major headlines and considerable scrutiny from state and federal prosecutors.

5. As a result of illegal off-label promotion, Warner-Lambert, acquired by Pfizer, drastically increased Neurontin sales via off-label marketing by more than 2,700% between 1995 and 2008, from $97.5 million to almost $2.7 billion.[2] As part of the 2004 Neurontin settlement, Pfizer not only paid over $430 million to settle criminal and civil violations relating to its unlawful

---

[2]     According to the prosecutor who led the investigation, Michael Loucks ("Loucks"), 94% of Neurontin's sales were off-label. Loucks attributed the sales to Pfizer making "a concerted effort to push for off-label uses."

promotion of Neurontin, it executed a Corporate Integrity Agreement ("CIA") with the Office of

Inspector General of the United States Department of Health and Human Services ("OIG"), in which

Pfizer promised to detect and prevent off-label marketing. Ex. A (attached hereto).

6.      Notwithstanding the settlement and Pfizer's representations to the federal court,

prosecutors and Pfizer shareholders, the illegal off-label promotion of drugs continued unabated at

Pfizer. In fact, even as Pfizer was finalizing the Neurontin settlement and executing the 2004 CIA,

defendants continued illegally marketing Pfizer's drugs off-label. According to an article appearing

in *Bloomberg* on 11/9/09:

> Prosecutor Michael Loucks [the U.S. Attorney for the District of
> Massachusetts] remembers clearly when lawyers for Pfizer Inc., the world's largest
> drug company, looked across the table and promised it wouldn't break the law
> [against off-label marketing] again.
>
> *          *          *
>
> What Loucks, who's now acting U.S. attorney in Boston, didn't know until
> years later was that ***Pfizer managers were breaking that pledge not to practice so-
> called off-label marketing even before the ink was dry on their plea***.
>
> *          *          *
>
> "They asserted that the company understood the rules and had taken steps to
> assure corporate compliance with the law," Loucks says. "We remember those
> promises."
>
> What Pfizer's lawyers didn't tell prosecutors was that ***Pfizer was at that
> moment running an off-label marketing promotion using more that 100 of its
> salespeople***. They were pitching Bextra, a Pfizer sales manager admitted when she
> pleaded guilty to misbranding a drug on March 30, 2009.

7.      Despite Pfizer's assurances that the Neurontin off-label marketing practices occurred

only at Warner-Lambert and prior to Warner-Lambert's acquisition by Pfizer, Pfizer was – both prior

to and during the Class Period – actively promoting Bextra, Geodon and Zyvox for off-label

indications by employing similar illegal marketing tactics to those used to unlawfully promote

Neurontin. And Pfizer was doing so with clear knowledge of the material adverse risks to the

Company. A PowerPoint presentation entitled "The 'Bottom Line' Analysis: the In-House View" prepared by Pfizer's assistant General Counsel for the Health Care Compliance Association (HCCA) 2005 Annual Compliance Institute confirms Pfizer's knowledge by the beginning of the Class Period that non-compliance with relevant laws (such as the prohibition on off-label marketing) bears costs including fines, civil judgments, exclusion, reputation and stock price. The presentation also acknowledges that prosecutions (and penalties) had increased for non-compliance.

8.      Pfizer promoted Bextra for the relief of acute pain even though clinical data did not support that indication and the FDA had rejected the application for that indication. In 4/05, the FDA forced Pfizer to remove Bextra from the market because it caused an increased risk of heart attacks and a severe skin reaction, risks that Pfizer downplayed in its marketing.

9.      Pfizer was also promoting off-label uses of Geodon at the same time it was settling the Neurontin investigation in 2004. Pfizer received FDA approval to market Geodon for schizophrenia, manic bipolar episodes and schizophrenia-related intramuscular pain. However, during the Class Period, defendants secretly marketed the drug for multiple off-label indications including depression, mood disorder, anxiety, aggression, dementia and attention deficit hyperactivity disorder, as well as for patients (pediatric and adolescent patients) and dosages that were unapproved. The unlawful off-label marketing of Geodon continued through the end of 2007.

10.      Pfizer also illegally promoted Zyvox during the Class Period for a variety of off-label conditions, including for infections caused by Methicillin-resistant staphylococcus aurous ("MRSA") related to cancer and dialysis treatments, when the drug was not approved for these indications. Further, defendants also illegally promoted Zyvox during the Class Period by saying that it was *more* effective than vancomycin, even though the Company received a letter from the

FDA prior to the Class Period in 2005 (the "2005 FDA Warning Letter") specifically warning Pfizer not to make that claim.

11.     Beginning in 9/05 Pfizer started using the same illegal methods to promote Lyrica (a drug designed to replace Neurontin) that Pfizer had previously pled guilty to using with respect to Neurontin. Continuing at least through the end of 10/08, Pfizer illegally promoted Lyrica for a wide variety of off-label uses including chronic pain, neuropathic pain, preoperative pain, migraines, mood improvement and anxiety, even though it had only obtained FDA approval for Lyrica to treat diabetic peripheral neuropathy ("DPN"), postherpetic neuralgia ("PHN") and, later, fibromyalgia.

12.     Although defendants continued and even increased Pfizer's off-label marketing efforts following the Neurontin settlement, defendants falsely assured investors in Pfizer's Securities and Exchange Commission ("SEC") filings and other public statements that the Company had controls that prevented the unlawful promotion of its drugs. In Pfizer's SEC filings defendants expanded on Pfizer's Policies on Business Conduct ("Policies" or the "Blue Book"), misleading investors into believing that Pfizer's existing controls prevented such unlawful practices and that its prior unlawful, off-label marketing practices had ceased. ¶¶58-67, 77.

13.     Defendants were well aware of the materially adverse risks to Pfizer from its illegal off-label marketing, including massive criminal and civil fines and debarment from any federal healthcare program. Yet, defendants deliberately concealed this information from investors. For example, defendants Kindler, McKinnell, Feczko and Read have admitted in court filings that by 2/04, Pfizer knew of the government's Bextra off-label marketing investigation. Likewise, Pfizer senior management was aware of the off-label marketing of Lyrica and Geodon no later than the fall of 2006. Defendants also knew of the off-label marketing of Zyvox no later than 7/05, when Pfizer received the 2005 FDA Warning Letter, and knew of the government's investigation of the illegal

- 5 -

promotion of Zyvox no later than 12/07. Pfizer's current General Counsel confirms in a 9/14/09 *National Law Journal* article that settlement negotiations with the U.S. Department of Justice ("DOJ") began prior to 6/08, when she joined the Company.

14. Further, senior management was tasked with advising Pfizer's Audit Committee promptly of compliance matters, and employed a tracking chart to monitor the *qui tams* and other complaints. This knowledge stands in stark contrast to defendants' public representations and the reserves Pfizer was required to take during the Class Period, but did not, for its unlawful conduct.

15. Defendants caused Pfizer to file with the SEC false and misleading Forms 10-Q and Forms 10-K. ¶¶68-77. Throughout the Class Period, defendants concealed that Pfizer was engaging in illegal off-label promotions and failed to inform investors of the materially adverse risks the Company faced as a result. And when the Company did finally begin to reveal that it had received "requests for information" regarding the "marketing of Celebrex and Bextra," it continued to conceal that Pfizer: (i) had illegally promoted Bextra and was continuing to unlawfully market Geodon, Zyvox and Lyrica off-label; (ii) that Pfizer's pattern and practice of illegal off-label promotions exposed it to a real risk of being banned from federal as well as state funded healthcare programs (*e.g.* Medicaid); (iii) was violating its own corporate Policies against off-label marketing; (iv) did not possess adequate internal controls to prevent, detect and stop off-label marketing; (v) was facing massive criminal and civil investigations; and (vi) faced materially adverse financial consequences that required contingency reserves.

16. Pfizer's later disclosures that it was working to resolve investigations were also false and misleading because the Company actively concealed that it had been illegally promoting products. The term "off-label" appears nowhere in these sections of Pfizer's SEC filings even though defendants were aware that this illegal practice would force the Company to pay record-level

criminal fines and civil penalties. Even worse, Pfizer's SEC filings deliberately downplayed the material risks of Pfizer's unabated off-label marketing after promises not to engage in such practices, claiming that any "government investigations" would not have "a material adverse effect material risks on [Pfizer's] financial condition." Yet, defendants knew that Pfizer's corporate reputation, its financial condition and its very existence were at risk as a result of federal law mandating debarment from government-funded health programs.

17.     Pfizer's publicly issued financial statements during the Class Period were also materially misstated in violation of U.S. Generally Accepted Accounting Principles ("GAAP") and SEC rules because Pfizer: (i) failed to timely record a minimum of a $2.3 billion loss reserve for its illegal off-label promotional practices; (ii) failed to disclose that the Company had submitted hundreds of millions of dollars in false or fraudulent claims, based on illegal off-label marketing, to federal and state healthcare programs, thus exposing the Company to multi-billion dollar legal liability; (iii) misrepresented the nature and the severity of the DOJ and state attorneys general investigations; and (iv) misrepresented the true nature of the Company's significant revenue growth reported from the sales of Geodon, Lyrica and Zyvox and its ability to meet its earnings targets. Pfizer's reported income and earnings were materially overstated and its disclosures omitted material information necessary for its financial results to be fairly and accurately presented to investors. *See* ¶¶78-80.

18.     Throughout the Class Period, defendants' statements about how Pfizer had achieved increased Geodon, Zyvox and Lyrica drug sales were false and misleading because they omitted the fact that Pfizer was only able to achieve its reported growth by utilizing illicit off-label promotions. ¶¶84-94. Pfizer also misrepresented the results of clinical studies to increase off-label sales to physicians and thereafter misrepresented those same clinical studies to investors. ¶¶88-89.

19.     On 1/26/09, Pfizer stunned investors by announcing that the Company had agreed to pay $2.3 billion to resolve criminal and civil investigations stemming from its continued unlawful off-label marketing of Bextra and three other drugs.  The $1.3 billion criminal fine represents the largest criminal fine in U.S. history.  To distract the market, defendants and their counsel made a decision to contemporaneously announce Pfizer's acquisition of Wyeth on the very same day.  Despite Pfizer's efforts to downplay that it was subject to the largest criminal fine in U.S. history, news of Pfizer's acquisition of Wyeth actually leaked into the market before the markets opened on 1/23/09.  As news of that merger was absorbed on 1/23/09, Pfizer's stock price actually increased 1.3%.  On 1/26/09 the market reacted to the stunningly adverse revelation that Pfizer faced $2.3 billion in penalties for off-label marketing.  The price of Pfizer common stock declined from $17.45 to $15.65 on 1/26/09 as the artificial inflation caused by defendants' misrepresentations and omissions came out of the stock price, resulting in massive losses to Pfizer's investors and a single day loss in Pfizer's market capitalization of more than $12 billion.

## JURISDICTION AND VENUE

20.     The claims asserted arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.  Jurisdiction is conferred by §27 of the 1934 Act.  Venue is proper pursuant to §27 of the 1934 Act.  Pfizer's headquarters are located in New York, New York, and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

21.     Lead Plaintiff Stichting Philips Pensioenfonds purchased Pfizer securities during the Class Period on the New York Stock Exchange ("NYSE") as set forth in the attached certification and was damaged thereby.

- 8 -

22.     Plaintiff Mary K. Jones purchased Pfizer securities during the Class Period on the NYSE as set forth in the attached certification and was damaged thereby.

23.     Defendant Pfizer is a pharmaceutical company with its headquarters located in New York, New York.  Pfizer is considered the world's largest research-based biopharmaceutical company.  Pfizer's stock is traded under the symbol PFE on the NYSE, which is an efficient market.

24.     Defendant Jeffrey B. Kindler has served in various executive positions with Pfizer since 2002.  From 1/02 to 7/06, Kindler was Pfizer's General Counsel.  He was the CEO and Chairman of the Board, from 7/06 and 2/07 to 12/5/10, respectively.  As CEO and Chairman, Kindler was ultimately responsible for all aspects of Pfizer's business, including discovering, developing, manufacturing and marketing Pfizer's prescription medicines.  Kindler was also Chair of Pfizer's Board Executive Committee and a member of the Executive Leadership Team and Executive Compliance Committee.  As one of the four members of the Executive Committee, Kindler was a part of Pfizer's most senior decision-making team responsible for compliance, legal, communications, government relations, corporate citizenship, policy development, vision, strategic direction and operation of Pfizer.  The committee reviews and approves all major management, operating and financial decisions.  It also has accountability and direct control over nearly all of Pfizer's operating and support groups.

25.     In 2005, Kindler was both the General Counsel and the Chief Compliance Officer as required under the terms of the 2004 CIA.  In these roles, Kindler was responsible for developing and implementing the Code of Conduct and procedures to ensure compliance with federal healthcare laws, and for monitoring the day-to-day compliance activities.  In his role as Chief Compliance Officer, he was responsible for overseeing the Corporate Compliance Committee, which reviewed off-label marketing issues reported via the Company's hotline reporting system put in place for

- 9 -

employees to report illegal marketing. As Chief Compliance Officer, he was also responsible for reporting off-label marketing matters at least semi-annually to the Board of Directors and the Audit Committee of the Board.

26. Kindler signed or authorized to be signed the 3/1/07 and 2/29/08 Forms 10-K, including the attached Sarbanes-Oxley Certifications. Kindler also signed or authorized to be signed the Sarbanes-Oxley Certifications attached to the 8/11/06, 11/3/06, 5/4/07, 8/6/07, 11/5/07, 5/2/08, 8/8/08 and 11/7/08 Forms 10-Q. Kindler participated in a number of conference calls during the Class Period, including, but not limited to, the 3Q06, 1Q07, 2Q07, 3Q07, 4Q07, 1Q08, 2Q08 and 3Q08 Pfizer earnings calls and the 2/10/06 and 1/22/07 Pfizer analyst meetings. Kindler unexpectedly announced his "retirement" on the evening of 12/5/10.

27. Defendant Henry A. McKinnell served in various executive positions with Pfizer from 1971 to 2007. McKinnell was the Company's CEO from 2001 to 7/06 and Chairman of the Board from 2001 until his retirement in 2/07. From 1984 until he became CEO in 2001, McKinnell served in a number of executive capacities, including Vice President of Strategic Planning, CFO, President of Pfizer Medical Service Group, President of Pfizer Pharmaceuticals Group and Chief Operating Officer ("COO"). McKinnell signed or authorized to be signed the 3/1/06 and 3/1/07 Forms 10-K, including the Sarbanes-Oxley Certification attached to the 2006 Form 10-K. McKinnell also signed the Sarbanes-Oxley Certification attached to the 5/8/06 Form 10-Q. McKinnell participated in conference calls during the Class Period, including, but not limited to, the 4Q05, 1Q06 and 2Q06 Pfizer earnings calls and the 2/10/06 analyst meeting.

28. Defendant Frank D'Amelio has served as the Company's CFO since 9/07. As CFO, D'Amelio is responsible for both the financial and business operations of Pfizer. D'Amelio is a member of Pfizer's Executive Leadership Team and Executive Compliance Committee. D'Amelio

signed the 2/29/08 Form 10-K, including the Sarbanes-Oxley Certification attached. D'Amelio also signed the Sarbanes-Oxley Certifications attached to the 11/5/07, 5/2/08, 8/8/08 and 11/7/08 Forms 10-Q. D'Amelio participated in a number of conference calls during the Class Period, including, but not limited to, the 3Q07, 4Q07, 1Q08, 2Q08 and 3Q08 Pfizer earnings calls and the 5/5/08 Deutsche Bank Securities Health Care Conference.

29.     Defendant David L. Shedlarz served various capacities at Pfizer from 1971 to 2007. Shedlarz was the Company's Executive Vice President and CFO from 1/99 to 7/05, and served as Vice Chairman from 3/05 until his retirement in 12/07. Shedlarz was also a member of Pfizer's Executive Committee. Shedlarz participated in a number of Pfizer conference calls during the Class Period, including, but not limited to, the 4Q05, 1Q06, 2Q06, 3Q06, 1Q07, 2Q07 and 3Q07 Pfizer earnings calls, the 2/10/06 and 1/22/07 analyst meetings and the 5/2/06 Deutsche Bank Securities 31st Annual Health Care Conference.

30.     Defendant Alan G. Levin was Pfizer's Senior Vice President and CFO of the Company from 3/05 to 9/07. Prior to being Pfizer's CFO, Levin served in various finance and accounting related capacities at Pfizer beginning in 1987. Levin signed Pfizer's 3/1/06 and 3/1/07 Forms 10-K, including the Sarbanes-Oxley Certifications attached. Levin also signed the Sarbanes-Oxley Certifications attached to the 5/8/06, 8/11/06, 11/3/06, 5/4/07 and 8/6/07 Forms 10-Q. Levin participated in a number of Pfizer conference calls during the Class Period, including, but not limited to, the 4Q05, 3Q06 and 2Q07 Pfizer earnings calls and the 1/22/07 analyst meeting.

31.     Defendant Ian C. Read has served in various executive positions with Pfizer since 1978, including as Pfizer's Senior Vice President and Group President of the Worldwide Biopharmaceutical Operations of the Company from 2006 to 12/5/10 and the Company's current CEO. As President of the Worldwide Biopharmaceutical Operations, Read was the head of the

- 11 -

world's largest organization devoted to developing, marketing and selling of prescription drugs. Read is also a member of Pfizer's Executive Leadership Team, Executive Compliance Committee and, as of 12/5/10, its Board of Directors. Read participated in a number of Pfizer conference calls during the Class Period, including, but not limited to, the 4Q05, 1Q06, 3Q06, 1Q07, 2Q07, 3Q07, 4Q07, 1Q08, 2Q08 and 3Q08 Pfizer earnings calls, the 1/22/07 analyst call and the 9/22/08 UBS Global Life Sciences Conference.

32.     Defendant J. Patrick Kelly served in various capacities at Pfizer between 1981 and 2006. Prior to being promoted to Vice President of Pfizer and President of U.S. Pharmaceuticals in 2002, a position he held until his departure in 8/06, Kelly held a number of marketing positions, including Group Vice President for Disease Management and Senior Vice President of Worldwide Marketing. During his marketing career at Pfizer, Kelly built and managed teams that developed and implemented educational and promotional programs in support of Pfizer medicines. Kelly was also a member of the Pfizer Pharmaceuticals Group Leadership Team and the Management Council. Kelly participated in the 4Q05 and 2Q06 Pfizer earnings calls, the 2/10/06 Pfizer analyst meeting and the 5/2/06 Deutsche Bank Annual Health Care Conference.

33.     Defendant Joeseph Feczko served in various positions at Pfizer for 22 years. During the Class Period, Feczko was Pfizer's Chief Medical Officer and a member of the Executive Leadership Team until his retirement in 5/09. As Chief Medical Officer, Feczko was responsible for all aspects of Pfizer's medical affairs, including regulatory matters, medical policies and safety activities. Feczko participated in Pfizer conference calls during the Class Period, including, but not limited to, the 4Q05, 1Q06, 2Q06 and 3Q06 Pfizer earnings calls and the 2/10/06 and 1/22/07 analyst meetings.

34.     Defendant Karen Katen served in various capacities at Pfizer since 1974.  From 3/05 to 3/07 Katen was Vice Chairman and President of Pfizer Human Health.  Pfizer Human Health is the Company's principal operating group, that Katen was responsible for the discovery, development, manufacture, distribution and commercialization of Pfizer's prescription medicines.  Katen participated in Pfizer conference calls during the Class Period, including, but not limited to, the 1Q06 and 2Q06 Pfizer earnings calls and the 2/10/06 analyst meeting.

35.     Defendant Allen Waxman began working in Pfizer's General Counsel's office in 2003.  In 2006 Waxman was appointed General Counsel and served in that capacity until he departed in 2008.  After the Board of Directors selected Kindler to become Pfizer's CEO in 2006, Waxman became the Company's General Counsel and therefore had the responsibility to ensure Pfizer's compliance with the FDCA, FDA regulations regarding illegal off-label marketing, the False Claims Act and federal healthcare programs.  As General Counsel, Waxman was also responsible for setting strategy for Pfizer's most significant legal and regulatory matters, including regulatory inquiries, litigation, employment matters and intellectual property issues.  Waxman was also a member of Pfizer's Executive Leadership Team, and participated in Board and Audit Committee meetings.  Waxman participated in Pfizer conference calls during the Class Period, including, but not limited to, the 3Q06, 1Q07, 2Q07, 3Q07 and 4Q07 Pfizer earnings calls and the 1/22/07 Pfizer analyst meeting.

36.     The defendants named in ¶¶24-35 are referred to herein as the "Individual Defendants."

## DEFENDANTS' ILLEGAL MARKETING PRACTICES

37.     Pfizer was founded in 1849 and is in the business of developing, manufacturing and selling pharmaceuticals.  As such, Pfizer's operations are regulated by the FDA.  During the Class Period, defendants illegally promoted the sale of drugs such as Bextra, Geodon, Lyrica and Zyvox

- 13 -

for uses unapproved by the FDA and, in certain instances, uses that the FDA had specifically told Pfizer were not permitted. The illegal conduct was systemic and directly or indirectly sanctioned by defendants.

38. Prior to the Class Period, on 5/13/04, a Pfizer subsidiary, Warner-Lambert, agreed to plead guilty to a felony and pay more than $430 million to resolve criminal charges and civil liabilities in connection with the illegal and fraudulent promotion of unapproved uses for Neurontin. According to the DOJ press release to announce the Neurontin settlement: "Warner-Lambert's strategic marketing plans, as well as other evidence, show that *Neurontin was aggressively marketed to treat a wide array of ailments for which the drug was not approved*." The DOJ also noted that "Warner-Lambert promoted Neurontin even when scientific studies had shown it was not effective."

39. The DOJ release set forth the off-label marketing tactics Warner-Lambert employed to illegally promote the unapproved uses of Neurontin, including:

- encouraging sales representatives to meet one-on-one with physicians to pitch off-label uses without prior inquiry by doctors;

- sales representatives making false and misleading statements to health care professionals regarding the drug's efficacy and whether it had been approved by the FDA for off-label uses;

- utilizing "Medical Liaisons" who falsely represented themselves as scientific experts to promote off-label uses;

- paying physicians to attend "consultants meetings" including expensive dinners or out-of-town conferences – such as trips to Florida, the 1996 Atlanta Olympics and Hawaii – during which presentations about off-label uses were made;

- sales representatives recruiting physicians to call a pre-arranged number to listen to other physicians or sales representatives speak about off-label uses;

- funding purportedly independent continuing medical education ("CME") conferences on off-label uses where Warner-Lambert controlled the speakers, topics, content and participants;

- 14 -

- planting people in the audience of CME conferences to ask questions about the off-label uses of Neurontin; and

- paying physicians to allow sales representatives to accompany the physician while seeing patients.

40. Because prosecutors discovered the concerted effort to market Neurontin for off-label uses, the 5/13/04 settlement imposed a $240 million criminal fine for violations of the FDCA. Warner-Lambert also pled guilty to two felonies. This fine was the second largest criminal fine ever imposed in a health care fraud prosecution at the time. Warner-Lambert also paid $83.6 million and $68.4 million, respectively, to settle civil violations of the False Claims Act as damages suffered by the federal and the 50 states' portions of the Medicaid programs. Warner-Lambert further paid $38 million to settle civil violations of consumer protection statutes in all 50 states and D.C.

41. As part of that settlement, Pfizer agreed to a corporate compliance program. According to the 5/13/04 DOJ press release:

> *Pfizer Inc*, Warner-Lambert's parent company, ***has agreed to comply with the terms of a corporate compliance program***, which will ensure that the changes Pfizer Inc made after acquiring Warner-Lambert in June 2000, are effective in training and supervising its marketing and sales staff, and ***ensures that any future off-label marketing conduct is detected and corrected on a timely basis***.

42. Even though the Neurontin settlement agreement specified that the illegal off-label marketing of Neurontin was conducted at Warner-Lambert before Pfizer acquired that company, Pfizer itself was required to execute the CIA to prevent illegal off-label marketing at Pfizer going forward.[3] The CIA imposed a Compliance Program which required Pfizer to: (i) appoint a Compliance Officer and a Deputy Compliance Officer who are members of senior management; (ii) form a Compliance Committee comprised of the Compliance Officer and other members of

---

[3] The full text of 2004 CIA Pfizer entered into as part of the Neurontin settlement can be found at Ex. A.

senior management; (iii) establish a Code of Conduct, known as Pfizer's Policies or Blue Book, requiring Pfizer's commitment to abide by federal healthcare program rules and FDA requirements "*including its commitment to comply with all government contracting requirements and to market, sell, and promote its products in accordance with such requirements*" and requiring Pfizer to develop a mechanism for reporting violations of federal healthcare program rules and FDA requirements within the Company; (iv) implement policies and procedures to address, among other items, "*methods for selling, marketing, promoting, advertising, and disseminating information about off-label uses of Pfizer's products in compliance with all applicable FDA requirements*; and (v) train and educate Pfizer employees how to comply with "*all applicable FDA requirements regarding the proper methods for selling, marketing, promoting, and advertising Pfizer's products, and disseminating information about the off-label uses of Pfizer's products including, but not limited to, the requirements of the Federal Food, Drug, and Cosmetic Act and FDA regulations*."

43. The CIA was very specific about senior management's responsibilities to monitor and report off-label marketing. The CIA required that Pfizer maintain a Disclosure Program to enable individuals to disclose any issues with "Pfizer's policies, conduct, practices, or procedure with respect to [any] Federal health care program requirements or FDA requirements believed by the individual to be potential violation of criminal, civil, or administrative law." Further, under the CIA, an internal review of the allegations was required where they were sufficiently specific to determine the appropriateness of the conduct and provided an opportunity for corrective action. The Compliance Officer (defendant Kindler, and later defendant Waxman) was charged with ensuring that a "disclosure log" be maintained that included a record and summary of each disclosure

- 16 -

received, the status of any internal review and any corrective action taken in response to any internal review.

44.     The CIA also required that the Compliance Officer and Deputy Compliance Officer make, at minimum, semi-annual reports regarding compliance matters directly to Pfizer's Board and charged these individuals as "***responsible for monitoring the day-to-day compliance activities*** engaged in by Pfizer as well as for [the CIA's] reporting obligations."  It mandated that a Compliance Committee consisting of members of senior management, such as senior executives of "internal audit, regulatory affairs, sales, marketing, personnel and operations," be maintained to "support the Compliance Officer in fulfilling his/her responsibilities," including "***monitoring of internal and external audits and investigations***."  Further, the CIA required an annual report to the OIG certified by the Compliance Officer that Pfizer is in compliance with the requirements of the CIA.

45.     As General Counsel, defendant Kindler oversaw Pfizer's negotiation and eventual settlement for unlawful off-label marketing of Neurontin.  As it was negotiating and executing the CIA, the Company was contemporaneously flouting the very law defendants agreed Pfizer would strictly adhere to and continued to do so after the agreement was penned.  In fact, defendants were, at the very moment that they entered the 2004 CIA, actively promoting drugs for off-label indications to the tune of billions of dollars (and millions of dollars in compensation for defendants).

46.     Defendants are well aware that physicians rely on Pfizer to comply with the law. Defendant McKinnell wrote in his book "A Call to Action" that "[d]octors, who are too busy to read all the literature on new drugs, value the briefings they receive[] from company representatives." He further admits that the "bulk of the pharmaceutical industry's 'marketing' budgets go to supporting professional representatives charged with the task of informing physicians about the products they

- 17 -

represent." To that end, "[e]xperience shows that face-to-face talks to doctors are more effective than printed information in getting doctors . . . to consider prescribing our products." Pfizer took advantage of this knowledge by consistently formulating and implementing marketing strategies that were designed to foment doctors' off-label drug use. Importantly, defendants knew throughout the Class Period that Pfizer faced a significant adverse material risk to its financial well-being, and even to its existence, as a result of the illegal promotion of drugs which they concealed from investors and for which they failed to reserve for in Pfizer's financial statements filed with the SEC. Set forth below is a description of the widespread illegal marketing tactics employed by Pfizer.

47. **Bextra**: Bextra was launched in 4/02 and marketed under a co-promotion agreement between Pharmacia and Pfizer, even before Pfizer's acquisition of Pharmacia. On 1/15/01, Pharmacia submitted an application to the FDA seeking approval of Bextra for the treatment of acute pain generally. On 11/16/01, *the FDA rejected the use of Bextra for acute pain generally*. The FDA only approved the use of Bextra to treat arthritis and menstrual discomfort. By no later than 6/03, Pfizer management was aware that members of Pfizer's sales force were distributing materials promoting the off-label use of Bextra. Additional off-label marketing tactics Pfizer employed to increase Bextra sales were described by the many relators who filed *qui tam* actions,[4] and include:

- **Paying Physicians**: Relator Glenn DeMott ("DeMott"), a former Pfizer sales representative, describes a 5/28/03 "*Plan of Attack*" *meeting, at which a district manager instructed Pfizer sales representatives to pay physicians to serve as speakers for off-label promotion* to induce other physicians to place standing orders for Celebrex, and the effects of Celebrex and Bextra on bone healing and bone grafts;

---

[4]     Nine *qui tam* actions were filed and eventually resulted in the $2.3 billion fine and penalties imposed on Pfizer. The *qui tam* actions allege additional detail beyond that set forth herein. If the Court requests additional details of Pfizer's illicit off-label marketing practices during the Class Period, plaintiffs are willing and able to submit the pleadings in the *qui tam* cases.

- **Promoting Indications Off-Label**:  DeMott also alleged that in 9/03 he and other sales representatives received materials created by Pfizer's Best Practices division in Portland, Oregon describing how to market Bextra and Celebrex off-label for pre-operative and post-operative treatments, not approved by the FDA.  In 1/04, DeMott attended a Plan of Attack meeting where the 2004 Business Plan was distributed. *The Business Plan suggested that sales representatives can establish physician protocols for Bextra and Celebrex by calling anesthesiologists for the purpose of obtaining off-label sales for post-operative pain*;

- **Off-Label Protocols**:  DeMott's notes taken during an 8/27/03 meeting with district manager and sales representatives confirm that a protocol was established for marketing 20 mg Bextra doses to the Columbus Blue Jackets, *an all-male professional hockey team* even though the only indication approved for 20 mg doses was for menstrual pain;

- **Misleading Safety**:  Relator John Kopchinski ("Kopchinski"), a Pfizer Senior Specialty Representative, attached exhibits to his complaint, including Exhibit 4, a 1/27/03 PowerPoint presentation which instructs sales personnel to *mislead doctors concerning the safety of Celeberex and Bextra*.  The presentation shows despite the limitations on Bextra's FDA approval, Pfizer viewed the entire "pain market" as a "huge opportunity" to sell Bextra.  Further, Pfizer used "master visual aids" to sell Bextra, including for "acute pain";

- **Scripts with Unapproved Uses and Doses**:  Kopchinski's Exhibit 9 is a script used as an aid to help Pfizer sales representatives market Bextra.  The script was e-mailed to a number of sales groups at Pfizer.  National sales director Mark Brown ("Brown") was carbon copied on the e-mail. *In a blatant contradiction of the FDA approved dosage for Bextra, the script suggests that sales representatives tell physicians that "Bextra provides the added spectrum of efficacy in that 20mg and 40mg doses are approved for more acute non-arthritic pain*."  Bextra was never approved for use for acute non-arthritic pain or at 40 mg doses, as it was only approved for use at 20 mg doses for menstrual pain;

- **Sales Strategy on Unapproved Uses**:  Exhibit 14 attached to the Kopchinski complaint includes an e-mail from Pfizer National Sales Director Brown to a number of Pfizer sales personnel. *The e-mail attaches a "review of the Oral Surgery study with Bextra." Brown informs the recipients that "[t]his is the study that Medical Inquiry sends out upon request." The FDA never approved the use of Bextra for oral surgery*.  Further, under the "Sales Strategy" heading in the document is the statement, "[m]ake a point of how this study can help or hinder our sales efforts"; and

- **Halo Effect**:  According to relator Kopchinski, Pfizer sales personnel were told to discuss only Celebrex safety for issues where Celebrex was purportedly better than Bextra, and to discuss only Bextra safety for the issues where Bextra was purportedly better than Celebrex.  The purpose of the misleading presentation was to *confuse*

- 19 -

*doctors into thinking that the drugs were essentially the same and favorable safety information applied to both. The practice was commonly referred to at Pfizer as the "Halo" effect.*

48.     In addition to the percipient witness accounts above, on 3/30/09 former Pfizer sales regional manager Mary Holloway ("Holloway"), who supervised 100 sales representatives and district managers, agreed to plead guilty to a federal charge based on her participation in the off-label marketing of Bextra.  As part of the plea, Holloway agreed to the charges the government alleged in the Information, including:

- Holloway *trained and directed her sales team to seek unapproved written surgical and pain management protocols, standing orders and pathways from physicians, hospitals and other customers for use in pre- and post-operative surgical situations*;

- In or about 6/02, 11/03, and at other times, Holloway *instructed the sales force to send out unsolicited letters known as Medical Inquiry Letters* to groups of physicians who prescribed a lot of Vioxx to try to take market share.  These letters were issued by Pharmco and purported to be responses to physicians' unsolicited inquiries; and

- Holloway *circulated to her sales team an electronic template* of a hospital-wide pain management pathway *that provided for administration of Bextra for unapproved uses and at unapproved dosages* and to give instructions on how to prepare such pathways for distribution in hospitals and institutions.

49.     The Holloway *sentencing memorandum confirmed that her actions were entirely* "*consistent with how Pfizer wanted her to promote and sell the product*."  According to the Holloway sentencing memorandum, "[t]he implementation of a marketing plan to obtain Bextra protocols and standing orders was *a company-wide initiative*."  As a result of these practices, annual sales of Bextra exceeded $1.2 billion by 2004.

50.     Ultimately, Pfizer was forced to remove Bextra from the market in 4/05 because of the increased risk of heart attacks and severe skin reactions resulting from its use.  Despite Bextra's removal, by the beginning of the Class Period, Pfizer had or was generating hundreds of millions of

- 20 -

dollars of revenue from Bextra prescriptions written as a result of the Company's off-label marketing. Pfizer has admitted through its shell subsidiary, Pharmacia & Upjohn Company, Inc. ("Pharmacia & Upjohn") as part of its criminal plea, that the pecuniary or gross gain from the offense (*i.e.* off-label marketing) was $664 million – a figure that was undoubtedly more. Defendants were aware from the Neurontin experience that Pfizer would be required to disgorge (i) ill-gotten gains with a multiplier for criminally promoting Bextra off-label, and (ii) amounts improperly paid by federal and state governments to Pfizer for off-label Bextra prescriptions via the Medicaid programs. Therefore, by the beginning of the Class Period, Pfizer had failed to reserve for these enormous contingent liabilities.

51. **Geodon**: Pfizer's unlawful promotion of Geodon began in 1/01 and continued through at least the end of 2007. Pfizer received FDA approval to market Geodon for schizophrenia, manic bipolar episodes and schizophrenia-related intramuscular pain relief only. Despite this approval, Pfizer marketed the drug for multiple off-label indications including depression, mood disorder, anxiety, aggression, dementia, and attention deficit hyperactivity disorder, and for unapproved patients (pediatric and adolescent patients) and at unapproved dosages. As a result of Pfizer's illegal marketing of Geodon, its revenue grew from $150 million in 2001 to over $850 million in 2007. Examples of Pfizer's promotion of Geodon off-label include:

- **Corporate Sanctioned Illegal Marketing Scheme**: According to the *qui tam* complaint filed by Mark R. Westlock ("Westlock"), a Pfizer District Sales Manager, after only tallying up $150 million in Geodon sales for 2001 and $128 million for the first three quarters of 2002, in 11/02, *the head of Pfizer's Geodon marketing conducted a national sales meeting* attended by Pfizer sales managers, including district managers, regional medical research specialists and VPs from Pfizer corporate sales, *at which he gave a presentation directing Pfizer's sales force to promote Geodon for a host of unapproved uses, including borderline personality disorder, depression, obsessive compulsive disorder, post traumatic stress disorder, dementia in the elderly, bipolar mania, bipolar maintenance and pediatric/ adolescent conduct disorders. Thereafter, the unapproved uses were cited in Pfizer-sponsored literature and by Pfizer-sponsored speakers*;

- 21 -

- **Sponsored Speakers**: Westlock's complaint explains that the Pfizer Field Guide, its compliance "bible," provides that "'Pfizer is held responsible for the conduct and content of its promotional speaker programs.'" He explains that ***Pfizer recruited a nationwide network of paid speakers to promote Geodon***, tracked each speaker's effectiveness (including each speaker's off-label presentations) and provided lists of these speakers to Pfizer's sales force. Westlock explains that one such speaker was Dr. Neil S. Kaye, who conducted hundreds of speeches promoting Geodon off-label wherein he was paid up to $4,000 a day plus expenses. He was such a frequent promoter that Pfizer paid for him to use his own private helicopter to give speeches and a Pfizer V.P. had to approve his payments. Another speaker, Dr. M. Michael Ishii, blatantly included a slide entitled "Geodon Applications: Indication and Off Label" discussing a myriad of off-label uses for Geodon;

- **Off-Label Materials**: Westlock further explained that documents such as the one entitled "Neil Kaye, MD Geodon Take Home Selling Points" summarizing Dr. Kaye's ***off-label presentation*** for such unapproved uses as borderline personality disorder, dementia and major depression, were provided to thousands of sales representatives;

- **Regional Medical Research Specialists ("RMRS")**: According to Westlock, in an end-run around to the sales representatives' duty to promote Geodon on-label, ***RMRSs regularly accompanied Pfizer sales representatives to promote off-label use of Geodon***. For example, RMRS Dr. Barry Herman, in approximately 5/03, e-mailed a Pfizer Regional Sales Manager indicating that all "influentials" should be referred to him. Pfizer recognized Dr. Herman for his advocacy that increased Geodon's market share. Another example provided by Westlock, was RMRS Dr. Douglas Geenens, a child psychiatrist, who in 11/06, was asked to speak at a Pfizer sales meeting (known at Pfizer as ***Plan of Attack meetings***) where he showed slides and discussed a host of non-approved uses, including "conjectural indications," such as autism, depression, bipolar disorder, as well as unapproved use of Geodon for children. Dr. Geenens gave 75 to 125 talks for Pfizer in 2006 primarily on Geodon at which he readily promoted off-label uses. He received approximately $150,000 for these talks;

- **Use of Non-Profits as a Trojan Horse**: Westlock indicates that Pfizer used NAMI (National Alliance for the Mentally Ill) as a front to increase the market share of Geodon. By way of example, Pfizer paid for Dr. Darrin Friesen to speak at a NAMI workshop on the advances of the treatment of schizophrenia and the results of the Clinical Antipsychotic Trials of Intervention Effectiveness ("CATIE") trial. Westlock explains that Dr. Friesen was a child psychiatrist and the CATIE trial was an adult trial, so Dr. Friesen was not qualified to speak on the trial. Further, Westlock explains that the real reason Pfizer paid for Dr. Friesen's speech was to ***secure continued heavy usage of Geodon*** by Dr. Friesen for his child and adolescent patients. Further still, the speech Dr. Friesen actually gave (paid for by Pfizer) was "***little more than a Geodon promotional program to market Geodon off-label***";

- **Promoting to Patients Where Use was Prohibited**: Westlock notes that Geodon has a ***black box warning against using it for treating elderly patients*** with dementia. Yet, Pfizer routinely promoted Geodon to doctors for this patient population to increase sales. For example, in 11/05 a Pfizer District Manager advised a group of 40-60 sales representatives at a ***Plan of Attack meeting*** that they could grow Geodon business by marketing ***in nursing homes***;

- 22 -

- **Marketing for Unapproved Dosages**: Geodon was approved for 80 mg doses, twice a day. ***Despite Pfizer informing the FDA in 2000 that there could be adverse events if Geodon were used in excess of 160 mg a day and receiving an FDA warning letter*** on 9/3/02 for minimizing the safety risks regarding Geodon to cause QT prolongation and sudden death, as early as 2002 ***Pfizer began regularly promoting the dosing of Geodon well beyond the approved amount***; and

- **Unsubstantiated Comparison Claims**: On 8/17/06, 90 sales representatives received a voice message from a Pfizer Regional Manager telling them to use the "***compare and win strategy***" – to compare Geodon to a Bristol Myers Squibb product, Abilify, even though Pfizer lacked any clinical data to support the comparison. A few months later, in 11/06, the ***Plan of Attack meeting*** at Pfizer was called "***Competing to Win***." Materials were provided to Pfizer sales force comparing Geodon to its competitors (*e.g.*, Seroquel, Zyprexa, Risperdal, Abilify). These materials ***contained unsubstantiated comparisons and also promoted Geodon for uses, such as bipolar maintenance, for which it was not approved***.

52. By the end of 2007, Pfizer had earned tens, if not hundreds, of millions of dollars via the illegal off-label promotion of Geodon and failed to reserve for the fines and penalties that would be assessed for this conduct or disclose to investors that the Company's financial condition was marred by Pfizer's unlawful off-label marketing of its drugs.

53. **Zyvox**: From 1/01 until late 2/08, Pfizer illegally promoted Zyvox for a variety of off-label conditions including infections caused by MRSA generally whereas the drug was only approved to treat certain MRSA infections. Further, Pfizer illegally promoted Zyvox as more effective than vancomycin during the Class Period even though the Company received the 2005 FDA Warning Letter specifically warning Pfizer not to market the drug as more effective than vancomycin. Pfizer continued to illegally promote the drug as more effective than vancomycin during the Class Period even though Pfizer agreed to stop marketing Zyvox in response to the 2005 FDA Warning Letter and vancomycin was much cheaper ($18 versus $150 per dose) and proven to be more effective than Zyvox. Pfizer accomplished its off-label marketing of the drug by offering and paying illegal remuneration to health care professionals to induce them to promote and prescribe Zyvox. As a result Zyvox's annual sales grew from $181 million in 2003 to more than $900 million

in 2007. *Qui tam* relator Ronald Rainero ("Rainero"), a former Pfizer District Manager, described Pfizer's practices as including:

- **Direct Promotions Off-Label**: Although ***Zyvox was only indicated to treat pneumonia and simple skin infections, Pfizer directed its Zyvox sales force to call on surgeons and cancer hospitals to promote the drug***. For example, a 3/28-30/07 sales meeting at the Kingsmill Resort & Conference Center in Williamsburg, Virginia featured a session titled "Selling in Cancer Centers"; and

- **Marketing for Unapproved Uses**: ***Despite the fact that Zyvox's FDA approved label does not contain an indication for CA-MRSA, a Pfizer document titled "Zyvox empiric treatment – The Way to $567 million" directed sales representatives to "reinforce Zyvox as the clear choice for empiric use for MRSA infection***." Rainero also describes that a 1/27/07 e-mail indicates that at the January Plan of Attack meeting at Pfizer's headquarters the strategy discussed for promoting Zyvox was to position "Zyvox as the clear choice for Empiric treatment" and "[r]einforce Zyvox use anywhere on the treatment continuum."

54. Additionally, as part of the $1.3 billion plea agreement by Pfizer's subsidiary Pharmacia & Upjohn with the DOJ regarding Zyvox, "Pharmacia expressly and unequivocally admits that it knowingly, intentionally and willfully committed the crime charged in the attached Information and is in fact guilty of the offense, and agrees that it will not make any statements inconsistent with this explicit admission."

55. Further, in connection with Pfizer's civil settlement for illicit sales practices, Pfizer admitted as "true and accurate" the following facts regarding its marketing of Zyvox:

- "On July 20, 2005, the FDA sent Pfizer the Warning Letter . . . regarding a journal advertisement for Zyvox. In this Warning Letter, the FDA stated that Pfizer's advertisement misbranded Zyvox by making misleading and unsubstantiated implied superiority claims, claims that broadened the indications of Zyvox, and omitted important safety information";

- "Despite notifying its sales force that it should cease using promotional materials that raised concerns of the type identified in the FDA Warning Letter, ***Pfizer did not provide adequate guidance to its sales force regarding what statements were permissible*** concerning data from head-to-head trials and retrospective analyses and what promotional statements were not permitted";

- "As a result, Pfizer's sales personnel thereafter continued to make claims to physicians that Zyvox was superior to vancomycin for certain patients with MRSA, which included the claim that Zyvox would have a higher cure rate, and would save more lives, despite the fact that these claims were inconsistent with the FDA's Warning Letter and Zyvox's FDA approved label, and which were inconsistent with the manner in which Pfizer, after the receipt of the Warning Letter, agreed to present the clinical data cited by the FDA";

- "Moreover, certain Pfizer sales managers, including a regional manager and a headquarters-based vice president, were aware of and, in certain cases, encouraged a sales message that Zyvox was superior to vancomycin for certain patients, despite their knowledge of the FDA Warning Letter and the issues it raised";

56.     **Lyrica**: Similar to Bextra, Geodon and Zyvox, Pfizer unlawfully promoted Lyrica, a drug referred to at Pfizer as the son of Neurontin.  Beginning in 9/05 and continuing at least through the end of 10/08, Pfizer illicitly promoted Lyrica for a wide variety of off-label uses, including chronic pain, neuropathic pain, perioperative pain, migraines, sleep medication, mood improvement and anxiety.  Pfizer had only obtained FDA approval for Lyrica to treat DPN/PHN and later fibromyalgia.  Defendants' unlawful promotion of Lyrica catapulted Lyrica's sales growth by more than 700% from $291 million in 2005 to over $2.5 billion in 2008.  Pfizer accomplished the off-label marketing of Lyrica by:

- **Unsubstantiated Comparisons**:  According to *qui tam* relator Casey Schildauer ("Schildauer"), a Pfizer professional healthcare representative ("PHR"), on 5/9/06, at the Technology Park Hilton in Denver, Colorado, Pfizer's senior sales management directed the Therapeutic Specialty Representatives to undertake a "*Compare and Win*" detail, comparing the purported efficacy of Keppra to Lyrica.  According to the directives given, *even though there had not been a head-to-head trial*, sales representatives were to create the impression for doctors that there had been such a head-to-head trial;

- **Promoting Unapproved Indicators**:  *Qui tam* relator David Farber ("Farber"), a Pfizer PHR and later a specialty representative, described that on 10/12/05, Pfizer's Rick Birch, Vice President of Arthritis, Pain and Metabolic-West, *sent an e-mail to the entire Pfizer sales force, instructing the sales force to off-label market the Lyrica secondary endpoints for which it was not approved*.  Copied on the Rick Birch e-mail are numerous members of senior management in the Pfizer Sales Division, including Carl D. Wilbanks, Executive Vice President of Sales;

- 25 -

- **Promotional Material with Unsubstantiated Comparisons**: In 9/06, Farber stated that Pfizer issued *promotional materials comparing gabapentin and Lyrica*, and included reprints of clinical studies for each drug including a study which discussed Lyrica's secondary endpoints even though Lyrica was not approved for these uses;

- **Solicitation of Physicians**: According to *qui tam* relator Robert A. Liter ("Liter"), a Pfizer PHR, during the 9/05 National Sales meeting in Anaheim, California, *the sales representatives were encouraged to improperly promote Lyrica*, including to directly solicit physicians to prescribe Lyrica for off-label uses; use unsubstantiated scientific reports and comparative studies to promote the sale of Lyrica for off-label uses; and make false statements to physicians and pharmacists concerning the efficacy and safety of Lyrica for off-label uses; and

- **Unbiased Solicitations**: On 11/1/05, at the Point-of-Action meeting with over 80 other Pfizer sales representatives and district managers, the Regional Sales Manager for Indiana and Kentucky, Steve Reese, urged all sales representatives who were present to "*send as many medical inquiries*" as possible on Lyrica, according to a relator.

57. By 3Q08, Pfizer had earned tens, if not hundreds, of millions from the off-label promotion of Lyrica and failed to reserve for the fines and penalties from Pfizer's unlawful conduct or disclose the material adverse risk of their illegal marketing activities.

## DEFENDANTS ISSUED FALSE AND MISLEADING STATEMENTS THAT PFIZER LAWFULLY PROMOTED ITS DRUGS

58. ***Pfizer's Business Conduct***: Each of Pfizer's Forms 10-K and annual proxy statements on Form 14A filed with the SEC during the Class Period on 3/1/06, 3/16/06, 3/1/07, 3/15/07, 2/29/08 and 3/14/08, reference Pfizer's Policies, which assured investors that Pfizer conducted its business in a lawful and ethical manner. The Company's annual proxy statements stated that "[a]ll of our employees, including our Chief Executive Officer, Chief Financial Officer and Principal Accounting Officer . . ., are required to abide by Pfizer's Policies on Business Conduct *to ensure that our business is conducted in a consistently legal and ethical manner*." The proxy statements further characterized the Policies as "form[ing] the foundation of a comprehensive process that includes compliance with all corporate policies and procedures" and directed investors

- 26 -

to "[t]he full texts of both Pfizer's Policies on Business Conduct and of the Code of Business Conduct and Ethics for our Directors are published on our website at http://www.pfizer.com/about/corporate_governance/board_policies.jsp." Additionally, the Forms 10-K filed with the SEC directed investors interested in "[i]nformation relating to corporate governance" to Pfizer's Policies.

59.     When he was CEO, defendant McKinnell emphasized in the introduction to the Policies that "***Pfizer truly stands apart. Pfizer is proud of our record on compliance. Compliance with all relevant statutes and rules is both the legacy of our 150-year history and one of our most important advantages***." He further confirmed that the Blue Book's "policies and practices are the foundation of our drive to become the world's most valued company."

60.     The Pfizer Policies referenced in the Company's annual proxy statements and Forms 10-K filed on 3/1/06, 3/16/06, 3/1/07, 3/15/07, 2/29/08 and 3/14/08 also emphasized that the Company had a "***well-structured compliance system***," was specifically complying with applicable laws and FDA requirements, and did not engage in off-label marketing when exactly the opposite was true. Asserting that, "***Pfizer is committed to full healthcare law compliance globally***," Pfizer Policies assured investors that "[i]n ***the U.S., healthcare law compliance seeks to . . . eliminate the improper influence of financial incentives on medical judgment***." Pfizer's Policies further confirmed that "***[a]s Pfizer employee, you must comply with all laws relating to the conduct of business in the pharmaceutical industry***."

61.     Significantly, the Policies referenced in Pfizer's Class Period SEC filings affirmatively stated that Pfizer complied with FDA regulations, specifically referring to the promotion of Pfizer's products as follows:

> *In a time when the news media is full of stories of business leaders and companies whose actions have engendered public suspicion and mistrust, Pfizer truly stands apart. Pfizer is proud of our record of compliance. Compliance with*

*all relevant statutes and rules is both the legacy of our 150-year history and one of our most important advantages in global business.*

\* \* \*

*Pfizer observes all requirements of the U.S. Food and Drug Administration* (FDA). . . .

While there are many aspects of FDA regulation to consider, *regulation of advertising and promotion of our products directly affects our customer relationships*. Therefore, *all employees are obligated to understand the basic rules Pfizer follows to ensure compliance with FDA law and regulations regarding labeling, promotion, off-label use, pharmaceutical samples, and adverse event reporting*.

62. Additionally, the Policies referenced in Pfizer's Forms 10-K and Forms 14A annual proxy statements filed with the SEC on 3/1/06, 3/16/06, 3/1/07, 3/15/07, 2/29/08 and 3/14/08 specifically addressed Pfizer's marketing practices. The Form 10-K and 14A confirmed that:

*Pfizer will compete lawfully and ethically in the marketplace. We will act responsibly in our relationships with healthcare professionals*, patients, hospitals, *academics, governments, regulatory entities*, partners, customers, suppliers, and vendors. . . .

*To keep this promise to our customers and the marketplace, we will*:

- *follow all antitrust and competition laws*;

- *market products honestly, in accordance with laws and regulations*;

- gather business intelligence properly;

- *comply will all healthcare law obligations and generally respect our regulatory requirements* . . . .

\* \* \*

*At Pfizer, we are committed to fair competition. This means, among other things, abiding by all laws that apply to our marketing activities*. Under these laws it is illegal to use unfair methods of competition or unfair or deceptive acts or practices in commerce. *This prohibition includes, but is not limited to*:

- *false or misleading advertising, or any other form of misrepresentation made in connection with sales*.

- 28 -

63. Pfizer's Policies referenced in Pfizer's Forms 10-K and Forms 14A annual proxy statements filed with the SEC on 3/1/06, 3/16/06, 3/1/07, 3/15/07, 2/29/08 and 3/14/08 also specifically addressed the anti-kickback laws, which defendants were then violating:

> In the United States, *there is a special healthcare law (the Anti-kickback Law) that prohibits the offering of anything to a person that is intended to influence that person to recommend or purchase a healthcare products (including a prescription medication) or service that may be reimbursed by Medicare or Medicaid*. This is to ensure that a healthcare provider's decision about a choice of treatment or product for his or her patient not be influenced by motives of personal gain or enrichment. Please visit the Compliance web site at http://compliance.pfizer.com for more information.

64. On 5/15/05, Pfizer issued to the media its Global Policy on Interactions with Healthcare Professionals ("Global Policy"), which also falsely assured investors that Pfizer complied with healthcare program regulations and FDA rules as follows:

> We recognize our interactions with healthcare professionals can give rise to apparent or actual conflicts of interest. We support the disclosure of financial and other interests and relationships that may create apparent or perceived conflicts of interest in research, education or clinical practice.

> \*     \*     \*

> We promote our medicines to healthcare professionals by providing substantiated information about the usage, safety, effectiveness and other aspects of the clinical profile of our medicines. . . . When describing the uses, effectiveness, safety and other aspects of our medicines, Pfizer colleagues and retained healthcare professionals must take care to avoid promoting *off-label* uses directly, indirectly or through third parties.

> \*     \*     \*

> In no instance will Pfizer provide financial support as an inducement for a healthcare professional to use, prescribe, purchase or recommend a Pfizer product or to influence the outcome of a clinical trial.

65. ***Internal Controls***: Accompanying each of the Forms 10-Q and 10-K filed with the SEC during the Class Period were certifications executed by Pfizer executives which falsely

- 29 -

represented that Pfizer's financial statements fairly presented "in all material respects the financial condition [and] results of [Pfizer's] operations":

I, [defendant],[5] certify that:

1.       I have reviewed this report on [Form 10-Q/Form 10-K] of Pfizer Inc.;

2.       Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading*** with respect to the period covered by this report;

3.       ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations*** and cash flows of the registrant as of, and for, the periods presented in this report;

4.       ***The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) . . . for the registrant and have:

(a)   ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

*       *       *

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most

---

[5]       Defendants McKinnell and Levin signed the certifications attached to Pfizer's 2005 Form 10-K and 1Q06 Form 10-Q; defendants Kindler and Levin signed the certification attached to Pfizer's 2Q06, 3Q06, 1Q07 and 2Q07 Forms 10-Q and FY 2006 Form 10-K; and defendants Kinder and D'Amelio signed the certifications attached to Pfizer's 3Q07, 1Q08, 2Q08, 3Q08 and FY 2007 Form 10-K.

- 30 -

recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors*** (or persons performing the equivalent functions):

(a)      ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*** which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

66.      On 4/2/07, Pfizer issued a release announcing that two subsidiaries of Pharmacia had reached settlements of $34.7 million to "resolve . . . improper activities prior to acquisition by Pfizer," relating to Genotropin.  While continuing to conceal the far more egregious off-label marketing campaigns related to Bextra, Lyrica, Geodon and Zyvox, defendants stated that "Pfizer discovered and promptly reported subsidiary's off-label marketing of Genotropin to Justice Department, other agencies."

67.      The 4/2/07 release also falsely assured investors that this $34.7 million settlement was an isolated incident and that Pfizer's "internal controls" prevented such practices from occurring at Pfizer.  According to defendant Waxman:

"***Pfizer's marketing and promotion practices are not involved in the settlement.  The company has internal controls to guard against these types of practices***."

68.      ***Legal Proceedings and Contingencies***:  Pfizer's discussion of Legal Proceedings and Contingencies as well as Government Investigations and Requests for Information in each of the Forms 10-K (2005-2007) and Forms 10-Q (1Q06-3Q08) filed during the Class Period were each

false and misleading when made.[6]   Each of the SEC filings was prepared, reviewed and/or

authorized by defendants, and concealed Pfizer's unlawful promotion of Geodon, Lyrica and Zyvox,

its illegal kickbacks to doctors to promote drugs and its massive liability for the off-label promotion

of Bextra.

69.    For example, Pfizer's FY 2005 Form 10-K filed with the SEC on 3/1/06 omitted

Pfizer's material adverse risk facing Pfizer for its illegal conduct, stating:

**Legal Proceedings**

We and certain of our subsidiaries are involved in various patent, product
liability, consumer, commercial, securities, environmental and tax litigations and
claims; government investigations; and other legal proceedings that arise from time
to time in the ordinary course of our business.  Litigation is inherently unpredictable,
and excessive verdicts do occur.  Although we believe we have substantial defenses
in these matters, we could in the future incur judgments or enter into settlements of
claims that could have a material adverse effect on our results of operations in any
particular period.

\*        \*        \*

**Contingencies**

We and certain of our subsidiaries are involved in various patent, product
liability, consumer, commercial, securities, environmental and tax litigations and
claims; government investigations; and other legal proceedings that arise from time
to time in the ordinary course of our business.  We record accruals for such
contingencies to the extent that we conclude their occurrence is probable and the
related damages are estimable.

\*        \*        \*

**Legal Proceedings and Contingencies**

We and certain of our subsidiaries are involved in various patent, product
liability, consumer, commercial, securities, environmental and tax litigations and

---

[6]    Copies of the precise language used with respect to the status of Pfizer's Legal Proceedings
and Contingencies in each of these SEC filings can be found at http://www.sec.gov/cgi-bin/browse-
edgar?action=getcompany&CIK=0000078003&owner=exclude&count=40.

- 32 -

claims; government investigations; and other legal proceedings that arise from time to time in the ordinary course of our business. We do not believe any of them will have a material adverse effect on our financial position.

\*      \*      \*

**F. Government Investigations and Requests for Information**

\*      \*      \*

We received requests for information and documents from the Department of Justice in 2003 concerning the marketing of Genotropin as well as certain managed care payments, and in 2005 concerning certain physician payments budgeted to our prescription pharmaceutical products.

In 2003 and 2004, we receive requests for information and documents concerning the marketing and safety of Bextra and Celebrex from the Department of Justice and a group of state attorneys general. In 2005, we received a similar request from the staff of the Securities and Exchange Commission.

\*      \*      \*

We received a letter from the Office of the Attorney General of the State of New York in 2004 requesting documents and information concerning clinical trials of certain of our pharmaceutical products for indications other than those approved by the FDA and concerning possible promotion of those products for such indications. We also received a letter from the Office of the Attorney General of the State of Connecticut in 2004 requesting similar materials concerning Zoloft.

70. Pfizer's 2006 Form 10-K filed with the SEC on 3/1/07 likewise concealed Pfizer's unlawful and criminal promotion of Geodon, Lyrica and Zyvox, its illegal kickbacks to doctors to promote drugs and its massive liability for the off-label promotion of Bextra. Rather, the 2006 Form 10-K misleadingly stated:

Since 2003, we have received requests for information and documents concerning the marketing and safety of Bextra and Celebrex from the Department of Justice and a group of state attorneys general. We have been considering various ways to resolve these matters.

Since 2005, we have received requests for information and documents from the Department of Justice concerning certain physician payments budgeted to our prescription pharmaceutical products.

- 33 -

71. On 11/5/07 Pfizer filed its 3Q07 Form 10-Q with the SEC. The Form 10-Q continued to mislead investors regarding Pfizer's illegal off-label marketing and the criminal and civil liability Pfizer faced as a result, stating:

> As previously reported, since 2003 we have received requests for information and documents in connection with potential claims concerning the marketing and safety of Bextra and Celebrex from a group of state attorneys general. We believe that we have strong defenses to any potential claims that may be asserted by members of the attorney general group, and we continue to explore various ways to resolve any such potential claims.

72. On 2/29/08 Pfizer filed its 2007 Form 10-K with the SEC. The Form 10-K continued to mislead investors about Pfizer's off-label marketing activities stating:

> The Department of Justice continues to actively investigate the marketing and safety of our COX-2 medicines, particularly Bextra. The investigation has included requests for information and documents. We also have received requests for information and documents in connection with threatened claims concerning the marketing and safety of Bextra and Celebrex from a group of state attorneys general. We have been considering various ways to resolve these matters.

73. On 8/8/08 Pfizer filed its 2Q08 Form 10-Q. In furtherance of defendants' wrongful scheme Pfizer continued to conceal its unlawful marketing practices. With respect to the active DOJ investigation, where settlement negotiations had been underway for more than two months, the Form 10-Q disclosed the following:

> The Department of Justice continues to actively investigate the marketing and safety of our COX-2 medicines, particularly Bextra, and more recently has begun to investigate the marketing of certain other drugs. These investigations have included requests for information and documents. *We have been considering various ways to resolve the COX-2 matter, which could result in the payment of a substantial fine and/or civil penalty*.

74. On 10/17/08, Pfizer issued a release regarding the $894 million settlement of personal injury claims related to Bextra and Celebrex, a class action consumer fraud case involving Bextra and Celebrex, and claims brought by 33 states and the District of Columbia relating to Bextra promotional practices for $60 million. The press release provided "'*[i]t puts the substantial*

*majority of the civil litigation the company is facing with regard to [Celebrex and Bextra] behind*

*us,*' said Amy Schulman, senior vice president and General Counsel of Pfizer. 'And I think the view

was, putting these matters substantially behind us was the right thing to do.'"

75.     Following the press release, the media reported on the settlement, noting:

- *Forbes* (10/17/08) – "Pfizer said it expects this all to be behind it by the end of the year."

- *Wall Street Journal* (10/18/08) – Credit Suisse analyst Catherine Arnold said in a *Wall Street Journal* article that "'[i]t's strategically disappointing they're writing a check for $900 million for a legal settlement [rather] than for buying up assets, which is what they need for future growth.'"

- *States News Service* (10/22/08) – "Attorney General Says Connecticut Will Receive $1.7 million Under Pfizer Settlement . . . 'Pfizer pumped profits by suppressing facts – dangerously disregarding patient safety by promoting drugs for unapproved uses.'"

- *Global Insight* (10/20/08) – "This allows the firm to look ahead to potential lower litigation costs in forthcoming years, and focus on bolstering its new products pipeline, with revenues expected to take a hit as the patent term of its blockbuster product Lipitor (atorvastatin) comes to a close."

76.     On 11/7/08 Pfizer filed with the SEC its Form 10-Q for 3Q08, which discussed the

Celebrex and Bextra settlement but continued to conceal Pfizer's enormous liability for off-label

marketing of Bextra, Lyrica, Geodon or Zyvox and the enormous liability Pfizer faced, including

exclusion from federally funded health care programs, because of its unlawful off-label promotion of

drugs:

A.  Product Litigation – Celebrex and Bextra

In October 2008, we reached agreements in principle to resolve the pending U.S. consumer fraud purported class action cases and more than 90% of the known U.S. personal injury claims involving Celebrex and Bextra, and *we reached agreements to resolve substantially all of the cases and claims of state attorneys general involving Celebrex and Bextra*. In connection with these actions, we recorded litigation-related charges of approximately $900 million in Other

- 35 -

(income)/deductions - net in the third quarter of 2008. Virtually all of this amount is included in Other current liabilities on the condensed consolidated balance sheet as of September 28, 2008.

\*     \*     \*

The settlement agreements and agreements in principle and the charge to earnings do not apply to the other previously reported actions relating to Celebrex and Bextra, including the purported class actions alleging the violation of federal securities laws, the purported derivative actions alleging breach of fiduciary duty and the purported class actions alleging the violation of the Employee Retirement Income Security Act of 1974 (ERISA), nor do they apply to the pending investigation by the Department of Justice of the marketing of the Company's COX-2 medicines, particularly Bextra. The Department of Justice investigation could result in the payment of a substantial fine and/or civil penalty.

77.     The foregoing statements in ¶¶58-76 regarding Pfizer's conduct, internal controls and disclosures were false and misleading when made. The true facts which were known or recklessly disregarded by defendants were that:

(a)     Pfizer's Policies referenced in its SEC filings throughout the Class Period and the Global Policy were misleading in that Pfizer was not, in fact, complying with federal health care statutes and FDA regulations prohibiting off-label marketing of drugs. Instead, defendants were employing (or had employed) a myriad of undisclosed illegal marketing tactics to promote unapproved uses of Bextra (¶¶47-50), Geodon (¶¶51-52), Zyvox (¶¶53-55) and Lyrica (¶¶56-57). For example, Pfizer's illegal marketing practices included: (i) paying-off physicians with lavish trips with the knowledge that these doctors would attend presentations and drive off-label sales of Bextra (¶47); (ii) paying doctors thousands of dollars to promote Geodon off-label (¶51); (iii) continuing to promote Zyvox as more efficacious than vancomycin (which cost substantially less than Pfizer's drug) in violation of the 2005 FDA Warning Letter (¶53); and (iv) promoting unsubstantiated head-to-head comparisons of Lyrica with other drugs (¶56);

- 36 -

(b)     The 2004 CIA mandated compliance with the law and that the institution of policies to ensure that Pfizer's business was "conducted in a consistently legal and ethical manner." Defendants assured investors that "Pfizer observes all requirements of the FDA" and that it committed to the "prohibition" against "false or misleading advertising." Defendants McKinnell, Levin, D'Amelio and Kindler also certified that various Pfizer Class Period financial statements "did not contain any untrue statements." In contrast to these affirmative statements, defendants knew or were deliberately reckless in not knowing of Pfizer's systemic disregard for the very laws they falsely claimed Pfizer was in compliance with. Defendants were well aware that Pfizer faced a material adverse risk to its bottom line and future well-being, including debarment as well as massive fines and penalties for violating health care statutes and FDA rules as a result of the negotiations leading up to and execution of the CIA. ¶¶37-46;

(c)     Despite the Company's own internal Policies, the reporting procedures mandated by the CIA requiring employees to report off-label promotion, and the fact that employees did report such violations to senior management, defendants nonetheless falsely assured investors that the adequacy of Pfizer's controls, including its "compliance system," prevented any such unlawful activity at Pfizer. Several former Pfizer employees, including regional manager Holloway, have detailed how off-label marketing practices were not isolated and were communicated up the chain via the Compliance protocol. ¶¶121-122;

(d)     Defendants concealed Pfizer's participation in off-label marketing campaigns and misrepresented the nature and the extent of the DOJ's investigation into Pfizer's off-label marketing of drugs Bextra, Geodon, Lyrica and Zyvox. Instead, defendants crafted a few purported "disclosures" which were themselves misleading because they concealed the material adverse risk to Pfizer's financial statements and its ongoing business as a result of their pervasive illegal marketing

- 37 -

tactics. Defendants were well aware, based on Pfizer's prior experiences that the Company's unlawful off-label promotions exposed Pfizer to billions of dollars of criminal fines and civil penalties. ¶¶37-46. Therefore, defendants' purported disclosures of "requests for information" and "investigations" were materially false and misleading because defendants had full knowledge of the extent and massive exposure the Company faced, including debarment; and

(e)     Even though, as part of a CIA Pfizer signed in 2002, Pfizer had agreed to detect and prevent payments to healthcare professionals to influence their product selections, defendants secretly continued their ongoing violations of the anti-kickback laws through 2004. Pfizer made illegal payments for speaker programs, mentorships, preceptorships, entertainment, travel and meals, and in cash to numerous healthcare professionals in exchange for the promotion and prescribing of drugs including Aricept, Celebrex, Lipitor, Norvasc, Relpax, Viagra, Zithromax, Zoloft and Zyrtec. Thus, defendants' public assurances that Pfizer was committed to "abiding by all laws that apply to our marketing activities" and "[i]n no instance will Pfizer provide financial support as an inducement for a healthcare professional" were false and misleading.

### PFIZER'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP

78.     Defendants caused Pfizer to issue false and misleading financial results in Pfizer's earnings releases issued during the Class Period (1/19/06, 4/19/06, 7/20/06, 10/19/06, 1/22/07, 4/20/07, 7/18/07, 10/18/07, 1/23/08, 4/17/08, 7/23/08 and 10/21/08) and SEC filings (4Q05, 1Q06, 2Q06, 3Q06, 1Q07, 2Q07, 3Q07, 1Q08, 2Q08 and 3Q08 Forms 10-Q and FY05, FY06 and FY07 Forms 10-K), including Pfizer's net income and diluted earnings per share ("EPS"), as follows:

*(In millions of $ except for EPS)*

| Fiscal Period | Other Income/ (Other Deductions) - Net | Net Income | Diluted EPS | Filed with the SEC |
|---|---|---|---|---|
| 4Q 2005 | $321 | $2,732 | $0.37 | 3/1/06 |
| **Full Year 2005** | **($347)** | **$8,085** | **$1.09** | **3/1/06** |
| 1Q 2006 | $272 | $4,111 | $0.56 | 5/8/06 |
| 2Q 2006 | $359 | $2,415 | $0.33 | 8/11/06 |
| 3Q 2006 | $343 | $3,362 | $0.46 | 11/3/06 |
| 4Q 2006 | ($70) | $9,449 | $1.30 | 3/1/07 |
| **Full Year 2006** | **$904** | **$19,337** | **$2.66** | **3/1/07** |
| 1Q 2007 | $402 | $3,392 | $0.48 | 5/4/07 |
| 2Q 2007 | $487 | $1,267 | $0.18 | 8/6/07 |
| 3Q 2007 | $260 | $761 | $0.11 | 11/5/07 |
| 4Q 2007 | $610 | $2,724 | $0.40 | 2/29/08 |
| **Full Year 2007** | **$1,759** | **$8,144** | **$1.18** | **2/29/08** |
| 1Q 2008 | $333 | $2,784 | $0.41 | 5/2/08 |
| 2Q 2008 | $167 | $2,776 | $0.41 | 8/8/08 |
| 3Q 2008 | ($721) | $2,278 | $0.34 | 11/7/08 |
| 4Q 2008[7] | ($1,811) | $266 | $0.04 | 2/27/09 |
| **Full Year 2008** | **($2,032)** | **$8,104** | **$1.20** | **2/27/09** |

79.     Pfizer's reported net income and diluted EPS as set forth in ¶78 above were materially false and misleading for the following reasons:

(a)     Net income and diluted EPS each incorporate not only revenue earned by a company, but also its costs and liabilities.  Pfizer's Class Period financials failed to properly account for the probable, or even reasonably possible, liabilities known to defendants as a result of Pfizer's unabated off-label marketing of four of its blockbuster drugs as described in ¶¶47-57, in violation of GAAP.  Thus, Pfizer's reported net income and diluted EPS were artificially inflated during the Class Period;

---

[7]     Pfizer's 4Q08 financial results are included in this chart for comparative purposes only.

- 39 -

(b)  Pfizer represented that its financial statements complied with GAAP.[8]  GAAP requires the accrual of a loss contingency by a charge to income, (in the case of Pfizer the charge would be in the form of a loss reserve) if, at the time that a financial statement is issued, it is probable that a contingent liability or potential loss has been incurred, and the loss can be reasonably estimated.  SFAS No. 5, ¶8.[9]  Defendants knew of Pfizer's exposure to increasing fines and penalties associated with off-label marketing because of, *inter alia*: (i) Pfizer's receipt of such fines and penalties less than two years prior to the Class Period in connection with the Neurontin settlement; (ii) its prior experience with government investigations; and (iii) its knowledge thereof of federal statutes from which any such fine or penalty would be derived.  Further still, defendants knew of internal compliance complaints regarding off-label marketing and violations of the CIA as well as the DOJ investigation into the marketing and sale of Bextra by 2004 (¶¶12, 121).  Thus, defendants were able to estimate the possible loss or range of loss and were required under GAAP to report this information in Pfizer's financial statements.  For example, by the start of the Class Period, defendants should have reserved a minimum of $1.8 billion in loss reserves related to its fraudulent

---

[8]  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

[9]  On 6/30/09, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, "The FASB Accounting Standards Codification™ and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162."  FASB Accounting Standards Codification™ ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC.  These allegations use the historical references to U.S. GAAP, as such references existed during the Class Period.

marketing of Bextra. As for Geodon, Lyrica and Zyvox, defendants should have increased the reserves during the Class Period as the off-label practices of these drugs continued, with the Company reserving the full $2.3 billion by 3Q08 at the latest. Instead, defendants misled investors by (i) not calculating and recording a contingent loss; and (ii) by not sufficiently disclosing that exposure until 1/09;

(c)     At the very least, defendants should have disclosed that Pfizer continued to engage in off-label marketing and faced the potential for exclusion from federally funded healthcare programs and the associated financial consequences or a record-setting fine. GAAP (SFAS No. 5, ¶10) requires, at a minimum, that "***disclosure of the contingency shall be made*** when there is at least a reasonable possibility that a loss or an additional loss may have been incurred."[10] The disclosure "***shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made***." (SFAS No. 5, ¶10). Nonetheless, in violation of SFAS No. 5, defendants failed to disclose that both prior to and during the Class Period, the Company engaged in an ongoing course of conduct designed to illegally promote the sale of Pfizer drugs, including Bextra, Geodon, Zyvox and Lyrica. As a result of defendants' conduct, the Company submitted hundreds of millions of dollars in false or fraudulent claims to several federal healthcare programs, exposing the Company to billions of dollars of untold legal liability and potential exclusion from federally funded health care programs; (¶¶37-57)

(d)     Additional GAAP provisions provide that pending or threatened litigation and actual or possible claims and assessments is a loss contingency under SFAS No. 5, ¶33, ***that must be***

---

[10]    Under SFAS No. 5, ¶10, "reasonable possibility," means the chance of the future event or events occurring is more than remote but less than likely.

*accrued for and/or disclosed in a company's financial statements*. In the case of an investigation by a governmental agency, if enforcement proceedings have been or are likely to be instituted, then a company should disclose the contingency and establish a reserve to cover the estimated potential loss. SFAS No. 5, ¶38. Defendants knew of the DOJ investigation of Bextra in 2004, and of the likelihood of enforcement proceedings for the pervasive off-label marketing of three additional blockbuster drugs – Geodon, Lyrica and Zyvox – beginning no later than fall 2006 (¶¶13, 121), but failed to accrue for or disclose the loss contingencies stemming from Pfizer's recidivist conduct;

(e)     Further, Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303) imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation." Management's Discussion and Analysis of Financial Condition and Results of Operations, Release Nos. 33-6835; 34-26831; IC-16961. Pfizer's unabated off-label marketing of Bextra, Zyvox, Lyrcia and Geodon, after the 2004 CIA, created a trend and uncertainty known to management (*i.e.* the defendants) *vis-a-vis* the compliance programs and reporting structure required by the CIA, and set forth in Pfizer's internal policies. This trend and uncertainty was "reasonably likely" to have material negative consequences to Pfizer's financial condition and results of operation in the form of contingent liabilities (which Pfizer at no point reserved for), as well as the real possibility of debarment from government funded healthcare programs. Yet, defendants failed to disclose in violation of Item 303 of Regulation S-K to investors the known trends and uncertainty facing Pfizer.

80.     Under GAAP and SEC standards, and as acknowledged by defendants in Pfizer's Forms 10-K filed during the Class Period, Pfizer's management is responsible for the preparation of Pfizer's financial statements, including the establishment and maintenance of adequate internal

- 42 -

controls over financial reporting.[11] With respect to loss contingencies, Pfizer's management is responsible for the identification of any potential litigation, claims and assessments against the Company and the evaluation of and accounting for such claims and assessments. Defendants, Pfizer's management, knew of material risks and contingencies as a result of the CIA's mandate and Pfizer's own stated policies requiring that they monitor and be informed of illegal marketing. Nevertheless, defendants failed to accrue for such contingencies or sufficiently disclose the contingencies to investors.

## DEFENDANTS' ASSURANCES REGARDING PFIZER'S DIVIDEND PAYMENTS WERE FALSE AND MISLEADING

81.     On 3/5/08 defendants caused Pfizer to host numerous analysts at a Pfizer Analyst Meeting in order to assuage concerns about Pfizer's ability to continue its dividend payments. Having previously assured investors that Pfizer's strong operating cash flow would support Pfizer's dividend payments, defendant D'Amelio indicated that Pfizer would continue to pay its dividend "at least at current levels" absent "significant unforeseen events":

> [Tim Anderson:]  And then Frank's question about the dividend, you said maintain it at least at current levels, and I'm just wondering what time period you're referring to and specifically I'm alluding to the period at which Lipitor goes away and are you suggesting that it stays all the way through that cliff period?
>
> *            *            *
>
> [D'Amelio:]  ***So on the dividend, the way I framed it was, I'll call it significant unforeseen events aside. So what's a significant unforeseen event? Something that's significant that I'll call it has a big impact on our operating cash flow, so that aside, our intention is to continue to fund the dividend at least at***

---

[11]     Pfizer also had no assurance from its auditors because in connection with the Company's audit of its financial statements and its internal control systems, Pfizer has adopted a reliance model with its external auditors whereby its external auditors would rely on the work of the Company's internal auditors and even Pfizer's management to a certain extent when conducting its audits.

*current levels, and that's going forward.* I said that was going forward in my comments.

82.     Analysts at Credit Suisse reported on 10/21/08 that Pfizer reaffirmed its commitment to continued funding of the dividend "*at least* at current levels."

83.     The statements in ¶¶81-82 above were false and misleading because defendants knew at the time the statements were made, but concealed from investors, that substantial fines and penalties as a result of Pfizer's off-label marketing campaigns of Bextra, Lyrica, Geodon and Zyvox, as well as the illegal kick backs defendants had paid to physicians, would have a significant and foreseen impact on Pfizer's cash-flow to the tune of more than $2 billion.  Further, defendants knew the importance of having enough U.S. cash on hand to the Company's bottom-line because the dividend was paid from Pfizer's U.S. funds.  Without sufficient cash on hand in the U.S. to maintain the dividend, Pfizer would have to borrow money or repatriate off-shore cash, which would have adverse tax consequences on earnings.

## DEFENDANTS' STATEMENTS REGARDING REVENUE GROWTH AND PFIZER'S DRUGS' EFFICACY WERE FALSE AND MISLEADING

84.     *Growth Fueled by Drug Performance*:  Throughout the Class Period, defendants repeatedly made false and misleading statements regarding the growth and success of its drugs, a performance that, unbeknownst to investors, was fueled by Pfizer's illegal off-label marketing.  The statements include, but not limited to:

- Release (1/19/06) – "*Geodon exhibited strong full-year growth*" and "*[i]ts balance of powerful efficacy and a favorable metabolic profile positions it for further growth*."

- Release (4/19/06) – "*Pfizer expects that performance of key products – including . . . Lyrica, and Geodon – will continue to drive overall performance for Pfizer Human Health*."

- Release (4/19/06) – "*Geodon growth is due to the improved perception among clinicians of its efficacy, increased benefits from optimal dosing, and its favorable metabolic profile, as confirmed by the Clinical Antipsychotic Trials of Intervention Effectiveness (CATIE) trial.  As the*

- 44 -

*only antipsychotic that demonstrates efficacy* . . . positioned to allow psychiatrists to treat mental health 'with the body in mind.'"

- Deutsche Bank Securities 31st Annual Healthcare Conference (5/2/06) – "*Geodon's strong performance is due to the improved perception among clinician's of its efficacy, increased benefits for optimal dosing and its favorable metabolic profile.*"

- Release (10/18/07) – "*Lyrica's growth continues to be fueled by strong efficacy as well as high patient and physician satisfaction in the marketplace.*"

- Release (10/21/08) – "'*We continue to deliver steady results this quarter, with many of our most important medicines performing well around the world, including Lyrica, . . . Zyvox and Geodon* . . . .'"

85. Throughout the Class Period defendants repeated false and misleading statements about Geodon, Lyrica and Zyvox, and how these drugs sales would drive Pfizer's growth. Plaintiffs attach as Ex. B the precise language of each statement plaintiffs allege to be materially false and misleading, and incorporate those statements by reference herein. Not only did defendants mislead physicians and patients about the efficacy and safety of their drugs to increase sales, they similarly misled investors about these very same issues by telling them that these drugs were performing well and to expect strong growth as a result. Pfizer's growth was, in fact, fueled by defendants' unlawful marketing campaigns including marketing these drugs for unapproved uses as follows:

|  | Approved | Illegal Marketing Tactics |
|---|---|---|
| Geodon | Acute Manifestations of Schizophrenia<br>Acute Manic or Mixed Episodes of Bipolar Disorder | depression<br>bipolar maintenance<br>mood disorder<br>anxiety<br>aggression<br>dementia<br>attention deficit hyperactivity disorder<br>obsessive compulsive disorder<br>autism<br>post-traumatic stress disorder<br>pediatric and adolescents<br>unapproved dosages |
| Lyrica | DPN/PNP<br>Fibromalygia | chronic pain<br>neuropathic pain<br>perioperative pain |

- 45 -

| | Approved | Illegal Marketing Tactics |
|---|---|---|
| | | migraine |
| Zyvox | Certain Infections Caused by MRSA | infections caused by MRSA generally in violation of the 2005 FDA Warning Letter prohibiting promotion of Zyvox as more effective than vancomycin |

86. Because defendants concealed from investors that they actively promoted Pfizer's drugs for unapproved indications and for uses that were specifically banned by the FDA, defendants' affirmative statements regarding the efficacy, safety and performance of these drugs were materially false and misleading. As explained below, defendants knew but concealed from Class members that the performance of Pfizer's drugs, including reported revenues of more than $9.7 billion during the Class Period for Geodon, Lyrica and Zyvox, included substantial revenues directly derived from unlawful off-label marketing. Defendants' affirmative statements misled investors into believing otherwise.

87. For example, each of defendants' statements between 2/10/06 and 12/31/07 about the growth of Geodon sales – "another fast-growing Pfizer product with plenty of growth potential left – Geodon," "Geodon contributed strong revenue growth during the first quarter," " and [l]et's now look at Geodon, a growing success story" – were false and misleading because the growth was achieved through Pfizer's illegal off-label marketing. As explained in ¶¶51-52, the illegal off-label marketing of Geodon was rampant and included: encouraging sales personnel at a national sales meeting to promote Geodon for uses not approved by the FDA; paying speakers to promote off-label uses; encouraging the use of Geodon during Plan of Attack meetings for elderly patient populations, when Pfizer knew that Geodon had a black box warning for dementia; promoting Geodon for use in treating children for whom it was not approved; and making unsubstantiated head-to-head comparisons between Geodon and other drugs.

- 46 -

88.     Not only did defendants encourage the use of Geodon off-label via Pfizer's salesforce, defendants also misrepresented the safety and efficacy of Geodon to investors.  For example, defendants repeatedly misrepresented the results of the CATIE trial comparing five frequently used antipsychotic agents.  In the 2/10/06 Pfizer Analyst Meeting (Ex. B at No. 4) defendants claimed that "Geodon was the only medicine of the five to effectively improve patients' psychiatric syndromes with comparable efficacy to established agents despite sub-optimal dosing while reducing weight, reducing cholesterol, reducing lipids and reducing measures of glucose."  On the same day, 2/10/06, defendants McKinnell and Kelly made specific assurances that Pfizer's "current promotional materials" for Geodon were "clearly on label."  These assurances were also false.  Similarly, on 4/19/06 Pfizer issued a release (Ex. B at No. 11), stating that: "Geodon growth is due to the improved perception among clinicians of its efficacy, increased benefits from optimal dosing, and its favorable metabolic profile, as confirmed by the [CATIE] trial."

89.     The CATIE trial actually revealed that Geodon was not more effective than the other anti-psychotic drugs to which it was compared.  The drug did ***not*** prove itself more effective at higher doses.  In fact, there was no proof that higher dosing of Geodon results in better outcomes for patients.  Defendants' statements were materially misleading because they also ignored the increased risks of adverse consequences associated with higher dosing.  Higher doses of Geodon increase the risk of extrapyramidal neurological problems, insomnia, internal restlessness, sudden death, tics, tardive dyskinesia and QTc prolongation with arrhythmogenic potential.  In addition, the CATIE trial actually demonstrated that the drug was less effective than Zyprexa, and although it has a better profile in terms of weight gain and some metabolic indications when compared in particular to Zyprexa, Geodon continued to have serious problems causing anxiety, insomnia, elevations in glycosylated hemoglobin, neurological side-effects and overall clinical intolerability.  Weight gain

- 47 -

was only *one* of the reasons individuals stop their antipsychotic medications. There were more significant reasons patients cease those medications, including akathesia, internal restlessness, sudden death, arrhythmias, dystonias, tardive dyskinesia, insomnia and excessive somnolence. Geodon caused each of these more significant side effects. Thus, defendants' statement that Pfizer grew market share for Geodon by increasing prescriptions for the treatment of schizophrenia and bipolar disorder because of the benefits of Geodon were false and concealed that Pfizer was actually growing market share for this drug by illegal off-label marketing.

90.     In addition, defendants' statements regarding Lyrica falsely implied that its sales growth was organic, and failed to disclose that sales actually increased as a result of defendants' illicit off-label marketing of Lyrica between 2005 and the end of 10/08. Defendants told investors that "there are an extraordinary number of patients with neuropathic pain" that were responsible for "a lot of the rapid uptake in Lyrica" and that Lyrica had been "well-received by both physicians and patients, because of its ability to relieve debilitating neuropathic pain." *See* Ex. B at Nos. 3, 19. Defendants were well aware, however, that Lyrica was approved only for pain associated with DPN and PHN, a much smaller market for Lyrica than the universal indications of neuropathic pain that defendants represented to investors. Pfizer later received approval for Lyrica to treat fibromyalgia. However, this market was also very small, and the physical symptoms associated with that disease do not relate to neuropathic pain. To increase profits, defendants illegally marketed Lyrica by several means as set forth in more detail above (¶¶56-57), which are incorporated by reference herein and include: (i) directly soliciting physicians to prescribe Lyrica for off-label uses; and (ii) sending unsolicited medical inquiries directly to physicians.

91.     On 9/22/08 defendants told the market that they were differentiating Lyrica "based on its rapid onset of action, persistence of efficacy and lack of titration, as well as clinical development

- 48 -

for new indications such as poststroke pain, cancer pain, restless leg syndrome and postoperative pain." Ex. B at No. 39. This statement was false and misleading. In fact, Lyrica was not approved for these uses. Additionally, Lyrica has very serious adverse side effects, including dizziness, somnolence, visual disturbances, ataxia (problems walking), mood changes, weight gain, depression and suicidality. By failing to tell investors that Lyrica was being promoted by off-label marketing, while simultaneously implying that Lyrica was "successful" and its sales were growing, defendants deliberately misled investors as to Lyrica's performance and future potential.

92. Defendants' statements regarding Zyvox's sales growth during the Class Period on 4/19/06 and 10/21/08, including that "*we saw good results from our in-line medicines and increasing contributions from new products*" and that "'*[w]e continued to deliver steady results this quarter, with many of our most important medicines performing well around the world, including Lyrica, . . . Zyvox and Geodon*,'" were also false and misleading when made. Ex. B at Nos. 12, 40. Defendants' Zyvox statements were false because defendants unlawfully stated Zyvox was superior to vancomycin even though the FDA ordered Pfizer to cease that comparison in 2005.

93. In 2005, the Company reported just $589 million, $291 million and $618 million from Geodon, Lyrica and Zyvox sales, respectively. Defendants' unlawful off-label marketing practices drove Geodon, Lyrica and Zyvox revenue growth during the Class Period such that by 2008, each of these drugs was considered a "blockbuster" drug generating over $1 billion in annual sales. Lyrica alone accounted for over $2.5 billion in sales. Defendants emphasized that Pfizer was experiencing significant revenue growth associated with these drugs, concealing that much of that growth was due to the Company's pervasive off-label unlawful marketing practices.

94. Defendants' statements regarding the sales performance of Geodon, Zyvox and Lyrica and their impact on Pfizer's bottom line were also false and misleading because defendants

- 49 -

failed to disclose that the Company was off-label marketing these drugs in violation of Pfizer's 2004 CIA and Blue Book for the reasons set forth in ¶¶58-77, incorporated by reference herein.

### THE TRUTH IS REVEALED

95.     Before the market opened on 1/26/09, the Company issued a release reporting that Pfizer had experienced 4Q08 revenue and EPS *declines* of 90%.  The release stated:

> *Fourth-quarter 2008 results were impacted by a $2.3 billion pre-tax and after-tax charge resulting from an agreement in principle with the Office of Michael Sullivan, the United States Attorney for the District of Massachusetts, to resolve previously disclosed investigations regarding allegations of past off-label promotional practices concerning Bextra, as well as other open investigations.*

96.     In an effort to manipulate the adverse reaction of Pfizer shareholders by mitigating the impact of the drastic revelations concerning defendants' off-label abuses and their impact on Pfizer, including the $2.3 billion in criminal and civil fines and the dramatic adverse impact the fines had on Pfizer's available cash (which caused Pfizer to reduce its dividend for the first time in 41 years), defendants and their counsel arranged to contemporaneously announce Pfizer's highly publicized acquisition of Wyeth.

97.     That same morning, 1/26/09, during the Company's conference call, defendants reiterated that:

> [D'Amelio:] *These significant year-over-year decreases were primarily driven by a $2.3 billion pretax and after-tax charge* resulting from an agreement in principle to resolve previously disclosed investigations regarding allegations of past off-label promotional practices concerning Bextra, as well as other open investigations.

98.     As a result of the disclosures that Pfizer's unlawful marketing practices and the impact thereof, including the payment of a $2.3 billion fine and reduction of Pfizer's dividend, the price of Pfizer common stock declined from a closing price of $17.45 on 1/23/09, the previous trading day, to close at $15.65 on 1/26/09, a drop of more than 10% on volume of 210 million shares (more than five times the average daily trading volume of Pfizer's stock) as the artificial inflation

- 50 -

caused by defendants' fraud came out of Pfizer's stock price. A decline that was moderated by Pfizer's concurrent announcement of the $68 billion acquisition of Wyeth.

## POST-CLASS PERIOD REVELATIONS

99.   In the wake of Pfizer's announcement that it would pay $2.3 billion in criminal fines and civil penalties related to the DOJ's investigation into the Company's off-label marketing practices, various news stories corroborated that defendants engaged in a fraudulent scheme to artificially prop up Pfizer's financial condition and conceal the material risk to the Company of defendants' illegal conduct.

100.   On 9/2/09, the DOJ issued a release entitled "Justice Department Announces Largest Health Care Fraud Settlement in Its History; Pfizer to Pay $2.3 Billion for Fraudulent Marketing," which provided further details of defendants' off-label practices. The release stated:

> ***American pharmaceutical giant Pfizer Inc.*** and its subsidiary Pharmacia & Upjohn Company Inc. (hereinafter together "Pfizer") ***have agreed to pay $2.3 billion, the largest health care fraud settlement in the history of the Department of Justice***, to resolve criminal and civil liability arising from the illegal promotion of certain pharmaceutical products, the Justice Department announced today.
>
> Pharmacia & Upjohn Company has agreed to plead guilty to a felony violation of the Food, Drug and Cosmetic Act for misbranding Bextra with the intent to defraud or mislead. . . . ***Pfizer promoted the sale of Bextra for several uses and dosages that the FDA specifically declined to approve due to safety concerns***. The company will pay a criminal fine of $1.195 billion, ***the largest criminal fine ever imposed in the United States for any matter***. Pharmacia & Upjohn will also forfeit $105 million, for a total criminal resolution of $1.3 billion.
>
> In addition, Pfizer has agreed to ***pay $1 billion*** to resolve allegations under the civil False Claims Act that ***the company illegally promoted four drugs – Bextra; Geodon, an anti-psychotic drug; Zyvox, an antibiotic; and Lyrica, an anti-epileptic drug – and caused false claims to be submitted to government health care programs for uses that were not medically accepted indications and therefore not covered by those programs***. The civil settlement also resolves allegations that Pfizer paid kickbacks to health care providers to induce them to prescribe these, as well as other, drugs. The federal share of the civil settlement is $668,514,830 and the state Medicaid share of the civil settlement is $331,485,170. ***This is the largest civil fraud settlement in history against a pharmaceutical company***.

- 51 -

\*      \*      \*

"Illegal conduct and fraud by pharmaceutical companies puts the public health at risk, corrupts medical decisions by health care providers, and costs the government billions of dollars," said Tony West, Assistant Attorney General for the Civil Division. "This civil settlement and plea agreement by Pfizer represent yet another example of what penalties will be faced when a pharmaceutical company puts profits ahead of patient welfare."

"*The size and seriousness of this resolution, including the huge criminal fine of $1.3 billion, reflect the seriousness and scope of Pfizer's crimes*," said Mike Loucks, acting U.S. Attorney for the District of Massachusetts. "*Pfizer violated the law over an extensive time period*. Furthermore, at the very same time Pfizer was in our office negotiating and resolving the allegations of criminal conduct by its then newly acquired subsidiary, Warner-Lambert, Pfizer was itself in its other operations violating those very same laws. Today's enormous fine demonstrates that *such blatant and continued disregard of the law will not be tolerated*."

101.    On 9/14/09 the *National Law Journal* reported that "Prosecutors said *recidivism was a key reason they were able to force a settlement that put the company on the hook for $2.3 billion* in fines and an admission of criminal conduct by its employees. Regulators and prosecutors paint a picture of a company where – from top to bottom – controls failed over marketing drugs like Bextra, the painkiller at the center of the latest settlement."

102.    On 9/23/09 the *New Haven Register* published an article, "Drug Companies Put Profits First," in which it described the motive of defendants to conduct such a massive fraud:

*Pfizer paid off doctors to prescribe unapproved uses of its drugs*.

\*      \*      \*

Pfizer had promoted four of its drugs to doctors for uses not approved by the U.S. Food and Drug Administration because of the potential threat to patient health. *Promoting these off-label uses helped drive Pfizer's profits higher. They also resulted in millions of dollars in false claims for Medicare and Medicaid coverage that the settlement helps recoup*.

\*      \*      \*

*Pfizer's behavior was particularly blatant. It had been caught before and promised never to do it again – a legal pledge it had no qualms in breaking. This was the fourth time since 2002 that it has settled charges of illegal marketing.*

- 52 -

103. On 10/21/09, the Honorable Douglas P. Woodlock of the United States District Court for the District of Massachusetts oversaw the criminal sentencing of Pharmacia, at which he made the following observation:

> [S]uffusing the materials that *I have been provided with is a lengthy pattern by persons, who may or may not still be with the corporation in its new incarnation, that are instinct with violations for which the corporation is pleading guilty*. It seems to me that those are things, even if they are not winners from the government's point of view, which bear prosecution.
>
> It has, I think, become something of cost of doing business, a very high cost of doing business, for some of these corporations to shed their skin like certain animals and leave the skin behind and move on to the future without ultimately giving the public what it is entitled to, which is the satisfaction of knowing that there has been full evaluation of the criminal responsibility of the individuals who occupied that skin.

104. On 11/9/09, *Bloomberg* published an article entitled "Pfizer Broke the Law by Promoting Drugs for Unapproved Uses," which reported:

> "*Marketing departments of many drug companies don't respect any boundaries of professionalism or the law*," says Jerry Avorn, a professor at Harvard Medical School in Boston and author of "Powerful Medicines: The Benefits, Risks, and Costs of Prescription Drugs" (Random House, 2004). "*The Pfizer* and Lilly *cases involved the illegal promotion of drugs that have been shown to cause substantial harm and death to patients*."
>
>        *       *       *
>
> *If the law is clear, why do drug companies keep breaking it? The answer lies in economics. Pharmaceutical companies spend about $1 billion to develop and test a new drug. To recoup their investment, the companies want doctors to prescribe their drugs as widely as possible.*
>
>        *       *       *
>
> *In the January 2004 settlement* negotiations with Loucks, Sullivan and two other prosecutors, *Pfizer's lawyers assured the U.S. Attorney's Office that the company wouldn't market drugs off-label*.
>
>        *       *       *
>
> *"They asserted that the company understood the rules and had taken steps to assure corporate compliance with the law," Loucks says. "We remember those promises."*

- 53 -

What Pfizer's lawyers didn't tell the prosecutors was that Pfizer was at that moment running an off-label marketing promotion using more than 100 of its salespeople.  They were pitching Bextra, a Pfizer sales manager admitted when she pleaded guilty to misbranding a drug on March 30, 2009.

Jeff Kindler, who became Pfizer's general counsel in 2002, supervised the lawyers who made the promises to prosecutors.  By 2004, Kindler increased the compliance budget 12-fold.  He became chief executive officer in 2006.  In Pfizer's ethics guide, he says stories about misbehaving companies and executives abound.

"Pfizer truly stands apart," he says.  "I am proud of our record." On Oct. 1, Kindler was elected to the board of the Federal Reserve Bank of New York.  Kindler declined to comment.

*     *     *

In the same time period that Pfizer was marketing Bextra off-label, the Company's sales force was promoting another drug, Zyvox, improperly, Pfizer admitted at the time of its September plea agreement.

Zyvox was approved in 2000 by the FDA for treating MRSA-caused pneumonia and skin infections.  Raniero told federal prosecutors that Pfizer began the Zyvox campaign in 2001.  The company admitted to falsely claiming that the drug was better than other medications for treating MRSA pneumonia.

"Misleading Promotion"

On July 20, 2005, the FDA sent a letter to Hank McKinnell, then Pfizer's CEO, saying, "Your misleading promotion of Zyvox, and in particular your unsubstantiated implied claims regarding its superiority to vancomycin, poses serious health and safety concerns."

*     *     *

By 2007, the criminal and civil cases against Pfizer, its employees and its subsidiaries had started to mount.  The tally of drugs cited by federal prosecutors for off-label promotion reached six by 2009.  In April 2007, P&U pleaded guilty to a felony charge of offering a $12 million kickback to a pharmacy benefit manager.

*     *     *

"Upsetting to Me"

U.S. District Court Judge Patti Saris, who had presided over the Neurontin whistle-blower case before the Pfizer probe, accepted Schering's plea in her Boston courtroom in January 2007.  She expressed dismay with the drug industry.

- 54 -

"*It's been upsetting to me how many of the big pharmaceutical companies have engaged in what I view as clearly illegal behavior in terms of off-label marketing," she said. "It almost seems as if the pharmaceutical companies said 'Yeah, yeah, yeah' to the FDA and then went and did it anyway*."

105.    The media continued to report on Pfizer's massive fines and guilty plea for more than a year after it was first announced.  For example, on 2/23/10 in a *Business Ethics*' article, Pfizer's then-Chief Compliance Officer, Douglas Lankler, was quoted in a *Business Ethics*' article, acknowledging that Pfizer's plea of guilty and $2.3 billion fine was "'like being hit in the face by a two-by-four.  Even for a big company, it's a very, very difficult thing to go through.'"  Lankler also admitted in an 4/2/10 *CNN.com* article that "'unequivocally . . . Pfizer perceived the Bextra matter as an incredibly serious one.'"

106.    On 2/3/10, *Bloomberg* reported:  "Profit in the period more than doubled" as compared to *the fourth quarter in 2008*, "when *results were hurt by a $2.3 billion legal settlement* related to the marketing of the Bextra painkiller."  Likewise, *Dow Jones* reported on the same day that Pfizer's 4Q09 earnings "more than doubled from a *year-earlier profit that was dampened" by a legal settlement*.

107.    On 3/1/10, *Life Extension Magazine* published an editorial, "As We See It:  Drug Company Pleads Guilty to Health Fraud," castigating Pfizer for its scheme to illegally promote its drugs:

> *It's one thing to break the law by paying doctors to prescribe drugs that at least have some degree of documented efficacy, but Pfizer went further than this*.
>
> The government's complaint describes how *Pfizer created new uses for its patented drugs and then engaged in all kinds of devious schemes to illegally promote these "new uses" to physicians*.  For instance, *Pfizer claimed their drug Lyrica was superior to lower-cost generic medications to treat neuropathic and surgical pain, and then illegally compensated doctors to prescribe Lyrica for these indications*.

- 55 -

*Geodon* is a drug approved to treat schizophrenia or acute bipolar mania, but the government outlined in its complaint that *Pfizer was inappropriately and illegally promoting it for use in children and adults to treat autism, attention deficit hyperactivity disorder, mood disorders, and depression*.

108. More recently, on 10/3/10, the *New York Times* published an article, "Side Effects May Include Lawsuits," which examined the role that marketing played in making antipsychotic drugs, including *Pfizer's Geodon*, the top-selling class of pharmaceuticals in America. *Pharmaceutical companies "'sold the story [that the antipsychotics are] more safe, when they aren't'* . . . . 'They had to cover up the problems. *Right from the start, we got this false story*.'" The article continued:

> "*It's the money*," says Dr. Jerome L. Avorn, a Harvard medical professor and researcher. "*When you're selling $1 billion a year or more of a drug, it's very tempting for a company to just ignore the traffic ticket and keep speeding*."
>
> \*     \*     \*
>
> *[The pharmaceutical companies] were aware that they were using questionable tactics when they marketed these powerful, expensive drugs.*
>
> *Such marketing, according to analysts and court documents, included, payments, gifts, meals and trips for doctors, biased studies, ghostwritten medical journal articles, promotional conference appearances, and payments for postgraduate medical education that encourages a pro-drug outlook among doctors. All of these are tools that federal investigators say companies have used to exaggerate benefits, play down risks and promote off-label uses* . . . .
>
> \*     \*     \*
>
> [According to Dr. Stefan Kruszewski, a psychiatrist who once worked as a paid speaker for Pfizer,] "*it got to the point where I was . . . given slides and told, 'We'll give you a thousand dollars if you say this for a half-hour*.'" . . .
>
> . . . "*They made it all up[.]*" . . . "*It was never true*."

- 56 -

## ADDITIONAL ALLEGATIONS OF SCIENTER

**Pfizer's Corporate Integrity Agreements Evidence Scienter**

109.     Pfizer's repeated disregard for the law underscores defendants' scienter.  In the three-and-a-half years leading up to the Class Period, Pfizer had entered into not just one, but *two* different CIAs, each which required Pfizer to comply with the law and abide by specific codes of conduct.

110.     In 10/02, Pfizer and its subsidiaries, Warner-Lambert and Parke-Davis, agreed to pay a $49 million settlement and entered into a CIA with the OIG related to its Medicaid Rebate payments for the drug Lipitor.  The 2002 CIA required Pfizer to maintain internal procedures designed to ensure compliance with rules against paying kickbacks to physicians in violation of the Medicaid program.

111.     In 2004, Pfizer entered into yet another CIA when it agreed to settle the Neurontin investigation for $430 million.  The 2004 CIA was negotiated by defendant Kindler and specifically addressed the rampant off-label marketing of Neurontin by requiring policies and procedures at Pfizer to prevent further off-label marketing.  The policies and procedures required that Pfizer put "in place strong review and disciplinary measures to ensure that its activities: (i) are in compliance with all Federal health care program requirements and FDA requirements, and (ii) meet Pfizer's goal of ensuring high ethical standards in all aspects of its business practice."

112.     Pfizer, not its subsidiary Warner-Lambert, was responsible for complying with the 2004 CIA.  *The 2004 CIA required that Pfizer itself notify the FDA and the OIG of any written reports, correspondences or communications in connection with Pfizer's or a covered Pfizer employee's promotion, discussion or dissemination of information concerning off-label uses of Pfizer's products*.

113. The agreement is clear that off-label marketing was prohibited and that the members of Pfizer's senior management were responsible for monitoring the Company's marketing program to ensure that Pfizer was not a repeat offender. *See* ¶¶41-45; Ex. B. The 2004 CIA also required Pfizer to promote and adhere to a number of codes of conduct, including:

- *full compliance with all federal healthcare program requirements and FDA requirements, including marketing, selling and promoting its products in compliance with all government contracting requirements*;

- all employees covered under the CIA shall comply with all federal healthcare program requirements and FDA requirements; and

- *all employees covered under the CIA were expected to report suspected violations of any federal healthcare program requirements or FDA requirements*.

114. To comply with the codes of conduct established in the CIA, Pfizer was required to develop policies and procedures that addressed, among other things, the following:

- *"methods for selling, marketing and promoting Pfizer products in compliance with all applicable Federal health care program requirements, including, but not limited to, the Federal anti-kickback statute"*;

- "*methods for selling, marketing, promoting, advertising, and disseminating information about off-label uses* of Pfizer's products in compliance with all applicable FDA requirements";

- "*the manner in which [Pfizer's] Medical Information Department receive[d] and respond[ed] to requests for information about off-label uses*; the form and content of information disseminated by the Medical Information Department in response to such requests, and the internal review process for the information dissemination"; and

- "speaker meetings, advisory board meetings, and all other consultant arrangements . . . designed to ensure that the consultant arrangements and related events are used for legitimate and lawful purposes in accordance with applicable Federal health care program requirements and with FDA requirements relating to the dissemination of information about off-label uses of products."

115. The 2004 CIA required all officers in Pfizer's U.S. pharmaceutical operations to certify that they received, read, understood and would abide by Pfizer's Code of Conduct, which included complying with all federal healthcare program requirements and FDA rules. As Pfizer's

- 58 -

General Counsel, defendant Kindler, and later defendant Waxman, were responsible for Company-wide compliance and everyone covered by the CIA were responsible for reporting to them. Because defendants were required to monitor compliance with laws precluding off-label marketing, they were informed of or were reckless in knowingly ignoring the Company-wide off-label promotion of Bextra, Geodon, Lyrica and Zyvox.

**The Scope and Content of the Criminal Plea Agreement Adds to Scienter**

116. In August 2009, Pfizer created a subsidiary, Pharmacia & Upjohn, for the purpose of insulating Pfizer from criminal charges, as a criminal guilty conviction related to off-label marketing drugs would prevent Pfizer from participating in the Medicare program, a death knell for a pharmaceutical company. Defendants caused Pharmacia & Upjohn to accept the guilty plea. Thus, Pharmacia & Upjohn pled guilty and was excluded from Medicare *without having ever sold a single drug*. Pharmacia & Upjohn entered into a plea agreement with the United States Attorney for the District of Massachusetts as a result of Pfizer's off-label marketing of Bextra between 2/02 and 4/05; Pfizer paid a $1.195 billion criminal fine, and a $105 million criminal forfeiture. "*Pharmacia expressly and unequivocally admits that it knowingly, intentionally and willfully committed the crime charged in the attached Information and is in fact guilty of the offense*, and agrees that it will not make any statements inconsistent with this explicit admission." The facts in the Information mentioned in the plea agreement, included, but are not limited to:

- "*PHARMACIA's* headquarters marketing team *created marketing messages and materials for the PHARMACIA sales force that promoted Bextra for unapproved uses and dosages, including materials that directed PHARMACIA's sales force to aggressively pursue written surgical and pain management standing orders* for Bextra, including for uses for which Bextra was unapproved";

- "*PHARMACIA managers instructed their sales teams to promote Bextra for the acute pain of surgery, both pre- and post-operatively, even though they knew that Bextra was not FDA-approved for these uses, and without disclosing to physicians, customers and others* that the FDA specifically declined to approve Bextra for those

- 59 -

uses and doses, and that the FDA's refusal was due in part to a safety concern about potential serious adverse events, including cardiovascular events, in some surgeries based upon the results of the CABG I study";

- "*PHARMACIA managers trained and directed their sales teams to seek written surgical and pain management protocols, standing orders and pathways from physicians, hospitals, and other customers for use in pre-and post-operative surgical situations*";

- "*PHARMACIA's sales representatives also created sham physician requests for medical information about unapproved uses in order to send unsolicited information to physicians about unapproved uses and dosages of Bextra*"; and

- "*PHARMACIA also promoted Bextra for unapproved uses and dosages through a 'publication strategy' whereby PHARMACIA initiated, funded, sponsored and sometimes drafted or hired medical write vendors to draft articles about Bextra for unapproved uses and dosages in order to promote these uses* and dosages, without always appropriately disclosing PHARMACIA's role in the process."

117. The Information thus confirms that the off-label marketing of Bextra was not only deliberate but was premeditated by senior management.

118. The Blue Book also assured investors that it had a "well-structured compliance system" consisting principally of the "Corporate Compliance Officer, the Corporate Compliance Committee Officer, the Corporate compliance Group, and local Compliance Liaisons." The Corporate Compliance Officer was Pfizer's General Counsel (defendant Kindler and then defendant Waxman), and was "responsible for overseeing Pfizer's compliance system, including the internal auditing, monitoring, and self-evaluation programs relating to the legal and regulatory obligations of the Company." Further, "[t]he Corporate Compliance Officer ensures that there is broad application ad consistent interpretation of our standards throughout the Company." He reported directly to, among others, the CEO (defendant McKinnell and then defendant Kindler). Additionally, the Corporate Compliance Committee contained representatives from each business division of Pfizer, included defendants D'Amelio and Read, and was responsible for overseeing "Pfizer's compliance strategy and system, and . . . charged with keeping the Corporate Compliance Officer, the Board of

- 60 -

Directors and senior management informed of significant compliance issues, risks, and trends." The "Corporate Compliance Group works with the Corporate Compliance Officer to ensure adherence to laws, regulations, and Company policies on a day-to-day basis."

119.    Additionally, Pfizer's Compliance Liaisons, according to a 2005 PowerPoint presentation of a Pfizer assistant General Counsel, were charged with ensuring not only that the Corporate Compliance Officer, but also that the CEO and CFO were "up-to-date on compliance issues at every Pfizer location."

120.    Consistent with the CIA and Pfizer's stated policies, the Blue Book indicates that all "significant violations of applicable law or Company policy . . . must be reported to the Corporate Compliance Group for investigation." Factors that weigh in favor of "significance" include (i) whether the action was intentional or part of a pattern; (ii) management involvement; (iii) exposure to the public of health or safety risks; and (iv) the consequences to the Company.

**Defendants' Treatment of the Blue Book as a Sham Bolsters Scienter**

121.    Many of the *qui tam* relators, percipient witnesses to defendants' fraud, reported unlawful off-label marketing up the ladder as required by the Blue Book and the 2004 CIA. Unfortunately, those at the top of the ladder, senior management at Pfizer, were willing to ignore the 2004 CIA and continued to promote off-label sales. The *qui tam* relators' accounts of widespread off-label marketing at Pfizer's highest levels contemporaneous with and after execution of the 2004 CIA include:

- In 9/04, relator DeMott *questioned* Pam Robertson ("Robertson"), Assistant to the Alta Division Regional Director, about *promoting Bextra in contradiction of the 2004 CIA*. Robertson's response was that the promotion *instructions came directly from Pfizer Executive Vice President Rick Birch*;

- In 2003 and 2004, DeMott repeatedly reported to his District Manager Michael Krams and to *Pfizer's national compliance officers in New York* that Pfizer's claims about Bextra were false;

- 61 -

- *On 3/29/04, DeMott e-mailed Human Resource Manager Andrew Powell* a message regarding the off-label use of Geodon at the Townstreet Clinic in Columbus, Ohio. Because of continued marketing, illegal payments and formulary promoting Pfizer drugs at the clinic, the high rate of Geodon use continued;

- During the *Lyrica pre-launch meeting* in August 2005, relator Schildauer raised concerns about using unsubstantiated comparative panels to promote Lyrica. His superior, District Manager Tracy Lucas, responded that representatives were to promote that Lyrica was a "better agent" than gabapentin despite the lack of any head-to-head adequate and well-controlled clinical trials;

- *On 5/12/06, relator Liter anonymously voiced his concerns about using medical inquiries to market Lyrica with Pfizer's corporate compliance department.* During the first week of 6/06, Lisa Shrayer ("Shrayer"), Pfizer Corporate Counsel, contacted Liter and scheduled a meeting for 6/12/06 to further discuss his concerns regarding the promotion of Lyrica. *On 6/12/06, Liter met with Shrayer and attorneys from the law firm Pfizer retained as outside counsel. During this meeting Liter provided these individuals copies of the Lyrica Launch Tracker, e-mails with Medical Information letters and unapproved FDA indications for Lyrica*; and

- According to relator Westlock, after receiving a flyer for a Pfizer funded Geodon promotional presentation at NAMI *in 1/07* regarding children's psychotic needs, he *called and e-mailed Pfizer Corporate Compliance*.

122. The account of Holloway, a former Pfizer regional sales manager, similarly confirms defendants' scienter. Holloway admitted that her region promoted the use of protocols for off-label usage, including to attain orthopedic, podiatry, urology, ob/gyn, ENT and dental indications. According to Holloway, "*[c]orporate tracked this information*, and at no time did it inform Ms. Holloway that any of the reported protocols were inappropriate. Instead, *the instruction was to get more protocols*."

123. Consistent with Holloway's account, on a 1/19/06 conference call defendant McKinnell acknowledged that he kept close tabs on the market share of Pfizer's drugs and the performance of the sales force: "I watch those numbers very closely. At 7:30 Monday morning I am looking at my computer screen" – sales which were fueled by off-label marketing.

- 62 -

**Defendants' Compensation and Insider Trading in Excess of $150 Million Support Scienter**

124.    Pfizer's executive compensation plan provided substantial financial incentive for each of the Individual Defendants to engage in the misconduct at issue here.  During the Class Period, according to Pfizer's 2007, 2008 and 2009 proxies filed with the SEC, Pfizer's executive compensation was tied directly to the performance of the Company, which defendants' misconduct was designed and did artificially inflate.  Additionally, defendants encouraged the off-label promotion of Pfizer's drugs by compensating Pfizer's sales force for sales derived from their unlawful practices.  For example, certain defendants have admitted that until at least December 2007 Pfizer commissioned sales representatives for Geodon prescriptions written by pediatricians and pediatric institutions despite the fact Geodon was not approved for children.

125.    Pfizer's executive compensation was based on the Company's financial performance and the individual executive's performance related to the Company's strategic objectives.  For example, each of the defendants had between 20%-50% of his or her FY06 incentive compensation tied to Pfizer's reported revenue, EPS and/or cash flow, each of which was artificially inflated by defendants' unlawful off-label marketing practices.  For 2007, the annual incentive pay was adjusted to place more of an emphasis on the Company's financial performance, accounting for 45%-70% of defendants' annual incentive pay.  For 2008, 50% of defendants' annual incentive pay was based on aspects of Pfizer's financial performance inflated by defendants' scheme.

126.    Pfizer executives also received long-term incentive pay during the Class Period.  As part of the long term incentive pay, Pfizer granted stock options, restricted stock units and performance-based shares.  In 2008, 25% of the long-term incentive equity awards was transferred to short-term equity awards.

- 63 -

127.    Under Pfizer's compensation program, defendants[12] received over $50 million in compensation during the Class Period as follows:

| Name | Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value & Non-Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|------|--------|-------|--------------|----------------------------------------|----------------------------------------------------------------------|------------------------|-------|
| Shedlarz | 2007 | $1,056,875 | $ 951,200 | $ 62,339 | $ 0 | $13,104,860 | $ 188,766 | $17,159,904 |
| | 2006 | $1,008,225 | $1,263,400 | $3,181,563 | $ 0 | $ 1,381,064 | $ 185,843 | $10,275,470 |
| Levin | 2007 | $ 687,943 | $ 486,750 | $ 36,998 | $ 0 | $ -154,923 | $2,104,635 | $ 5,004,265 |
| | 2006 | $ 784,575 | $ 580,600 | $2,026,454 | $ 0 | $ 212,143 | $ 70,345 | $ 4,766,299 |
| Kindler | 2008 | $1,575,000 | -- | $4,715,947 | $3,000,000 | $ 759,298 | $ 438,261 | $13,770,422 |
| | 2007 | $1,462,500 | $3,100,000 | $1,162,835 | -- | $ 477,783 | $ 441,456 | $ 9,513,440 |
| | 2006 | $1,103,883 | $3,300,000 | $2,736,265 | -- | $ 422,091 | $ 265,318 | $ 9,799,234 |
| D'Amelio | 2008 | $1,051,500 | -- | $4,328,129 | $1,250,000 | $ 423,085 | $ 127,303 | $ 8,132,350 |
| | 2007 | $ 320,625 | $4,040,000 | $ 907,717 | -- | $ 927,990 | $ 32,278 | $ 6,434,532 |
| Read | 2008 | $1,051,500 | -- | $1,732,560 | $1,250,000 | $ 963,274 | $ 237,188 | $ 6,835,125 |
| | 2007 | $ 944,083 | $ 990,000 | $ 190,134 | -- | $ 133,784 | $ 160,626 | $ 4,053,307 |
| | 2006 | $ 813,450 | $ 667,200 | $1,651,580 | -- | $ 455,792 | $ 86,159 | $ 4,779,162 |
| McKinnell | 2006 | $2,270,500 | | $8,315,642 | -- | -- | $ 383,517 | $19,418,446 |
| Katen | 2006 | $1,220,300 | $1,383,000 | $4,616,454 | -- | $17,426,208 | $ 287,311 | $28,995,078 |

128.    The Individual Defendants also traded their Pfizer stock while in possession of adverse material information regarding Pfizer including: (i) Pfizer's unlawful off-label marketing; and (ii) its false financial statements.  The proceeds from defendants illicit trades exceeded $22 million and included: Levin received $5 million; Read received $2.3 million; McKinnell received $6.4 million; Shedlarz received $2.1 million; Feczko received $3 million; and Katen received $4 million.  Attached hereto as Ex. C are the dates and amounts of each of these defendants' trades.

## NO SAFE HARBOR

129.    The statutory safe harbor provided for forward-looking statements ("FLS") under certain circumstances does not apply to any of the allegedly false statements pleaded in this

---

[12]    Defendants Waxman's, Feczko's and Kelly's compensations are not publicly available in Pfizer's proxies.

complaint. Many of the specific statements pleaded herein were not forward-looking and were not identified as FLS when made.

130. To the extent there were any FLS, there were no ***meaningful*** cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly FLS. Rather, defendants statements were boilerplate warnings. Further, Pfizer's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

131. The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Pfizer who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## PROXIMATE LOSS CAUSATION/ECONOMIC LOSS

132. As detailed herein, defendants engaged in a scheme and wrongful course of business, which was designed to and did deceive Class Period purchasers of Pfizer's securities as defendants misrepresented and/or omitted material information about Pfizer's drug sales, off-label marketing practices and financial performance. When the materialization of the risks that had been fraudulently concealed by defendants occurred and the true facts became known to the market and investors, Pfizer's stock price fell precipitously as the prior artificial inflation came out of the price, causing loss and damages to plaintiffs and members of the Class.

- 65 -

133.    Defendants' false statements and omissions, identified herein at ¶¶58-74, 76, 78, 81-82, 84-92, had the intended effect and caused Pfizer stock to trade at artificially inflated levels during the Class Period as reflected in the chart below:[13]



134.    As a direct result of the 1/26/09 disclosure that Pfizer agreed to pay $2.3 billion to settle criminal and civil violations arising out of defendants' off-label marketing practices and corresponding dividend cut, Pfizer's stock price dropped immediately on the NYSE, falling from a closing price of $17.45 on 1/23/09, the previous trading day, to close at $15.65 on 1/26/09, a decline of more than 10.3%. By contrast, the peer group index increased during the same period. Trading volume increased tremendously to over 210 million shares on 1/26/09 or more than 500% the normal daily volume. Thus, in a single day over $12 billion in Pfizer's market capitalization was eliminated

---

[13]    The peer group index is derived from the pharmaceutical peer group listed in Pfizer's 2009 proxy.

and investors suffered economic losses. This drop removed the artificial inflation from Pfizer's stock price, causing real economic loss to investors who purchased Pfizer securities during the Class Period.

135. The decline in Pfizer's stock price at the end of the Class Period was a direct result of the materialization of the risks concealed by defendants' prior false statements and omissions and the nature and extent of the truth revealed to investors and the market. The adverse consequences of the end of the Class Period disclosures, including the largest criminal fine in U.S. history and Pfizer's first dividend cut in four decades, were foreseeable to defendants at all relevant times. Indeed, as set forth above, the defendants knew of the adverse consequences to Pfizer's stock price, reputation, and cash flow (in the form of fines) as well as the impact on Pfizer's dividend, prior to the 1/26/09 disclosure. Defendants' conduct proximately caused foreseeable losses and damages to plaintiffs and members of the putative Class. The timing and magnitude of Pfizer's stock price declines negate any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct. As noted above, on 1/26/09, the same day Pfizer's stock price fell nearly $2.00 per share due to the revelation of defendants' fraud, Pfizer's peer group index increased.

136. Defendants tried to offset the dramatic adverse announcement of the largest healthcare related fine in U.S. history by concurrently announcing on 1/26/09 that Pfizer had agreed to acquire Wyeth. But the *Wall Street Journal* had already leaked the merger on the preceding Friday morning, 1/23/09, resulting in more than double the trading volume of Pfizer's shares and driving Pfizer's stock price up from a close of $17.21 on 1/22/09 to $17.45 on 1/23/09. Other media outlets, such as Fox Business Network LLC's, "Money for Breakfast" 7:00 a.m. EST show on

- 67 -

1/23/09 broadcasted that the *Financial Times* reported "that the deal could be announced as soon as Monday [1/26/09]."

137.     The merger transformed Pfizer overnight into a highly diversified pharmaceutical and healthcare company and insured Pfizer's a place as the largest pharmaceutical company in the world. Defendant Kindler described the deal on a 1/26/09 conference call as "transformational and positions [Pfizer] to be in the best possible position for future success."

138.     Despite defendants' maneuver to announce the $68 billion Wyeth acquisition on 1/26/09, Pfizer's stock price still declined more than 10% that day, in reaction to the revelation of defendants' illegal off-label marketing tactics and the resulting fine and dividend reduction.  The news of the Wyeth merger had already been absorbed by the market on 1/23/09.  The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class, was a direct result of defendants' fraudulent scheme to illegally promote Pfizer's drugs off-label and hide that conduct from investors.  Defendants' scheme artificially inflated Pfizer's stock price and maintained the price at artificially inflated levels until the subsequent significant decline in the value of Pfizer's stock occurred when the risks concealed by defendants' prior misrepresentations and omissions materialized and were publicly revealed.

139.     Thus, Pfizer attempted but failed to obscure the impact of its fraud by announcing the Wyeth merger on the same day it announced the $2.3 billion in penalties and fines.  Defendants rushed to close the Wyeth merger so they could dilute the adverse stock price impact they knew would result from disclosing that their unlawful off-label marketing scheme had existed for years and had now come to an end, forcing Pfizer to cut its dividend for the first time in 41 years.  On 1/26/09 – the day of the twin announcements – *The AmLaw Daily* published an article detailing the timing of this maneuver stating:

617336_2

Dennis Block, an M&A partner at Cadwalader, Wickersham & Taft, first got the call in June: his longtime client, Pfizer, was interested in buying rival Wyeth in what would likely be the largest deal in the history of the pharmaceutical industry. *The deal sputtered off and on for more than six months until Thursday [1/22/09], when Block says Pfizer indicated it was ready to get the deal done – and fast*.

Block left his office for only a couple of hours a night over the next four days as he and Wyeth's attorneys at Simpson Thacher & Bartlett *rushed to complete the $68 billion takeover before the markets opened today*.

They succeeded, despite Wyeth's insistence that Pfizer agree to an unprecedented breakup fee of $4.5 billion should it back out of the deal; that's twice as large as a typical breakup fee in a deal this big, the New York Times reports.

\* \* \*

*It's not all good news. Pfizer is set to fire 15,000 of the combined company's 130,000 employees and cut its dividend, in part because of a $2.3 billion charge it is taking in anticipation of a settlement with government investigators over alleged off-label promotion of the painkiller Bextra. Cadwalader also advised Pfizer on that matter, Block says*.

140.     The following day, the *Wall Street Journal*, the *New York Times* and the *Associated Press* issued articles corroborating that Pfizer's disclosure of its $2.3 billion charge for off-label marketing was dramatically negative news for the market, and that the timing of the disclosure of the Wyeth merger was not a coincidence:

- *Wall Street Journal* (1/27/09) – "*The takeover announcement came amid the kind of bleak industry news that caused Pfizer Chief Executive Jeffrey Kindler to search for a big deal to begin with*. The two companies said that their *net income was down in the fourth quarter. And Pfizer reported taking a record $2.3 billion charge to resolve a federal investigation into the off-label marketing* of withdrawn painkiller Bextra."

- *New York Times* (1/27/09) – "After announcing the $68 billion megamerger with Wyeth on Monday morning, *Pfizer's chief executive, Jeffrey B. Kindler, did not have much time to celebrate. There was too much gloomy news to deal with*. The companies' combined work force of 128,000 will shed 19,000 jobs. Pfizer will slash its stock dividend in half. And *Pfizer is taking a $2.3 billion charge to settle a federal investigation over illegal off-label promotion* of its former painkiller, Bextra. . . . *On any other day, the Bextra settlement might have been big news for Pfizer – which is why some analysts said the company had probably decided to disclose it on Monday*."

- 69 -

- *Associated Press* (1/27/09) – "Pfizer Inc., the world's largest drugmaker, said Monday it is buying rival Wyeth for $68 billion in a deal that will quickly boost Pfizer's revenue and diversification and, if it works as advertised help the company become more nimble. . . . It comes as ***Pfizer's 2008 fourth-quarter profit takes a brutal hit from a $2.3 billion legal settlement over allegations it marketed pain reliever Bextra and possibly other products for indications that had not been approved***."

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET

141. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Plaintiffs and other members of the Class purchased Pfizer securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

142. At all relevant times, the market for Pfizer securities was efficient for the following reasons, among others:

(a) As a regulated issuer, Pfizer filed periodic public reports with the SEC;

(b) Pfizer trades on the NYSE; and

(c) Pfizer regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major

- 70 -

news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

143.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Pfizer securities during the Class Period (the "Class").  Excluded from the Class are defendants and their families, directors and officers of Pfizer and their families and affiliates.

144.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Pfizer traded on the NYSE and had more than seven billion shares of stock outstanding, owned by thousands of persons.  Members of the Class may be identified from records maintained by Pfizer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

145.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual class members include:

(a)   Whether the 1934 Act was violated by defendants;

(b)   Whether defendants omitted and/or misrepresented material facts;

(c)   Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether defendants knew or recklessly disregarded that their statements were false and misleading;

- 71 -

(e)  Whether the prices of Pfizer securities were artificially inflated; and

(f)  The extent of damage sustained by class members and the appropriate measure of damages.

146.  Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct in violation of federal law that is complained of herein.

147.  Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

148.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

149.  Plaintiffs incorporate ¶¶1-148 by reference as if fully set forth herein.

150.  During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.  Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)  employed devices, schemes, and artifices to defraud;

(b)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 72 -

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Pfizer securities during the Class Period.

152.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Pfizer as specified herein.

153.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Pfizer's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Pfizer and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Pfizer securities during the Class Period.

154.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly, deliberately or recklessly and for the purpose and effect of concealing Pfizer's true operating condition and future business prospects from the investing public and supporting the artificially inflated price of its publicly traded securities.

155.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Pfizer securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Pfizer's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Pfizer's securities during the Class Period at artificially high prices and were damaged by the subsequent decline in stock price when the relevant truth concealed by defendants' fraud scheme was revealed to the market and the risks concealed by the fraud scheme began to materialize.

156.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pfizer securities.  Plaintiffs and the Class would not have purchased Pfizer securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

157.     As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Pfizer securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against Pfizer, Kindler, McKinnell, D'Amelio, Levin, Shedlarz, Read, Feczko and Waxman

158.     Plaintiffs incorporate ¶¶1-157 by reference as if fully set forth herein.

159.    Defendants Kindler, McKinnell, D'Amelio, Levin, Shedlarz, Read, Feczko and Waxman acted as controlling persons of Pfizer within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Pfizer described in detail in ¶¶24-31, 33, 35, defendants Kindler, McKinnell, D'Amelio, Levin, Shedlarz, Read, Feczko and Waxman had the power and ability to control (and did influence and control, directly or indirectly) the actions of Pfizer and its employees, including the content of Pfizer's financial statements, releases and conference call statements. Pfizer controlled the content of its financial statements, releases and conference call statements, its subsidiaries, the Individual Defendants and its other officers and employees. Pfizer had the power to hire, fire, supervise and otherwise control the actions of its employees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiffs and the members of the Class damages and interest;

C.    Awarding plaintiffs' reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

DATED:  April 15, 2011

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

- 75 -

617336_2

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
HENRY ROSEN
WILLOW E. RADCLIFFE
RYAN A. LLORENS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
henryr@rgrdlaw.com

Lead Counsel for Plaintiffs

617336_2

## CERTIFICATE OF SERVICE

I, Kelly Stadelmann, hereby certify that on April 15, 2011, I caused a true and correct copy of the attached:

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

to be: (i) filed by hand with the Clerk of the Court of the Southern District of New York; and (ii) served by United States mail to all counsel listed on the attached service list.

Kelly Stadelmann

PFIZER 10
Service List - 4/14/2011    (10-0080)
Page 1 of  1

**Counsel For Defendant(s)**

Dennis J. Block
Gregory A. Markel
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY  10281
   212/504-6000
   212/504-6666 (Fax)


**Counsel For Plaintiff(s)**

Joe  Kendall
Kendall Law Group, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
   214/744-3000
   214/744-3015 (Fax)

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba Jr.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)


Darren J. Robbins
Henry  Rosen
Danielle S. Myers
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

STICHTING PHILIPS PENSIOENFONDS ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*City of Monroe Employees' Retirement System v. The Hartford Financial Services Group, Inc., et al.*, No. 1:10-CV-02835-NRB (S.D.N.Y.)

6.  The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

PFIZER

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7 day of June , 2010.

STICHTING PHILIPS PENSIOENFONDS

Signature: _____

Print Name: J.D.J. hemme

Print Title: managing director

- 2 -

PFIZER

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 03/17/2006 | 122,000 | $26.25 |
| 03/17/2006 | 220,100 | $26.41 |
| 03/20/2006 | 14,000 | $26.45 |
| 03/21/2006 | 33,900 | $26.35 |
| 05/17/2006 | 11,800 | $24.76 |
| 05/17/2006 | 150,200 | $24.45 |
| 06/16/2006 | 221,400 | $23.37 |
| 08/03/2006 | 33,459 | $25.63 |
| 09/12/2006 | 100,250 | $27.97 |
| 10/04/2006 | 98,760 | $28.41 |
| 12/06/2006 | 40,000 | $24.97 |
| 12/18/2006 | 96,000 | $25.83 |
| 12/18/2006 | 330,000 | $25.83 |
| 03/22/2007 | 23,700 | $25.84 |
| 03/22/2007 | 37,600 | $25.73 |
| 03/23/2007 | 3,400 | $25.69 |
| 03/23/2007 | 4,400 | $25.60 |
| 03/26/2007 | 58,277 | $25.56 |
| 03/26/2007 | 96,000 | $25.56 |
| 04/09/2007 | 950 | $25.95 |
| 04/09/2007 | 4,000 | $25.95 |
| 05/18/2007 | 48,000 | $27.41 |
| 05/21/2007 | 10,200 | $27.45 |
| 05/24/2007 | 133,800 | $27.32 |
| 06/25/2007 | 23,700 | $25.52 |
| 06/26/2007 | 36,230 | $25.59 |
| 06/27/2007 | 270 | $25.59 |
| 07/16/2007 | 6,000 | $26.00 |
| 07/23/2007 | 6,000 | $25.12 |
| 09/04/2007 | 41,900 | $25.04 |
| 09/05/2007 | 19,700 | $24.69 |
| 09/10/2007 | 9,000 | $24.03 |
| 09/17/2007 | 2,000 | $24.10 |
| 09/24/2007 | 1,000 | $24.50 |
| 09/24/2007 | 7,000 | $24.50 |
| 10/01/2007 | 2,000 | $24.80 |
| 10/15/2007 | 2,000 | $25.04 |
| 10/18/2007 | 125,000 | $24.81 |
| 10/22/2007 | 8,000 | $23.98 |
| 10/29/2007 | 6,000 | $24.43 |
| 11/05/2007 | 1,000 | $23.69 |
| 11/12/2007 | 6,000 | $23.05 |
| 12/17/2007 | 3,000 | $23.09 |

| | | |
|---|---|---|
| 12/17/2007 | 9,000 | $23.09 |
| 12/24/2007 | 1,000 | $23.25 |
| 12/24/2007 | 4,000 | $23.25 |
| 12/31/2007 | 1,000 | $22.76 |
| 12/31/2007 | 5,000 | $22.76 |
| 01/22/2008 | 5,000 | $22.07 |
| 02/25/2008 | 1,000 | $22.69 |
| 03/10/2008 | 2,000 | $21.23 |
| 03/17/2008 | 2,000 | $20.61 |
| 03/17/2008 | 3,000 | $20.61 |
| 04/14/2008 | 2,000 | $20.55 |
| 04/14/2008 | 6,000 | $20.55 |
| 04/21/2008 | 10,000 | $20.22 |
| 04/21/2008 | 12,000 | $20.22 |
| 06/09/2008 | 11,000 | $18.04 |
| 06/09/2008 | 49,000 | $18.04 |
| 06/16/2008 | 1,000 | $17.81 |
| 06/16/2008 | 2,000 | $17.81 |
| 06/23/2008 | 1,000 | $17.39 |
| 06/23/2008 | 3,000 | $17.39 |
| 07/01/2008 | 36,400 | $17.47 |
| 10/13/2008 | 1,000 | $16.23 |
| 11/10/2008 | 1,000 | $16.67 |
| 11/24/2008 | 3,000 | $15.97 |
| 12/01/2008 | 2,000 | $15.73 |
| 12/22/2008 | 1,000 | $17.20 |
| 12/22/2008 | 8,000 | $17.20 |
| 01/05/2009 | 2,000 | $18.19 |
| 01/12/2009 | 1,000 | $17.41 |
| 01/12/2009 | 2,000 | $17.41 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 01/03/2007 | 135,000 | $25.98 |
| 03/20/2007 | 53,227 | $25.36 |
| 05/07/2007 | 3,000 | $27.18 |
| 05/21/2007 | 2,000 | $27.45 |
| 06/25/2007 | 5,000 | $25.52 |
| 07/02/2007 | 2,000 | $25.69 |
| 07/02/2007 | 2,000 | $25.69 |
| 08/06/2007 | 2,000 | $23.92 |
| 08/06/2007 | 9,000 | $23.92 |
| 08/13/2007 | 2,000 | $23.95 |
| 08/13/2007 | 5,000 | $23.95 |
| 08/20/2007 | 2,000 | $24.12 |
| 08/27/2007 | 1,000 | $24.78 |
| 09/25/2007 | 11,476 | $24.30 |
| 10/08/2007 | 4,000 | $25.56 |

| | | |
|---|---|---|
| 10/08/2007 | 12,000 | $25.46 |
| 11/20/2007 | 23,508 | $22.79 |
| 01/08/2008 | 6,741 | $23.69 |
| 01/14/2008 | 34,000 | $23.97 |
| 02/01/2008 | 53,332 | $23.52 |
| 03/03/2008 | 47,000 | $22.22 |
| 03/06/2008 | 32,000 | $21.66 |
| 04/17/2008 | 167,412 | $20.40 |
| 05/05/2008 | 3,000 | $20.52 |
| 07/07/2008 | 34,000 | $17.50 |
| 07/14/2008 | 9,400 | $17.79 |
| 07/28/2008 | 6,000 | $18.79 |
| 08/26/2008 | 24,900 | $19.31 |
| 08/27/2008 | 11,000 | $19.12 |
| 08/27/2008 | 39,300 | $19.05 |
| 08/27/2008 | 82,500 | $19.08 |
| 08/28/2008 | 43,000 | $19.22 |
| 08/29/2008 | 8,600 | $19.30 |
| 09/02/2008 | 6,400 | $19.47 |
| 09/30/2008 | 90,000 | $17.93 |
| 10/06/2008 | 8,000 | $18.45 |
| 10/06/2008 | 22,000 | $18.45 |
| 10/20/2008 | 8,000 | $17.26 |
| 11/04/2008 | 55,000 | $18.28 |

*Opening position of 172,000 shares.

Plaintiff's Certification of Investment of
Pfizer

I, Mary Jones, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the Complaint in this action and authorize the filing of this Certification.

2.      If chosen, I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial (if necessary). I am willing to participate on an executive committee of shareholders.

3.      Plaintiff's transaction in PFE security that is the subject of this action is:

| # SHARES PURCHASED | DATE PURCHASED | PRICE PER SHARE | CLASS OF STOCK (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SOLD PRICE |
|---|---|---|---|---|---|---|
| 500 | 9-18-09 | 23.99 | COMMON | | | |
| | | | | | | |
| | | | | | | |

4.      I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

5.      During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

6.      I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

Signed under penalty of perjury, this 15 day of SEPT , 2009.

*Mary K. Jones*
Signature

MARY K. JONES
Name (please print)

Return to:
Hamilton Lindley
Kendall Law Group, LLP
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Telephone: 214-744-3000
Facsimile: 214-744-3015
Email: administrator@kendalllawgroup.com
Website: www.kendalllawgroup.com